# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons, | ) ) | |
| | ) | |
| *Plaintiff*, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | 1:23-cv-12002-WGY |
| | ) ) | |
| SABA UNIVERSITY SCHOOL OF MEDICINE AND R3 EDUCATION, INC., | ) ) ) | |
| | ) | |
| *Defendants*. | ) ) | |

## PLAINTIFF NATALIA ORTIZ'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS SABA UNIVERSITY SCHOOL OF MEDICINE AND R3 EDUCATION, INC.'S MOTION TO DISMISS

MAYNARD NEXSEN PC
Margaret M. Siller (admitted *pro hac vice*)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

BERMAN TABACCO
Patrick T. Egan (BBO #637477)
Christina L. Gregg (BBO#709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cgregg@bermantabacco.com

NATIONAL STUDENT LEGAL DEFENSE NETWORK
Alexander S. Elson (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org

*Counsel for Plaintiff Natalia Ortiz and the Putative Class*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL ALLEGATIONS ................................................................................................... 2

LEGAL STANDARD ............................................................................................................... 5

ARGUMENT ............................................................................................................................ 6

I.   MS. ORTIZ STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED ............... 6

   A.   Ms. Ortiz Alleges a Chapter 93A Claim ................................................................. 6

      i.   Saba's Representations and Omissions Surrounding its USMLE Passage Rate Violate Chapter 93A ................................................................................................................ 7

      ii.   Saba's Misrepresentations Were not "Self-Evident" or "Easily Ascertained" ........... 11

   B.   Ms. Ortiz Alleges a Violation of Chapter 266 ............................................................ 14

   C.   Ms. Ortiz Alleges an Unjust Enrichment Claim ......................................................... 15

II.   THE STATUTE OF LIMITATIONS DOES NOT BAR ANY OF MS. ORTIZ'S CLAIMS ........................................................................................................................... 16

   A.   Ms. Ortiz's Chapter 93A and Chapter 266 Claims are Timely ..................................... 16

   B.   Ms. Ortiz's Unjust Enrichment Claim is Timely ........................................................ 19

CONCLUSION ........................................................................................................................ 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co*.,
267 F.3d 30 (1st Cir. 2001)..........................................................................................5, 17

*Arthur D. Little, Inc. v. Dooyang Corp*.,
147 F.3d 47 (1st Cir. 1998)................................................................................................6

*Artuso v. Vertex Pharms., Inc.*,
637 F.3d 1 (1st Cir. 2011)..................................................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................................5

*Aspinall v. Phillip Morris Cos.*,
813 N.E.2d 476 (Mass. 2004).....................................................................................6, 8, 9

*Bayer v. Neiman Marcus Grp., Inc*.,
861 F.3d 853 (9th Cir. 2017) ...........................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................................................................................................5

*Bernstein v. Conopco, Inc*.,
2022 WL 2161149 (D. Mass. June 15, 2022)..................................................................14

*Bevelacqua v. Brooklyn L. Sch.*,
2013 WL 1761504 (N.Y. Sup. Ct. Apr. 22, 2013) .....................................................12, 13

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021) ............................................................................................14

*Casey v. Fla. Coastal Sch. Of L., Inc*.,
2015 WL 10096084 (M.D. Fla. Aug. 11, 2015)...........................................................12, 13

*Clorox Co. P.R. v. Proctor & Gamble Com. Co*.,
228 F.3d 24 (1st Cir. 2000)..............................................................................................17

*Cohen v. State St. Bank & Trust Co*.,
893 N.E.2d 425 (Mass. App. Ct. 2008) ...........................................................................13

*Czerwienski v. Harvard Univ.*,
2023 WL 2763721 (D. Mass. Mar. 31, 2023) ..................................................................19

*Dumont v. Reily Foods Co.*,
934 F.3d 35 (1st Cir. 2019)...............................................................................6, 7, 10, 11

*Gomez–Jimenez v. New York L. Sch.*,
103 A.D.3d 13 (N.Y. App. Div. 2012) ..............................................................................13

*Gomez-Jimenez v. New York L. Sch.*,
943 N.Y.S.2d 834 (N.Y. Sup. Ct. 2012)......................................................................12, 13

*Gray v. Evercore Restructuring L.L.C.*,
544 F.3d 320 (1st Cir. 2008)......................................................................................18, 19

*Harnish v. Widener Univ. Sch. of L.*,
  931 F. Supp. 2d 641 (D.N.J. 2013)............................................................... 13

*In re Int'l Harvester Co.*,
  104 F.T.C. 949 (1984) ........................................................................... 6, 9

*Kannavos v. Annino*,
  247 N.E.2d 708 (Mass. 1969) ...................................................................... 9

*LaChapelle v. Berkshire Life Ins. Co.*,
  142 F.3d 507 (1st Cir. 1998).................................................................... 19

*MacDonald v. Thomas M. Cooley L. Sch.*,
  880 F. Supp. 2d 785 (W.D. Mich. 2012) ........................................................ 13

*Maffeo v. White Pine Invs.*,
  537 F. Supp. 3d 45 (D. Mass. 2021)......................................................... 18, 19

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
  552 F.3d 47 (1st Cir. 2009)...................................................................... 15

*Munsell v. Colgate-Palmolive Co.*,
  463 F. Supp. 3d 43 (D. Mass. 2020).............................................................. 11

*Patenaude v. Orgain, LLC*,
  594 F. Supp. 3d 108 (D. Mass. 2022)............................................................ 14

*Pietrantoni v. Corcept Therapeutics Inc.*,
  640 F. Supp. 3d 197 (D. Mass. 2022)....................................................... 11, 12

