**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons,** )<br>)<br>)<br>    *Plaintiff*, )<br>)<br>**v.** )<br>)<br>)<br>)<br>**SABA UNIVERSITY SCHOOL OF** )<br>**MEDICINE AND R3 EDUCATION, INC.,** )<br>)<br>)<br>    *Defendants*. ) | **1:23-cv-12002-WGY
CLASS ACTION** |

**PLAINTIFF NATALIA ORTIZ'S MEMORANDUM OF LAW
IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION**

MAYNARD NEXSEN PC
Margaret M. Siller (admitted *pro hac vice*)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

BERMAN TABACCO
Patrick T. Egan (BBO #637477)
Christina L. Gregg (BBO#709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cgregg@bermantabacco.com

NATIONAL STUDENT LEGAL DEFENSE NETWORK
Alexander S. Elson (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org

*Counsel for Plaintiff Natalia Ortiz and the Proposed Class*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 4

PROPOSED CLASS DEFINITION .................................................................................... 7

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.    The Proposed Class Is Ascertainable ..................................................................... 8

    II.   All Four Requirements of Rule 23(a) Are Satisfied ............................................... 9

       Numerosity ............................................................................................................. 9

       Commonality .......................................................................................................... 9

       Typicality .............................................................................................................. 11

       Adequacy of Representation ................................................................................. 13

    III.  The Proposed Class Meets the Requirements of Rule 23(b)(3) ........................... 14

       Predominance ....................................................................................................... 14

       Superiority ............................................................................................................ 17

    IV.  The Court Should Appoint Plaintiff's Choice of Counsel ................................... 20

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................Passim

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................ 7, 8

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985)................................................................................. 13

*Aspinall v. Phillip Morris Cos.*,
  813 N.E.2d 476 (Mass. 2004)............................................................................ 12, 15

*Bezdek v. Vibram USA Inc.*,
  79 F. Supp. 3d 324 (D. Mass. 2015)................................................................... 12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................. 16

*Costa v. FCA US LLC*,
  2022 WL 18910359 (D. Mass. Sept. 30, 2022) .............................................. 11, 19

*Deposit Guar. Nat'l Bank v. Roper*,
  445 U.S. 326 (1980) ............................................................................................... 19

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
  177 F.R.D. 54 (D. Mass. 1997) .......................................................................... 11

*Feeney v. Dell*,
  908 N.E.2d 753 (Mass. 2009)............................................................................. 3, 19

*Garcia v. E.J. Amusements of New Hampshire, Inc.*,
  98 F. Supp. 3d 277 (D. Mass. 2015)................................................................... 16

*Garcia-Rubiera v. Calderon*,
  570 F.3d 443 (1st Cir. 2009)............................................................................... 9, 12

*Glass Dimensions, Inc. v. State St. Bank & Tr. Co.*,
  285 F.R.D. 169 (D. Mass. 2012) ........................................................................ 10

*Gonzalez v. XPO Last Mile, Inc.*,
    579 F. Supp. 3d 252 (D. Mass. 2022)........................................................ 12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ............................................................................... 15

*Henderson v. Bank of N.Y. Mellon*,
    332 F. Supp. 3d 419 (D. Mass. 2018)........................................................ 10

*Hogan v. InStore Grp., LLC*,
    512 F. Supp. 3d 157 (D. Mass. 2021)........................................................ 11

*In re Boston Sci. Corp. Sec. Litig.*,
    604 F. Supp. 2d 275 (D. Mass. 2009)........................................................ 18

*In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*,
    270 F.R.D. 45 (D. Mass. 2010) ......................................................... 10, 15

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)........................................................................ 10

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    297 F.R.D. 168 (D. Mass. 2013) ............................................................... 8

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015)...............................................................Passim

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mass. 2003) ...................................................... 9, 18, 19

*Lannan v. Levy & White*,
    186 F. Supp. 3d 77 (D. Mass. 2016)......................................................... 13

*Matamoros v. Starbucks Corp.*,
    699 F.3d 129 (1st Cir. 2012)........................................................ 8, 13, 14

*McCuin v. Sec'y of Health and Hum. Servs.*,
    817 F.2d 161 (1st Cir. 1987)...................................................................... 9

*Mowbray v. Waste Mgmt. Holds., Inc.*,
    189 F.R.D. 194 (D. Mass. 1999) ............................................................. 17

*Nat'l Bd. of Med. Exam'rs v. Optima U. LLC*,
    2011 WL 7615071 (W.D. Tenn. Sept. 29, 2011) ......................................... 1

*Ouadani v. Dynamex Operations E., LLC*,
  405 F. Supp. 3d 149 (D. Mass. 2019)....................................................................... 7, 11, 12, 18

*Ruiz v. NEI Gen. Contracting, Inc.*, --- F. Supp. 3d ----,
  2024 WL 869445 (D. Mass. Feb. 29, 2024) ................................................................ 8, 10, 12

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003).......................................................................................... 15, 16, 17

*Special. Nat. Ass'n v. Fed. Trade Comm'n*,
  238 F.2d 108 (1st Cir. 1956)................................................................................................... 9

*Tigges v. AM Pizza, Inc.*,
  2016 WL 4076829 (D. Mass. July 29, 2016) ........................................................................ 10

*Tyler v. Suffolk Cnty.*,
  253 F.R.D. 8 (D. Mass. 2008) ............................................................................................... 11

*Vara v. DeVos*,
  2020 WL 3489679 (D. Mass. June 25, 2020)........................................................................ 17

*Waithaka v. Amazon.com, Inc.*,
  966 F.3d 10 (1st Cir. 2020).................................................................................................... 19

*Wal–Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................................... 9, 10, 12

