# EXHIBIT 1

Exhibits: 1-26          Volume 1, Pages 1-226

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 1:23-CV-12002-WGY

---------------------------

NATALIA ORTIZ, on behalf of

herself and a class of similarly

situated persons

                Plaintiff

vs.

SABA UNIVERSITY SCHOOL OF MEDICINE

and R3 EDUCATION, INC.

                Defendants

----------------------------

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF NATALIA ORTIZ

Friday, June 28, 2024, 9:25 a.m.

Locke Lord, LLP

111 Huntington Avenue

Boston, Massachusetts

--------Reporter:  David A. Arsenault, RPR--------

Farmer Arsenault Brock LLC

Boston, Massachusetts

617.728.4404

1      Q.   When was the first time he learned about
2  the case?
3      A.   I'm speculating here but I believe it was
4  last year.
5      Q.   Mr. Yi, was he ever a student at Saba
6  University?
7      A.   No.
8      Q.   Is Mr. Yi employed?
9      A.   Yes.
10      Q.   What does he do for a living?
11      A.   He works at Tesla as a technician.
12      Q.   In preparation for today's deposition, did
13  you meet with your attorneys?  Before you answer
14  that question, I don't want to know about anything
15  that you discussed.  Yes or no, did you meet with
16  your attorneys?
17      A.   Yes.
18      Q.   How many times did you meet with your
19  attorneys?
20      A.   Twice.
21      Q.   And for approximately how long did you meet
22  with your attorneys on each of those visits?
23      A.   I'm speculating here, a few hours.  I would
24  say, speculating, five or six hours.

1      Q.   That's per meeting or total over the two

2  meetings?

3      A.   Per meeting.

4      Q.   So roughly 10, 12 hours you've spent

5  preparing for the deposition?

6      A.   I'm sorry.   One meeting was around five

7  hours.   The other meeting was less than that, it was

8  around four hours probably.

9      Q.   And at these meetings with your attorney,

10 was there anyone present other than your attorneys

11 or representatives from their law firm?

12     A.   No.

13     Q.   Ms. Ortiz, where did you currently live?

14     A.   Tampa, Florida.

15     Q.   How long have you lived there?

16     A.   About a year and a half now.

17     Q.   Do you have any roommates?

18     A.   No.

19     Q.   Do you live by yourself?

20     A.   I live with my partner.

21     Q.   So you have lived in Tampa for a year and a

22 half.   Let's say you moved in in approximately the

23 beginning of 2023; is that right?

24     A.   End of 2022.

1      Q.   Where did you live before that?

2      A.   Davie, Florida.

3      Q.   Before coming to Massachusetts for the

4   deposition today, have you ever been to

5   Massachusetts?

6      A.   Yes.

7      Q.   And when was that?

8      A.   I believe last -- I'm sorry, no.  I believe

9   the last time I came was in 2022.

10     Q.   What was the purpose of that visit?

11     A.   My little sister was graduating college.

12     Q.   Where did she go to college?

13     A.   Mount Holyoke University.

14     Q.   Other than the visit in approximately 2022

15   for your sister's graduation, have you ever been to

16   Massachusetts?

17     A.   Yes.

18     Q.   And when was that visit?

19     A.   Before 2022.  I don't remember when.

20     Q.   Do you have an approximate, five years ago,

21   ten years ago, between-a-time range?

22     A.   I'm speculating here; I want to say

23   between 2019 and 2022 I visited a few times.

24     Q.   A few times.  And this was at a time when

1    you were an undergrad or were you in medical school

2    at that time?

3         A.   I was in medical school at that time.

4         Q.   You said a few times.  Approximately how

5    many?

6         A.   Two or three.

7         Q.   What was the purpose of those visits?

8         A.   To visit my little sister.

9         Q.   Aside from the trips to Massachusetts to

10   visit your sister and attend her graduation, other

11   than those few times have you been to Massachusetts

12   outside of that?

13        A.   Yes.

14        Q.   What was the purpose of those visits?

15        A.   I was on a road trip with my family.

16        Q.   Approximately how long ago was that?

17        A.   Years ago.  I cannot give a number.

18        Q.   Was it back when you still lived with your

19   family?

20        A.   Yes.

21        Q.   So you've had a family trip to

22   Massachusetts.  You visited your sister a few times.

23   That's the extent of your travels to Massachusetts?

24        A.   Yes.

1      Q.   Are you currently working?

2      A.   No.

3      Q.   When was the last time you were employed?

4      A.   2022.

5      Q.   Where were you employed?

6      A.   Medsys Health.

7      Q.   Going back to Boston -- going back to

8  Massachusetts, have you ever lived in the State of

9  Massachusetts?

10     A.   No.

11     Q.   Have you ever lived outside of Florida?

12     A.   Yes.

13     Q.   And where was that?

14     A.   Arizona.

15     Q.   I understand you are from Colombia?

16     A.   Yes.   Excuse me, I have lived in Arizona; I

17  have lived on Saba; and I have lived in Colombia.

18     Q.   Medsys Health, what kind of business is

19  that.

20     A.   That is a virtual health care type of

21  software company.

22     Q.   What was your position at Medsys Health?

23     A.   Customer service.

24     Q.   How long did you work at Medsys?

```
 1      A.  No.

 2      Q.  Who is Diego Gonzalez?

 3      A.  He's a friend.

 4      Q.  And did you speak with Mr. Gonzales about

 5   your application to Saba University?

 6      A.  I don't think so.  I don't remember.

 7              MR. EVANS:  Why don't we mark another

 8   exhibit.

 9              (Marked, Exhibit 3, Plaintiff's

10   Supplemental Responses and Objections to Defendant

11   Saba's First Set of Interrogatories.)

12      Q.  I'm showing you what we have marked as

13   Exhibit 3.  Do you recognize this document?

14      A.  Yes.

15      Q.  And what is it?

16      A.  These are the interrogatories.

17      Q.  And this is one of the two documents that

18   you reviewed in preparation for your deposition

19   today?

20      A.  Yes.

21      Q.  If we go to the second to last page, is

22   that your signature there?

23      A.  Yes.

24      Q.  So you signed under penalty of perjury that
```

1   these answers are correct?

2        A.  Yes.

3        Q.  I was asking about folks that you discussed

4   medical school with.  Rather than make it a memory

5   test, I figure we can look at some these answers and

6   go through them.  In particular I would like to

7   direct your attention to Interrogatory Number 3 on

8   Page 7.  The question was in that interrogatory:

9   Identify each friend and family member with whom you

10  talked about applying to medical school as you

11  describe in Paragraph 67 of your complaint.

12            We've talked about Mr. Avila,

13  Mr. Gaiefsky.  And now we are on to Diego Gonzalez.

14  What did you discuss with Mr. Gonzalez about your

15  applying to medical school?

16       A.  I'm sorry.  Your previous question asked me

17  if I asked, if I talked to people about applying to

18  Saba specifically.  But we are talking about talking

19  to medical school generally.

20       Q.  Let's focus on that then.  What did you

21  discuss with Mr. Gonzalez about applying to medical

22  school?

23       A.  That I was going to be applying to medical

24  school because I wanted to become a doctor.

1      Q.   Okay.   So going back to the previous

2   question.   Did you research any other medical

3   schools when you were in the process of applying to

4   Saba?

5      A.   Yes.

6      Q.   What schools did you look at?

7      A.   University of Central Florida, UCF, USF and

8   UF, if I remember correctly.

9      Q.   University of Central Florida, University

10   of South Florida and then the University of Florida?

11      A.   Correct.

12      Q.   Any other schools besides Saba, obviously?

13   Did you look into FIU?

14      A.   Yes.

15      Q.   What about Medical Universities of America?

16      A.   And Ross, yes.

17      Q.   Aside from Saba, MUA and Ross, did you

18   research any other Caribbean medical schools?

19      A.   No.

20      Q.   So American University of Antigua, did you

21   research them?

22      A.   No.

23      Q.   How about, St. George's University?

24      A.   I may have.   I may have.   I don't remember

1    though.

2         Q.   What makes you say you may have?

3         A.   When you said the name, it sounded

4    familiar.

5         Q.   What about Trinity?

6         A.   No.

7         Q.   Did you look into Xavier School of

8    Medicine?

9         A.   The name sounds familiar, but I don't

10   believe so.

11        Q.   How about St. James School of Medicine?

12        A.   No.

13        Q.   When you were looking at Saba and MUA and

14   Ross, was there anything about those schools in the

15   Caribbean that made you willing to consider them?

16        A.   Yes.

17        Q.   And what was that reason?

18        A.   I'm not sure how this is properly called,

19   but they have ongoing admissions, they have

20   admissions three times a year.  So instead of having

21   to wait a full year for a university in the United

22   States, you can apply and get accepted fairly

23   quickly.

24        Q.   You were anxious to get started and begin

1    your education?

2         A.   I wasn't anxious to get started, but I was

3    ready to continue my education.

4         Q.   What did you do to research these different

5    medical schools?

6         A.   I went on their websites.  I looked at what

7    their websites had to say.

8         Q.   So you looked at their websites?

9         A.   Yes.

10        Q.   Did you look at any other third-party

11   sources of information?

12        A.   What is a third-party source exactly?

13        Q.   So good question.  It can be anything --

14   what I'm referring to is any information that's not

15   specifically on the university's website.  So that

16   could be something published by the Department of

17   Education or published by a third party about these

18   medical schools.

19        A.   Yes.

20        Q.   What did you look at?

21        A.   I did a little bit more research on Saba I

22   think it was a general research.  I'm sorry.  I

23   don't remember exactly.  Like I don't remember, but

24   I believe it was general research about Caribbean

1           Do you see that?

2      A.   Yes.

3      Q.   The phrase "on their first attempt," that

4  necessarily only includes folks that actually took

5  the Step 1, correct?

