# EXHIBIT  1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No. 1:22-cv-1919** |
| Plaintiff, | |
| v. | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF** |
| Human Resource Development Services, Inc., a corporation, also d/b/a Saint James School of Medicine and HRDS, | |
| Delta Financial Solutions, Inc., a corporation, and | |
| KAUSHIK GUHA, individually and as an officer of Human Resource Development Services, Inc. also d/b/a Saint James School of Medicine, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105; the Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses ("Holder Rule"), 16 C.F.R. Part 433; and the FTC's Trade Regulation Rule Concerning Credit Practices ("Credit Practices Rule"), 16 C.F.R. § 444, which authorize the FTC to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule

1

("TSR"), 16 C.F.R. Part 310, the Holder Rule, and the Credit Practices Rule, in connection with their deceptive marketing and sale of educational services.

## SUMMARY OF CASE

2.     Defendants operate a for-profit medical school in the Caribbean called Saint James School of Medicine ("SJSM") from their offices in Illinois.   Defendants market enrollment at their Caribbean medical schools primarily to consumers from the United States; they state that 68.64% of the student body are American citizens.   SJSM brochures provide a demographic breakdown of the student body and state that 60% of SJSM students are African American, Asian, or Hispanic or Latino.

3.     Since at least April 1, 2018, Defendants have convinced consumers to enroll in SJSM with phony assurances regarding success on a standardized test and students' job prospects.   Namely, Defendants lure consumers with false guarantees of student success at passing a critical medical school standardized test, the USMLE Step 1 Exam ("USMLE"). Defendants also make false or unsubstantiated representations regarding potential students' likelihood of matching into residency programs upon graduation from SJSM.

4.     Defendants also market financing for their tuition and living expenses used for attending Defendants' classes.   Defendants' financing contracts contain language attempting to waive consumers' rights under federal law and omit legally-mandated disclosures.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

2

6.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.   15 U.S.C. §§ 41–58.   The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the TSR, which prohibits abusive and deceptive telemarketing acts or practices, as well as the Holder Rule and Credit Practices Rule, which prohibit certain practices in connection with extending credit to consumers.

## DEFENDANTS

8.    Human Resource Development Services, Inc., also d/b/a Saint James School of Medicine and HRDS ("HRDS") is an Illinois corporation with a principal address of 1480 Renaissance Drive, Suite 300, Park Ridge, Illinois 60068.   HRDS transacts or has transacted business in this District and throughout the United States.   At all times relevant to this Complaint, acting alone or in concert with others, HRDS has advertised, marketed, distributed, or sold education services including enrollment in medical school to consumers throughout the United States.

9.    Delta Financial Solutions, Inc. ("Delta") is an Illinois corporation with a principal address of 1480 Renaissance Drive, Suite 300, Park Ridge, Illinois 60068.   Delta transacts or has transacted business in this District and throughout the United States.   Delta provides financing exclusively for Saint James Medical School students.   At all times relevant to this

Complaint, acting alone or in concert with others, Delta has advertised, marketed, distributed, or sold education services including enrollment in medical school to consumers throughout the United States.

10.     Defendant Kaushik Guha is the Executive Vice President of Operations of HRDS. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of HRDS and Delta, set forth in this Complaint.   Defendant Guha is responsible for strategic direction and marketing approvals for HRDS advertising campaigns.   Defendant Guha oversees the daily operations of the Renaissance Drive offices and the Caribbean medical school campuses.   He is responsible for the school's accreditation and finance departments.   He resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

11.     Defendants HRDS and Delta (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.   Corporate Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, employees, and office locations.   Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

4

## COMMERCE

12.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

13.     Defendants operate Saint James School of Medicine ("SJSM"), a private, for-profit medical school, which has two campuses in the Caribbean – one in Anguilla and one in St. Vincent.   Defendants describe themselves as a lower-cost alternative to American medical schools: "Receive the same high-quality medical education and opportunities as US and Canadian medical schools."

14.      Defendants' curriculum is comprised of ten trimesters over the course of four years for each student.   Defendants charge consumers tuition ranging from about $6,650 to $9,859 per trimester (depending on campus and course study).   Between 2016 and 2020, Defendants have had approximately 1,300 students enrolled in their schools each year.