*Quality Cleaning Prod. R.C., Inc. v. SCA Tissue N. Am., LLC*,
  794 F.3d 200 (1st Cir. 2015).................................................................... 18

*Sacks v. Dissinger*,
  178 N.E.3d 388 (Mass. 2021)..................................................................... 19

*Shaulis v. Nordstrom, Inc.*,
  865 F.3d 1 (1st Cir. 2017)....................................................................... 15

*Shaw's Supermarkets, Inc. v. Melendez*,
  173 N.E.3d 356 (Mass. 2021)..................................................................... 17

*Silva v. City of New Bedford*,
  602 F. Supp. 3d 186 (D. Mass. 2022)............................................................ 17

*Taygeta Corp. v. Varian Assocs., Inc.*,
  763 N.E.2d 1053 (Mass. 2002).................................................................... 18

*Tomasella v. Nestlé USA, Inc.*,
  962 F.3d 60 (1st Cir. 2020)............................................................. 6, 9, 15, 16

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*,
  524 F.3d 315 (1st Cir. 2008)................................................................ 18, 20

*Uzuegbunam v. Preczewski*,
  141 S.Ct. 792 (2021)............................................................................ 14

*Young v. Wells Fargo Bank, N.A.*,
  717 F.3d 224 (1st Cir. 2013)...................................................................... 5

**Statutes**

Mass. Gen. L. c. 260, § 5A ................................................................................ 16

Mass. Gen. L. c. 266, § 91 ................................................................................ 14

Mass. Gen. Laws ch. 93A, § 2(a)........................................................................ 6

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................... 11, 17, 20

Fed. R. Civ. P. 12(c) ........................................................................................ 11

Fed. R. Civ. P. 12(d) ........................................................................................ 11

Fed. R. Evid. 201(b)......................................................................................... 11

**Regulations**

34 C.F.R. § 600.55 ............................................................................................ 8

Plaintiff Natalia Ortiz, by and through undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion," Doc. 15) and accompanying Memorandum of Law (Doc. 16) filed by Defendants Saba University School of Medicine and R3 Education, Inc. (collectively referred to as "Saba" or "Defendants").

## PRELIMINARY STATEMENT

In choosing medical schools, perhaps no metric is more important to prospective students than the passage rate on the United States Medical Licensing Examination ("USMLE")—a multi-step test that all students must pass before obtaining their medical license. A high USMLE passage rate signifies to prospective students that the medical school provides a high-quality education, making the substantial financial investment feel like a sound investment in their future.

Recognizing this, Saba advertises that 98%–100% of its students pass Step 1 of the USMLE on their first attempt. Saba describes this passage rate as an "***unprecedented achievement***" that is "***unmatched by any other international medical school***," "***better than most U.S. Schools***," and a "***testament to the quality of our education***."[1] Saba assures prospective students that "***virtually every Saba student passes the USMLE on their first attempt***."[2]

Yet, Saba conceals the critical fact that, on average, only around 50% of its enrolled students actually sit for the USMLE. This statistic is in stark contrast to the roughly 90% of students enrolled at U.S. medical schools that sit for the exam. If Saba had disclosed the truth about the number of students who matriculate but do *not* sit for the USMLE, prospective students including Ms. Ortiz would never have enrolled.[3]

---

[1] (Doc. 1 ¶¶ 58, 63, 70.)

[2] (*Id.* ¶ 70.)

[3] (*Id.* ¶ 84.)

Saba defends its deception by arguing that the advertised percentages were technically accurate and that prospective students are "highly educated and intelligent"[4] and should have fact-checked Saba's assertions. As detailed herein, Massachusetts law forbids this type of deception and does not require prospective students to conduct such an investigation. In any event, as revealed by the sources[5] that Saba relies on in its Motion (which are not cited in the Complaint), prospective students could not have readily obtained the information necessary to uncover Saba's misleading claims.

Furthermore—in an attempt to sidestep accountability for its unlawful conduct—Saba argues that Ms. Ortiz's claims are time-barred. That contention fails for three reasons: (i) it ignores that the Massachusetts Supreme Judicial Court tolled the statute of limitations for all civil actions accruing before June 30, 2020 by 105 days, which makes this case timely even under Saba's analysis; (ii) it is contingent on a "Letter of Intent to Enroll & Tuition Deposit Form" that cannot be considered on this Motion and, even if it were, does not establish the date of the claim's accrual; and (iii) it does not account for the fact that Ms. Ortiz did not discover Saba's misrepresentations until long after she started classes, the precise date of which is a question of fact not ripe at the pleadings stage. For each of these reasons, Defendants' Motion must be denied in its entirety.

## FACTUAL ALLEGATIONS

Saba, a for-profit medical school located in the Dutch Caribbean, caters primarily to American and Canadian students who plan to return to their respective home countries to practice medicine. (Doc. 1 ¶¶ 12, 19, 22.) Saba provides students an alternative pathway to becoming a

---

[4] (Doc. 16 at 5.)

[5] (*See id*. at 6 n.3.)

2

doctor and is seen as less competitive than its American counterparts, as it typically admits applicants with lower GPAs and MCAT scores. (*Id.* ¶ 2.)

To overcome such perceptions, Saba aggressively promotes a 98%–100% first-time passage rate on the USMLE, a multi-step examination that medical students must pass before obtaining their medical license. (*Id.* ¶¶ 3-5, 53.)[6] Through its advertisements—on its website, social media pages, and in direct communications with consumers—Saba touts this high USMLE passage rate as an "unprecedented achievement" that is "unmatched by any other international medical school" and "better than most U.S. Schools." (*Id.* ¶¶ 58, 70.)  Saba also states in widely disseminated representations that its USMLE passage rate is a "testament to the quality of our education" and that "virtually every Saba student passes the USMLE on their first attempt." (*Id.* ¶¶ 63, 70.)