**Statutes**

Chapter 93A of the Massachusetts General Laws ........................................................................ 3

**Rules**

Federal Rule of Civil Procedure Rule 23(a) ...................................................... 1, 3, 10, 12, 14, 20

Federal Rule of Civil Procedure Rule 23(a)(1)............................................................................ 9

Federal Rule of Civil Procedure Rule 23(a)(2)............................................................................ 9

Federal Rule of Civil Procedure Rule 23(a)(3)........................................................................ 11, 12

Federal Rule of Civil Procedure Rule 23(a)(4)................................................................ 12, 13, 14, 20

Federal Rule of Civil Procedure Rule 23(b)(3) ........................................................................Passim

Federal Rule of Civil Procedure Rule 23(b)(3)(A) ........................................................... 19

Federal Rule of Civil Procedure Rule 23(b)(3)(D) ........................................................... 18

Federal Rule of Civil Procedure Rule 23(g) ...................................................................... 20

Federal Rule of Civil Procedure Rule 23(g)(1) ........................................................... 14, 20

**Other Authorities**

2 NEWBERG ON CLASS ACTIONS § 4:57 (6th ed.) .............................................................. 17

Pursuant to Federal Rule of Civil Procedure ("Rule") 23(a) and 23(b)(3), Plaintiff Natalia Ortiz moves this Court to certify a class comprised of former students who were victims of deceptive tactics by Defendants Saba University School of Medicine and R3 Education, Inc. (collectively "Saba" or "Defendants").

## INTRODUCTION

Saba is a for-profit medical school located on Saba Island in the Dutch Caribbean that recruits students from the United States and around the world. This action challenges the methods of its recruitment, specifically those marketing practices that were designed to entice enrollment by deceptively inflating the success of Saba students.

For years, Saba has aggressively advertised that 98%–100% of its students pass Step 1 of the United States Medical Licensing Exam ("USMLE")—a critical part of medical school education—on their first attempt. Designed to "assess a physician's ability to apply knowledge, concepts, and principles, as well as demonstrate fundamental patient-centered skills," students must pass each step of the USMLE to proceed to the next stage of—and therefore complete— medical school. *See Nat'l Bd. of Med. Exam'rs v. Optima U. LLC*, 2011 WL 7615071, at *1 (W.D. Tenn. Sept. 29, 2011) (describing the USMLE). As Saba explains, the USMLE Step 1 "is the key 'pivot point' in med school" and a medical school's "[f]irst-time pass rate is critical" to students evaluating medical schools.[1]

Recognizing the importance of the USMLE passage rates to prospective students, Saba widely touts its supposed rate, including on its website, in marketing emails, in search engine ads,

---

[1] *See* Ex. 1 to the Declaration of Margaret M. Siller ("Siller Decl."), R3S00000081 at R3S00000096 ("USMLE is the key 'pivot point' in med school"); Ex. 2 to Siller Decl., R3S00003900 at R3S00003914 (same); Ex. 3 to Siller Decl., R3S00003702 at R3S00003709 ("USMLE is the key 'pivot point' in med school. Taken midway in med school—before clinical rotations. First-time pass rate is critical.").

on YouTube, at the top of its Facebook, Twitter, and LinkedIn profiles, in brochures, and at open

houses and webinars.[2] Saba boasts that its USMLE passage rate is an "unprecedented

achievement" that is "unmatched by any other international medical school," "**exceeds** most US

medical schools and ALL international medical schools," and a "testament to the quality" of Saba's

education.[3] Saba assures prospective students that "virtually every Saba student passes the USMLE

on their first attempt"[4] and that its "99% USMLE Step 1 first-time pass rate *speaks for itself*."[5]

---

[2]      Ex. 4 to Siller Decl., P-000838 (Saba's website: "Virtually every student passes the USMLE Step 1 on their first attempt. 100% USMLE Step 1 Exam first-time pass rate"); Ex. 5 to Siller Decl., P-000359 (advertising email from Saba: "virtually **every Saba student passes the USMLE** on their first attempt") (emphasis in original); Ex. 6 to Siller Decl., R3S00012265 at R3S00012275 (sponsored Google search result: "You have until Aug 4 to apply – 98% USMLE Step 1 Pass Rate"); Ex. 7 to Siller Decl., R3S00012418 at R3S00012421 (Facebook: "100% USMLE Step 1 First-Time Pass Rate"); Ex. 19 to Siller Decl., P-000835 ("Saba offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1"); Ex. 9 to Siller Decl., R3S00012037 at R3S00012064 (YouTube: "Students achieve a 99% USMLE Step 1 first-time pass rate"); Ex. 8 to Siller Decl., R3S00001083 at R3S00001084 (prospectus: "99% USMLE Step 1 first time pass rate"); Ex. 13 to Siller Decl., R3S00018045 at R3S00018049 (open house presentation: "USMLE Test Results >99% First Time Pass Rate, Step 1").

[3]      Doc. 1 ¶¶ 58, 63, 70; Ex. 10 to Siller Decl., R3S00004463 ("Each year, virtually **every Saba student passes the USMLE** on their first attempt – an unprecedented achievement unmatched by any other international medical school.") (emphasis in original); Ex. 11 to Siller Decl., R3S00012091 at R3S000012095 ("In 2021, the first-time pass rate among Saba students was 100% on the USMLE Step 1. This is a testament to the quality of our education"); Ex. 12 to Siller Decl., R3S00003945 at R3S00003952 ("Saba's first time pass rate **exceeds** most US medical schools and ALL international medical schools.") (emphasis in original); Ex. 13 to Siller Decl., R3S00018045 at R3S00018049 ("When you look at two key measures of medical school performance, USMLE results and residency attainment, there are few international medical schools that can match Saba's results.").