6      A.   Yes.

7      Q.   There are several links on this website --

8  this email, rather.  Did you click any of these

9  links?

10     A.   Not that I recall.

11     Q.   So you don't recall clicking the link to

12 the Saba website?

13     A.   I don't recall.

14     Q.   Did you review the Saba View Book before

15 applying to Saba?

16     A.   No, I don't remember.

17     Q.   Sitting here today, do you remember what

18 content the Saba View Book covered?

19     A.   I don't remember reviewing the view book so

20 I wouldn't be able to tell you.

21     Q.   Besides yourself, who else received this

22 email?

23     A.   I don't know.

24     Q.   You understand you brought this lawsuit on

 1    behalf of a class of students similarly situated,

 2    correct?

 3         A.   Correct.

 4         Q.   Sitting here today, do you know whether any

 5    of your class members received this email?

 6         A.   I do not know.

 7         Q.   I want to turn the page to Exhibit 2.  This

 8    is a March 31, 2019 email.  Do you recognize it?

 9         A.   Yes.

10         Q.   There are a number of features or aspects

11    of Saba that are listed in this email, including a

12    few that are set out in a bulleted list.  Do you see

13    that?

14         A.   Yes.

15         Q.   How important were each of these factors to

16    you when you were deciding to apply to Saba

17    University?

18         A.   Important.

19         Q.   So they publish a 100 percent USMLE Step 1

20    first-time pass rate.  Was that important to you?

21         A.   Having a high USMLE Step 1 first-time pass

22    rate, that specifically was not important to me.

23    But because they advertised it, to me it spoke on

24    their education, and that was important to me.

```
 1        Q.  Why wasn't it necessarily important to you?
 2   Did you feel like whether the pass rate was a
 3   hundred percent or 90 percent, did you feel like you
 4   had what it took to pass the Step 1?
 5        A.  Yes.  And it said first-time pass rate.  So
 6   it doesn't necessarily, like what they advertise
 7   that it was the first time, to me that spoke on
 8   their education.  I just confused myself a little
 9   bit.  Can we repeat the question?
10             MR. EVANS:  Can you read that back.
11             (Question read by the reporter.)
12             REPORTER:  "Why was it not necessarily
13   important to you?  Did you feel like, like the pass
14   rate was a hundred percent or 90 percent, did you
15   feel that you had what it took to pass the Step 1?"
16             MR. EGAN:  Objection to form.
17        A.  Yes, I thought I had what it took to pass
18   the Step 1, but that wasn't important to me, because
19   to me what was important is the education you are
20   getting in order to take this exam.  Because that
21   education is what you use to actually take the exam.
22   So that's what was important.
23        Q.  So if I'm understanding you correctly, this
24   pass rate was important to you because it showed
```

1  that other students as well were passing the Step 1,

2  but you felt like you were going to pass the Step 1

3  no matter what?

4            MR. EGAN:  Objection to form.

5       A.  Again, this was not important to me.  This

6  spoke about their education.  I took this as our

7  education is this good, that we have a hundred

8  percent or 98 percent or 99, whatever I read,

9  percent first-time pass rate.

10      Q.  Going through the rest of this email.

11 First of all, this email is addressed to you

12 individually, right?

13      A.  Correct.

14      Q.  It's not addressed to anyone else?

15      A.  Correct.

16      Q.  Do you know whether any other members of

17 your class received this particular email?

18      A.  I do not know.

19      Q.  Some of the other aspects that are listed

20 in this email list is small class sizes.  I believe

21 you said earlier that was important to you?

22      A.  That became important.  When I was looking

23 at medical schools, classroom sizes weren't a big

24 importance to me.  But when Saba said they had small

1    classroom sizes, that became something I wanted for

2    myself.

3         Q.   You realized that was an option and it

4    became an option that you would like to take

5    advantage of?

6         A.   Correct.

7         Q.   How small were the classes?

8         A.   Like I said, my original cohort was a

9    little below a hundred, from what I believe, I

10   remember.

11        Q.   So when you say class sizes were important,

12   you're not talking like going into a particular

13   course and there being a small number of students

14   with the professor.  You're talking about a small

15   cohort versus a school that allows a lot of people

16   to come in.  Is that what you're saying?

17        A.   I never thought about it that way.  Since

18   Saba isn't the type of school that does -- you go in

19   with your original cohort and you all take the same

20   classes together.  I didn't really think about, oh,

21   small classroom sizes could also be you take a

22   particular class and that class is small itself.  I

23   think I liked that I was going to be able to see the

24   same people.

```
 1      Q.  This list also listed a distinguished
 2   faculty.  Was that important to you as well?
 3      A.  Yes.
 4      Q.  And it lists below that a modern curriculum
 5   and a technologically advanced campus, anatomy
 6   classes taught with real cadavers, and state-of-the-
 7   art test centers.  Was that important to you as
 8   well?
 9      A.  Yes.  And to go back on your previous
10   question, a distinguished faculty wasn't necessarily
11   the most important, it was the exceptional
12   qualifications and a personal commitment to your
13   education.
14      Q.  So looking at these various aspects of Saba
15   University, which of these were more important to
16   you, if you had to rank them or sort of weigh them?
17   Were there any that stood out over the others?
18      A.  No.  They all seemed like great things.
19      Q.  Any of these factors here, are any of them
20   sort of deal breakers; if one of them wasn't present
21   you weren't going to go to Saba no matter what?
22      A.  No.
23      Q.  What would you say the most important
24   factor about Saba was in your decision to attend the
```

1  school?  Was it starting early?

2      A.  Starting early.

3      Q.  I want to flip the page to Exhibit 3.  Do

4  you recognize this document?

5      A.  No.

6      Q.  It is attached to your complaint.  Was it

7  an advertisement or part of an email?

8      A.  I'm going to assume an email because I

9  don't have physical advertisements.

10     Q.  You didn't keep a copy of any of the

11 advertisements that you viewed before applying to

12 Saba?

13              MR. EGAN:  Objection to form.

14     A.  Like physical documents?

15     Q.  Or like stored on your computer?

16     A.  No.  Whatever is on my email is what I

17 have.

18     Q.  Okay.  So this email refers to a June 6th

19 open house at the Miami Marriott, Biscayne Bay.  Is

20 that the one you went to?

21     A.  I believe so, yes.

22     Q.  Let's flip the page to the next exhibit,

23 Exhibit 4.  Do you recognize this document?

24     A.  Yes.

1       Q.   And what is this?

2       A.   This is from my email.   This is an

3    advertisement.

4       Q.   This is an email dated June 8, 2019; is

5    that correct?

6       A.   Yes.

7       Q.   Do you remember -- going back -- sorry, I

8    missed a question.   Going back to this open-house

9    document.   Do you remember whether any members of

10   your alleged class received a copy of this document?

11      A.   I do not know.

12      Q.   Going back to this email, do you know

13   whether any of the members of your class received

14   this email?

15      A.   I do not know.

16      Q.   We can put the complaint away for the

17   moment.   We'll probably come back to it in a little

18   bit.

19           (Marked, Exhibit 6, Ortiz Applicant

20   Information Form.)

21      Q.   I'm showing you what has been marked as

22   Exhibit 6.   Do you recognize this?

23      A.   No.

24      Q.   You don't recognize this document?

1      Q.  It wasn't that it wasn't relevant, there

2   just wasn't a need.

3      A.  Again, this --

4            MR. EGAN:  Objection to form.

5            Go ahead.

6      A.  I'm speculating, but that's what I believe,

7   yeah.

8            (Marked, Exhibit 13, Letter,

9   Unconditional Acceptance, 07-30-19.)

10     Q.  Showing you what's been marked as Exhibit

11   13.  Do you recognize this document?

12     A.  Yes.

13     Q.  What is it?

14     A.  This is Saba's letter letting me know that

15   I've been unconditionally accepted into the

16   university.

17     Q.  So you were initially conditionally

18   accepted, you provided some more information, and

19   then you were unconditionally accepted as of July

20   30, 2019; is that correct?

21     A.  Correct.

22     Q.  I want to talk about some of these

23   advertisements and emails that we talked about that

24   listed the USMLE Step 1 pass rate.  Do you recall

```
 1   looking at those pass rates when you received those
 2   emails?
 3        A.  Yes.
 4        Q.  And at the time that you received those
 5   emails, what did you understand a Step 1 pass rate
 6   to mean?
 7        A.  That what are represented are put in front
 8   of that, that's the amount of students that are
 9   passing on their first time taking this.
10        Q.  So it's the people that took the exam on
11   their first time and passed it.
12        A.  Mm-hmm, correct.
13        Q.  Did you understand that Step 1 was an exam
14   that you took after completing the basic science
15   portion of the degree?
16        A.  Yes.
17        Q.  Not everyone completes the basic science
18   program, right?
19        A.  Correct.
20        Q.  And that's true at every university,
21   correct?
22        A.  Correct.
23        Q.  And if someone doesn't complete the basic
24   science program, then necessarily they wouldn't
```

```
 1  reach the Step 1.

 2      A.  Correct.

 3      Q.  And so those folks wouldn't be part of the

 4  pass rate because they never got there.

 5      A.  Correct.

 6      Q.  Let me set the question up.  You've seen

 7  the emails that refer to a pass rate.  Other than

 8  what Saba was telling you about the pass rate, do

 9  you have any independent knowledge of what Saba's

10  Step 1 pass rate was in 2018?

11      A.  No.

12      Q.  You didn't attempt to double-check that

13  from another source?

14      A.  No.

15      Q.  Do you believe that the pass rates that

16  were advertised, which range between 99 and a

17  hundred percent, do you think those pass rates are

18  false?

19              MR. EGAN:  Objection to form.

20      A.  You ask me if I think they are false?  I

21  think they are misleading.

22      Q.  And what's your basis for that?

23      A.  Nowhere in the pass rates do they mention

24  these students who were going in the amount of
```

1    students who were actually taking the exam.  It is

2    misleading.