15.     Defendants advertise SJSM via the Internet and email marketing.   They have also advertised via radio and television.   Defendants have purchased lead contact information for consumers who have taken the MCAT examination.   Defendants both respond to incoming calls and place outgoing telephone calls to contact potential students and conduct a sales pitch for SJSM enrollment.   Defendants utilize high-pressure sales tactics to persuade consumers to pay a $55 application fee, a $1,000 reservation fee, and enroll.   SJSM telemarketers are instructed to try to collect the reservation fee during the telemarketing call itself, even telling consumers that they have 48 hours to pay the fee or risk losing their spot at the school.   SJSM telemarketers are

compensated based on the number of consumers they convince to pay reservation fees for SJSM, and those that ultimately enroll. Defendants also hold open houses at hotels around the United States to induce enrollment.

16.     Prior to enrollment, SJSM telemarketers inform consumers that they can finance their tuition and living expenses through Defendant Delta. SJSM telemarketers do not disclose that Delta is affiliated with SJSM, nor do they disclose that the entities are owned by the same person.

17.     Defendants make false and unsubstantiated representations in their marketing about SJSM and a student's likelihood of success and use credit contracts that violate the law.

## Medical License Exam Pass Rate Misrepresentations

18.     The U.S. Medical License Exam ("USMLE") is a standard medical school examination that has three parts or "Steps." Medical students are eligible to take the USMLE Step 1 exam after they complete their basic science courses, typically after five semesters. There is no prerequisite test required to take the USMLE Step 1 exam. At U.S. and Canadian medical schools, 98% of first time USMLE Step 1 test takers in 2020 passed the exam.[1]

19.     In their sales calls, presentations, and marketing materials, Defendants represent that the first time USMLE Step 1 pass rate for SJSM students is very high. For example, Defendants distribute a brochure at their open houses that states: "96.77% FIRST TIME USMLE STEP 1 PASS RATE" and "ST JAMES IS THE FIRST AND ONLY MEDICAL SCHOOL TO OFFER A USMLE STEP 1 PASS GUARANTEE." During an open house, the presenter echoed this claim by stating that SJSM had a "USMLE Step 1 pass rate of 97%" in the preceding

---

[1] *See* https://www.usmle.org/performance-data/default.aspx#2020_step-1.

year and "96% pass rate for the USMLE Step 2." HRDS admissions staff have claimed to consumers that SJSM has a "94% first time pass rate." PowerPoint slides from Defendants' open house presentation also refer to the "USMLE Step 1 Guarantee."

20. In fact, the USMLE pass rate is lower than touted, and lower than that reported by U.S. and Canadian medical schools. Since 2017, only 35% of Saint James students who have completed the necessary coursework to take the USMLE Step 1 exam passed the test. Defendants allow only students that first pass a National Board of Medical Examiners ("NBME") practice exam, and meet other criteria, to take the USMLE Step 1 exam. They disclose this fact in inconspicuous places on their website and in the middle of a student handbook provided only after payment of reservation fees, but do not mention it when touting the purported high USMLE Step 1 exam rate or otherwise bring it to consumers' attention. Even when limiting the pool to those who meet Defendants' undisclosed or inadequately disclosed criteria, the rate is lower than advertised. Defendants are unable to provide a reasonable basis for the statement that the first time USMLE Step 1 pass rate for SJSM students is 94% or higher.

21. The first time USMLE Step 1 pass rate is a material fact for consumers. Consumers routinely questioned HRDS admissions staff about the first time USMLE Step 1 pass rates for SJSM students. If consumers knew that the pass rate for SJSM students was lower than advertised, then it would likely affect their conduct, including whether to attend SJSM.

**Residency Match Rate Misrepresentations**

22. Medical schools typically participate in a program that matches medical school

seniors with residency programs in the United States.   The matching is conducted by an organization called the "National Resident Matching Program" ("NRMP").   NRMP describes the residency matching program as beginning for students "in the fall during the final year of medical school, when they apply to the residency programs of their choice.   Throughout the fall and early winter, applicants interview with programs.   From mid-January to late February, applicants and program directors rank each other in order of preference and submit the preference lists to NRMP, which processes them using a computerized mathematical algorithm to match applicants with programs."[2]   For example, the NRMP website has reports on historic and 2020 residency match rates: "For U.S. MD seniors, the match rate was 93.9, within the historical 92-94 percent match rate."[3]

23.     In their sales calls, presentations, and marketing materials, Defendants tout SJSM students' residency match rates and advertise the SJSM educational opportunities as "the same" as American medical schools.   For example, Defendants' telemarketers are instructed to tell consumers the match rate for SJSM students is 85-90%.   Defendants' advertising brochure promotes a "high match rate" and their slides include a photograph of apparent students posing with signs that read "I MATCHED" and a slide listing more than thirty hospitals across the United States under the heading "WHERE WILL YOU GO? YOU CHOOSE."   Defendants have stated on their website that the residency match rate for SJSM students is 83%.