Specifically, Saba represents that:

- "[V]irtually every Saba student passes the USMLE on their first attempt—an unprecedented achievement unmatched by any other international medical school." (*Id.* ¶ 70.)

- "Saba students have a 99% first-time pass rate on the USMLE. Based on data compiled by U.S. News and World Report, that not only exceeds any other Caribbean school, it's better than most U.S. schools." (*Id.* ¶ 58.)

- "Between 2018-2022, the first-time pass rate among Saba students was 98% on the USMLE Step 1 & 2. This is a testament to the quality of our education." (*Id.* ¶ 63.)

- "Saba offers an excellent medical education with students consistently achieving a first-time average pass rate of 100% on the USMLE Step 1 (2021)." (*Id.* ¶ 60.)

- "In recent years, 99% of our students have passed the USMLE Step 1 Exam on their first attempt." (*Id.* ¶ 61.)

---

[6] Medical students typically take the USMLE Step 1 after they complete their basic science courses—usually after two years or five semesters. (*Id.* ¶ 54.)

- "Did you know that Saba University students achieved a 99% first-time pass rate on the USMLE Step One from 2015 to 2019?" (*Id.*)

When Ms. Ortiz visited Saba's website, she was immediately impressed by the USMLE representations, prompting her to request more information about the school. (*Id.* ¶ 60.) On November 2, 2018, Saba's Director of Admissions responded via email to Ms. Ortiz's inquiry and repeated the claims on Saba's website and social media accounts—namely, that "virtually every Saba student passes the USMLE on their first attempt—an unprecedented achievement unmatched by any other international medical school." (*Id.* ¶ 70.)

As Ms. Ortiz continued to research medical schools, Saba continued to tout its USMLE passage rates. In a May 31, 2019 email from Saba to Ms. Ortiz, Saba stated that it has a "100% USMLE Step 1 first-time pass rate." (*Id.* ¶ 71.)  One week later, in an email inviting Ms. Ortiz to an open house, Saba stated that the "average USMLE Step 1 pass rate for the past five years for Saba students is >99%." (*Id.* ¶ 72.) Ms. Ortiz attended that open house, where Saba employees reiterated that nearly 100% of Saba students pass the USMLE Step 1. (*Id.* ¶ 73.) After the open house, in an email dated June 8, 2019, Saba stated that its "100% first-time pass rate on the USMLE Step 1 outperformed most medical schools—and is the clear leader among international schools." (*Id.* ¶ 74.) After Saba repeatedly told her that virtually all of its students passed the USMLE Step 1, Ms. Ortiz applied, was accepted, and began classes in September of 2019. (*Id.* ¶¶ 76–77.)

What Defendants did not disclose when making these USMLE representations is that roughly half of Saba students do not make it far enough through the program to sit for the USMLE. (*Id.* ¶¶ 78, 80.) Of the approximately 270 students who matriculate at Saba each year, an average of 50% never sit for the USMLE Step 1. (*Id.* ¶¶ 79–80.) By contrast, of the 64,830 students that matriculated at U.S. medical schools from 2017-2019, 57,864 students (89.3%) sat for the USMLE Step 1 and 55,517 students (85.6%) passed on their first attempt. (*Id.* ¶ 81.) Saba did not disclose

these attrition rates—nor the true passage rate—on its website, its social media posts, or in emails to students. Had Ms. Ortiz known the truth about the number of Saba students who matriculate but do not sit for the USMLE Step 1, she would not have enrolled at Saba and incurred significant student debt to attend. (*Id*. ¶¶ 84–85.)

## <u>LEGAL STANDARD</u>

At the motion-to-dismiss stage, courts accept "as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Artuso v. Vertex Pharms., Inc.,* 637 F.3d 1, 5 (1st Cir. 2011). The complaint must contain sufficient "facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co*., 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id*. (citation and internal quotation marks omitted); *see also Young v. Wells Fargo Bank, N.A*., 717 F.3d 224, 231 (1st Cir. 2013) ("[Courts] may also rely on any documents attached to the complaint or incorporated by reference therein.").

## ARGUMENT

## I.      MS. ORTIZ STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.      Ms. Ortiz Alleges a Chapter 93A Claim

Saba contends that Ms. Ortiz fails to state a claim upon which relief can be granted pursuant to Massachusetts' consumer protection statute, Chapter 93A. This is incorrect. Chapter 93A proscribes "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." *See* Mass. Gen. Laws ch. 93A, § 2(a). An act or representation "is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." *Aspinall v. Phillip Morris Cos.*, 813 N.E.2d 476, 488 (Mass. 2004). "The spectrum of liability for deceptive acts or practices spans from affirmative misrepresentations, to certain kinds of nondisclosures, such as 'advertising [that] may consist of a half truth, or even may be true as a literal matter, but still create[s] an over–all misleading impression through failure to disclose material information.'" *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020) (quoting *Aspinall*, 813 N.E.2d at 487) (internal citation omitted). It is forbidden, therefore, "to tell only half the truth, and to omit the rest," or stated differently, one cannot "fail[] to disclose qualifying information necessary to prevent one of his affirmative statements from creating a misleading impression." *Id.* at 72 (quoting *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1057 (1984)).