[4]      Doc. 1 ¶¶ 58, 70; Ex. 10 to Siller Decl., R3S00004463 ("Each year, virtually **every Saba student passes the USMLE** on their first attempt – an unprecedented achievement unmatched by any other international medical school.") (emphasis in original); Ex. 14 to Siller Decl., R3S00012773 at R3S00012776 ("In short, Saba University is committed to doing everything possible to help ensure your success on this all-important exam [(the USMLE Step 1)]. Saba University students' 99%* [(2015-2019 average)] USMLE Step 1 first-time pass rate speaks for itself.").

[5]      Ex. 15 to Siller Decl., R3S00004229 at R3S00004230 (emphasis added).

2

But Saba's claimed Step 1 passage rate does not speak for itself—far from it. Saba conceals the critical fact that a large number of students who enroll at Saba do not sit for the Step 1 Exam. For instance, from 2016 through May 2022, only around 49% of the students who enrolled actually sat for the USMLE Step 1, including only 27.4% of students in 2021.[6] Saba does not provide prospective students with any information that would allow them to understand that "virtually every student" really means less than half of the students who enroll. While Defendants argued in their unsuccessful motion to dismiss that Saba's attrition rate was "easily ascertained" based on publicly available information,[7] recently produced internal communications (described below) reveal a coordinated effort to conceal Saba's attrition rates from the public. Not only does Saba deliberately not publish any information about these rates, but it also trains recruitment and admissions staff to dodge questions about attrition by pivoting to Saba's purportedly high USMLE passage rates.

Ms. Ortiz brings this action individually and on behalf of similarly situated individuals under Rule 23(a), Rule 23(b)(3), and Chapter 93A of the Massachusetts General Laws. *See Feeney v. Dell*, 908 N.E.2d 753, 762 (Mass. 2009) (discussing the strong policy favoring class actions under Chapter 93A). Class treatment is appropriate because the claims of every proposed class member hinge on the answer to the exact same question: Were Saba's representations deceptive or misleading in violation of Chapter 93A? Because the claims of each proposed class member are identical with respect to Saba's liability, common issues predominate over any individual issues

---

[6]     Ex. 16 to Siller Decl., Defendants' Response to Interrogatory 4 (chart comparing the number of students enrolled at Saba for a given semester against the number of students that sat for the USMLE Step 1 that semester). Defendants have yet to produce sufficient data to accurately calculate Saba's attrition rates from May 2022 to present.

[7]     Doc. 16 at 5–6 (arguing that Saba's attrition rate was "easily ascertained" because there was "[a]mple information [] available online about attrition rates of medical schools generally and Caribbean medical schools specifically, including Saba") (footnotes omitted).

that could arise. Moreover, Defendants have already produced records that: (i) identify each proposed class member and (ii) set forth the tuition, fees, and costs that each of them paid to Defendants. Thus, the class is ascertainable, and its damages can be readily calculated on a class-wide basis. A class action is the best method for the hundreds of aggrieved former students to obtain a remedy for Saba's widespread misconduct.

## STATEMENT OF FACTS

It is undisputed that the USMLE Step 1 passage rate is a critical factor in a prospective student's evaluation of a medical school.[8] Given the importance of this figure, Saba goes to great lengths to tout its Step 1 passage rates. Specifically, Saba represents that:

- "Each year, virtually every Saba student passes the USMLE Step 1 on their first attempt. In 2017, Saba's first-time pass rate was a perfect 100%. That's an achievement unmatched by any other international medical school."[9]

- "Passing [the USMLE Step 1] with a high score on first attempt is key to residency. Saba's first-time pass rate **exceeds** most US medical schools and ALL international schools."[10]

- "Every year, virtually every Saba student passes the USMLE Step 1 on their first attempt. Between 2015 and 2019, the first time pass rate averaged 99% - a consistently strong performance."[11]

- "Saba University offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1."[12]

- "98% USMLE Step 1 & 2 First-Time Pass Rate (avg. 2018-2022). Strong USMLE Track Record. Passing the USMLE Step exams help you to become a successful doctor in the U.S. and Canada."[13]

---

[8]     *See*, *e.g.*, Doc. 1 ¶¶ 53–66; Ex. 3 to Siller Decl., R3S00003702 at R3S00003709 ("USMLE Is the Key 'Pivot Point' in Med School. Taken midway in med school—before clinical rotations. **First-time pass rate is critical**.") (emphasis added).

[9]     Ex. 17 to Siller Decl., R3S00003653.

[10]    Ex. 18 to Siller Decl., R3S00012588 at R3S00012595 (emphasis in original).

[11]    Ex. 8 to Siller Decl., R3S00001083 at R3S00001096.

[12]    Ex. 19 to Siller Decl., P-000835.

[13]    Ex. 20 to Siller Decl., R3S00012527 at R3S00012540.

- Saba assures prospective applicants that "virtually **every Saba student passes the USMLE** on their first attempt," an "unprecedented achievement unmatched by any other international medical school."[14]

Although Defendants aggressively and prominently promote these Step 1 passage rates throughout Saba's website, social media accounts, and in direct communications with prospective students, they are well aware that 98% to 100% of Saba's enrolled students do *not* pass the Step 1 exam; in fact, from 2016 through May 2022, only approximately 49% of enrolled students actually sat for the exam.[15]

As part of this scheme to entice and mislead, Defendants have concealed—and continue to conceal—Saba's high attrition rates from prospective students and the public. In response to an internal question about the number of students attending Saba, Donald Donahue (formerly a Senior Vice President of Marketing and Enrollment at Defendant R3 Education, Inc.) wrote: "I'm always a bit leary [*sic*] to say. If somebody does the math then attrition assessment becomes easier."[16] In a separate communication with marketing staff, Mr. Donahue explained that "[w]e do not publish anything on this number."[17] Admissions staff were also trained to dodge questions about attrition by stating that "it varies," that "online information is not always accurate," or that the numbers were not available and to pivot to topics like the USMLE passage rate or small class sizes.[18] This

---

[14]    Ex. 10 to Siller Decl., R3S00004463 (emphasis added).