3         Q.  In your research of other medical schools,

4    do you recall whether any other medical schools

5    publish an attrition rate along with its Step 1 pass

6    rate?

7         A.  No.

8         Q.  Are you familiar with the ECFMG?

9         A.  No.

10        Q.  And just for clarity, that's the

11   Educational Commission on Foreign Medical Graduates.

12   Does that ring a bell?

13        A.  No.

14        Q.  So assuming that Saba receives reports from

15   the ECFMG that tells Saba what their students' first-

16   time pass rates are, it's not your position  that the

17   numbers are literally false.  Your position  is that it

18   is misleading because they don't also  publish an

19   attrition rate side by side with that  information?

20                MR. EGAN:  Objection to form.

21        A.  Yes.

22        Q.  In all the correspondence that we have

23   discussed today -- and we can pull any of them out

24

```
 1    if you need to refer back to them -- but did Saba
 2    ever make any statements to you about its attrition
 3    rate before you enrolled?
 4         A.   Not that I'm aware of.
 5         Q.   Before you enrolled at Saba, did you ever
 6    ask anyone at Saba what its attrition rate was?
 7         A.   No.
 8                   (Marked, Exhibit 14, Saba University
 9    School of Medicine 2018 to 2020 catalog.)
10         Q.   I'm showing you what we marked as Exhibit
11    14.  Do you recognize this document?
12         A.   Yes.
13         Q.   This is the Saba University School of
14    Medicine 2018 to 2020 catalog, correct?
15         A.   Yes.
16         Q.   Have you reviewed this document prior to
17    today?
18         A.   Like at any point in life?
19         Q.   Yes.
20         A.   Yes.
21         Q.   When did you first receive this document?
22         A.   I don't remember.
23         Q.   Was it before or after you started at Saba?
24         A.   I don't remember.
```

```
 1                   AFTERNOON SESSION
 2                   THE VIDEOGRAPHER:   We are back on the
 3   record.   The time is 1:16.
 4                   (Marked, Exhibit 17, Natalia Andrea
 5   Ortiz Lopez Saba transcript.)
 6      Q.   Ms. Ortiz, we are showing you what's been
 7   marked as Exhibit 17.   This is a copy of your Saba
 8   transcript.   Have you seen this before?
 9      A.   No.
10      Q.   Take a look at these courses and the grades
11   and the courses.   Let me know if everything looks
12   accurate to you.
13      A.   Yes.
14      Q.   Did you ever miss class at Saba?
15      A.   Yes.
16      Q.   How often?
17      A.   I missed the allowed amount of times.
18      Q.   And how many was that?
19      A.   It depended on the class.
20      Q.   And when did that occur?
21      A.   Every semester.
22      Q.   You missed the allowed amount of times for
23   every class you attended?
24      A.   I don't remember if it was every class I
```

1    attended.

2        Q.   And why was that?

3        A.   Because either personal reasons or to catch

4    up on study and rest.

5        Q.   And what was the penalty for missing the

6    allowed amount of times?

7        A.   There was no penalty.

8        Q.   Who set the guidelines for class  attendance?

9     Was that set by each professor or was  it set by the

10   administration?

11       A.   I don't know.

12       Q.   And do you think missing those classes

13   negatively impacted your performance?

14       A.   No.

15       Q.   And why is that?

16       A.   Because I still studied for my classes.

17   And the lectures were actually provided online

18   through a website, so I was able to review those

19   missed lectures.

20       Q.   And when you missed the allowable amount of

21   classes or, stated differently, your absences

22   exceeded what was allowed, did your professors give

23   you a warning of any kind?

24       A.   My absences didn't exceed the amount that

1  was allowed.  I was given warnings when I was

2  approaching that amount.

3      Q.  Do you recall which classes you received

4  warnings for?

5      A.  No.

6      Q.  So I'm a little confused.  I thought your

7  testimony was that you frequently missed the allowed

8  amount of times.  Is that correct?

9          MR. EGAN:  Objection to form.

10     Q.  Because it sounds like you just said you

11 never missed the allowed amount but you came close.

12     A.  I missed, but I didn't exceed, I didn't

13 pass the amount that was allowed.  But I did miss

14 the allowed amount of times more than once

15 throughout my Saba time.

16     Q.  And do you remember any example of a class

17 in which you missed more than the allowed amount of

18 times?

19     A.  You were not allowed to miss more than the

20 allowed amount of times; if not, I think you were

21 dismissed or you had to repeat a semester.  I don't

22 know what the consequences were.

23     Q.  Okay.  So I think I understand.  So you

24 missed some classes but never more than you were

1    allowed to miss?

2        A.  Correct.

3        Q.  Okay.  And you missed those classes for

4    personal reasons as well as to rest and study?

5        A.  Correct.

6        Q.  And do you remember approximately how many

7    classes you would miss on an average semester?

8        A.  No.

9        Q.  Which professors warned you that you were

10   approaching your maximum absences?

11       A.  I don't remember.

12              (Marked, Exhibit 18, Letter to Ortiz,

13   08-12-21.)

14       Q.  I'm showing you what we marked as Exhibit

15   1.  Do you recognize this letter?

16       A.  Yes.

17       Q.  What is this letter?

18       A.  This is an email letting me know that I did

19   not pass the NBME comprehensive exam.

20       Q.  And the NBME comprehensive exam, that's the

21   course that's at the end of Foundations of Clinical

22   Medicine; is that correct.

23       A.  Correct.

24       Q.  This letter gives you a choice of attending

1   required to take, retake it, right?

2      A.  Correct.

3      Q.  And did you retake Foundations of Clinical

4   Medicine?

5      A.  Yes.

6            (Marked, Exhibit 20, Ortiz ███ text

7   messages.)

8      Q.  Who is ████████?

9      A.  That is a friend from Saba.

10     Q.  How did you meet ███ ███?

11     A.  I met him through an advising meeting.  So

12  it was, Saba requires you to attend within the first

13  few weeks, they assign you to one of the professors

14  to be your advisor.  And then you are required to

15  attend a meeting with -- I don't know if it is the

16  correct time, the advisoree, the people that advise,

17  so like a group meeting.  And I met ███ through

18  that.

19     Q.  Was he in your same class year or was he

20  one of your advisors?

21     A.  He was a year ahead of me, a semester ahead

22  of me.

23     Q.  So was he considered your advisor or were

24  you guys just part of the same advisory group?

1     A.   The same advisory group.

2     Q.   I want to look at the text message that's

3   dated December 9, 2021 at 10:15 a.m.

4            Do you see that?

5     A.   Yes.

6     Q.   You say:  "So I didn't pass.  I knew I

7   wasn't going to because honestly I didn't study like

8   I should have and I contemplate leaving the program.

9   I'm not upset, but I'm still kind of bleh.  Do you

10  have any advice or words of wisdom?"

11           Did I read that correctly?

12    A.   Yes.

13    Q.   So you felt when you got your results that

14  you didn't study as hard as you could have?

15    A.   I think like any student who fails

16  something, yeah.

17    Q.   I'll set that aside for now.

18           (Marked, Exhibit 21, Letter to Ortiz,

19  04-15-22.)

20    Q.   Showing you what's been marked as Exhibit

21  21.  Do you recognize this letter?

22    A.   Yes.

23    Q.   What is this letter?

24    A.   This is an email letting me know that I did

1    not pass the NBME comprehensive exam in April.

2         Q.   And this is your third failure of the

3    course?

4         A.   Correct.

5         Q.   Again you were given an option of retaking

6    Foundations of Clinical Medicine or a review course

7    of your choice.  Which option did you utilize on

8    this occasion?

9         A.   I used the review course on my own.

10        Q.   And what was that course?

11        A.   The same materials I used before.

12        Q.   So after failing your second attempt based

13   on, after using the review materials of your own

14   choosing and after feeling like you didn't study

15   hard enough you undertook the same type of

16   preparation as before?

17             MR. EGAN:  Objection to form.

18        A.   I used the same materials to study.  But

19   this time I took a different approach when it came

20   to my study techniques.

21        Q.   And what was that approach?

22        A.   I went out of the house.  I went to the

23   library.  I dedicated more time this time.  I tried

24   to time myself in these moments.

1    detriment elements."

2              Do you see that?

3        A.  Yes.

4        Q.  On the following page the Department of

5    Education provided information about seeking

6    reconsideration or appeals.  Did you do either of

7    those things?

8        A.  No.

9        Q.  Why not?

10       A.  Because I didn't understand this document

11   the first time -- I didn't fully understand

12   everything the first time I filled it out.  There's

13   a lot of jargon that can be confusing.  So when I

14   got denied I didn't know what else I could do

15   exactly to help my case with them.  I didn't know

16   how to go about it.

17       Q.  The communications that you had with the

18   members of your cohort, were those in writing or

19   were those verbal?

20       A.  Verbal.  I don't know if any were in

21   writing, I can't remember.  But a lot of things were

22   word of mouth.

23       Q.  I would like to come back to Exhibit 20,

24   please.  I would like to turn your attention to the

1   text message on the page that's Bates labeled P

2   1507.  In particular the text message on December 9,

3   2021 at 4:12 p.m.  Do you see that?

4       A.  Yes.

5       Q.  Now if you recall from our discussion of

6   these messages earlier, 12/9/2021, that was also the

7   date that you texted with ██████████ about failing

8   the comp exam.  Do you recall that?

9       A.  Yes.

10      Q.  You stated in this text message at 4:12

11  p.m.:  "I just feel lost right now and that sucks.

12  Like I've been feeling lost for months now so it's

13  not this exam that made me feel this way.  I don't

14  know what's been making me feel like this.  I just

15  want to get to the point where I felt like I was

16  doing what I was meant to do with my life."