24.     In fact, the match rate for SJSM students is lower than touted, and lower than that reported by U.S. medical schools.   Since 2018, Defendants' average match rate has been 63%.

---

[2] *See* https://www.nrmp.org/2021-press-release-delivers-strong-residency-match-2/.

[3] *See*
https://www.nrmp.org/press-release-mrm-results-and-data-2020/#:~:text=The%20PGY%2D1%2

Defendants are unable to provide a reasonable basis for the statement that the residency match rate for SJSM students is 83% or higher.

25. Residency match rates are material to consumers who, during the admissions process, routinely ask questions about residency matching. Defendants include match rate representations on their "FAQs" website, indicating this information is relevant to consumers' selection of a school. If consumers knew that the residency match rate was lower than advertised, or that Defendants' residency match rate included people who graduated years beforehand, it would likely affect their conduct, including whether to attend SJSM.

**Use of Illegal Credit Contracts**

26. Defendants do not provide a legally mandated Holder Rule notice in their credit agreements or Credit Practices Rule disclosure in connection with their credit agreements.

27. The Holder Rule requires any seller that receives the proceeds of a purchase money loan to include, in the underlying credit contract, a specific notice informing the consumer of their right to assert claims against any holder of the credit contract. Defendants fail to do so. Instead, they include a notice in the application, which differs from the language required by the Holder Rule and is prefaced by this qualifier: "If the school is considered to be a business subject to the Federal Trade Commission rules, then the following notice applies."

28. Defendants not only fail to include the required notice in their credit agreements, but attempt to waive consumers' legal rights by including the following language in the credit agreement: "ALL PARTIES, INCLDING BOTH STUDENT BORROWER AND COSIGNER .

---

[0match%20rate,1.77%2C%20the%20highest%20since%201976.](0match%20rate,1.77%2C%20the%20highest%20since%201976.)

9

. . WAIVE ANY CLAIM OR CAUSE OF ACTION OF ANY KIND WHATSOEVER THAT
THEY MAY HAVE WITH RESPECT TO SAINT JAMES SCHOOL . . . "

29.     Separately, the Credit Practices Rule requires that every creditor that extends
credit to consumers must inform cosigners of their liability prior to obligating the cosigner, in a
separate document using specific language.

30.     Defendants' credit agreement contains a cosigner notice not in a separate
document, but in the middle of a contract.   Further, Defendants' notice fails to include the
specific language required by the Credit Practices Rule.

31.     Based on the facts and violations of law alleged in this Complaint, the FTC has
reason to believe that Defendants are violating or are about to violate laws enforced by the
Commission because their business is ongoing and their websites and telemarketing lines appear
active as of the date of filing this Complaint.

## VIOLATIONS OF THE FTC ACT

32.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts
or practices in or affecting commerce."

33.     Misrepresentations or deceptive omissions of material fact constitute deceptive
acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

34.     In numerous instances in connection with the advertising, marketing, promotion,
offering for sale, or sale of educational services, including through the means described in
Paragraphs 15–31, Defendants represent, directly or indirectly, expressly or by implication, that:

10

    A.      SJSM students have a first time pass rate of greater than 93% for the USMLE Step 1 Exam; and

    B.      More than 83% of SJSM students are matched with a medical residency program.

35.     The representations set forth in Paragraph 34 are false or misleading or were not substantiated at the time the representations were made.

36.     Therefore, the making of the representations as set forth in Paragraph 34 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

37.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

38.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

39.     It is a deceptive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to misrepresent, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

40.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an

unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

41.     In numerous instances, in connection with the telemarketing of educational services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of their services, including, but not limited to that:

>     A.     SJSM students have a first time pass rate of greater than 93% for the
>     USMLE Step 1 Exam; and
>
>     B.     More than 83% of SJSM students upon graduation are matched with a
>     medical residency program.

42.     Therefore, Defendants' acts or practices as set forth in Paragraph 41 violate Section 3103(a)(2)(iii) of the TSR. 16 C.F.R. § 310.3(a)(2)(iii).

## <u>VIOLATIONS OF THE HOLDER RULE</u>

43.     The Holder Rule, promulgated by the Commission under Section 18 of the FTC Act, 15 U.S.C. § 57a, became effective in its entirety on May 14, 1976, and since that date has remained in full force and effect.