Whether conduct is deceptive under Chapter 93A is a "question . . . of fact." *See Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st Cir. 2019); *see also Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998) ("Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the fact-specific nature of the inquiry.") (citation and quotation marks omitted). "As with any question of fact, [the Court's] role is limited

to defining the outer boundaries of its answer—i.e., the point at which a juror could reasonably find only one way." *Dumont*, 934 F.3d at 40. Thus, this Court "need only determine whether the complaint's allegations make it plausible that, on a full factual record, a factfinder could reasonably regard" Saba's representations about USMLE Step 1 passage rates "as having the capacity to mislead." *See id*. The Complaint easily satisfies this standard.

      i.   <u>Saba's Representations and Omissions Surrounding its USMLE Passage Rate Violate Chapter 93A[7]</u>

According to Defendants, Ms. Ortiz's Chapter 93A claim must fail because "the *only statement* Saba made was true," and true statements cannot be unfair or deceptive under 93A. (Doc. 16 at 4) (emphasis added). This argument fails for multiple reasons.

As an initial matter, Plaintiff's Complaint is about far more than a single statement or percentage. Defendants make no argument, for example, that the representation to prospective students that "virtually every Saba student passes the USMLE on their first attempt" was true. (Doc. 1 ¶ 70.) Nor do they contend that Saba was truthful when it represented that its USMLE passage rates are "unprecedented," "unmatched," "better than most U.S. schools," and a "testament to the quality of [the Saba] education"—statements that all reinforced to applicants that Saba's outcomes were better than almost anywhere else they could enroll. (*Id*. ¶¶ 58, 63, 70). In their Motion, Defendants fail to even acknowledge that these representations are at issue in this case.[8] This alone provides a basis to deny Defendants' Motion.

---

[7] Saba also argues that Ms. Ortiz alleges that it misrepresented "the fact that in order to take the Step 1 exam, students first must pass the Comp Exam." (Doc. 16 at 4.) But Ms. Ortiz does not claim that the failure to disclose the Comp Exam was itself a Chapter 93A violation. Rather, her Chapter 93A claim is based on Saba's misrepresentations surrounding its USMLE passage rates.

[8] It is no surprise that Saba does not argue that the statement regarding its USMLE passage rates being "better than most U.S. Schools" is true, let alone address it in the Motion. (Doc. 1 ¶ 58.) No reasonable consumer of medical schools would agree with such a statement, as nearly 90% of

Saba contends that its USMLE representations are true because they "were made in accordance with federal requirements." (Doc. 16 at 4.) It appears that Saba is referring to federal regulations governing how foreign medical schools are to calculate and report USMLE passage rates to the United States Department of Education. (*See* Doc. 16 at 2) (citing 34 C.F.R. § 600.55(d)(1) and (f)(1) for the proposition that USMLE passage rates reported to the federal government are "simply the number of Saba students who pass the Step 1 exam on their first attempt divided by the total number of Saba students making that first attempt"). Although this regulation describes what Saba must report to the U.S. Department of Education, it says nothing about how institutions can advertise USMLE rates to the public. Nor does it permit institutions to mislead students by proclaiming that all students pass the test, while concealing that over half do not even take it. The federal regulations are irrelevant to the legality of the many representations Saba made to Ms. Ortiz and other prospective students, which give rise to the asserted Chapter 93A claim.

Further, Saba's arguments are untenable in light of binding First Circuit and Massachusetts Supreme Judicial Court precedent interpreting Chapter 93A. Chapter 93A prohibits "half-truth" statements that "create an over-all misleading impression through failure to disclose material information." *See Aspinall*, 813 N.E.2d at 487. Here, Saba proclaims that its 98% to 100% USMLE rates are an "unprecedented achievement," a "testament to the quality" of the Saba education, and that "virtually every Saba student passes the USMLE on their first attempt" when, in truth, over half of the students who enroll do not even sit for the test, a fact that, according even to the

---

students who matriculate at U.S. medical schools sit for the USMLE Step 1, almost all of whom pass on their first attempt. (*Id*. ¶ 81.)

materials Saba cites in its brief, are not publicly available.[9] At best, Saba's USMLE representations create an "over-all misleading impression through failure to disclose material information." *See Aspinall*, 813 N.E.2d at 487; *Kannavos v. Annino*, 247 N.E.2d 708, 711–12 (Mass. 1969) ("Fragmentary information may be as misleading as active misrepresentation, and half-truths may be as actionable as whole lies.") (citation omitted).

Saba's misrepresentations are grossly misleading. As the First Circuit explained in *Tomasella*, "[a]n example of telling a half-truth and omitting the rest would be advertising a product that allegedly cures baldness but failing to disclose that most baldness results from male heredity and cannot be treated." 962 F.3d at 72 (citation and internal quotation marks omitted). Just as the defendant in this illustration could not defend itself on the grounds that its product successfully treated some instances of baldness, Saba cannot evade Chapter 93A liability by relying on the literal truth (or more aptly, the literal "half-truth") of its representation that 98% to 100% of its students pass the USMLE.[10] *See Aspinall*, 813 N.E.2d at 487 ("In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which [the act or practice] might reasonably be expected to have upon the general public.") (citations and internal quotation marks omitted).

---

[9] (*See* Doc. 16 at 6 n.3) (citing the medschooltips.com website, wherein the author explains that he "was unable to find [Saba's] published attrition rates online" so had to conduct his own study to attempt to figure them out); *see also infra* I.A.ii.

[10] Citing *Tomasella*, Saba erroneously asserts that it cannot be liable because it "made no statement at all about the percentage of students who reach Step 1." (Doc. 16 at 4.) Saba deems this a "pure omission" that does not violate Chapter 93A. (*See id*. at 4–5.) But *Tomasella* clearly states that a defendant is liable if he "fails to disclose qualifying information necessary to prevent one of his affirmative statements from creating a misleading impression." *Tomasella*, 962 F.3d at 72 (quoting *In re Int'l Harvester Co*., 104 F.T.C. 949, 1057 (1984)). If Saba had said nothing at all about its USMLE Step 1 passage rates, then perhaps its conduct would fall into the "pure omission" category. The problem for Saba, of course, is that it made many "affirmative statements" about its Step 1 passage rates yet failed to disclose "qualifying information" of vital importance. *See id*.