[15]    Doc. 1 ¶ 6; Ex. 16 to Siller Decl., Defendants' Response to Interrogatory 4 (chart comparing the number of students enrolled at Saba for a given semester against the number of students that sat for the USMLE Step 1 that semester.)

[16]    Ex. 22 to Siller Decl., R3S00012685.

[17]    Ex. 24 to Siller Decl., R3S00012689.

[18]    *See, e.g.*, Ex. 25 to Siller Decl., R3S00012691 (providing a scripted answer to a question about attrition that stated "[u]nfortunately online information is not always accurate so we think it is important to stick with facts," and then failing to provide any information about attrition); Ex. 26 to Siller Decl., R3S00012696 (in a correspondence titled "Admissions FAQs," the stock response for questions about attrition was that "it varies" followed by statements about Saba's

core information about the number of students who enrolled at Saba and did not sit for the USMLE—wholly in Defendants' control—was concealed from prospective students, denying them the opportunity to make informed decisions.

*Allegations of Proposed Class Representative Natalia Ortiz*

Ms. Ortiz is a typical and adequate class representative. In researching medical schools, she visited Saba's website and social media accounts where she saw the USMLE passage rates and requested additional information about Saba's medical education.[19] In response to her request for information, she received standardized solicitations from Saba touting its high USMLE Step 1 passage rates.[20] She also attended an open house, where Saba reiterated its impressive pass rate for the USMLE Step 1 exam.[21] At no point in her enrollment process did Saba inform Ms. Ortiz that around 50% of Saba's students do not sit for the exam.[22] Impressed by Saba's USMLE Step 1 representations, Ms. Ortiz enrolled at Saba in September 2019.[23]

---

small class size and ability to give students "constant feedback"); Ex. 27 to Siller Decl., R3S00017443 (in response to a prospective student's question about attrition rates, Saba's admissions coordinator states: "I do not have those specific numbers" and then goes on to explain that Saba has "a 99% pass rate for the USMLE step 1 which is higher than any other school in the Caribbean and, in fact higher than many US medical schools," and further assures the prospective student that Saba students "felt that they were very prepared for the USMLE step 1 test and that it was almost easy.").

[19]    Doc. 1 ¶ 68; Declaration of Natalia Ortiz Lopez ("Ortiz Decl.") ¶ 3.

[20]    Ortiz Decl. ¶ 3; Ex. 28 to Siller Decl., at P-000222-224 (99%); Ex. 29 to Siller Decl., at P-000234-241 (99%); Ex. 30 to Siller Decl., at P-000293-295 (99%); Ex. 31 to Siller Decl., at P-000296-298 (99%); Ex. 32 to Siller Decl., at P-000315-318 (100%); Ex. 33 to Siller Decl., at P-000319-322 (100%); Ex. 34 to Siller Decl., P-000359 ("virtually every student"); Ex. 35 to Siller Decl., at P-000393-398 (100%); Ex. 36 to Siller Decl., at P-000399-404 (100%); Ex. 37 to Siller Decl., at P-000405-410 (100%); Ex. 38 to Siller Decl., at P-000799-804 (100%).

[21]    Ortiz Decl. ¶ 4; Ex. 29 to Siller Decl., at P-000234-241 ("The average USMLE Step 1 pass rate for the past five years for Saba Students is >99%").

[22]    Ortiz Decl. ¶ 5.

[23]    Ortiz Decl. ¶¶ 3, 6; *see also* Ex. 39 to Siller Decl., R3S00002135 at R3S00002143 ("First Day of Enrollment – September 2, 2019").

Like other proposed class members, Ms. Ortiz was dismissed from Saba before she had the opportunity to take the USMLE Step 1 exam.[24] Ms. Ortiz was injured by the same wrongful conduct that harmed the rest of the class and has demonstrated her commitment to the vigorous prosecution of this action.[25] Moreover, she has selected counsel with significant experience in prosecuting complex consumer class actions and who will zealously prosecute this action.[26]

## PROPOSED CLASS DEFINITION

The proposed class consists of all individuals who enrolled at Saba from September 2017 to the date of the certification order in this matter who: 1) are no longer enrolled at Saba and 2) did not sit for the USMLE Step 1 exam. Excluded from the Class are: Defendants, any entity in which Defendants have a controlling interest, and Defendants officers, directors, legal representatives, successors, and assigns.

## LEGAL STANDARD

To certify a Rule 23(b)(3) class, a court must "determine whether plaintiffs [meet] the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites"—predominance and superiority. *In re Nexium Antitrust Litig.*, 777 F.3d 9, 17 (1st Cir. 2015). Courts also assess whether the proposed class is "ascertainable." *See Ouadani v. Dynamex Operations E., LLC*, 405 F. Supp. 3d 149, 167 (D. Mass. 2019).

While "a court's class-certification analysis . . . may entail some overlap with the merits of the plaintiff's underlying claim," *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455,

---

[24]     Ortiz Decl. ¶ 7.

[25]     Ortiz Decl. ¶¶ 8–10.