17              So on this date you tell ██████████ that

18  you have been feeling lost, but it's not the exam

19  that's making you feel that way, it's something

20  else.  Did you ever discover what was causing you to

21  feel lost?

22      A.  Yes.

23      Q.  And what was it?

24      A.  The stress and anxiety that I acquired

1    through the program on Saba.

2        Q.  So the stress of medical school was taking

3    a toll on you?

4        A.  The stress and anxiety that I acquired

5    during this time was taking a toll on me.  It was

6    new.  I never experienced such high amounts of

7    stress and anxiety.

8        Q.  Are you experiencing similar amounts of

9    stress and anxiety in your program in USF?

10       A.  Not USF, and not at all.

11       Q.  Do you feel like the anesthesiology program

12   that you're going to pursue is more what you were

13   meant to do with your life?

14       A.  I'm sorry.  From the previous question, I

15   do have -- for the previous question, I do

16   experience testing anxiety currently at USF.  It is

17   something I've been working on to undo.  That was

18   acquired through the program at Saba.

19            To answer your current question, your

20   current question was asking me whether

21   anesthesiology assistant is what I want to do with

22   my life now?

23       Q.  Well, you say in this message you just want

24   to get to the point where you feel like what you're

1    doing is what you are meant to do with your life.

2    Do you feel you're on that track now?

3              MR. EGAN:  Objection.

4        A.  Yes.

5        Q.  You mentioned testing anxiety.  Has that

6    been diagnosed by a medical professional?

7        A.  I see a therapist.  It is not diagnosed.

8        Q.  And you feel like you acquired that during

9    medical school?

10       A.  Yes.

11       Q.  I'd like to turn the page to P 1508, in

12   particular the text messages with ███████ on

13   December 10.  Take a look at those for a moment and

14   let me know when you've had a chance to review them.

15       A.  (Witness complies.)  Okay.

16       Q.  There's some discussion here about taking

17   the Kansas IMOB review course.

18       A.  Sorry.  Did you want me to continue reading

19   to the second page, the other page?

20       Q.  Yeah, you might as well.  That's fine.

21   Just through December 10 is fine.

22       A.  (Witness complies.)  Okay.

23       Q.  So it appears that you and Mr. Woode are

24   talking about Kansas IMOB review course?

1       A.   Correct.

2       Q.   What is that course?

3       A.   Saba -- after COVID happened, I don't know

4    what the rules were exactly, but we had it under --

5    I don't know if this happened because of the COVID

6    situation or not, but my cohort had to take this

7    Kansas course afterwards, if I remember correctly.

8    Once they passed the Step 1, they had to take this

9    Kansas course, like Saba required them to take the

10   Kansas course, which no one knew about until then.

11              So what was the question?

12      Q.   I think I just asked what is the Kansas

13   IMOB review course.

14      A.   It was like a USMLE prep course.

15      Q.   So this was a course that Saba was

16   requiring?

17      A.   Yes.

18      Q.   And was this required before sitting for

19   the Step 1 or after?

20      A.   After -- sorry, before.

21      Q.   When you refer to your cohort, are you

22   referring to your original cohort who is now ahead

23   of you?

24      A.   Yes.

```
 1        Q.   Were you ultimately required to take that
 2   exam?
 3        A.   No.
 4        Q.   Why not?
 5        A.   Sorry, exam?
 6        Q.   Course.  Good point.
 7        A.   No.  Because in order to, in order to take
 8   the course that Saba required, you had to pass the
 9   NBME comp exam and then you were required to take
10   that course and then Step 1.
11        Q.   If I'm following the communications here,
12   it seems to me that you and          are working on
13   some request to the school to take that in lieu of
14   Foundations of Clinical Medicine; is that correct?
15             MR. EGAN:  Objection to form.
16        A.   Correct.
17        Q.   And why did you want to do that?
18        A.   As I mentioned earlier, the Foundations of
19   Clinical Medicine was not helpful.  It was
20   confusing, if anything.
21        Q.   Did you ever take the Kansas IMOB review
22   course?
23        A.   No.
24        Q.   Do you know whether that course is easier
```

 1    than Foundations of Clinical Medicine?

 2         A.   I have no idea.

 3         Q.   You just wanted to give it a shot because

 4    you knew you had gone through Foundations of

 5    Clinical Medicine?

 6         A.   Correct.

 7         Q.   What was Saba's response to that request?

 8         A.   Well, I don't remember.  But I'm assuming

 9    they denied it.

10         Q.   If we look at the text on P 1509, starting

11    at 1:53 p.m., ███████  says:  "Sorry, I was driving

12    but we probably got the same response.  FML."  Then

13    he said "Thanks for trying," and you said:  "Of

14    course."

15              Are those the communications surrounding

16    Saba's response?

17         A.   I believe so.

18         Q.   So sitting here today, you think they

19    rejected that request?

20         A.   I think so.

21         Q.   I want to go to Page P 1514, please.  I

22    want to look at the text on October 22, 2022 at

23    10:22 p.m. from ████████.

24         A.   I'm sorry, October what?

```
 1        Q.  26.

 2        A.  At what time?

 3        Q.  10:22 p.m.  He says:  "I'm all right.

 4   There's a bunch to update you on, but in regards to

 5   that we are still waiting on R3 to make a decision.

 6   We sent something called a Chapter 93A demand letter

 7   due to the error in process regarding the appeal.

 8   As for the other firm, Student Defense, I haven't

 9   heard from Abigail yet.  Last I heard the firm was

10   doing research."

11             So at this time it appears that

12   ██████████  engaged counsel to send a Chapter 93A

13   demand letter?

14        A.  Correct.

15        Q.  Who is his counsel?

16        A.  I don't know.

17        Q.  It's not the counsel you have in this case;

18   is that correct?

19        A.  That's correct.

20        Q.  When he refers to the other firm, is he

21   referring to Alex Elson's firm, Student Defense?

22        A.  He put in parentheses Student Defense.  I'm

23   going to assume, yes.

24        Q.  In response you say:  "Yes.  I'm moving
```

```
 1   dude, starting a brand-new chapter in my life.  She

 2   sent a link to apply to a potential loan forgiveness

 3   thing, but that's about it from her.  Do you know

 4   when you'll find out?"

 5              When you refer to she, what are you

 6   referring to there, or who rather?

 7       A.  I don't remember.

 8       Q.  Is that Abigail at Student Defense?

 9              MR. EGAN:  Objection to form.

10       A.  I'm speculating, yes.

11       Q.  And this potential loan forgiveness thing

12   that you refer to in the text, is that the borrower

13   defense claim?

14       A.  I think so.

15       Q.  Have you ever spoken with ███████'s

16   attorneys?

17       A.  No.

18       Q.  I want to look at P 1515.  In particular, I

19   just want to make a note that the final

20   communication on that page is October 31, 2022 at

21   3:22 p.m., correct?

22       A.  Yes.

23       Q.  And then if we flip to the next page, the

24   next text that you had with ██████ was March 15,
```

```
 1   2024 at 1:49 p.m.  Do you see that?
 2        A.   I'm sorry.  What did you say?
 3        Q.   The first text on Page P 1516 that has a
 4   Bates stamp is March 15, 2024, right?
 5        A.   Correct.
 6        Q.   So that's a gap in time of approximately a
 7   year and a half, October of 2022 to March 2024.  Do
 8   you see that?
 9        A.   Yes.
10        Q.   Why did you go so long without speaking
11   with ███?
12        A.   ███  and I communicate on other platforms
13   as well.
14        Q.   Okay.  Have you produced those
15   communications in this case?
16        A.   Yes.
17        Q.   What are the other platforms?
18        A.   I'm not sure if it is Whatsapp -- no, this
19   is iCloud.  So this is iMessage.  Oh, I'm sorry.
20   The gap was a year?  So this is iMessage.  I have
21   Whatsapp as well.  I know I had phone calls with
22   ███ so...
23        Q.   So you believe that during that time you
24   were speaking with ███ you just don't think it
```

```
 1   was on iMessage?

 2        A.   Correct.

 3        Q.   Do you think it was on Whatsapp?

 4        A.   Or phone call.

 5        Q.   And is it your testimony that you produced

 6   all the messages that you have had with Mr. ████ on

 7   Whatsapp?

 8             MR. EGAN:  Objection to form.

 9        A.   Yes.

10        Q.   Have you had any discussions with ███████

11   about the pendency of his separate lawsuit?

12        A.   What do you mean by pendency?

13        Q.   I'll go back.  Are you aware that Mr. ████

14   filed a separate lawsuit against Saba?

15        A.   Yes.

16        Q.   Have you had any discussions with him about

17   this lawsuit?

18        A.   Yes.

19        Q.   What have those discussions been?

20        A.   That the lawsuit is happening, the

21   progression, the different points of it:  We just

22   had a deposition or discovery happened.  So that's

23   it.

24        Q.   What did he tell you about his deposition?
```

1          MR. EGAN:  Page 2.

2      Q.  Paragraph 4 states:  "Defendants have and

3  continue to lure potential students with false

4  guarantees of passing the United States Medical

5  Licensing Examination, a multi-step examination that

6  medical students must pass before obtaining their

7  medical license."

8          How did Saba guarantee that students

9  would pass the USMLE?

10         MR. EGAN:  Objection to form.

11     A.  Saba through their, through misleading with

12  their advertisements, they, I feel like they have

13  guaranteed a certain level of education, and that

14  wasn't true.

15     Q.  So to me misleading and a guarantee, those

16  are two different things.  How did Saba guarantee

17  that students would pass the Step 1?

18         MR. EGAN:  Objection to form.

19     A.  Like I said, I believed that through the

20  misleading of information, they are creating a false

21  reality within the people who are seeing this within

22  the consumers.  And that false reality is in a

23  sense, at least for me it was I'm guaranteed a good

24  education and I'm going to get to take this exam.

1      Q.  All the ads and emails that we looked at

2   earlier, do any of them contain a guarantee that you

3   can point to?