44.     "Creditor" means a person who, in the ordinary course of business, lends purchase money or finances the sale of goods or services to consumers on a deferred payment basis; provided, such person is not acting, for the purposes of a particular transaction, in the capacity of a credit card issuer.   16 C.F.R. § 433.1(c).   Defendant Delta is a "creditor" as defined in the Holder Rule because it lends purchase money or finances the sale of goods or services to

consumers on a deferred payment basis in the ordinary course of business.

45.     "Seller" means a person who, in the ordinary course of business, sells or leases goods or services to consumers.   16 C.F.R. § 433.1(j).   Defendant HRDS is a "seller" as defined in the Holder Rule because it sells goods or services to consumers in the ordinary course of business.

46.     "Purchase money loan" means a cash advance which is received by a consumer in return for a "Finance Charge" within the meaning of the Truth in Lending Act and Regulation Z, which is applied, in whole or substantial part, to a purchase of goods or services from a seller who (1) refers consumers to the creditor or (2) is affiliated with the creditor by common control, contract, or business arrangement.   16 C.F.R. § 433.1(d).   Defendant Delta offers purchase money loans to consumers, the proceeds of which consumers use to purchase goods or services from Defendant HRDS.   Defendant HRDS refers consumers to Defendant Delta and is affiliated with Defendant Delta by common control, contract, or business arrangement

47.     The Holder Rule prohibits sellers from accepting, as full or partial payment for such sale or lease, the proceeds of any purchase money loan, unless the consumer credit contract made in connection with such purchase money loan contains the following provision in at least ten point, bold face type:

NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

16 C.F.R. § 433.2(b).

48.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

the Holder Rule constitutes an unfair or deceptive act or practice in violation of Section 5(a)(1)

of the FTC Act, 15 U.S.C. § 45(a)(1).

### Count III

49.     In numerous instances, in connection with the selling or offering for sale of goods

services to consumers in or affecting commerce, as "commerce" is defined in Section 4 of the

FTC Act, 15 U.S.C. § 44, Defendants have violated the Holder Rule by accepting the proceeds of

purchase money loans, without the consumer credit contracts made in connection with such

purchase money loans containing the Notice set forth in Paragraph 49, as required by 16 C.F.R. §

433.2(a).

### VIOLATIONS OF THE CREDIT PRACTICES RULE

50.     The Credit Practices Rule promulgated by the FTC under Section 18 of the FTC

Act, 15 U.S.C. § 57a, became effective on March 1, 1985, and has remained in full force and

effect since that date.

51.     Defendants are "lender[s]" as that term is defined in the Credit Practices Rule, 16

C.F.R. § 444.1(a).

52.     The Credit Practices Rule prohibits lenders, in connection with the extension of

credit to consumers, from obligating a cosigner unless the cosigner is informed prior to

becoming obligated of the nature of his or her liability as cosigner.   16 C.F.R. § 444.3(a)(2).

53.     Section 444.3 of the Credit Practices Rule requires that every lender that extends

credit to consumers must inform cosigners of their liability prior to obligating the cosigner.   16

C.F.R. § 444.3(a)(2).   This disclosure must be presented in a separate document and contain the

following statement and no other, as detailed in 16 C.F.R. § 444.3(c):

#### NOTICE TO COSIGNER

14

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of *your* credit record.

This notice is not the contract that makes you liable for the debt.

54.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Credit Practices Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV

55.    In numerous instances, in connection with the extension of credit to consumers, Defendants have failed to present cosigners with a separate document that contains the disclosure statement detailed in 16 C.F.R. § 444.3(c).

56.    Under 16 C.F.R. § 444.3(a)(2), the acts and practices alleged in Paragraph 57 constitute unfair acts and practices in violation of the FTC Act.

## CONSUMER INJURY

57.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, the Holder Rule, and the Credit Practices Rule.   Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

15

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, the Holder Rule, and the Credit Practices Rule;

B.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

C.    Award monetary and other relief within the Court's power to grant; and

D.    Award any additional relief as the Court may determine to be just and proper.


                                      Respectfully submitted,


Dated:  April 14, 2022

                                      QUINN MARTIN
                                      K. MICHELLE GRAJALES
                                      Federal Trade Commission
                                      600 Pennsylvania Ave., NW
                                      Mail Stop: CC-10232
                                      Washington, DC  20580
                                      (202) 326-2080, 3172


                                      JAMES DAVIS, Local Counsel
                                      Federal Trade Commission
                                      Midwest Region
                                      230 South Dearborn Street, Room 3030 Chicago, IL 60604
                                      jdavis@ftc.gov
                                      (312) 960-5596


                                      Attorneys for Plaintiff
                                      FEDERAL TRADE COMMISSION