The First Circuit's decision in *Dumont v. Reily Foods Co.* further illustrates the expansive sweep of Chapter 93A, especially at the motion-to-dismiss stage. 934 F.3d 35 (1st Cir. 2019). In *Dumont*, the plaintiff alleged a Chapter 93A claim based on the misleading labeling of a package of "Hazelnut Crème" coffee. *Id*. at 37–38. "[T]he front label of the package . . . described the coffee" as "'100% Arabica Coffee' and 'Hazelnut Crème,'" while the back of the package listed the following ingredients: '100% Arabica Coffee Naturally and Artificially Flavored.'" *Id*. The plaintiff purchased the coffee because she thought it contained real hazelnuts but eventually discovered that it contained only hazelnut flavoring. *See id*. at 38. The *Dumont* dissent argued that most consumers would have known the phrase "Hazelnut Crème" "is at most a reference to a flavor," and that the front label indicating that the package contained "100% Arabica coffee" should have provided sufficient notice that the package contained only coffee with no hazelnuts. *Id*. at 45. The majority summarily rejected these arguments. Even though the plaintiff could have checked the ingredient list on the back label, which would have revealed the "100% Arabica Coffee Naturally and Artificially Flavored" description, the court reasoned that "a reasonable consumer would find in the product name sufficient assurance so as to see no need to search the fine print on the back of the package." *Id*. at 40. As a result, the court held that it was "best that six jurors, rather than three judges, decide on a full record whether the challenged label has the capacity to mislead reasonably acting, hazelnut-loving consumers." *Id*. at 41 (citation and quotation marks omitted). Under *Dumont*, therefore, Defendants would not be saved even if Saba had a "back label" or fine print disclosure warning students that only half of them would ever sit for the USMLE. And Saba did not even have that—students like Ms. Ortiz would only learn the truth through experience and crushing debt.

ii.   Saba's Misrepresentations Were not "Self-Evident" or "Easily
Ascertained"

In addition to arguing that their statements are truthful, Defendants also contend that these

misrepresentations could have been discovered by Ms. Ortiz and other purported "reasonable

consumers" if these prospective students had reviewed "readily available information."  (Doc. 16

at 8.)  This is meritless.

*First*, Saba claims that "[t]he fact that medical schools including Saba have some degree

of attrition . . . is both self-evident and easily ascertained" because "[a]mple information is

available online about attrition rates of medical schools generally and Caribbean medical schools

specifically, including Saba." (Doc. 16 at 5–6.) This is false.

Reasonable consumers like Ms. Ortiz are not required to search the fine print or read

between the lines, let alone conduct their own investigation of outside sources to determine

whether the statements like those at issue here are true. *See Dumont*, 934 F.3d at 40; *see also*

*Munsell v. Colgate-Palmolive Co.*, 463 F. Supp. 3d 43, 52 (D. Mass. 2020) ("[T]he question of

whether a reasonable consumer could be expected to take investigative steps to educate himself or

herself . . . is, at this stage, a factual question to be addressed on a full record by the factfinder.").

Even if reasonable consumers like Ms. Ortiz were expected to conduct their own research

to test the veracity of Saba's USMLE representations, the sources cited by Saba support Plaintiff's

position. In its Motion, Saba cites to four third-party websites for the proposition that Ms. Ortiz

should have known about its high attrition rate.  (Doc. 16 at 5–6.)[11] But the only percentage about

---

[11]  These outside sources are not cited in the Complaint and need not be considered on a motion to
dismiss. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside
the pleadings are presented to and not excluded by the court, the motion must be treated as one for
summary judgment under Rule 56."). These websites are also not subject to judicial notice, as the
information they contain is not "generally known within the trial court's territorial jurisdiction"
and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably

Saba in these four websites appears in "medschooltips.com," a blog by an unnamed author who explains—contrary to Saba's argument—that he "was *unable* to find most of the Caribbean medical schools' [including Saba's] published attrition rates online."[12] Because he was unable to do so, the author devised his own "study" whereby he called "at least ten" students or alumni from each school and asked them what "they *thought* their school's attrition rate was." *Id.* (emphasis added). After placing these phone calls, the author concluded that Saba had a 35% "estimated attrition rate," but he cautioned that this number was little more than a "guestimation." Needless to say, reasonable prospective students would be ill-advised to base their choice of medical school on a homemade "guestimation" devoid of any empirical rigor. Of the other three websites, one appears to reference this 35% guestimation,[13] and the other two say nothing about Saba at all.[14]

 *Second*, Saba cites three cases pertaining to law schools—*Gomez-Jimenez v. New York L. Sch.*, 943 N.Y.S.2d 834 (N.Y. Sup. Ct. 2012), *Casey v. Fla. Coastal Sch. Of L., Inc.*, 2015 WL 10096084 (M.D. Fla. Aug. 11, 2015), and *Bevelacqua v. Brooklyn L. Sch.*, 2013 WL 1761504 (N.Y. Sup. Ct. Apr. 22, 2013)—to support its contention that prospective students should have

---

[12] be questioned." *See* Fed. R. Evid. 201(b); *cf. Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 204–06 (D. Mass. 2022) (Young, J.).

[12] *Best Caribbean Medical Schools*, MED SCHOOL TIPS, https://medschooltips.com/best-caribbean-medical-schools/ (last accessed November 20, 2023).

[13] This website states, without any citation, that "Saba's estimated attrition rate is 35%," so the audience is left to guess how this number was derived. *See How Hard Is It To Get Into Saba Medical School? (Explained!)*, WILLPEACHMD, https://willpeachmd.com/how-hard-is-it-to-get-into-saba-medical-school (last accessed November 20, 2023).