[26]     Ortiz Decl. ¶ 9; Siller Decl. ¶¶ 3–8; Declaration of Alexander S. Elson ("Elson Decl.") ¶¶ 3–11; Declaration of Patrick T. Egan ("Egan Decl.") ¶¶ 3–5 and Exhibit A attached thereto.

465–66 (2013) (citation and quotation marks omitted), "Rule 23 class certification ought not, however, turn into a free-ranging merits inquiry through unnecessary demands for exact calculations of damages," *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 175 (D. Mass. 2013) (Young, J.), *aff'd* 777 F.3d 9 (1st Cir. 2015). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

## ARGUMENT

The proposed class is ascertainable, satisfies each of the threshold requirements of Rule 23(a), and meets the "predominance" and "superiority" requirements of Rule 23(b)(3).

### I. THE PROPOSED CLASS IS ASCERTAINABLE

A proposed class is ascertainable if class membership is based on "objective criteri[a]." *See Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012); *Ruiz v. NEI Gen. Contracting, Inc.*, --- F. Supp. 3d ----, 2024 WL 869445, at *4 (D. Mass. Feb. 29, 2024) ("For a class to be ascertainable, membership must be based on objective terms that do not rely on the merits of the claim itself[.]") (Young, J.). The proposed class meets this requirement because it is defined by straightforward, objective criteria readily available to Saba. Specifically, an individual fits the class definition if he or she: (1) was enrolled at Saba for any period between September 2017 and the date of the certification order in this matter; (2) is no longer enrolled at Saba; and (3) did not sit for the USMLE Step 1 exam. These criteria require no subjective assessments or merits determinations, and Saba has already produced documents that identify class members according to these criteria.[27] Accordingly, the proposed class is ascertainable.

---

[27]     *See* Ex. 40 to Siller Decl., R3S00011799; Ex. 41 to Siller Decl., R3S00011839 (when asked to provide the total number of students enrolled at Saba from September 2017 to the present who were dismissed or withdrew prior to sitting for the Step 1 exam, and to identify all funds received

## II.   ALL FOUR REQUIREMENTS OF RULE 23(A) ARE SATISFIED

The proposed class also satisfies the prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See In re Nexium Antitrust Litig*., 777 F.3d at 17.

### Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "Impracticability does not mean impossibility but only difficulty or inconvenience of joining all members of the class." *Advert. Special. Nat. Ass'n v. Fed. Trade Comm'n*, 238 F.2d 108, 119 (1st Cir. 1956) (citation and quotation marks omitted). Further, "courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health and Hum. Servs*., 817 F.2d 161, 167 (1st Cir. 1987). Ultimately, the numerosity requirement is a "low threshold," *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009), and this Court has determined that a class of "forty individuals generally . . . establish[es] numerosity," *In re Relafen Antitrust Litig*., 218 F.R.D. 337, 342 (D. Mass. 2003) (Young, C.J.).

Here, Saba has produced charts and spreadsheets revealing that at least five hundred former students fit the class definition, more than enough to establish numerosity.[28]

### Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Commonality requires that the claims of the proposed class members "depend upon a common contention." *See Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "That

---

by Defendants for attendance at Saba paid by or on behalf of such students, Defendants produced charts showing enrollment and exit dates for each student and whether each student sat for the Step 1 exam).

[28]   *See id*. (showing enrollment and exit dates for each student during the class period and whether each student sat for the Step 1 exam).

common contention, moreover, must be . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

"Rule 23(a)'s requirement of commonality is a low bar, and courts have generally given it a permissive application." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir. 2008) (citation and quotation marks omitted). In fact, "class members . . . need only have a single issue in common." *NEI Gen. Contracting*, 2024 WL 869445, at *4 (Young, J.); *Henderson v. Bank of N.Y. Mellon*, 332 F. Supp. 3d 419, 426 (D. Mass. 2018) ("Commonality demands only the existence of a single issue common to all members of the class.") (citation and quotation marks omitted).

The commonality requirement is satisfied here.[29] The claims of every class member depend on the answer to the same question: Is Saba's widespread marketing of its USMLE Step 1 passage rates deceptive or misleading under Chapter 93A? The answer to this question does not vary from one proposed class member to the next; in fact, Saba has used—and continues to use—the same USMLE advertising campaign to attract students. For relevant purposes, therefore, Saba treated all of the proposed class members the same, and each one was affected in the same way by the same course of conduct. Thus, the commonality element is met. *See, e.g.*, *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (finding commonality based on allegation that the defendants engaged in "uniformly deceptive and misleading sales practices.");

---

[29]    In a Rule 23(b)(3) class like this one, commonality is "subsumed" by the predominance requirement. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997); *Glass Dimensions, Inc. v. State St. Bank & Tr. Co.*, 285 F.R.D. 169, 177 (D. Mass. 2012) ("In cases where the plaintiff seeks class certification under Rule 23(b)(3), the inquiry into commonality is often subsumed by the more stringent requirement that common questions of law or fact predominate over individual ones.") (citation and quotation marks omitted). As discussed *infra*, the predominance factor clearly favors certification.

*In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*, 270 F.R.D. 45, 54 (D. Mass. 2010) ("[I]t is beyond dispute that common core questions lie at the heart of this litigation . . . these include: whether Gillette misrepresented the capabilities of the M3P razor to the potential class."); *Tigges v. AM Pizza, Inc.*, 2016 WL 4076829, at *7 (D. Mass. July 29, 2016) ("[W]here 'implementation of [a] common scheme is alleged, the commonality requirement usually is satisfied.'") (Young, J.); *Hogan v. InStore Grp., LLC*, 512 F. Supp. 3d 157, 188 (D. Mass. 2021) ("Commonality is generally satisfied where class claims arise out of a uniform company policy or practice."); *Costa v. FCA US LLC*, 2022 WL 18910359, at *14 (D. Mass. Sept. 30, 2022) ("The Court finds that [plaintiff] has identified a number of common questions, including . . . whether FCA failed to disclose information in violation of Chapter 93A, including whether that nondisclosure was material to a reasonable buyer.").