4      A.  No.

5      Q.  You just mentioned they guaranteed the

6   level of education.  What do you mean by that?

7      A.  I didn't say that they guaranteed the level

8   of education; but through their advertisement they

9   created this false sense of they have a good

10  education to the consumer, me, being somebody who

11  has seen it, I remember what I thought, and it

12  wasn't true.

13     Q.  And how was that not true?

14     A.  Sorry, I misspoke.  It was misleading.

15     Q.  And how was it misleading, because they

16  didn't list the attrition rate along with it?

17     A.  Because they don't disclose that

18  information, yeah.

19     Q.  Look at Paragraph 6.  Your allegation says:

20  "What defendants do not disclose to the public is

21  that only approximately half the students who enroll

22  at Saba even sit for the USMLE because they either

23  drop out of the program, or because the defendants,

24  in an effort to make their percentages appear high

1  bar students from taking the exam by requiring them

2  to obtain a certain score on a Saba-administered

3  pretest, something students are not told before they

4  enroll."

5          How do you know that only approximately

6  half of the students enrolled at Saba sit for the

7  USMLE?

8          MR. EGAN:  Objection.

9      A.  I'm talking about what my cohort.  What I

10  saw was that a lot less than half made it to the

11  point where you take the fifth semester class,

12  Foundations of Clinical Medicine, and even less of

13  those actually took the Step 1.

14      Q.  Earlier I asked you what the attrition rate

15  for your cohort was, and I thought your answer was

16  that you didn't know.  Did you know what the

17  attrition rate was for your cohort?

18      A.  I said that it was around about 90.  I

19  never said that I didn't know.  I said that it was

20  around 90.

21      Q.  The attrition rate was around 90?

22      A.  I'm sorry.  My original cohort was around

23  90.  What I'm saying right now is that from those

24  individuals less than half made it towards the fifth

1    today, that's not true, is it?

2                MR. EGAN:  Objection.

3        Q.  In particular we went over the catalog,

4    which lists that requirement.

5        A.  Yes.

6        Q.  So is that statement true, Paragraph 6?

7                MR. EGAN:  Objection.

8        A.  Is the statement in Paragraph 6 false, is

9    that what you're asking me, or not true?

10       Q.  Right.  How is this statement accurate

11   "something students are not told before they enroll"

12   when the catalog lists that requirement?

13       A.  The requirement is listed, but the

14   statement is not false because the statement also

15   includes the efforts of Saba to increase their

16   percentages, to make their percentages appear high.

17   They mislead.  I don't know how else to answer that

18   question.

19       Q.  So is your position that students are not

20   told about the Saba-administered pretest before they

21   enroll?

22                MR. EGAN:  Objection to form.

23       A.  As I found out today, there's a mention of

24   a pretest in their catalog.

1    Q.  Paragraph 7 says that:  "Saba conceals the

2  fact that their USMLE calculation excludes many

3  students who do not take the exam."

4        Do you see that?

5  A.  Yes.

6  Q.  How did they conceal that fact?

7  A.  They don't have it at -- they don't make it

8  open.  They don't have their attrition rates as

9  something that's posted right next to their

10  advertisement.

11  Q.  You're not aware of whether any other

12  medical schools publish attrition?

13  A.  Correct.

14  Q.  You never asked Saba what their attrition

15  rate was.

16  A.  Correct.

17  Q.  Do you know how Saba calculates its Step 1

18  pass rates?

19  A.  No.

20  Q.  Do you know where Saba obtains the data

21  that it uses to calculate its Step 1 pass rates?

22  A.  No.

23  Q.  I want to go to Paragraph 10.  It says:

24  "Plaintiff brings this case on behalf of herself and

1    a class of individuals who enrolled in Saba from

2    September of 2017 to the present," defined as the

3    class period, "who, one, are no longer enrolled, and

4    two, did not sit for the USMLE Step 1 exam," defined

5    as the class.

6                    Do you see that?

7        A.   Yes.

8        Q.   Does this class include students that

9    voluntarily withdraw from Saba before they took Step

10   1?

11                   MR. EGAN:   Objection to form.

12       A.   Yes.

13       Q.   Does it include students that transferred

14   to other medical schools before they took the Step

15   1?

16                   MR. EGAN:   Objection to form.

17       A.   Yes.

18       Q.   Does it include students that were

19   dismissed for nonacademic reasons such as

20   misconduct?

21                   MR. EGAN:   Objection to form.

22       A.   Yes.

23       Q.   Why are they entitled to compensation?

24       A.   Because at the end of the day if they were

1    lured into the university through the

2    advertisements, then they were misled no matter what

3    their circumstances were.

4        Q.   Even if their departure had nothing to do

5    with academics?

6            MR. EGAN:   Objection to form.

7        A.   Correct.

8        Q.   Obviously some people were able to pass the

9    Step 1 and went on to become doctors; is that

10   correct?

11       A.   Yes.

12       Q.   Why doesn't the class include these

13   students?

14           MR. EGAN:   Objection to form.

15       A.   Because they were able to take the USMLE

16   and get their degree.   They were able to make it all

17   the way through.

18       Q.   So those ads weren't misleading to them

19   because they were able to succeed?

20           MR. EGAN:   Objection to form.

21       A.   They were misleading, but they got to

22   succeed.

23       Q.   So it is the students' academic outcome

24   that determines whether the ads were misleading or

1    deceptive?

2              MR. EGAN:  Objection to form.

3        A.  No.

4        Q.  What do you contend your damages are in

5    this case?

6              MR. EGAN:  Objection to form.

7        A.  I don't know the exact number.  I believe

8    it is over 140,000.

9        Q.  What is that number comprised of or how did

10   you calculate that number?

11       A.  That number was found on the Ed Financial

12   Services website, and through receipts of my mom.

13       Q.  And Ed Financial is your loan servicer?

14       A.  Correct.

15       Q.  What was the original balance of your

16   student loans?

17       A.  What do you mean, like at the end of the

18   Saba period?

19       Q.  Yes.

20       A.  I don't remember the exact number but I

21   believe it was over 130,000.

22       Q.  Do you know what it is sitting here today?

23       A.  I don't know it.

24       Q.  How much of your student loans have you

 1    other fashion?

 2              MR. EGAN:  Objection to form.

 3        A.  Yes.  I love my mom.

 4        Q.  And Ed Financial is your servicer as of

 5    today?

 6        A.  Yes.

 7        Q.  I want to go back to Paragraph 9 of the

 8    complaint, please.  The first sentence says:  "These

 9    representations communicate to students that taking

10    out substantial debt to attend Saba will be worth

11    the risk because at Saba they are near certain to

12    succeed."

13              Where did Saba say that students are

14    near certain to succeed?

15        A.  I believe one of their advertisements says

16    -- I don't know if Saba says that, the near certain

17    to succeed part.  I don't know how to answer that

18    question.  I don't know where it says that, "near

19    certain to succeed."  But my lawyers helped put this

20    together.  And I agree that the representations

21    communicate that taking a substantial debt will be

22    worth the risk.  I can't specify where it says "near

23    certain to succeed" specifically.

24        Q.  So in your answer to Interrogatory Number 1

```
 1   you state that your current balance on your student
 2   loans is $147,827.94, correct?
 3                MR. EGAN:   Exhibit 3, Page 5.
 4      A.   Can you repeat the question, please?
 5      Q.   I was just confirming the balance of the
 6   tuition that you have listed in answer to
 7   Interrogatory Number 1.
 8      A.   Yes.
 9      Q.   And by filing this lawsuit you are seeking
10   a refund of that tuition?
11      A.   Yes.
12      Q.   Why are you entitled to a refund of your
13   tuition?
14      A.   Because I was misled by the university.
15      Q.   You received the classes you paid for,
16   right?
17                MR. EGAN:   Objection.
18      A.   Correct.
19      Q.   And you received course credits for the
20   classes you passed, correct?
21      A.   Correct.
22      Q.   And in a few of the courses, I know we
23   looked at your transcript earlier, you earned As,
24   Bs, a few Cs, which demonstrates you actually
```

1   learned the materials or at least enough to pass the

2   courses, right?

3       A.   Correct.

4       Q.   And you don't know whether or not you would

5   be able to transfer those credits to another medical

6   school if you decided you wanted to continue

7   pursuing a medical education, correct?

8              MR. EGAN:   Objection to form.

9       A.   Correct.

10      Q.   If you were allowed to transfer those

11  course credits, that would allow you to save tuition

12  at another school, right?

13             MR. EGAN:   Objection to form.

14      Q.   You can answer.

15      A.   I don't know if it would allow save.  You

16  said that it would allow save.  Can you repeat that?

17      Q.   It would allow you to save the tuition at

18  that other school if you were able to transfer

19  credits for those courses.

20             MR. EGAN:   Objection to form.

21      A.   What was the specific question?

22      Q.   The question was, if you were able to

23  transfer your credits that you earned at Saba to

24  another medical school, that would save you money at

1    that medical school, correct?

2         A.   Correct.

3              MR. EGAN:   Objection to form.

4         Q.   If you had actually passed Foundations of

5    Clinical Medicine and passed Step 1, you obviously

6    wouldn't say your basic sciences course work was

7    worthless, right?

8         A.   Correct.

9         Q.   I want to turn to Paragraph 58 of the

10   complaint, Exhibit 5.   It starts at Page 14.

11   There's a series of screen shots starting on the

12   next page, Page 15.   Actually, this first one is a

13   little confusing because the footnote is different

14   on different pages of the screen shot.   If you go to

15   Page 15, Paragraph 58 A has a quote.   It says:

16   "Virtually every student passes the USMLE Step 1 on

17   their first attempt."   Then there's a footnote 32.

18   You see footnote 32 down at the bottom?

19        A.   Yes.

20        Q.   Then the actual screen shot is at the top

21   of the next page.   You see that screen shot, the one

22   in gray?