[14] One website—"internationalstudent.com"—contains only the following sentence about attrition rates generally: "Make sure to avoid any schools with an attrition rate higher than 50%, but to be safe, shoot for an even lower number. Caribbean schools with accreditation or recognition from US agencies generally have low attrition rates, around 10%." The final website—"doctorscrossing.com"— is an interview with an anonymous doctor ("Dr. Andrew is not his real name") who attended a Caribbean medical school, and who says only the following: "Depending on the school, attrition rates can be as high as 40%."

conducted due diligence and reviewed readily available information in order to unearth its misrepresentations.  (Doc. 16 at 8.) This is baseless. Not only were the decisions cited by Saba highly fact specific (and not controlling),[15] but they stand in stark contrast to other courts that have held the opposite.  *See, e.g.*, *Harnish v. Widener Univ. Sch. of L.*, 931 F. Supp. 2d 641, 650 (D.N.J. 2013) ("The study of law is the learning of a profession. Widener's website promotes a professional school. Its function is to persuade a prospective law student to attend Widener in order to receive a degree in law. The employment rate was disseminated to third-party evaluators to establish Widener's standing among law schools. Within this context, it is not implausible that a prospective law student making the choice of whether or which law school to attend, would believe that the employment rate referred to law related employment.").[16]

Ultimately, when the chaff is cleared away, Saba is arguing that a reasonable consumer should have known that "virtually *every* Saba student passes the USMLE on their first attempt" really means that no more than half of the students who matriculate pass the test, even though that information was nowhere to be found on Saba's website or, according to the external sources cited by Saba, on the internet in general. Chapter 93A prohibits this sort of casuistry.[17]

---

[15] All three cases involve the "statistical gamesmanship" of law schools reporting post-graduate employment statistics in the wake of the Great Recession of 2008. *See Gomez-Jimenez*, 943 N.Y.S.2d at 846; *Casey*, 2015 WL 10096084, at *3; *Bevelacqua*, 2013 WL 1761504, at *3.

[16] Saba also seems to suggest that college-educated consumers should be held to a higher standard. However, on appeal in one of the cases cited by Saba, the court disagreed. *See Gomez–Jimenez v. New York L. Sch.*, 103 A.D.3d 13, 19 (N.Y. App. Div. 2012) ("We recognize that students may be susceptible to misrepresentations by law schools. As such, '[t]his Court does not necessarily agree . . . that [all] college graduates are particularly sophisticated in making career or business decisions.'") (quoting *MacDonald v. Thomas M. Cooley L. Sch.*, 880 F. Supp. 2d 785, 797 (W.D. Mich. 2012)).

[17] Saba fleetingly argues that "insofar as Plaintiff alleges that Saba's statements amounted to 'false assurances of success' . . . any such statements would be in the nature of a 'prediction about the future,' which cannot support a claim of fraud for allegedly concealing 'past or present conditions.'" (Doc. 16 at 6.) Although Saba's argument here is hard to follow, Ms. Ortiz does not allege that Saba falsely assured her success by predicting the future; she alleges that Saba

**B.      Ms. Ortiz Alleges a Violation of Chapter 266**

Chapter 266, § 91 prohibits advertisements "contain[ing] any assertion, representation or statement of fact which is untrue, deceptive or misleading." *See* Mass. Gen. L. c. 266, § 91. Because courts treat Chapter 266 and Chapter 93A interchangeably, Ms. Ortiz alleges a violation of Chapter 266 for the same reasons she alleges a violation of Chapter 93A. *See, e.g.*, *Patenaude v. Orgain, LLC*, 594 F. Supp. 3d 108, 116 (D. Mass. 2022); *Bernstein v. Conopco, Inc.*, 2022 WL 2161149, at *5 (D. Mass. June 15, 2022).

Instead of addressing the merits of Ms. Ortiz's Chapter 266 claim, Saba focuses on the relief she seeks, arguing that Chapter 266 provides no private right of action for damages and Ms. Ortiz lacks standing to seek injunctive relief. (Doc. 16 at 11.) This argument fails for two reasons.

*First*, Ms. Ortiz can be awarded nominal damages as a form of equitable relief. *Cf. Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 874 (9th Cir. 2017) (holding that nominal damages can constitute a form of equitable relief); *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 796 (2021) ("[A]n award of nominal damages by itself can redress a past injury.").

*Second*, Saba fails to note that the Complaint seeks retrospective declaratory relief (Doc. 1 at 36), which Ms. Ortiz does have standing to pursue. *Cf. Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021) ("[W]hile declaratory relief can sometimes have much the same practical effect as injunctive relief, it differs legally and materially.").

Putting aside the strict distinctions Saba attempts to draw, it would be fundamentally inequitable to deny relief under Chapter 266 merely because Ms. Ortiz does not allege that she will

---

misrepresented the USMLE Step 1 passage rates of its past students. The case quoted by Saba, *Cohen v. State St. Bank & Trust Co.*, 893 N.E.2d 425 (Mass. App. Ct. 2008), is inapposite. This quote from *Cohen* pertains to the tolling of the limitations period in the breach of fiduciary duty context. *See id.* at 428.

reapply to Saba. No reasonable person would reapply—or incur thousands of dollars in student debt—after having been deceived in this way. For all of these reasons, Ms. Ortiz has a viable Chapter 266 claim.

### C.     Ms. Ortiz Alleges an Unjust Enrichment Claim

Saba erroneously asserts that Ms. Ortiz's unjust enrichment claim fails because she has an adequate remedy at law. "To plausibly state a claim for unjust enrichment, the plaintiff must allege: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." *Tomasella*, 962 F.3d at 82. "Massachusetts courts emphasize the primacy of equitable concerns in a finding of unjust enrichment[.]" *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*., 552 F.3d 47, 57 (1st Cir. 2009).