The only difference between proposed class members—the exact amount of tuition, fees, and costs that each would recover—does not require separate fact finding, mini-trials, or individualized assessments. Rather, a straightforward formula based on Defendants' records can easily be applied to determine the amount of tuition, fees, and costs paid to Saba by each member of the class. Such differences do not undermine commonality. *See Tyler v. Suffolk Cnty.*, 253 F.R.D. 8, 10–11 (D. Mass. 2008) (finding commonality where prisoners alleged common claims of unlawful conditions, although class members would be entitled to varying amounts of damages); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015).

### *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "Typicality requires that the class representative's injuries arise from the same events or course of conduct as do the injuries of the

class, but his claims need not be identical to those of absent class members." *Ouadani*, 405 F. Supp. 3d at 162 (citation and quotation marks omitted). "The claims of the class representative and the class overall must share essential characteristics, but they need not be precisely identical." *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 338 (D. Mass. 2015). Similar to the preceding Rule 23(a) factors, the typicality requirement is "not highly demanding." *See Gonzalez v. XPO Last Mile, Inc.*, 579 F. Supp. 3d 252, 262 (D. Mass. 2022) (citation omitted). "Rule 23(a)(3) tolerates even significant differences between the named plaintiff and the proposed class members as long as the named plaintiff's experience is reasonably coextensive with the experiences of the rest of the class." *Ouadani*, 405 F. Supp. 3d at 162 (citation and quotation marks omitted). In other words, "[a] representative party's claims are typical of the class if the representative can fairly and adequately pursue the interests of the absent class members without being sidetracked by her own particular concerns." *NEI Gen. Contracting*, 2024 WL 869445, at *4 (Young, J.) (citation and quotation marks omitted). The typicality requirement "tend[s] to merge" with the commonality requirement and Rule 23(a)(4)'s adequacy-of-representation requirement, so the analyses for these three requirements overlap to a substantial degree. *See Wal–Mart*, 564 U.S. at 349 n.5.

As outlined in the commonality section, Ms. Ortiz's claim "arise[s] from the same . . . practice or course of conduct that gives rise to the claims of other class members, and . . . [is] based on the same legal theory." *See Garcia-Rubiera*, 570 F.3d at 460 (citations omitted). Like the rest of the proposed class, Ms. Ortiz's claim stems from Saba's widely disseminated USMLE Step 1 representations, and each class member pursues relief under Chapter 93A. *See Aspinall v. Phillip Morris Cos.*, 813 N.E.2d 476, 488 (Mass. 2004) ("[A]n advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted."). Therefore, Ms. Ortiz's claims are typical of the claims

of the proposed class members. *See Lannan v. Levy & White*, 186 F. Supp. 3d 77, 86 (D. Mass. 2016) ("The central inquiry in determining whether a proposed class has typicality is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class.") (citation and quotation marks omitted).

### *Adequacy of Representation*

Rule 23(a)(4)'s adequacy-of-representation requirement ensures: (1) "that the interests of the representative party will not conflict with the interests of any of the class members," and (2) "that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

With respect to the first requirement, courts assess whether the named plaintiff's interests conflict with, or are antagonistic to, those of the proposed class members. *See Amchem*, 521 U.S. at 625–26. "[P]erfect symmetry of interest is not required," and only fundamental conflicts "that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *Matamoros*, 699 F.3d at 138 (citation omitted). "Put another way, to forestall class certification, [an] intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." *Id.*

Ms. Ortiz's interests align with the interests of the proposed class. Ms. Ortiz and the proposed class members were injured by the same misleading marketing scheme and have the same interest in proving that Saba's representations were deceptive because their claims rise or fall on whether a reasonable consumer was likely to be misled by Saba's USMLE Step 1 marketing. The entire class—including Ms. Ortiz—has the common interest of establishing that Saba's Step 1 advertisements violate Chapter 93A and in receiving a refund for all tuition, fees,

13

and costs paid to Saba. Because Ms. Ortiz's interests are the same as the interests of the class, any conflicts that could conceivably arise would not "go to the heart of the litigation." *See Matamoros*, 699 F.3d at 138. Further, as Ms. Ortiz attests in her declaration, she understands the role and obligations of representing a class and is committed to protecting the interests of the class.[30] Ms. Ortiz has vigorously pursued the proposed class's claims since the inception of this action and has actively participated in the discovery process.[31] She will continue to monitor the prosecution of this action and is committed to vindicating the interests of the class.[32]

Rule 23(a)(4)'s second requirement—pertaining to the experience and qualifications of class counsel—is also met. *See* FED. R. CIV. P. 23(g)(1). Ms. Ortiz's litigation team has substantial experience in successfully prosecuting consumer class actions and in the higher education space.[33] Counsel's commitment, expertise, and diligence in consumer class litigation demonstrate their ability to adequately protect the interests of the class.

## III.   THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(B)(3)

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: [1] Common questions must predominate over any questions affecting only individual members; and [2] class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615 (quotation marks omitted). Each of these requirements is satisfied.

### *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

---

[30]     *See* Ortiz Decl. ¶¶ 8–10.

[31]     *Id*.

[32]     *Id*.

[33]     *See* Siller Decl. ¶¶ 3–8; Elson Decl. ¶¶ 3–11; Egan Decl. ¶¶ 3–5 and Exhibit A thereto.