23        A.   Yes.

24        Q.   So according to the footnote 32, that

 1   screen shot was last accessed on January 30, 2023.
 2   Were you the person that accessed that screen shot
 3   on that date?
 4        A.   January 30, 2023?  No.
 5        Q.   Before filing this complaint, had you ever
 6   personally saw this advertisement?
 7        A.   No.
 8        Q.   I want to look at the screen shot in
 9   Subparagraph B.  Do you see that?
10        A.   Yeah.
11        Q.   Footnote 33 says it was last accessed on
12   August 23, 2023.  Were you the person that accessed
13   that screen shot on that date?
14        A.   No.
15        Q.   Have you ever seen this ad before you filed
16   the complaint?
17        A.   No.
18        Q.   The next screen shot is in Subparagraph C.
19   Footnote 34, it shows last access date on August 23,
20   2023.  Were you the person that accessed that screen
21   shot on that date?
22        A.   No.
23        Q.   Did you see the screen shot before you
24   filed the complaint?

1      A.   No.

2      Q.   Moving on to 60 A, the same question, were

3  you the person that saw this screen shot on August

4  23, 2023?

5      A.   No.

6      Q.   Did you ever see that screen shot before

7  filing the complaint?

8      A.   No.

9      Q.   Just for clarity, when I say screen shot, I

10 refer to the thing it depicts, not the screen shot

11 itself.  The same answer?

12     A.   Yes.

13     Q.   In Paragraph 60 B, were you the person that

14 accessed this image on August 23, 2023?

15     A.   No.

16     Q.   Did you see this image prior to the filing

17 of the complaint?

18     A.   No.

19     Q.   The next paragraph, I think it is

20 Subparagraph or Paragraph 60 C, but I think the C is

21 cut off because the screen shots overlap.  I think

22 it is an Instagram screen shot.  Do you see that?

23     A.   Yes.

24     Q.   The footnote should be 37, which also shows

1    a last access date of August 23, 2023.  Were you the

2    person that accessed the screen shot on that date?

3        A.  No.

4        Q.  Did you see that image prior to the filing

5    of the complaint?

6              MR. EGAN:  Objection.

7        A.  No.

8        Q.  Paragraph 60 D shows a Facebook screen shot

9    with a last access date of August 23, 2023.  Were

10   you the person that accessed this image on that

11   date?

12       A.  What screen shot?

13       Q.  60 D.  The paragraph describing it is on

14   Page 17, but the screen shot is actually on Page 18

15   at the top.

16       A.  No.

17       Q.  Paragraph 61 refers to defendants'

18   representations on social media and Saba's website

19   back in 2019.  The first one is an FAQ screen shot

20   right underneath 61 Paragraph A, and it has a last

21   access date on August 23, 2023, but it reflects it

22   was archived on April 4 of 2019.  Did you ever see

23   that ad before the complaint was filed -- not the ad

24   but the FAQs?

1       A.   I don't remember.   I don't remember.

2       Q.   When you say you don't remember, is that

3  because when you are looking at it today, you don't

4  remember seeing that before you applied?

5       A.   Exactly, yes.

6       Q.   What about Paragraph 61 B, which is a

7  screen shot that starts with a record of success.

8  Just for specificity, I'm asking if you recall

9  seeing that before you applied to Saba.

10      A.   I don't remember if I saw this ad

11 specifically.

12      Q.   What about the screen shot in 61 C, do you

13 recall seeing that before you applied?

14      A.   I have a vague memory.   I believe so.

15      Q.   Do you remember where you saw this

16 statement?

17      A.   No.

18      Q.   What about Paragraph 61 D, do you recall

19 seeing that before you applied at Saba?

20      A.   I am so sorry.   I confused C and D.   Sorry,

21 my response is still the same for C.   And it is the

22 same for D as well.   I believe I had seen this or

23 something similar.

24      Q.   Do you remember where you saw it?

1      A.   No.

2      Q.   You think your browser history would

3   reflect that you navigated to those pages?

4      A.   I don't know.

5      Q.   All of these ads that we just looked at,

6   some of which are current and some of which are past

7   ads, do any of them contain a future guarantee of

8   success for prospective students?

9              MR. EGAN:   Objection to form.

10     A.   No.

11     Q.   I would like to direct your attention to

12  Paragraph 79, please.   Paragraph 79 contains a table

13  that runs onto Page 26.   Have you seen this table

14  before?

15     A.   Yes.

16     Q.   The description on Paragraph 79 or the

17  statement says:   "According to data produced to the

18  undersigned counsel by the Department of Education

19  pursuant to the Freedom of Information Act,

20  since 2015 the following number of Saba students

21  have sat for the USMLE Step 1 exam per year."

22              Have you reviewed the data that was

23  referenced in this paragraph that was provided by

24  the Department of Education?

1     A.   What do you mean by review?

2     Q.   Have you seen it?

3     A.   Yes.

4     Q.   What kind of data is it?

5     A.   This is data specifying the percent of

6  students who do take the USMLE Step 1 in the year if

7  270, around 270 students enroll.

8     Q.   So you saw the data that was used to

9  calculate this table?

10    A.   No.

11    Q.   You've just seen this table?

12    A.   Yes.

13    Q.   Looking at the top row, far right column it

14 says:  "Percentage of Saba students taking the USMLE

15 Step 1 assuming 270 students enroll per year."

16            Did I read that correctly?

17    A.   Yes.

18    Q.   Do you have any information that would

19 substantiate that 270 students enrolled at Saba

20 every year from 2015 to 2021?

21    A.   I do not.

22    Q.   Wouldn't these percentages be off if less

23 than 270 students actually enrolled?

24    A.   Yes.

1      Q.   The percentage would be higher if the

2   number that enrolled was lower 270, right?

3      A.   That's assuming that that same amount of

4   students passed the Step 1?

5      Q.   Correct.  Assuming the same number of

6   students passed but there were actually fewer

7   students that enrolled, the percentage would be

8   higher.

9      A.   Correct.

10     Q.   Do you know whether this table includes

11  only students that were in the same cohort?

12              MR. EGAN:  Objection.

13     A.   No, I do not know.

14     Q.   Do you know how these percentages were

15  calculated at all?

16              MR. EGAN:  Objection to form.

17     A.   No.

18     Q.   I'm going to go to Paragraph 81.  It says:

19  By contrast, 64,830 students that matriculated at

20  U.S. medical schools from 2017 to 2019, 57,864

21  students, 89.3 percent sat for Step 1."

22              Do you see that?

23     A.   Yes.

24     Q.   What that means is 10.7 students at U.S.

1    schools never sat for Step 1; is that correct?

2              MR. EGAN:  Objection to form.

3    A.  Correct.

4    Q.  And you never applied to any U.S. medical

5    schools, right?

6    A.  Correct.

7    Q.  But even if U.S. medical schools are having

8    folks that don't sit for the Step 1, wouldn't you

9    agree that attrition is an unavoidable consequence

10   for all medical schools in some amount?

11             MR. EGAN:  Objection to form.

12   A.  Can you restate or ask it a different way?

13   I don't understand it.

14   Q.  Sure.  Would you agree with the notion that

15   attrition happens in all medical schools?

16   A.  Yes.

17   Q.  So were all medical school students that

18   don't sit to for the Step 1 exam entitled to a

19   refund of their tuition?

20             MR. EGAN:  Objection to form.

21   A.  No.

22   Q.  Why not?

23   A.  Because not every student -- because these

24   universities do not advertise a certain thing, a

1    certain level of education to these students so they

2    were not mislead by the universities.

3        Q.  Would you repeat the last part.  I was too

4    busy talking over you rudely.

5        A.  That's okay.  So these students were not

6    misled by the universities when they applied.

7        Q.  Name one other school other than Saba whose

8    advertising you are familiar with.

9        A.  I am not familiar with advertisements.  It

10   has been a long time since I saw this stuff.

11       Q.  So how can you say which students were or

12   were not misled at other schools?

13                MR. EGAN:  Objection.

14       A.  Because Saba's main advertisement -- I

15   don't know if it is the main one -- but their

16   biggest advertisement that I kept seeing routinely

17   was the USMLE first-time pass rates.  This is not

18   something that I saw from the other universities at

19   all.

20       Q.  What did you look at at the other

21   universities?  Earlier you testified that you just

22   looked at their websites.

23       A.  Yes.

24       Q.  So on all the schools that we talked about

1    to publish it alongside your Step 1 rates?

2                MR. EGAN:  Objection to form.

3        A.  I'm not a professional.  I wouldn't know

4    what to say exactly, what to specify.  But it's my

5    belief that if it is more than 50 percent, I should

6    be told.

7        Q.  So if Saba's attrition was less than 50

8    percent, then their advertising is fine?

9                MR. EGAN:  Objection to form.

10       A.  I'm not a professional to excuse Saba's

11   advertising.  So I don't know.

12       Q.  So according to your own complaint, U.S.

13   medical schools, they have an attrition rate of

14   around 10 percent.  That's an acceptable amount?

15               MR. EGAN:  Objection to form.

16       A.  I believe so.

17       Q.  Is 15 percent attrition an acceptable

18   amount?

19               MR. EGAN:  Objection to form.

20       A.  Again, this is me speculating.  I'm not a

21   professional.  This is what I believe.  I think so.

22       Q.  15 percent is acceptable?

23       A.  I think so.

24       Q.  20 percent?

1          MR. EGAN:  Objection to form.

2     A.  I think now we are starting to get to

3  numbers that I think should be disclosed.

4     Q.  And why is that?

5     A.  Because now you have about 20 percent of

6  students who are not passing, let's say a hundred

7  students.  I'm not a professional, this is what I

8  believe.  I'm going through a feeling.