The elements of unjust enrichment are satisfied in this case, which Saba does not dispute. Saba received in excess of $150,000 from Ms. Ortiz for tuition and fees, yet Ms. Ortiz "has nothing to show for" her efforts. (Doc. 1 ¶ 85.) Despite touting a 98%-100% passage rate, Ms. Ortiz was never even permitted to sit for the USMLE Step 1. (*Id.* ¶¶ 94–96.)  In these circumstances, it would be inequitable for Saba to retain Ms. Ortiz's funds because Saba obtained them through its many deceptive representations. Ms. Ortiz would not have enrolled had she known the truth about the number of Saba students who enroll and never sit for the USMLE. (*Id.* ¶ 84.)

Ms. Ortiz acknowledges that, as a general rule, "a party with an adequate remedy at law cannot claim unjust enrichment" and "[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." *See Shaulis v. Nordstrom, Inc*., 865 F.3d 1, 16 (1st Cir. 2017). As outlined above, Ms. Ortiz contends that the remedies offered by

Chapter 93A and Chapter 266 are available; however, under Saba's interpretation, these remedies are effectively unavailable in this context. If the Court determines that Chapter 93A and Chapter 266 are unavailable, then these two statutes are "insufficient remed[ies] at law." *Cf. Tomasella*, 962 F.3d at 84. In that case, Ms. Ortiz should be allowed to maintain her unjust enrichment claim inasmuch as she would lack an adequate remedy at law.

## II.  THE STATUTE OF LIMITATIONS DOES NOT BAR ANY OF MS. ORTIZ'S CLAIMS

Saba argues that all of Ms. Ortiz's claims are barred by the statute of limitations. For the reasons below, this argument is baseless.

### A.  Ms. Ortiz's Chapter 93A and Chapter 266 Claims are Timely

Chapter 93A and Chapter 266 both have a four-year limitations period.[18] *See* Mass. Gen. L. c. 260, § 5A. Assuming (incorrectly) an accrual date of June 29, 2019, Saba contends that these claims are untimely because the Complaint was filed sixty-three days[19] after the expiration of the four-year statute of limitations. (*See* Doc. 16 at 9.) This argument fails for multiple independent reasons: (1) even if Saba's alleged accrual date is correct, the Massachusetts Supreme Judicial Court tolled the statute of limitations for all civil actions accruing before June 30, 2020 by 105 days, which would make the Complaint timely even accepting Saba's position on accrual; (2) Saba's alleged accrual date is based on a "letter of intent" that cannot be considered on a motion to dismiss and, even if it were considered, does not establish the date of the claim's accrual; and

---

[18]  Defendants appear to suggest—incorrectly—that Chapter 266 has a three-year statute of limitations. (Doc. 16 at 12.) Chapter 266 has a four-year limitations period because it is a "law intended for the protection of consumers." *See* Mass. Gen. L. c. 260, § 5A. Nonetheless, even if Chapter 266 did have a three-year limitations period, Ms. Ortiz's claim should not be dismissed for the reasons explained *infra* II.A and II.B.

[19]  The Complaint was filed on August 30, 2023. (Doc. 1 at 37.)

(3) Ms. Ortiz did not discover Saba's misrepresentations until long after she started classes, the precise date of which is a question of fact that is not appropriate to consider on a motion to dismiss.

*First*, even if Ms. Ortiz's Chapter 93A and Chapter 266 claims accrued on June 29, 2019—which they did not—in June of 2020, the Massachusetts Supreme Judicial Court tolled the statute of limitations for all civil actions "from March 17, 2020, though June 30, 2020, due to the exigencies of the COVID-19 pandemic." *See Shaw's Supermarkets, Inc. v. Melendez*, 173 N.E.3d 356, 358 (Mass. 2021) (citation and internal quotation marks omitted); *cf. Silva v. City of New Bedford*, 602 F. Supp. 3d 186, 198 (D. Mass. 2022) (Young, J.). The tolling order "include[s] all causes of action for which the relevant limitations period ran for some period between, or through, those dates." *Shaw's Supermarkets, Inc.*, 173 N.E.3d at 362–63; *see also id.* (rejecting the argument that tolling should apply only to statutes of limitation that would have expired during the tolling period and finding instead that it applied to all cases). Thus, for any claims that accrued before June 30, 2020, the statute of limitations is extended by 105 days. Accordingly, even if Ms. Ortiz's Chapter 93A and Chapter 266 claims accrued on June 29, 2019, under the tolling order, the four-year statute of limitations would not have expired until on or about October 13, 2023—over 40 days *after* Ms. Ortiz filed the Complaint.

*Second*, Saba's alleged accrual date of June 29, 2019 is improperly based on a "Letter of Intent to Enroll & Tuition Deposit Form," attached to Defendants' Motion. (Doc. 16-1.) As an initial matter, the Court cannot consider this letter because it fails to qualify under the "narrow exception" for extraneous evidence that can be considered at the motion-to-dismiss stage. *See Alt. Energy*, 267 F.3d at 33; *see also Clorox Co. P.R. v. Proctor & Gamble Com. Co*., 228 F.3d 24, 31–32 (1st Cir. 2000) (limiting consideration of extraneous materials on a motion to dismiss).