14

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "[T]he need for some individualized determinations at the liability and damages stage does not defeat class certification." *In re Nexium Antitrust Litig.*, 777 F.3d at 21. "Rather, the question is whether there is 'reason to think that [individualized] questions will *overwhelm* common ones and render class certification inappropriate[.]'" *Id.* (emphasis in original) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)). Moreover, "[c]lasses . . . that are made up of consumers are especially likely to satisfy the predominance requirement." *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 n.9 (1st Cir. 2003); *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud.").

Predominance is satisfied because the claims of the proposed class members and their method of proving damages are identical. Here, the central issue of liability is the same for the entire class: Was Saba's widespread marketing of its USMLE Step 1 passage rates deceptive or misleading under Chapter 93A? The answer to this question will be the same for every class member, each of whom was exposed to Defendants' multi-year deceptive marketing scheme. If the factfinder determines that Defendants' USMLE representations "ha[ve] the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted," then Defendants are liable to all class members. *See Aspinall*, 813 N.E.2d at 488.[34]

---

[34]     Chapter 93A "does not require reliance, rather the applicable standard for determining whether an act is deceptive is whether it possesses a tendency to deceive." *In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*, 270 F.R.D. at 60 (citation and quotation marks omitted); *Aspinall*, 813 N.E.2d at 486 ("A successful [Chapter] 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation."). Therefore, students' individual circumstances or subjective motivations for enrolling have no bearing on Saba's liability, and this action will not involve any inquiries into individual reliance. *See id.* at 489 ("[T]he plaintiffs [need not] show that each individual consumer relied on the defendants' false promise when purchasing Marlboro Lights. Neither an individual's smoking habits nor his or her subjective motivation in

In these circumstances—where a defendant's liability can be resolved "in one stroke" as to each class member, and the class is comprised of consumers—the First Circuit has held that predominance is satisfied. *See Smilow*, 323 F.3d at 40 ("Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); *id*. at 41 n.9; *see also Amchem*, 521 U.S. at 625.

Ms. Ortiz also satisfies Rule 23(b)(3)'s requirement that a plaintiff demonstrate that damages can be calculated on a class-wide basis. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). While a plaintiff's damages model should be "consistent with [the proposed class's] liability case," *id*., "it is well-established that '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3),'" *In re Nexium Antitrust Litig*., 777 F.3d at 21 (quoting *Smilow*, 323 F.3d at 40). Where "common questions predominate regarding liability, . . . courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Id*.; *see also Garcia v. E.J. Amusements of New Hampshire, Inc*., 98 F. Supp. 3d 277, 291 (D. Mass. 2015) ("Calculating the precise amount of damages owed to each class member may also require some individualized inquiry. But this task also does not stand in the way of class certification.").

Here, damages can and will be calculated using a common methodology for all class members. The proposed class seeks to recover the total amount of tuition, fees, and costs paid to Saba for attendance, which is easily determined from Saba's business and personnel records. This theory of recovery has been held to apply under Chapter 93A in analogous circumstances regarding deceptive marketing by a for-profit institution of higher education. *See, e.g.*, *Commonwealth v.*

---

purchasing Marlboro Lights bears on the issue whether the advertising was deceptive.") (citation omitted).

*Corinthian Colls., Inc*., No. 2014-1093-E (Mass. Super. Ct. Aug. 1, 2016) (awarding damages consisting of "all monies acquired by [a for-profit college] from [students]" because the college misrepresented, *inter alia*, "the value and quality of the education provided" in violation of Chapter 93A); *see also, e.g.*, *Vara v. DeVos*, 2020 WL 3489679, at *7 (D. Mass. June 25, 2020) (discussing the *Corinthian* case). Accordingly, no individualized assessments, separate hearings, or mini-trials are required; records already produced by Defendants appear to provide the information needed to identify class members and calculate these monetary relief amounts.[35] Because damages for each class member are formulaic, common issues predominate. *See Smilow*, 323 F.3d at 40 ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.").[36]

### Superiority

Rule 23(b)(3) also requires an assessment of whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* FED. R. CIV. P. 23(b)(3). Because "[t]he superiority inquiry is closely related to the predominance inquiry,"

---

[35]     *See, e.g.*, Ex. 41 to Siller Decl., R3S00011839 (reflecting the total amount of tuition paid on behalf of each putative class member).

[36]     Along similar lines, any issues presented by the statute of limitations—which Saba raised at the motion-to-dismiss stage—do not prevent certification. As with damages, "[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *See Smilow*, 323 F.3d at 39; 2 NEWBERG ON CLASS ACTIONS § 4:57 (6th ed.) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims — rarely defeat class certification."). As this Court has recognized, "possible differences in the application of a statute of limitations to individual class members . . . does not preclude certification of a class action so long as the necessary commonality and, in a 23(b)(3) class action, predominance, are otherwise present." *See Mowbray v. Waste Mgmt. Holds., Inc*., 189 F.R.D. 194, 199 (D. Mass. 1999) (Young, C.J.), *aff'd*, 208 F.3d 288 (1st Cir. 2000) (citations omitted). Moreover, the statute of limitations may only affect a subset of the class, so predominance is not threatened. *See id.* at 200 n.4.

*Ouadani*, 405 F. Supp. 3d at 167 (citing *Amchem*, 521 U.S. at 615–16), a finding of predominance also strongly supports a finding of superiority, *In re Relafen Antitrust Litig.*, 218 F.R.D. at 346 ("[T]he requirement of superiority, like that of predominance, ensures that resolution by class action will achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated[.]") (citation and quotation marks omitted) (Young, C.J.).