9     Q.  I want to go to Paragraph 84 -- actually,

10  let's go to Paragraph 85.  In Paragraph 85 at the

11  very end you say after paying for all this schooling

12  you have nothing to show for it.  Do you see that?

13     A.  Yes.

14     Q.  We looked at your transcript earlier.  You

15  got As and Bs in several courses.  Safe to say you

16  got something out of those courses, correct?

17          MR. EGAN:  Objection.

18     A.  Did I obtain knowledge during the times of

19  those courses?  Yes.

20     Q.  Did you learn anything in those classes

21  beyond the actual science involved; for example,

22  note-taking skills, discipline, team work, et

23  cetera?

24          MR. EGAN:  Objection to form.

1    A.   No.

2    Q.   Do these classes have any value to you?

3         MR. EGAN:   Objection.

4    A.   It's hard to answer that because it is very

5    broad.

6    Q.   Let's talk about the classes you got As and

7    Bs in, which I have listed as clinical skills 1

8    through 4, ethics, systems and disease 4.   You got

9    As and Bs in those courses.   Obviously those had

10   some educational value; is that correct?

11        MR. EGAN:   Objection to form.

12   A.   Again, that I obtained knowledge around the

13   time of these courses -- because of the knowledge I

14   obtained at the time of these courses, yes, there

15   was an educational value.

16   Q.   I want to talk about your undergraduate

17   degree in chemistry.   Did that degree provide any

18   value to you?

19   A.   Yes.

20   Q.   Can you quantify that value?

21        MR. EGAN:   Objection to form.

22   A.   No.

23   Q.   It is sort of an intangible value of

24   learning things and going through the program?

1              MR. EGAN:  Same objection.

2       A.  And being able to apply the degree that I

3   acquired as well.

4       Q.  You also had to get another degree to go on

5   to anesthesiology program, right?

6       A.  That was a personal choice.

7       Q.  Does that program have value to you?

8       A.  Yes.  Are you done with the complaint so we

9   can take a break?

10      Q.  We are not done with it, but we can take a

11  break.  That's fine.

12              THE VIDEOGRAPHER:  It is 2:56.  We are

13  off the record.

14              (A recess was taken.)

15              THE VIDEOGRAPHER:  We are back on the

16  record.  The time is 3:08.

17              (Marked, Exhibit 26, Ortiz personal

18  statement.)

19      Q.  Ms. Ortiz, I'm showing you what we marked

20  as Exhibit 26.  Do you recognize this document?

21      A.  Yes.

22      Q.  What is it?

23      A.  My personal statement.

24      Q.  I want to direct your attention to the

1   even though they are not showing adequate academic

2   performance.

3            MR. EGAN:  Objection to form.

4      A.  So the question is, like, could Saba have

5   done this to profit instead?

6      Q.  Right.  The paragraph alleges that Saba

7   does what it does so that it can get two years of

8   tuition from these students.  But if profit was

9   really the end goal, couldn't they just leave

10  students in the program to continue along even

11  though they are not ready to be doctors?

12     A.  I don't know how Saba operates.  I have

13  understood that in the past they have actually

14  allowed at least around seven, seven attempts on the

15  NBME comprehensive exam.  I don't know why they

16  brought it down to four exactly, but I have

17  understood that they have changed the number around.

18     Q.  Bringing it down to four would actually

19  decrease the tuition that they could receive from

20  students, right, because more students are being

21  dismissed?

22            MR. EGAN:  Objection to form.

23     A.  Yes.

24     Q.  I want to look at Paragraph 95.  There's a

1    reference in this paragraph to the fact that you

2    didn't achieve Saba's required score on the comp

3    exam.  Do you see that?

4        A.   Yes.

5        Q.   How much lower would the score have had to

6    have been in order for you to pass on any of your

7    four attempts?

8               MR. EGAN:  Objection to form.

9        A.   How much lower Saba's passing score would

10   have to be?

11       Q.   Right.

12       A.   I believe only a few points, but I don't

13   remember the exact numbers.

14       Q.   And where did that required score fall on a

15   percentile basis, do you recall?

16       A.   No.

17       Q.   Earlier we discussed the fact that you

18   filed this case as a class action.  What does that

19   mean to you?

20       A.   That I am representing not myself alone but

21   the class.  So I believe it says in the complaint

22   that the class is from 2017, a certain date.

23       Q.   And have you spoken to any potential class

24   members?

```
 1     A.  ████████████  and  ██████████.

 2     Q.  I'm sorry.  Who was the last person?

 3     A.  ██████████

 4     Q.  And what's  ████████████  last name?

 5     A.  I actually don't know her last name.

 6              THE REPORTER:  Is it  ██████████  or

 7  ████████████

 8              THE WITNESS:  ██████████████  ████████████████████.

 9     Q.  Who is  ██████████████

10     A.  She's a friend from Saba.

11     Q.  And you believe that she is eligible to

12  join the class if it is certified?

13     A.  I'm sorry.  She is not.  She graduated from

14  Saba.

15     Q.  Are you aware of the ads that potential

16  class members did or did not see as it relates to

17  Step 1?

18     A.  No.

19     Q.  Isn't it true that the language of these

20  ads are different from ad to ad?

21              MR. EGAN:  Objection.

22     A.  Not the entire language but some of it,

23  yes.

24     Q.  Some of these ads refer to different
```

1    things, some refer to 99 percent pass rate, some

2    refer to a hundred percent pass rate; is that fair

3    to say?

4            MR. EGAN:  Objection to form.

5        A.  Yes.

6        Q.  Looking at Paragraph 106, Subsection F,

7    which is on Page 31.  Why would it be unjust for

8    Saba to retain the tuition for the courses that

9    students took?

10           MR. EGAN:  Objection to form.

11       A.  Because they took their money by misleading

12   people to want to joint this program.

13       Q.  Do you know what was important to

14   individual class members to their decision to enroll

15   in Saba?

16           MR. EGAN:  Objection to form.

17       A.  No.

18       Q.  Nowhere in this complaint do you allege

19   that the putative class members, you never say they

20   didn't receive the courses they paid for, right?

21           MR. EGAN:  Objection to form.

22       A.  Correct.

23       Q.  What damages did the other class members

24   incur?

1             MR. EGAN:  Objection to form.

2        A.  I don't know.

3        Q.  Do you know how their damages would be

4   calculated?

5             MR. EGAN:  Objection to form.

6        A.  No.

7        Q.  Do you think the damages for each class

8   member would be the same or different?

9             MR. EGAN:  Objection; expert testimony.

10       A.  I would assume different.

11       Q.  And why is that?

12            MR. EGAN:  Same objection.

13       A.  Because depending on where you live, you

14   paid a certain amount of rent.  Depending on what

15   you ate, you pay a certain amount on food.  So it's

16   going to vary per person.

17       Q.  And I imagine that class members would have

18   different levels of financial aid, scholarships,

19   assistance from family; is that correct?

20            MR. EGAN:  Same objection.

21       A.  Correct.

22       Q.  Ms. Ortiz, have you ever been convicted of

23   a felony punishable by at least one year in prison?

24       A.  No.

1    Q.   Have you ever been convicted of a crime of

2  dishonesty?

3    A.   No.

4    Q.   Paragraph 120, it says:  "These deceptive

5  representations and omissions caused individuals

6  such as plaintiff and members of the class acting

7  reasonably under the circumstance to enroll at Saba

8  when they otherwise would not have."

9        You don't actually know why class

10  members decided to enroll at Saba, do you?

11        MR. EGAN:  Objection to form.

12    A.   No.  I also want to state that I do know

13  that ███████ did see some of these

14  advertisements as well.  That's something that we

15  discussed before.

16    Q.   Which ads did ████ see?

17    A.   I don't know.

18    Q.   Why did ████ choose to attend Saba?

19    A.   I don't know the final reason.

20    Q.   It's possible that class members could have

21  decided to attend Saba for reasons entirely

22  unrelated to Step 1, right?

23        MR. EGAN:  Objection.

24    A.   That's possible.

1      Q.  For example, they were paying more

2  attention to the residency placement, right?

3              MR. EGAN:  Objection to form.

4      A.  (Inaudible).

5      Q.  Perhaps they liked the geographic location

6  of Saba?

7              MR. EGAN:  Objection to form.

8      A.  It's possible.

9      Q.  Some students go to the school because

10  perhaps their family member attended or a friend

11  attended, right?

12             MR. EGAN:  Objection.

13     A.  I don't know.

14     Q.  Did Saba University have students that were

15  not from the United States?

16     A.  Yes.

17     Q.  Would students that did not intend to ever

18  work in the United States be concerned with the

19  USMLE?

20             MR. EGAN:  Objection to form.

21     A.  Yes.

22     Q.  Why is that?

23     A.  Because they are still required to take it

24  to get a license from Saba, from my understanding.

1    Q.   Even if they don't intend to practice in

2    the United States?

3              MR. EGAN:   Objection to form.

4    A.   Correct.

5    Q.   And what is that information based on?

6    A.   I believe it is because to get -- I just

7    lost my brain.  I believe to do rotations the

8    rotations are only in the United States, and in

9    order to do those you have to take USMLE Step 1.  So

10   I think that's the situation.

11   Q.   Step 2 wouldn't be required in that

12   circumstance.

13   A.   I don't know.

14   Q.   Step 2 follows rotations?

15   A.   I'm not sure what Step 2 follows.

16   Q.   Did your uncle or cousins who studied in

17   Colombia take the USMLE?

18   A.   Not that I'm aware of.

19   Q.   I want to go back to the interrogatories

20   for a moment.  In particular I would like to point

21   your attention to Interrogatory Number 2 and the

22   answer to it.  The interrogatory asks you to

23   identify each known putative class member in this

24   case.  And there's a supplemental response on the

 1    next page that identifies ██████████, I believe

 2    her name is.  The spelling is ████████.  Who is

 3    ██████████?