Even if the Court considers the letter, it would not establish the date of the claim's accrual because it contradicts facts alleged in the Complaint. "Affirmative defenses, such as the statute of limitations, may be raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), *provided that the facts establishing the defense are clear on the face of the plaintiff's pleadings*." *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc*., 524 F.3d 315, 320 (1st Cir. 2008) (cleaned up) (emphasis added). Here, Ms. Ortiz's claim could not have accrued before September of 2019, when she alleges that she enrolled and started classes. (Doc. 1 ¶ 77.) Defendants cannot supersede that allegation by introducing a letter establishing nothing more than Ms. Ortiz's "intent to enroll" and payment of a nonrefundable $750 deposit. (*See* Doc. 16-1.)

*Third*, even if the claim somehow accrued on June 29, 2019 (and assuming the tolling period during the COVID-19 pandemic did not apply), Ms. Ortiz did not learn—and could not have learned—of Saba's deceptive conduct until long after she started classes. Under Massachusetts law, the discovery rule "tolls the statute of limitations until a plaintiff knows, or reasonably should have known, that it has been harmed or may have been harmed by the defendant's conduct." *Taygeta Corp. v. Varian Assocs., Inc*., 763 N.E.2d 1053, 1063 (Mass. 2002); *see also Quality Cleaning Prod. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 205 (1st Cir. 2015) ("[A] federal court sitting in diversity must apply the relevant state's statute of limitations, including its accrual rules."). "In most instances, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact." *Taygeta Corp.*, 763 N.E.2d at 1063; *see also Maffeo v. White Pine Invs*., 537 F. Supp. 3d 45, 48 (D. Mass. 2021) ("[W]hat the plaintiff knew or should have known is generally a factual question that is appropriate for the trier of fact.") (internal quotations omitted).

To establish a statute-of-limitations defense on a motion to dismiss, "the facts establishing that defense must: (1) be definitively ascertainable from the complaint and other allowable sources of information, and (2) suffice to establish the affirmative defense with certitude." *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008) (citation and internal quotation marks omitted). Saba cannot meet this burden. The facts establishing the defense are not "ascertainable from the complaint," and Saba has come nowhere close to establishing the defense "with certitude." *See Evercore Restructuring*, 544 F.3d at 324; *see also Maffeo*, 537 F. Supp. 3d at 47 (holding that a motion to dismiss on limitations grounds can only be granted "when the complaint 'leave[s] no doubt that an asserted claim is time-barred.'") (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998)).  It is therefore "premature to determine whether the discovery rule applies or plaintiff's claim is time-barred." *Maffeo*, 537 F. Supp. 3d at 48; *see also Czerwienski v. Harvard Univ.*, 2023 WL 2763721, at *31 (D. Mass. Mar. 31, 2023) ("Because the facts establishing Defendant's statute of limitations defense are not 'clear on the face of the plaintiffs' pleadings,' their motion to dismiss for untimeliness must be denied.") (cleaned up).

### B.     Ms. Ortiz's Unjust Enrichment Claim is Timely

For similar reasons, Ms. Ortiz's unjust enrichment claim is also timely. Even if Saba is correct that this claim has a three-year statute of limitations, *see Sacks v. Dissinger*, 178 N.E.3d 388, 399 n.14 (Mass. 2021), Saba's limitations defense founders because the question of "what the plaintiff knew or should have known is generally a factual question that is appropriate for the trier of fact." *See Maffeo*, 537 F. Supp. 3d at 48 (citation and internal quotation marks omitted). As with the other two claims, Saba cannot establish its limitations defense "with certitude" because the facts establishing the defense are not "definitively ascertainable from the complaint." *See*

*Gray*, 544 F.3d at 324; *see also Trans-Spec Truck Serv*., 524 F.3d at 320 ("[T]he facts establishing the defense are [not] clear on the face of the plaintiff's pleadings.").  Ms. Ortiz did not discover Saba's misrepresentations until long after she started classes, the precise date of which is a question of fact that is not appropriate to consider on a motion to dismiss. Thus, Saba's statute of limitations defense fails.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants Saba University School of Medicine and R3 Education, Inc.'s Rule 12(b)(6) Motion to Dismiss (Doc. 15) should be denied in its entirety.

December 1, 2023                                    Respectfully submitted,


                                                   */s/ Patrick T. Egan*

                                                   BERMAN TABACCO
                                                   Patrick T. Egan (BBO #637477)
                                                   Christina L. Gregg (BBO#709220)
                                                   One Liberty Square
                                                   Boston, MA  02109
                                                   (617) 542-8300
                                                   pegan@bermantabacco.com
                                                   cgregg@bermantabacco.com

                                                   MAYNARD NEXSEN PC
                                                   Margaret M. Siller (admitted *pro hac vice*)
                                                   1131 4th Avenue South, Suite 320
                                                   Nashville, TN 37210
                                                   (629) 258-2253
                                                   msiller@maynardnexsen.com

                                                   NATIONAL STUDENT LEGAL DEFENSE NETWORK
                                                   Alexander S. Elson (admitted *pro hac vice*)
                                                   1701 Rhode Island Ave. NW
                                                   Washington, DC 20036
                                                   (202) 734-7495
                                                   alex@defendstudents.org

                                                   *Counsel for Plaintiff Natalia Ortiz and the Putative Class*

20

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss was filed through the CM/ECF system, which will send notice electronically to the registered participants identified below and identified on the Notice of Electronic Filings (NEF).

Daryl J. Lapp (BBO No. 554980)
daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
617.230.0100

Dale A. Evans, Jr.
dale.evans@lockelord.com
LOCKE LORD LLP
777 South Flagler Drive – East Tower Suite 215
West Palm Beach, FL 33401
561.820.0248

Michael J. McMorrow
michael.mcmorrow@lockelord.com
LOCKE LORD LLP
111 S. Wacker Drive
Chicago, IL 60606
312.443.0246

*/s/ Patrick T. Egan*