This Court has previously found the superiority requirement satisfied: (1) when "it appears that resolution by class action would provide substantial savings in time, effort, and expense"; (2) when "resolving . . . claims in a single forum limits the possibility of inconsistent rulings"; and (3) when "[r]esolution by class action would . . . promote uniform treatment of class members." *See id.* at 346–47 (Young, C.J.).

Each of these is satisfied here. A class action would allow the central dispute in this action—whether Saba's USMLE Step 1 representations are deceptive or misleading under Chapter 93A—to be resolved for hundreds of former Saba students by a single factfinder, thereby saving time, effort, and expense and promoting "uniformity of decision." *See Amchem*, 521 U.S. at 615. Class treatment would prevent needless duplication of litigation, which would waste scarce resources and impose a burden on the judicial system. *See, e.g.*, *In re Boston Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 287 (D. Mass. 2009) ("Given the size of the proposed class in this case, it is clear that piecemeal adjudication of claims covering substantially similar issues would be an inefficient allocation of court resources.").

Moreover, class treatment would not create special management or administrative difficulties. *See* FED. R. CIV. P. 23(b)(3)(D). Saba's records can be used to identify each class member—and the amount of tuition, fees, and costs paid by each class member—with certainty.[37]

---

[37]      *See, e.g.*, Ex. 40 to Siller Decl., R3S00011799; Ex. 41 to Siller Decl., R3S00011839.

*See In re Relafen Antitrust Litig.*, 218 F.R.D. at 347 (noting that having "readily identifiable" class members supports a finding of superiority) (Young, C.J.). And it is unlikely that individual class members have a strong interest "in individually controlling the prosecution" of separate actions. FED. R. CIV. P. 23(b)(3)(A). By and large, members of the proposed class are burdened with significant amounts of student debt and lack the means to effectively pay down their debt because they did not obtain a medical degree at Saba.[38] As a result, many members of the proposed class would be unable to devote the time, energy, and resources required to bring separate Chapter 93A lawsuits. *Cf. Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 n.9 (1980) ("A significant benefit to claimants who choose to litigate their individual claims in a class-action context is the prospect of reducing their costs of litigation . . . by allocating such costs among all members of the class who benefit from any recovery.").

Finally, class certification would vindicate Massachusetts' strong public policy favoring Chapter 93A consumer class actions. *See In re Relafen Antitrust Litig.*, 218 F.R.D. at 346 (explaining that the purpose of the superiority requirement is achieved when an "action is predicated on a statutory mandate that is designed to promote the private rectification of conduct thought undesirable or to effectuate some other expression of public policy") (Young, C.J.).[39]

---

[38]   While a finding of superiority is especially appropriate when individual damages are low, Rule 23(b)(3) "does not exclude from certification cases in which individual damages run high." *See Amchem*, 521 U.S. at 617; *see also In re Relafen Antitrust Litig.*, 218 F.R.D. at 347 (Young, C.J.).

[39]   *See also Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 30 (1st Cir. 2020) ("Massachusetts public policy strongly favors class actions in the consumer context."); *Costa*, 2022 WL 18910359, at *13 (D. Mass. Sept. 30, 2022) ("[T]he Court is mindful of the Commonwealth's general legislative policy favor[ing] class actions in Chapter 93A cases.") (citation and quotation marks omitted); *Feeney*, 908 N.E.2d at 762 ("[E]xpressions of three branches of Massachusetts government indicate that the public policy of the Commonwealth strongly favors G.L. c. 93A class actions.").

## IV.   THE COURT SHOULD APPOINT PLAINTIFF'S CHOICE OF COUNSEL

A court certifying a class "must appoint class counsel." FED. R. CIV. P. 23(g)(1). In doing so, "the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.* Here, Maynard Nexsen PC, the National Student Legal Defense Network, and Berman Tabacco have extensive experience handling complex class and consumer protection litigation, and each has demonstrated a willingness to commit substantial resources to the successful prosecution of this action.[40] For these reasons and those discussed *supra* at 13–14, proposed class counsel meet Rule 23(a)(4)'s adequacy requirements and should be appointed under Rule 23(g).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (i) certify a class pursuant to Rule 23(a) and Rule 23(b)(3); (ii) appoint Plaintiff as class representative pursuant to Rules 23(a) and 23(b)(3); and (iii) appoint Maynard Nexsen PC, the National Student Legal Defense Network, and Berman Tabacco as class counsel pursuant to Rule 23(g).

---

[40]   *See* Siller Decl. ¶¶ 3–8; Elson Decl. ¶¶ 3–11; Egan Decl. ¶¶ 3–5 and Exhibit A attached thereto.

Dated: June 7, 2024                              Respectfully submitted,


                                                 */s/ Patrick T. Egan*

                                                 BERMAN TABACCO
                                                 Patrick T. Egan (BBO #637477)
                                                 Christina L. Gregg (BBO#709220)
                                                 One Liberty Square
                                                 Boston, MA  02109
                                                 (617) 542-8300
                                                 pegan@bermantabacco.com
                                                 cgregg@bermantabacco.com

                                                 MAYNARD NEXSEN PC
                                                 Margaret M. Siller (admitted *pro hac vice*)
                                                 1131 4th Avenue South, Suite 320
                                                 Nashville, TN 37210
                                                 (629) 258-2253
                                                 msiller@maynardnexsen.com

                                                 NATIONAL STUDENT LEGAL DEFENSE NETWORK
                                                 Alexander S. Elson (admitted *pro hac vice*)
                                                 1701 Rhode Island Ave. NW
                                                 Washington, DC 20036
                                                 (202) 734-7495
                                                 alex@defendstudents.org

                                                 *Counsel for Plaintiff Natalia Ortiz and*
                                                 *the Proposed Class*

21