 4        A.  I don't know.  I made a mistake here.  I'm

 5    not sure if ██████ graduated or not.  She attended

 6    Saba but I don't keep in contact with her.

 7        Q.  So is the mistake that she potentially

 8    graduated and wouldn't be a part of the class?

 9        A.  Correct.

10        Q.  How did you meet ██████

11        A.  She was in my cohort, my original cohort.

12        Q.  So if she in fact graduated --

13            (Phone rings.)

14        Q.  If Ms. ██████ indeed graduated, she

15    wouldn't be a member of the class because she wasn't

16    damaged?

17        A.  Correct.

18            MR. EGAN:  Objection.

19        Q.  Where does ██████████ live now?

20        A.  I don't know.

21        Q.  Who is ████████?

22        A.  I'm going to say the same mistake with ██████

23    ██████.  I don't know if he graduated or not.

24        Q.  So you don't know what his current status

```
 1   is with respect to Saba?
 2        A.   Correct.
 3        Q.   What about ███████████?
 4        A.   That I made a definite mistake.   She
 5   recently graduated.
 6        Q.   What about ████████████, who is she?
 7        A.   She's a friend from Saba.
 8        Q.   What is her current status at Saba?
 9        A.   She is no longer at Saba.
10        Q.   Did she withdraw or was she dismissed?
11        A.   She withdrew.
12        Q.   And do you know why she withdrew?
13        A.   I'm sorry.   I believe that's not the
14   correct term I should be using.   She transferred to
15   AUA.   I don't know if that's the school that's in
16   St. Martin that she transferred to.
17        Q.   AUA?
18        A.   I believe that's the one in St. Martin.
19        Q.   Have you spoken with her since she
20   transferred?
21        A.   Yes.
22        Q.   Was she able to transfer her credits to
23   AUA?
24        A.   Not all of them.
```

1      Q.   Some of them?

2      A.   Yes.

3      Q.   Do you know which credits transferred?

4      A.   No.

5      Q.   We talked about ███████ ███████ who is listed

6  here.  Was Mr. ██████ a good student?

7      A.   I believe so.

8      Q.   What were his grades like?

9      A.   I don't know.

10     Q.   Did he fail any courses at Saba?

11     A.   Yes.

12     Q.   Which ones?

13     A.   I don't know.

14          (Discussion off the record.)

15     Q.   Did Mr. ██████ fail the comprehensive exam?

16          MR. EGAN:  Objection to form.

17     A.   I'm sorry.  For the last question, I do

18  know that they failed Foundations of Clinical

19  Medicine.  But I don't know what other courses he

20  failed.  And he did not pass the comp.

21     Q.   Where is Mr. ██████ now?

22     A.   I'm not sure he transferred or he -- I

23  don't know if he transferred or he spoke to another

24  university but he's at another Caribbean university.

1  It might be Xavier.

2      Q.  So he's enrolled at another school?

3      A.  Correct.

4      Q.  Was he able to transfer his credits from

5  Saba?

6      A.  Yes.

7      Q.  So we talked about transferring credits

8  earlier.  At a minimum, it's possible to transfer at

9  least some of Saba's credits to other Caribbean

10  schools, other schools in the Caribbean, right,

11  based on your experience with Ms. Richmond and

12  ███████████

13      A.  Based on their experiences, they were able

14  to do it because of their particular circumstances,

15  but I don't know if that's true to everyone.

16      Q.  What were their particular circumstances?

17      A.  I have understood that ████ did pass, she

18  passed that one, but because she felt that there was

19  some racism within the institution and unfairness

20  she decided to transfer, and she was able to do it

21  because she did pass that one.  So the other school

22  allowed her to, I believe, repeat fifth semester and

23  then take Step 1 again.  I'm sorry.  I don't know if

24  she took Step 1 or passed comp.  I'm not sure.

```
 1        Q.   ████████  did not pass Foundations of
 2   Clinical Medicine at Saba, correct?
 3        A.   He did not pass, yeah, he did not pass.
 4        Q.   And he was still able to transfer to his
 5   current university?
 6        A.   Correct.
 7        Q.   And so ████████ and ████████, do they
 8   each currently reside somewhere in the Caribbean?
 9        A.   No.
10        Q.   Where do they reside?
11        A.   ██████ I don't know where she's at right
12   now.  And ██████ is I believe in Chicago at the
13   moment.
14        Q.   Do you know if any class members reside in
15   Massachusetts?
16        A.   No.
17        Q.   For all these folks that we just discussed,
18   do you know what Step 1 advertisements from Saba
19   they saw?
20        A.   No.
21        Q.   For any of these class members or potential
22   class members that we just discussed, do you have
23   any idea what their damages would be?
24             MR. EGAN:  Objection to form.
```

```
 1        A.   No.
 2        Q.   Do you know if you could have transferred
 3   to another medical school when you were initially
 4   dismissed in 2022?
 5        A.   No.
 6        Q.   Did you ever try to look into that?
 7        A.   No.
 8        Q.   For all these students that we just
 9   discussed, do you know whether they had student
10   loans?
11        A.   I do not know.
12        Q.   Do you know whether any of them received
13   scholarships from Saba?
14        A.   I do not know.
15        Q.   Do you know what any of their housing
16   expenses were?
17        A.   I do not know.
18        Q.   Just so make sure I understand before I
19   move on, ███████████████, you're not sure if she
20   graduated or not.
21        A.   Correct.
22        Q.   ██████████████, you're not sure whether he
23   graduated?
24        A.   Correct.
```

```
 1        Q.   ███████████, you're not sure?

 2        A.   She did graduate.

 3        Q.   She did graduate.  ████████████

 4   transferred?

 5        A.   Correct.

 6        Q.   Voluntarily?

 7        A.   Yes.

 8        Q.   ██████████ was dismissed and then

 9   transferred?

10        A.   Correct.  And I never finished answering

11   about ███████ particular circumstances, why he was

12   able to transfer.  I don't know the details of

13   anything, but I have it understood that it's because

14   he wasn't -- he started Saba the semester before me

15   and there were different rules during the time.  So

16   I think he was able to work around that or find a

17   loophole through that, but I'm not sure.

18        Q.   If he was dismissed from Saba, how would

19   their rules have any impact on where he was able to

20   transfer?

21        A.   Like I said, I don't know.

22        Q.   Do you think that every Saba student should

23   be allowed to take USMLE Step 1?

24        A.   No.
```

1                    MR. EGAN:  Objection.

2        A.  Can we define contract?

3        Q.  Sure.  A written agreement between Saba and

4   yourself.

5        A.  No.

6        Q.  Why not?

7        A.  Because a written agreement states that, to

8   me personally, a written agreement is something that

9   is basically kind of final, but I have it understood

10  that in the handbook it says that they are allowed

11  to make changes if they wish.  So that's not a

12  contract in my opinion.

13       Q.  What about the OER document that we looked

14  at, is that part of a contractual relationship?

15                   MR. EGAN:  Objection.

16       A.  Can I look at that again?

17       Q.  Sure.

18       A.  Which exhibit was it?

19       Q.  16.

20       A.  No.

21       Q.  And why not?

22       A.  Because I haven't seen this ever.

23                   MR. EVANS:  Let's take a short break.  I

24  might be just about done here.  I want to review my

```
 1   notes.
 2                 THE VIDEOGRAPHER:  The time is 3:41.  We
 3   are off the record.
 4                 (A recess was taken.)
 5                 THE VIDEOGRAPHER:  We are back on the
 6   record.  The time is 3:51.
 7       Q.  Just a few more questions.  Earlier we
 8   talked about the way in which financial aid was
 9   distributed.  Do you remember that?
10       A.  Yes.
11       Q.  And we discussed that financial aid goes
12   first to the university and then the rest goes to
13   the students.
14                 With respect to your financial aid
15   specifically, did you receive those refunds or those
16   overages after Saba received the funds for the
17   tuition?
18       A.  Yes.
19       Q.  And what did you do with those sums of
20   money?
21       A.  I paid for my housing; my transportation on
22   Saba, my transportation to Saba, the island; my
23   school resources; and my food, necessities.
24       Q.  We talked about your communications with
```

1       ████████.  To your knowledge, have your lawyers

2  spoken with ████████?

3       A.  Yes.

4       Q.  And when did they speak?

5       A.  I don't know.

6       Q.  What did they speak about?

7       A.  I do not know.

8       Q.  How do you know that they spoke?

9       A.  Because ██████ reached out to Student

10 Defense first.

11      Q.  As did you, correct?

12      A.  David reached out to Student Defense.  And

13 I don't remember -- no, he spoke to me afterwards

14 letting me know kind of the situation and asked me

15 if I wanted to speak to them too, and I said yes and

16 then Student Defense reached out to me.

17      Q.  So when you say your lawyers spoke to ██████

18 ██████, are you referring to the lawyers at Student

19 Defense?

20      A.  Correct.

21      Q.  And just to clarify a point that we

22 discussed earlier, the lawyers at Student Defense

23 helped you file your borrower defense application?

24              MR. EGAN:  Objection to form.

```
 1        A.   No.

 2        Q.   I'm sorry, what was your answer?

 3        A.   No.

 4        Q.   They did not help you file it?

 5        A.   They did not help me file it.

 6        Q.   But they assisted you with preparing the

 7   application?

 8             MR. EGAN:   Objection.

 9        A.   No.

10        Q.   You prepared the application on your own?

11        A.   Correct.

12        Q.   How did you learn about the borrower

13   assistance application?

14        A.   Student Defense.

15        Q.   What did you learn from Student Defense

16   about that?

17        A.   The borrower application, I don't remember

18   if I was asked whether I filed it or it was

19   mentioned and I asked what that is.  But when it was

20   mentioned, I asked what that is.  And then I was

21   told that --

22             MR. EGAN:   Let me stop you there.  You

23   can't disclose conversations with your attorneys.

24             MR. EVANS:   I don't think the
```