## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons,** | ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| **v.** | ) ) ) | **1:23-cv-12002-WGY** **CLASS ACTION** |
| | ) ) | |
| **SABA UNIVERSITY SCHOOL OF MEDICINE AND R3 EDUCATION, INC.,** | ) ) ) | |
| *Defendants.* | ) ) ) | |

### PLAINTIFF NATALIA ORTIZ'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION

MAYNARD NEXSEN PC
Margaret M. Siller (admitted *pro hac vice*)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

John R. Alford, Jr. (admitted *pro hac vice*)
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1847
jalfordjr@maynardnexsen.com

BERMAN TABACCO
Patrick T. Egan (BBO #637477)
Christina L. Gregg (BBO#709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cgregg@bermantabacco.com

NATIONAL STUDENT LEGAL DEFENSE NETWORK
Alexander S. Elson (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org

*Counsel for Plaintiff Natalia Ortiz and the Proposed Class*

## <u>TABLE OF CONTENTS</u>

STATEMENT OF ADDITIONAL FACTS ................................................................................ 1

ARGUMENT ......................................................................................................................... 4

   I.    CHAPTER 93A GOVERNS THE CLAIMS OF THE CLASS .......................................... 4

  II.    PLAINTIFF'S DAMAGES THEORY IS WORKABLE ON A CLASS BASIS ............... 9

    A.  Plaintiff Presents a Cognizable Damages Theory ............................................................ 9

    B.  There is a Causal Connection Between Saba's USMLE Representations and the Injuries
       to Plaintiff and the Class .............................................................................................. 13

  III.    THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23 ................. 17

CONCLUSION .................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Amchem Prod., Inc. v. Windsor,*
521 U.S. 591 (1997) ........................................................................................... 19

*Bezdek v. Vibram USA,*
79 F. Supp. 3d 324 (D. Mass. 2015) .................................................................. 6, 8

*Boos v. Abbott,*
925 F. Supp. 49 (D. Mass. 1996) ......................................................................... 4

*Bushkin Assocs., Inc. v. Raytheon Co.,*
473 N.E.2d 662 (Mass. 1985) ............................................................................... 5

*Camey v. Force Factor,*
2016 WL 10998440 (D. Mass. May 16, 2016) ....................................................... 8

*Catalan-Aguilar v. R3 Educ., Inc.,*
2015 WL 6043598 (D. Mass. Oct. 15, 2015) ........................................................ 6

*Clark v. Capital Vision Servs.,*
2024 WL 3458525 (D. Mass. July 18, 2024) ...................................................... 11

*Com. v. Fall River Mtr. Sales,*
565 N.E.2d 1205 (Mass. 1991) ........................................................................... 11

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ............................................................................................. 10

*Conway v. Planet Fitness Holdings,*
189 N.E.3d 675 (Mass. App. Ct. 2022) ................................................................ 5

*Costa v. FCA US,*
2022 WL 18910359 (D. Mass. Sept. 30, 2022) ..................................................... 8

*Cristostomo v. New Balance Athletics,*
647 F. Supp. 3d 1 (D. Mass. 2022) .................................................................. 4, 7

*DeVry Educ. Grp.,*
2016 WL 684950 (C.D. Cal. Jan. 27, 2016) ....................................................... 11

*Drakopoulos v. U.S. Bank Nat. Ass'n,*
991 N.E.2d 1086 (Mass. 2013) ............................................................................. 9

*Eldridge v. Provident Cos.*,
    2000 WL 289640 (Mass. Super. Mar. 6, 2000) ..................................................... 6, 7

*F.T.C. v. Figgie Int'l, Inc.*,
    994 F.2d 595 (9th Cir. 1993) ................................................................... 12, 13

*F.T.C. v. Ivy Capital*,
    2013 WL 1224613 (D. Nev. 2013) ............................................................... 10

*F.T.C. v. Trudeau*,
    579 F.3d 754 (7th Cir. 2009) ................................................................... 12, 18

*Fed. Home Loan Bank of Bos. v. Ally Fin.*,
    2013 WL 5466628 (D. Mass. Sept. 30, 2013) ................................................. 7

*Feeney v. Dell Inc.*,
    908 N.E.2d 753 (Mass. 2009) ..................................................................... 8

*Foisie v. Worcester Polytechnic Inst.*,
    967 F.3d 27 (1st Cir. 2020) ......................................................................... 5

*Geis v. Nestlé Waters N. Am.*,
    321 F. Supp. 3d 230 (D. Mass. 2018) ......................................................... 5, 7

*Grace v. Perception*,
    128 F.R.D. 165 (D. Mass. 1989) ................................................................. 7

*Holbrook v. Bos. Sci. Corp.*,
    487 F. Supp. 3d 100 (D. Mass. 2020) ......................................................... 7, 9

*Holt v. FoodState, Inc.*,
    2018 WL 11319513 (D.N.H. Dec. 20, 2018) ............................................... 6

*Idrees v. American Univ. of the Caribbean*,
    546 F. Supp. 1342 (S.D.N.Y. 1982) ........................................................... 10

*In re Celexa and Lexapro Marketing*,
    65 F. Supp. 3d 283 (D. Mass. 2014) ........................................................... 8

*In re M3 Power Razor*,
    70 F.R.D. 45 (D. Mass. 2010). ................................................................... 6, 14, 16

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mass. 2003) ................................................................. 20

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004) ................................................................. 7

*In re Relafen Antitrust Litig.*,
  225 F.R.D. 14 (D. Mass. 2004) ................................................................. 6

*In re Suffolk Univ. Covid Refund Litig.*,
  2022 WL 6819485 (D. Mass. Oct. 11, 2022) ........................................... 20

*In re Zurn Pex Plumbing*,
  267 F.R.D. 549 (D. Minn. 2010) ............................................................. 20

*Killian v. Pacific Educ. Servs.*,
  2007 WL 1303023 (D. Haw., May 3, 2007) ............................................ 10

*Kimball Laundry Co. v. United States*,
  338 U.S. 1 (1949) .................................................................................... 13

*Klairmont v. Gainsboro Rest.*,
  987 N.E.2d 1247 (Mass. 2013) ............................................................... 11

*Makaeff v. Trump Univ.*,
  309 F.R.D. 631 (S.D. Cal. 2015) ............................................................ 10

*McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*,
  775 F.3d 109 (1st Cir. 2014) .................................................................. 11

*McGregor v. Chierico*,
  206 F.3d 1378 (11th Cir. 2000) ........................................................ 12, 17

*Mowbray v. Waste Mgmt. Holdings*,
  189 F.R.D. 194 (D. Mass. 1999) ............................................................. 19

*Omori v. Brandeis Univ.*,
  673 F. Supp. 3d 21 (D. Mass 2023) .......................................................... 9

*Payne v. Goodyear Tire & Rubber*,
  216 F.R.D. 21 (D. Mass. 2003) ................................................................. 5

*Pride Hyundai v. Chrysler Fin.*,
  263 F. Supp. 2d 374 (D.R.I. 2003) ........................................................... 9

*Purity Supreme v. Att'y Gen.*,
  407 N.E.2d 297 (Mass. 1980) ................................................................... 9

*S. States Police Benev. Ass'n v. First Choice Armor & Equip.*,
  241 F.R.D. 85 (D. Mass. 2007) ................................................................. 8

*Shaulis v. Nordstrom*,
  865 F.3d 1 (1st Cir. 2017) ...................................................................... 14

*Shaw's Supermarkets v. Melendez*,
 173 N.E.3d 356 (Mass. 2021)............................................................................. 19

*Silva v. City of New Bedford*,
 602 F. Supp. 3d 186 (D. Mass. 2022).................................................................. 19

*Smilow v. Sw. Bell Mobile Sys.*,
 323 F.3d 32 (1st Cir. 2003)........................................................................... 18, 19

*State v. Minnesota Sch. of Bus., Inc.*,
 935 N.W.2d 124 (Minn. 2019)............................................................................ 17

*UBS Fin. Servs. v. Aliberti*,
 133 N.E.3d 277 (Mass. 2019)............................................................................... 9

*Vara v. DeVos*,
 2020 WL 3489679 (D. Mass. June 25, 2020)..................................................... 10

*Waithaka v. Amazon.com*,
 966 F.3d 10 (1st Cir. 2020)................................................................................... 8

*Williams v. DeVos*,
 2018 WL 5281741 (D. Mass. Oct. 24, 2018) ..................................................... 11

*Woode v. R3 Educ., Inc. d/b/a Saba Univ. Sch. of Med.*,
 No. 2381-CV-00982 (Mass. Super. Ct.) ............................................................... 6

## RULES

FED. R. CIV. P. 23 ....................................................................................................... 4

FED. R. CIV. P. 23(a)............................................................................................. 1, 17

FED. R. CIV. P. 23(b) ...............................................................................1, 18, 19, 20

## REGULATIONS

Institutional Eligibility under the Higher Education Act,
 87 Fed. Reg. 65,904 (Nov. 1, 2022) .................................................................. 13

## OTHER AUTHORITIES

2 NEWBERG ON CLASS ACTIONS § 4:57 (6th ed.).......................................................... 19

Plaintiff Natalia Ortiz ("Ms. Ortiz" or "Plaintiff"), on behalf of herself and those similarly situated, respectfully submits this Reply Memorandum of Law in Support of her Motion for Class Certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

## STATEMENT OF ADDITIONAL FACTS[1]

From their corporate headquarters in Massachusetts, Defendants devised and implemented a scheme to mislead and outright lie to prospective students about one of the most critical indicators of a medical school's quality—the percentage of students who pass Step 1 of the USMLE.

Defendants' USMLE passage rate representations are carefully crafted, reviewed, and approved by executive leadership at R3, including CEO Steven Rodger.[2] The focus of these representations—posted prominently across Defendants' digital footprint—is not just on the 97% to 100% passage rate, but also on that statistic's significance: that Saba's USMLE performance is "████████████████████████" and that the high rates are a testament to "████████ ████████████████"[3] Defendants' intense focus on USMLE rates is based on internal data showing that they are "████████████" for prospective students deciding whether to enroll.[4]

While promoting these high USMLE rates, Defendants also carefully tracked Saba's attrition data, which they used to calculate profitability, make revenue forecasts, and provide

---

[1]    This section incorporates some of the over 1,500 documents produced by Defendants after Plaintiff filed her opening brief that provide further factual support for Plaintiff's motion.

[2]    Ex. 1 to the Supplemental Declaration of Margaret M. Siller ("Siller Decl."), R3S00025713 ████████████████████████████████████████████████████████████████████ ); Ex. 2 to Siller Decl., R3S00025718-726 (Rodger edits USMLE representations for the website); Ex. 3 to Siller Decl., R3S00016284-85 (████████████████████████████); Ex. 4 to Siller Decl., R3S00016142-43 (Donahue edits representation that "virtually every Saba student passes the USMLE," and approves the language); Ex. 5 to Siller Decl., R3S00015842 (Donahue email regarding USMLE pass rates asking: "Do you want to continue to use these figures?" to which Rodger responds: "Yes, those figures need to be altered. They are not correct.").

[3]    Ex. 6 to Siller Decl., R3S00026499; Ex. 7 to Siller Decl., R3S00028831.

[4]    Ex. 8 to Siller Decl., R3S00024119; *see also* Ex. 9 to Siller Decl., R3S00016462-478 (████████████████████████████████████████████████████████████████ ).

updates to the board.[5] This data—closely held and guarded by only a few senior executives—reveals that Saba has long had a serious attrition problem that posed a "███████████"[6]

Although Defendants represented to this Court that Saba's attrition numbers are "both self-evident and easily ascertained," Doc. 16 at 5, the evidence tells a different story. Defendants did not disclose Saba's high attrition, opting to implement a coordinated campaign to conceal it from the public. R3's SVP of Marketing and Enrollment (Donald Donahue) made clear that "████████ ███████████████████████[7] and closely guarded even basic enrollment data because "███████████████████████████[8] In one email between marketing executives about how to answer questions from prospective students about Saba's "retention challenge," R3's director of enrollment for North America (Jennifer Bosco) explained: "We want to ensure we can respond to the question in a way that does not give too much

---

[5]    Ex. 10 to Siller Decl., R3S00022067-96 ████████████████████████ ██████████████████; Ex. 11 to Siller Decl., R3S00022097 at R3S00022101 (███████████████████); Ex. 12 to Siller Decl., R3S00022290 (██████████████████████████████ ████"); Ex. 13 to Siller Decl., R3S00022360 ██████████████████████████); Ex. 14 to Siller Decl., R3S00022280 ████████████████████ ████████████████████████"███████████████████████████████████████████").

[6]    Ex. 15 to Siller Decl., R3S00021920 ("██████████████████████); Ex. 16 to Siller Decl., R3S00022132 ("[O]ur retention is a challenge"); Ex. 17 to Siller Decl., R3S00012697 ("███████████████████████████ ██████████████"); Ex. 26 to Siller Decl., R3S00021829 (██████████████ █████████"); Ex. 18 to Siller Decl., R3S00022125 ███████████████████ ████); Ex. 19 to Siller Decl., R3S00030739 ███████████████████████████ ███████████████). Defendants have failed to produce sufficient data to calculate the attrition rate for the entire class period, but based on discovery to date, the attrition rate for certain cohorts appears to be over ██████ Ex. 20 to Siller Decl., R3S00022350 (██████████████████████████.

[7]    Ex. 22 to Siller Decl., R3S00012689.
[8]    Ex. 21 to Siller Decl., R3S00012685.

information and subsides the concern."[9] In another, R3's VP of Marketing (Melissa Kushner) asked: "Who has the ability to pull attrition rates based upon upcoming scores. I'm sure Patrick [Donnellan] and Steve [Rodger] have it, but will they share it?"[10] In response, R3's EVP for Marketing and Enrollment (Gerald Wargo) wrote: "Melissa – go ahead and ask. He may want to know why you want the info as I think they are trying to protect that number from getting out. I think it's really bad."[11]

To ensure that the truth did not leak, admissions staff were trained to dodge questions about attrition by stating that "it varies," that "█████████████████████████████" or that (despite Defendants' close tracking of attrition) the numbers were not available, and to pivot to topics like the USMLE passage rate or small class sizes.[12] Dozens of actual conversations with prospective students confirm that Defendants routinely misled or even outright lied to prospective students who simply wanted to know how many students made it through the program.[13] In fact, Plaintiff

---

[9]     Ex. 16 to Siller Decl., R3S00022132.
[10]    Ex. 23 to Siller Decl., R3S00021747.
[11]    Ex. 23 to Siller Decl., R3S00021747.
[12]    Ex. 24 to Siller Decl., R3S00012696 (stock response for attrition questions is "[i]t varies" followed by comments about Saba's small class size and giving students "constant feedback"); Ex. 25 to Siller Decl., R3S00012691 ████████████████████████████████████████████████████████████████████ ); Ex. 27 to Siller Decl., R3S00014445 ("What percentage of your students graduate" is answered with "[o]ur students do very well at Saba thanks to our small class sizes, one-on-one interaction with their professors and interactive systems-based curriculum . . .[H]owever there are some students, roughly 10%, who do not progress through their education due to academic reasons even with this support.").
[13]    Ex. 6 to Siller Decl., R3S00026499-500 ████████████████████████████████████████ ); Ex. 29 to Siller Decl., R3S00026497 ("████████████████████████████████████████████████████████████ ); Ex. 30 to Siller Decl., R3S00026543 ████████████████████████████████████████ "); Ex. 31 to Siller Decl., R3S00029159-161 (when a prospective student says he heard attrition was "around 40 percent," the response was that the attrition rate is "20-25%" and that the "numbers you are hearing or reading about on blogs are all hearsay from no school officials"); Ex. 32 to Siller Decl., R3S00026552 ("████████████████████████████████████████████████████ ).

has not located a single conversation in Defendants' production in which a prospective student asking about attrition was told the truth. Perhaps the only time that the truth was uncovered was by the Dutch Inspectorate of Education, who wrote in their notes from an online 2021 site visit with Rodger, Donnellan, and others that "████████████████████████████████ ████████████████"[14] However, this information was never made available to students.

## ARGUMENT[15]

Defendants contend that class certification is inappropriate for three principal reasons: (1) Chapter 93A cannot govern the claims of a nationwide class; (2) individualized damages assessments are necessary; and (3) class members cannot identify a causal connection between the USMLE Step 1 misrepresentations and their injuries. Each of these arguments is baseless. Because Saba devotes the majority of its opposition to these three arguments, Ms. Ortiz will address each one independently before discussing Saba's additional arguments regarding the Rule 23 factors—each of which also lack merit.

### I.   CHAPTER 93A GOVERNS THE CLAIMS OF THE CLASS

Defendants first argue that Massachusetts law cannot apply to out-of-state class members. Doc. 69 at 10–12. But Section 9 of Chapter 93A "provides sufficient basis for a nationwide claim against a Massachusetts company because it does not require a plaintiff to reside in Massachusetts or for the allegedly deceptive activity to have primarily and substantially occurred in Massachusetts." *Cristostomo v. New Balance Athletics*, 647 F. Supp. 3d 1, 14 (D. Mass. 2022).[16]

---

[14]  Ex. 33 to Siller Decl., R3S00026082.

[15]  Ms. Ortiz requests that the Court disregard "Appendix A" to Defendants' Opposition. Doc. 69 at 32. "Appendix A" is a transparent end-run around the Court's Order denying Defendants' motion for leave to file a brief of excess 30 pages. Doc. 65. Moreover, Defendants address more than twenty cases in Appendix A that are not otherwise cited in their opposition brief.

[16]  Indeed, the Massachusetts Legislature intended for Section 9 to be broadly available to all consumers, whether they reside in Massachusetts or not. *See Boos v. Abbott Lab'ys*, 925 F. Supp. 49, 55 (D. Mass. 1996) (describing 1979 amendment to Chapter 93A that removed the geographic limit on

Defendants also contend that choice of law principles *require* application of the law of each class member's home state, which would make certification unmanageable. Doc. 69 at 3–5.[17] But Defendants ignore the decisions of numerous Massachusetts courts that have reached the opposite conclusion under the required choice of law analysis.

"Massachusetts generally follows a functional approach to resolving choice of law questions on substantive matters, eschewing reliance on any particular choice-of-law doctrine." *Conway v. Planet Fitness Holdings*, 189 N.E.3d 675, 681 (Mass. App. Ct. 2022) (citation omitted). This "functional choice-of-law approach . . . responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 668 (Mass. 1985). Ultimately, "[r]egardless of the particular flavor of the underlying action, it is pellucid that Massachusetts would apply the law of the state with the 'most significant relationship' to the parties," and their dealings with each other. *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 41–42 (1st Cir. 2020).

Massachusetts has—by far—the most significant relationship to the parties. First, Saba and R3 chose to operate out of Massachusetts, are familiar with its laws, and, when they believe the Commonwealth benefits them, they seek its protection.[18] Moreover, from their headquarters in

---

consumer actions). For this reason, courts have consistently held that non-Massachusetts consumers may assert Chapter 93A claims. *See, e.g.*, *Geis v. Nestlé Waters N. Am.*, 321 F. Supp. 3d 230, 241 (D. Mass. 2018) ("[T]he Court declines to hold that Massachusetts residents are the only consumers who can bring chapter 93A actions, particularly when a consumer is harmed by a fraudulent statement that was made in Massachusetts.").

[17]   Even if laws of other states were implicated (and they are not), "defendants bear the burden to show that conflicts would defeat the class." *Payne v. Goodyear Tire & Rubber*, 216 F.R.D. 21, 27 (D. Mass. 2003); *see also id.* ("Ordinarily, the court need not even undertake a choice-of-law inquiry unless an actual conflict is demonstrated.").

[18]   For example, Defendants publicly tout that disputes regarding terms of use of its website "will be resolved in accordance with, the laws of Massachusetts, without regard to its conflicts of law provisions." *Terms of Service*, Saba University, https://www.saba.edu/terms-of-use. Although these terms of use do not control this dispute, they provide strong support for the application of 93A here. The terms of use show that, to the maximum extent possible, Defendants want the law of their home state—Massachusetts—to govern any claims asserted against them by users of Saba's website, wherever they happen to reside. Thus,

Massachusetts, Defendants: (i) crafted the misleading USMLE representations—down to the precise turn of phrase that would best sell their school—and posted them throughout Saba's online footprint; (ii) drafted training materials requiring admissions staff to evade questions about attrition; and (iii) misled and lied to countless prospective students seeking basic information about attrition. *See supra* p. 1–4; Doc. 1 ¶¶ 16, 17, 49. In addition, students, including Plaintiff, were required to send all checks and other tuition payments, to Defendants' headquarters in Massachusetts. Doc. 1 ¶ 47. No other state has such a connection to the issues in this case.

In similar circumstances, multiple courts have recognized the propriety of nationwide Chapter 93A class actions. *See, e.g.*, *Bezdek v. Vibram USA*, 79 F. Supp. 3d 324, 339, 343 (D. Mass. 2015), *aff'd*, 809 F.3d 78 (1st Cir. 2015) (certifying a nationwide class of consumers who purchased shoes based on misrepresentations of their benefits because "93A provides a serviceable and appropriate cause of action common to all class members" and "a consumer class action against a Massachusetts corporate defendant alleging misrepresentations made in advertising and promotional materials in violation of Chapter 93A . . . is superior to any other mechanism for adjudicating the case");[19] *In re M3 Power Razor*, 270 F.R.D. 45, 56 (D. Mass. 2010) (holding that "Chapter 93A . . . [was] available to all plaintiffs challenging alleged misrepresentations made during a North American marketing campaign by a Massachusetts corporate defendant"); *Eldridge*

---

applying 93A to the claims of every class member can come as no surprise to Defendants, and would seem to be in accord with their wishes and expectations. Moreover, in other cases, R3 appears to have conceded or otherwise accepted that Massachusetts law applies. *See Catalan-Aguilar v. R3 Educ., Inc.*, 2015 WL 6043598 (D. Mass. Oct. 15, 2015); Answer, *Woode v. R3 Educ., Inc. d/b/a Saba Univ. Sch. of Med.*, No. 2381-CV-00982 (Mass. Super. Ct.), Ex. 43 to Siller Decl., at 1.

[19]     Defendants wrongly imply that cases where classes were certified for settlement purposes lack persuasive value with respect to choice of law. *See* Doc. 69 at 11. This Court and numerous others have determined that choice of law considerations continue to apply with full force when settlement classes are certified. *See In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 22 (D. Mass. 2004) (Young, C.J.); *In re M3 Power Razor*, 270 F.R.D. at 57 (noting that various "Circuits have required a rigorous analysis of state law variation must precede class certification" in the settlement context); *Holt v. FoodState, Inc.*, 2018 WL 11319513, at *1–*2 (D.N.H. Dec. 20, 2018).

*v. Provident Cos.*, 2000 WL 289640, at \*3–\*6 (Mass. Super. Mar. 6, 2000) (applying 93A when certifying nationwide class against a Massachusetts insurance company).[20]

Massachusetts also has a considerable interest in applying 93A here. First, as this Court has explained, Massachusetts has a "'significant interest' in seeing a resident defendant . . . 'be held accountable for its conduct, which took place in Massachusetts, and which allegedly caused the plaintiff's injury.'" *Holbrook v. Bos. Sci. Corp.*, 487 F. Supp. 3d 100, 106 (D. Mass. 2020) (Young, J.) (citation omitted); *Fed. Home Loan Bank of Bos. v. Ally Fin.*, 2013 WL 5466628, at \*2 (D. Mass. Sept. 30, 2013) (applying Massachusetts choice of law rules in a case involving rating agencies' misrepresentations to find that, for "the sake of uniformity and predictability," the law of the state where the corporate defendant conducted its business should apply, "rather than the law of the various and numerous States to which the ratings ended up being disseminated.").[21] By contrast, the interest of states in which class members reside is "less compelling" where, as here, they have no defendants that face liability. *Holbrook*, 487 F. Supp. 3d at 106 (Young, J.).

Second, this Court has observed that a "primary aim . . . of consumer protection laws . . . is compensating consumers." *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 277 (D. Mass. 2004) (Young, C.J.). Uniform application of Chapter 93A to the entire class would best achieve this

---

[20]    *See also Cristostomo*, 647 F. Supp. 3d at 14; *Geis*, 321 F. Supp. 3d at 241–42 (collecting cases and allowing a Florida plaintiff to assert a Chapter 93A claim for "allegedly deceptive practices that arose from" Massachusetts); *Grace v. Perception Tech.*, 128 F.R.D. 165, 171 (D. Mass. 1989) (applying Massachusetts law to the state law claims of a nationwide class where defendant was headquartered in Massachusetts and "all alleged misrepresentations emanated [from] Massachusetts").

[21]    Given this robust body of law, it is not surprising that R3 has made similar arguments to a Massachusetts court before and been unsuccessful. In *Balasanyan v. R3 Educ. Inc.*, No. 2085CV01052 (Mass. Super. Mar. 29, 2022), a wrongful death case, R3 argued that the laws of the Caribbean island where the incident occurred should apply. Rejecting this argument, the court found that Massachusetts had a "significant interest in seeing a resident defendant like R3 be held accountable for its conduct, which took place in Massachusetts, and which allegedly caused the plaintiff's injury." Ex. 42 to Siller Decl., at 4. The court further explained that Massachusetts had a "dominant interest" in applying its law because "much of R3's alleged negligence with regard to its decisions regarding hiring, selection, and retention . . . involved in the management of [the school's] dormitories occurred in Massachusetts, at the facility in Devens." *Id.*

"primary aim" because "the protections provided by . . . [Chapter 93A] are quite robust and arguably more consumer friendly than any other state consumer protection provision." *Bezdek*, 79 F. Supp. 3d at 341 (citation omitted). Accordingly, as Defendants cannot dispute, other states have no relevant interests that are not better vindicated by a nationwide Chapter 93A class action.[22]

Finally, the Commonwealth's "significant interest" is heightened here because "Massachusetts public policy strongly favors class actions in the consumer context," *Waithaka v. Amazon.com*, 966 F.3d 10, 30 (1st Cir. 2020)—especially Chapter 93A class actions. *See Costa v. FCA US*, 2022 WL 18910359, at *13 (D. Mass. Sept. 30, 2022) (noting "the Commonwealth's general legislative policy favor[ing] class actions in Chapter 93A cases"); *Feeney v. Dell Inc.*, 908 N.E.2d 753, 762 (Mass. 2009) ("[E]xpressions of three branches of Massachusetts government indicate that the public policy of the Commonwealth strongly favors G.L. c. 93A class actions."). Indeed, by "imposing liability on [Defendants]" for "seeking to profit from unfair practices," the Commonwealth's fundamental public policy interests, embodied in Chapter 93A, would be advanced: Defendants would "be held accountable for [their] conduct, which took place in

---

[22]     Because Defendants do not grapple with Massachusetts' functional choice of law principles, they attempt to deflect by asserting—without any elaboration—that "the law of the state in which a plaintiff took action in reliance on a defendant's representations applies." Doc. 69 at 12 (citing *S. States Police Benev. Ass'n v. First Choice Armor & Equip.*, 241 F.R.D. 85, 93 (D. Mass. 2007)). In *S. States Police Benev. Ass'n*, however, the plaintiff did not argue for the applicability of Chapter 93A to the entire class, and as a result, the court had no occasion to address the arguments raised here—or otherwise engage in the functional choice of law analysis required. *See* 241 F.R.D. at 93. In any event, this dictum regarding generic fraud and misrepresentation choice of law principles has no applicability in the Chapter 93A context because "reliance" is not a component of a Chapter 93A claim. Saba also cites two other cases for the same proposition. In one of them—*In re Celexa and Lexapro Marketing*, 65 F. Supp. 3d 283, 295 (D. Mass. 2014), the court provided no reasoning for its decision and did not discuss Massachusetts choice of law principles. In the other—*Camey v. Force Factor*, 2016 WL 10998440, at *2–*3 (D. Mass. May 16, 2016), the court openly acknowledged that "Section 9 of the Massachusetts Consumer Protection Act has no textual constraints on its application." *Id.* at *3. However, without analyzing Massachusetts' functional choice of law principles, the court improperly assumed that the law of the state in which a plaintiff took action in reliance on a defendant's representations applies. One of the principal authorities relied on by *Camey* was *S. States Police Benev. Ass'n*, which as explained, likewise failed to engage in the necessary functional choice of law analysis.

Massachusetts," *Holbrook*, 487 F. Supp. 3d at 106; the "proper disclosure of information" to prospective students would be promoted, *Purity Supreme v. Att'y Gen*., 407 N.E.2d 297, 306–07 (Mass. 1980); and educational institutions would be deterred from making similar misrepresentations in the future, thereby "improv[ing] the commercial relationship between consumers and business persons and . . . encourage[ing] more equitable behavior in the marketplace," *UBS Fin. Servs. v. Aliberti*, 133 N.E.3d 277, 291 (Mass. 2019).[23] For all of these reasons, Chapter 93A applies to the entire class.

## II.    PLAINTIFF'S DAMAGES THEORY IS WORKABLE ON A CLASS BASIS

Defendants assert two primary arguments with respect to Plaintiff's damages theory: (1) Plaintiff fails to present a cognizable damages theory and (2) there is no causal connection between the acts of Defendants and the purported damages of class members. Each are baseless.

### A.  Plaintiff Presents a Cognizable Damages Theory

First, Defendants strangely assert that Ms. Ortiz "sets forth no damages theory whatsoever." Doc. 69 at 16; *id.* at 24–25. This assertion is especially baffling because, in the same breath, they articulate her theory—that all class members are entitled to their tuition, fees, and costs of attending Saba. *Id*. at 16. This theory is beyond sufficient at this stage of the case, and tellingly, Defendants cite no relevant legal authority to the contrary.[24]

---

[23]     *See also Drakopoulos v. U.S. Bank Nat. Ass'n*, 991 N.E.2d 1086, 1097 n.20 (Mass. 2013) (noting that the SJC "interpret[s] consumer protection statutes broadly to effectuate their remedial purposes") (citation omitted); *Pride Hyundai v. Chrysler Fin*., 263 F. Supp. 2d 374, 397 (D.R.I. 2003), *aff'd* 369 F.3d 603 (1st Cir. 2004) (observing "that the increased interventionism contemplated by Chapter 93A . . . stemmed, at least in part, from a desire to remedy what had been gross inequalities in bargaining power that had resulted in deceitful or unfair practices by powerful market players against weak ones").

[24]     *Omori v. Brandeis Univ.*, 673 F. Supp. 3d 21 (D. Mass 2023) is inapposite. That case was brought as a breach of contract, where Plaintiffs' own damages theory was premised on the difference between the value of online education and the price paid for in-person education after the outbreak of COVID-19. Plaintiff's claim here is premised on entirely different theories of liability and damages.

At the outset, the standard governing plaintiff's burden of establishing damages for purposes of class certification is "unremarkable." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiff must establish that "damages are susceptible of measurement across the entire class" and that the damages are "consistent" with Plaintiff's theory of liability. *Id.* Plaintiff's proposed damages framework has been adopted by numerous courts and thus easily satisfies this standard. Most notably, in *Commonwealth v. Corinthian Colleges*, No. 2014-1093-E (Mass. Super. Aug. 1, 2016) (Lauriat, J.), Doc. 71-5,[25] the court applied Chapter 93A to award over $67 million in damages to former students of Corinthian Colleges, representing "all monies acquired by [Corinthian] from" its students, including payments for "tuition, fees, books, and supplies." *Id.* at 4, 6. The liability in the case was premised on Corinthian's misrepresentations to students regarding, *inter alia*, "the value and quality of the education" and student outcomes. *Id.* at 3. The $67 million damages award against the for-profit college was designed to "restore[]" the students "to the position they were in prior to the unfair or deceptive acts or practices." *Id.* at 4; *see also Vara v. DeVos*, 2020 WL 3489679, at *7, *32 n.27 (D. Mass. June 25, 2020) (noting that the damages award in the *Corinthian* litigation was consistent with Chapter 93A case law).[26]

Defendants do not question the holding in *Corinthian*, nor do they dispute that the total

---

[25]     Attached as Exhibit 5 to the Declaration of Dale Evans, Doc. 71.

[26]     The model employed by *Corinthian* and proposed by Ms. Ortiz has been adopted by numerous courts to remedy deception in higher education and workforce training. For instance, in *Makaeff v. Trump Univ.*, 309 F.R.D. 631 (S.D. Cal. 2015), the court applying California law found that the Plaintiffs' proposed damage model that sought a "recovery of all funds paid" was "not an arbitrary measurement" and was "consistent" with the theory of liability. *Id.* at 637–40. Likewise, in *F.T.C. v. Ivy Capital*, 2013 WL 1224613 (D. Nev. 2013) *vacated in part on other grounds*, 616 F. App'x 360 (9th Cir. 2015), the court allowed for "full restitution," *i.e.*, the "full amount lost by consumers," due to the fraudulent marketing of the workforce program. *Id.* at *17. In *Killian v. Pacific Educ. Servs.*, 2007 WL 1303023, at *6 (D. Haw., May 3, 2007), the court applying Hawaii law determined that the "proper measure of damages" in a case regarding misrepresentations regarding institutional accreditation included "amounts actually paid for [] tuition." And in *Idrees v. American Univ. of the Caribbean*, 546 F. Supp. 1342, 1350 (S.D.N.Y. 1982), the court held that damages appropriately included tuition and fees after a Caribbean medical school misrepresented material facts regarding the institution.

amount of tuition, fees, and costs paid by each student can be easily determined from their own

records. Instead, Defendants argue that *Corinthian* is not applicable because: (1) it was not a class

action and (2) the Attorney General's office used an in-house expert to calculate damages. Doc.

69 at 25. These are distinctions without a difference. What matters is that *Corinthian* allowed

deceived students to recover the total amount of tuition, fees, and costs as a remedy for the school's

Chapter 93A violations. It does not matter that *Corinthian* was not a class action; the proposed

class here seeks to do precisely the same thing in response to analogous facts.[27] Nor is *Corinthian*

distinguishable because Ms. Ortiz has not proffered a damages expert. Plaintiff's damages theory

requires nothing more than simple arithmetic to assess the amount of tuition, fees, and costs paid

to Saba by each class member. In such cases, expert testimony is not only unnecessary, it is often

excluded. *See Clark v. Capital Vision Servs.*, 2024 WL 3458525, at *19 (D. Mass. July 18, 2024)

(excluding expert's calculations because they involved "basic math that a layperson can

understand without the assistance of an expert").[28]

      Defendants' only retort is that the education they provided had some value. Doc. 69 at 16,

24–25. However, this argument fails for two independent reasons: (1) a full refund is available in

these circumstances even if goods or services have some purported value and (2) the limited

---

[27]    Although *Corinthian* was not a class action, the damages award was recovered by the Commonwealth on behalf of former Corinthian students. *See Williams v. DeVos*, 2018 WL 5281741, at *1–*7 (D. Mass. Oct. 24, 2018).

[28]    Because Chapter 93A was modeled on the FTC Act and the Massachusetts Supreme Judicial Court has directed courts to "be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to [the FTC Act]," it is unsurprising that *Corinthian* is squarely in line with the interpretations of both. *Klairmont v. Gainsboro Rest.*, 987 N.E.2d 1247, 1256 n.17 (Mass. 2013); *see also McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 122 (1st Cir. 2014) ("The SJC [has] announced with striking clarity that Massachusetts has 'wholly incorporated' the FTC Act . . . into Chapter 93A.") (citation omitted); *Com. v. Fall River Mtr. Sales*, 565 N.E.2d 1205, 1211 (Mass. 1991). For instance, in the higher education context specifically, the FTC sued DeVry University, a national for-profit chain, over deceptive marketing regarding the outcome of its graduates. Although the case ultimately settled, the FTC—applying section 5 of the FTC Act—specifically sought the "refund of monies paid" by students to redress the injuries caused by DeVry's alleged deceptive marketing of post-graduate student success rates. *See* Compl., *F.T.C. v. DeVry Educ. Grp.*, 2016 WL 684950, at ¶ 1 (C.D. Cal. Jan. 27, 2016).

education provided by Saba has no value. As to the first, in *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993), the Ninth Circuit rejected the notion that a full refund is available only if purchased goods or services are worthless. *See id.* at 606. There, the court reasoned that a full refund model is often appropriate in unfair and deceptive practices cases under the FTC Act, even if what was purchased has some value:

> To understand why, we return to the hypothetical dishonest rhinestone merchant. Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some. . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds[.]

*Id.* That reasoning applies here. Defendants purported to offer a "███████" they didn't have: a Caribbean medical school with USMLE pass rates that were "█████████████████████████ ████████████████████████████████████████████"[29] Defendants did not advertise— and students did not sign up for—a medical school where nearly half of the matriculating students left within two years; they signed up for a medical school where "virtually every student passes the [Step 1 exam]" on their first attempt.[30] As in *Figgie*, therefore, the "fraud [is] in the selling, not the value of the thing sold," so it does not matter if Saba's education arguably had some value—whether tangible or intangible—to certain students. 994 F.2d at 606. The point is that Defendants intended to "taint[] the . . . purchasing decisions" of prospective students. *Id.*[31]

---

[29]    Ex. 6 to Siller Decl., R3S00026499; Ex. 7 to Siller Decl., R3S00028831.

[30]    Ex. 36 to Siller Decl., P-000359.

[31]    Other circuits have also adopted this rationale. *F.T.C. v. Trudeau*, 579 F.3d 754, 773 n.16 (7th Cir. 2009) ("In unfair and deceptive trade practices cases, . . . if the customers had known the truth, they might not have bought any goods at all. The fraud is in the selling, not in the value of the thing sold.") (cleaned up); *McGregor v. Chierico*, 206 F.3d 1378, 1388–89 (11th Cir. 2000) ("[T]he central issue here is whether the seller's misrepresentations tainted the customer's purchasing decisions. We agree with the Ninth Circuit in *Figgie* that in cases like this, the fraud is in the selling, not the value of the thing sold.") (cleaned up).

Confronted with the clarity of Plaintiff's damages theory, and without any case law on its side, Defendants resort to selective quotations from Ms. Ortiz's deposition to suggest that Saba had some "value" for students who never sat for the Step 1 exam. Doc. 69 at 16, 24–25. But "[a]s Mr. Justice Brandeis observed, '[v]alue is a word of many meanings.'" *Kimball Laundry Co. v. United States*, 338 U.S. 1, 4–5 (1949) (citation omitted). Accordingly, Plaintiff's counsel not only objected to Defendants' "value" line of questioning, but Ms. Ortiz articulated that any "value" offered by Saba was entirely intangible as she understood the question.[32] Although Plaintiff's damages model does not require an analysis of the value received by class members, Plaintiff's expert, Dr. Pinsky attests that Saba's education was and is economically nearly valueless to each class member because the purpose of attending medical school is to obtain a medical degree and become a physician.[33] No reasonable medical student enrolls in a medical school seeking a partial education or other intangible value.[34] As a result, Defendants' contentions regarding Plaintiff's damages theory fail.

### B. There is a Causal Connection Between Saba's USMLE Representations and the Injuries to Plaintiff and the Class

---

Likewise, the U.S. Department of Education has declared full student loan discharge relief the appropriate remedy when borrowers seek relief from the government due to institutional misconduct. *See* Final Rule, Institutional Eligibility under the Higher Education Act, 87 Fed. Reg. 65,904 (Nov. 1, 2022). In that context, where an institution's act or omission caused detriment to the borrower, the Department, looking to the *Restatement (Third) of Restitution*, determined that the borrower is entitled to full debt relief without a separate calculation of educational value. *Id.* at 65,946. The Department noted that this principle holds true where, as here, "wrongful or intentional conduct undermines a key reason for entering the transaction in the first place." *Id.*

[32]    Ex. 41 to Siller Decl., Deposition of Natalia Ortiz ("Ortiz Dep."), at 188:20–193:5; *id.* at 189:2–190:9 ("Q: Do these classes have any value to you? A: It's hard to answer that because it is very broad.")

[33]    Declaration of William W. Pinsky, MD ("Pinsky Decl."), ¶ 18.

[34]    With respect to the limited number of transfer students, *some* of whom may have been able to transfer *some* credits from Saba, Dr. Pinsky explains that little to no value should be attributed to these students' Saba education either. Pinsky Decl., ¶ 18. Regardless, because "the fraud was in the selling, not the value of the thing sold," *Figgie*, 994 F.2d at 606, it does not matter if transfer students received some course credit attributable to Saba.

Defendants next contend that Ms. Ortiz fails to show a causal connection between the USMLE representations and her injury. Doc. 69 at 17–18, 26–27. A causal connection is "established by a showing that the deceptive representation 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" *In re M3 Power Razor*, 270 F.R.D. at 60 (citation omitted). Relying on *Shaulis v. Nordstrom*, 865 F.3d 1 (1st Cir. 2017), Defendants claim that Ms. Ortiz cannot establish injury or causation because she "admits she received all the classes she bargained for," such that there is nothing she "bargained for that she did not, in fact, receive." Doc. 69 at 17. This perfunctory argument misunderstands *Shaulis* and the requirements for injury and causation.

Under *Shaulis*, "legally cognizable injuries under Chapter 93A must involve objective, 'identifiable' harm that goes beyond the deception itself." 865 F.3d at 10. For example, "falsely advertising a watch as a 'Rolex' is a material misstatement about the watch's quality," sufficient to establish injury. *Id.* at 12. The *Shaulis* plaintiff failed this test because she did not allege an "objective injury traceable to the purchased item itself—for example, that the . . . materials [of the sweater she bought] were misrepresented." *Id.* at 11. Because she "got exactly what she paid for, no more and no less," the plaintiff failed to establish an injury. *Id.* at 12.

Unlike the *Shaulis* plaintiff, Ms. Ortiz alleges a clear, objective injury traceable to her enrollment at Saba: she "bargained for" the Rolex—"one of the world's leading international medical schools" with a "top-quality medical education" as evidenced by its nearly perfect Step 1 pass rate[35]—but got something much worse in its place—a medical school where approximately

---

[35]    On May 31, June 16, June 23, and July 2, 2019, Defendants sent Ms. Ortiz an email stating that "[f]or more than 25 years, we've built a reputation as one of the world's leading international medical schools, based on our commitment to providing future physicians with a top-quality medical education. *It's a mission we've lived up to, with a 100% USMLE Step 1 first-time pass rate*." Ex. 37 to Siller Decl., P-000393; Ex. 38 to Siller Decl., P-000399; Ex. 39 to Siller Decl., P-000405; Ex. 40 to Siller Decl., P-

half of the matriculating students do not even sit for Step 1, and where the executive leadership conceals this truth in order to boost enrollment. This is more than enough to establish injury.

Defendants next argue that even if there was an injury, it was not causally connected to Saba's advertisements. To make this argument, they cherry pick Ms. Ortiz's deposition testimony to suggest that the USMLE Step 1 misrepresentations were "not a meaningful factor in her decision to attend Saba." Doc. 69 at 18. Defendants should know this is not true, as Ms. Ortiz testified multiple times that "[o]ne of the biggest things for [her] was the USMLE pass rates that they were advertising," which she explained "indicated an idea about their education. So I thought that if they have such good pass rates that means their education is really good."[36] Ignoring this testimony, Defendants focus on her statement that "[h]aving a high USMLE Step 1 first-time pass rate, that specifically was not important to me," but fail to provide the full context, which reveals—like her testimony above—that the high USMLE rates were important to her because, in her words (which Defendants omit): "to me it spoke on their education, and that was important to me . . . I took this as our education is this good, that we have a hundred percent or 98 percent or 99, whatever I read, percent first-time pass rate."[37]

The causal connection between Defendants' deceptive marketing and the injuries to the class is readily discernible. Defendants' widely disseminated USMLE Step 1 representations appeared (and continue to appear) on Saba's website, in scripted marketing emails to prospective and admitted students, in search engine ads, on YouTube, at the top of Saba's social media profiles,

---

000799 (emphasis added). This is one of many widely disseminated representations linking the USMLE passage rate to Saba's "top-quality" education.

[36]     Ex. 41 to Siller Decl., Ortiz Dep. at 66:9-16; *see also id.* at 58:3-17 (when asked to recall what she viewed on the website that was important, she explained: "it was the USMLE pass rates that they were advertising" which "kind of give you an idea of like their education, how they are better or how they compete with other schools and stuff like that"); *id.* at 66:19-20 (explaining that "such good numbers for the USMLE pass rates" indicated to her that the Saba education "is really good").

[37]     Ex. 41 to Siller Decl., Ortiz Dep. at 91:15-93:9.

in brochures, and in PowerPoint presentations at webinars and open houses. Defendants also acknowledge that the USMLE "███████████████████████" and a medical school's ███████████████████████" to students evaluating medical schools, with make-or-break ramifications for a prospective student's entire medical career.[38] Defendants' marketing campaign—based on internal data showing that high USMLE rates are "the selling points" for prospective students deciding whether to enroll[39]—would have affected any reasonable student's decision in choosing Saba and, as set forth above, directly affected Ms. Ortiz's decision to do so.[40]

Finally, it makes no difference whether the USMLE rate was "the most important factor," in each class member's decision to enroll. For a causal nexus under Chapter 93A, the relevant inquiry is whether "the deceptive representation 'could reasonably be found to have caused a [reasonable student] to act differently from the way he [or she] otherwise would have acted.'" *In re M3 Power Razor*, 270 F.R.D. at 60. Although it is theoretically possible that "class members could have decided to attend Saba for reasons entirely unrelated to Step 1," Doc. 69 at 27, that possibility does not undermine causation because, as Defendants' records reveal, the USMLE was one of the biggest "selling points" for the school. Even if a particular student was confident she could pass Step 1 (as Ms. Ortiz was when she was an applicant), "a near perfect" Step 1 pass rate would have influenced the decision of any reasonable applicant because, as Saba touted, it is indicative of a high quality medical education on par with top-ranked U.S. medical schools.

---

[38]   Ex. 34 to Siller Decl., R3S00000096 ("████████████████████████████"); Ex. 28 to Siller Decl., R3S00003914 (████████████); Ex. 35 to Siller Decl., R3S00003709 (████████████████████████████████████████████████████████").

[39]   *See supra* note 4.

[40]   *See* Ex. 41 to Siller Decl., Ortiz Dep. at 66:14–20 ("One of the biggest things for me was the USMLE pass rates that they were advertising . . . [I]f they have such good pass rates that means their education is really good.").

Accordingly, the class satisfies Chapter 93A's causation and injury requirements.[41]

## III.    THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23[42]

As to *numerosity*, Defendants do not dispute that "at least five hundred former students fit the class definition, [which is] more than enough to establish numerosity." Doc. 51 at 15. Defendants nonetheless assert that numerosity is lacking because: (1) "the class is not limited to those who saw the same ads Plaintiff claims to have seen" and (2) "the definition is not limited to those who suffered an injury." Doc. 69 at 19–20. Neither of these arguments is tenable, largely for reasons already explained.

First, Defendants' widely disseminated USMLE representations made the same essential claim: that virtually every Saba student passes Step 1, which was a sign of Saba's high quality program. Defendants do not deny that this core message appeared in all of the representations at issue and do not contend that there are any relevant variations in the advertisements. As a result, Defendants' attempt at sleight of hand goes nowhere.

Second, all members of the class were injured by Defendants' conduct: as explained above, Defendants' coordinated campaign to conceal the truth about attrition meant that students did not

---

[41]    Defendants also contend that not all class members have standing because some may not have seen the USMLE ads or been influenced by them, such that not all would have suffered an injury. Doc 69 at 10. Defendants appear to conflate causation (addressed above) with reliance. And even if reliance were required under Chapter 93A (it is not), the ubiquity of Defendants' USMLE advertisements across its digital platforms would create a presumption of actual reliance. *See McGregor*, 206 F.3d at 1388 ("A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.") (citation omitted); *State v. Minnesota Sch. of Bus., Inc.*, 935 N.W.2d 124, 135 (Minn. 2019) ("[W]here a defendant's misrepresentations were directed at and affected a broad group of consumers, proof of direct individual reliance is not required to establish a causal nexus between [violations of consumer protection statutes] and the harm suffered by consumers.").

[42]    Defendants do not challenge Ms. Ortiz's adequacy to protect the interests of the class, which is not surprising given that she has demonstrated a commitment to vigorous prosecution of this case. Defendants also do not dispute ascertainability or the adequacy of counsel and devote only a single conclusory footnote to typicality. Accordingly, these factors require no further discussion. Because predominance subsumes the Rule 23(a)(2) commonality requirement, these two elements—discussed separately in Ms. Ortiz's opening memorandum—are combined.

know they were enrolling in a medical school where nearly half of the matriculating students do not sit for the Step 1 exam. Every member of the class therefore suffered the same injury. *See Trudeau*, 579 F.3d at 773 n.16 ("In unfair and deceptive trade practices cases, . . . if the customers had known the truth, they might not have bought any goods at all. The fraud is in the selling, not in the value of the thing sold.") (cleaned up).

Regarding *predominance*, Defendants argue that Ms. Ortiz's "application of predominance flows from three assumptions: that Massachusetts law applies to all class members, that all saw and were swayed by the same ads, and that all are entitled to their full tuition, fees, and costs." Doc. 69 at 23. But as discussed at length: (1) Chapter 93A governs the claims of the class; (2) the class is entitled to recover the total amount of tuition, fees, and costs paid to Saba for attendance; and (3) the content of Saba's deceptive advertisements is substantively identical, and there is a causal connection between Saba's deception and the injuries of the class. Thus, Defendants' three main objections to predominance fail.

Defendants also perplexingly argue that Plaintiff cites to "no ad to which any class member was exposed," and that there is "insufficient information in the record" to identify how the class "received the same, essential information," such that commonality must fail. Doc. 69 at 21–22. But the record is replete with examples of widely disseminated ads across Saba's online footprint, and Defendants' orchestrated campaign to conceal, misrepresent, and lie about attrition.

Defendants also erroneously suggest that issues presented by the statute of limitations defeat certification. Doc. 69 at 23. However, "[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 39 (1st Cir. 2003). "Instead, where common issues otherwise predominated, courts have usually certified Rule

23(b)(3) classes even though individual issues were present in one or more affirmative defenses." *Id*; 2 NEWBERG ON CLASS ACTIONS § 4:57 (6th ed.) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification.").

While class members who enrolled prior to May 2019 will be subject to the discovery rule, common issues predominate, and certification is appropriate.[43] First, because Defendants' longstanding and concerted effort to conceal Saba's attrition problem was not revealed until discovery in this lawsuit, the class members who enrolled prior to May 2019 had no reasonable means of uncovering the true nature and length of Defendants' deception. Thus, the discovery rule applies uniformly to these class members, and no individualized inquiries are necessary. Further, "possible differences in the application of a statute of limitations to individual class members . . . does not preclude certification of a class action so long as the necessary commonality and, in a 23(b)(3) class action, predominance, are otherwise present." *Mowbray v. Waste Mgmt. Holdings*, 189 F.R.D. 194, 199 (D. Mass. 1999) (Young, C.J.), *aff'd*, 208 F.3d 288 (1st Cir. 2000) (citations omitted). The statute of limitations will not be an issue for class members who enrolled between May 2019 and the present, so predominance is not threatened. *Id*. at 200 n.4.[44]

Finally, as to *superiority*, Defendants largely ignore Ms. Ortiz's arguments and focus on the fact that most class members have significant damages. But Rule 23(b)(3) "does not exclude from certification cases in which individual damages run high." *Amchem Prod., Inc. v. Windsor*,

---

[43]     As detailed in Plaintiff's opposition to Defendants' motion to dismiss (Doc. 25), the Massachusetts Supreme Judicial Court tolled the statute of limitations for all civil actions "from March 17, 2020, though June 30, 2020, due to the exigencies of the COVID-19 pandemic." *Shaw's Supermarkets v. Melendez*, 173 N.E.3d 356, 358 (Mass. 2021) (citation and internal quotation marks omitted); *Silva v. City of New Bedford*, 602 F. Supp. 3d 186, 198 (D. Mass. 2022) (Young, J.). Thus, for any claims that accrued before June 30, 2020, the statute of limitations is extended by 105 days.

[44]     And if "evidence later shows that" the statute of limitations "is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms" at its disposal. *Smilow*, 323 F.3d at 39–40. If necessary, the First Circuit directs district courts to "place class members with potentially barred claims in a separate subclass." *Id*. at 40.

521 U.S. 591, 617 (1997); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 347 (D. Mass. 2003) (Young, C.J.). And even though many class members have substantial damages, it remains true (as Defendants do not dispute) that: "resolution by class action would provide substantial savings in time, effort, and expense"; "resolving . . . claims in a single forum [would] limit[] the possibility of inconsistent rulings"; "[r]esolution by class action would . . . promote uniform treatment of class members"; and class certification would vindicate Massachusetts' strong public policy favoring Chapter 93A consumer class actions. *See In re Relafen*, 218 F.R.D. at 346–47 (Young, C.J.).

Defendants take issue with Ms. Ortiz's claim that "[b]y and large, members of the proposed class are burdened with significant amounts of student debt and lack the means to effectively pay down their debt because they did not obtain a medical degree at Saba" and that "many members of the proposed class would be unable to devote the time, energy, and resources required to bring separate Chapter 93A lawsuits." Doc. 51 at 25.[45] This Court, however, recently found that a similar argument supported a finding of superiority. *See In re Suffolk Univ. Covid Refund Litig.*, 2022 WL 6819485, at *3 (D. Mass. Oct. 11, 2022) (Young, J.) ("Here there is definitely a question whether individual college students would have the capacity to litigate against Suffolk. . . . [T]here is a considerable disparity in resources between a large university like Suffolk and individual plaintiffs.") (citation omitted). Accordingly, a class action is a superior "method[] for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

## **CONCLUSION**

Plaintiff respectfully requests that the Court grant her Motion for Class Certification.

---

[45]     Defendants suggest that superiority is diminished because a *single* putative class member is *currently* pursuing a separate lawsuit against Defendants in Massachusetts state court. As explained in the numerosity section, at least five hundred former Saba students fall within the class definition. One separate (and unresolved) lawsuit pertaining to one student's circumstances says nothing about the superiority of a class action as a method of adjudication. *See In re Zurn Pex Plumbing*, 267 F.R.D. 549, 567 (D. Minn. 2010) (finding superiority where "[o]nly a small number of . . . claims have escalated into litigation").

Dated: August 16, 2024                    Respectfully submitted,


                                          /s/ Patrick T. Egan
                                          BERMAN TABACCO
                                          Patrick T. Egan (BBO #637477)
                                          Christina L. Gregg (BBO#709220)
                                          One Liberty Square
                                          Boston, MA 02109
                                          (617) 542-8300
                                          pegan@bermantabacco.com
                                          cgregg@bermantabacco.com


                                          MAYNARD NEXSEN PC
                                          Margaret M. Siller (admitted *pro hac vice*)
                                          1131 4th Avenue South, Suite 320
                                          Nashville, TN 37210
                                          (629) 258-2253
                                          msiller@maynardnexsen.com

                                          John R. Alford, Jr. (admitted *pro hac vice*)
                                          1901 6th Avenue North, Suite 1700
                                          Birmingham, AL 35203
                                          (205) 254-1847
                                          jalfordjr@maynardnexsen.com


                                          NATIONAL STUDENT LEGAL DEFENSE NETWORK
                                          Alexander S. Elson (admitted *pro hac vice*)
                                          1701 Rhode Island Ave. NW
                                          Washington, DC 20036
                                          (202) 734-7495
                                          alex@defendstudents.org

                                          *Counsel for Plaintiff Natalia Ortiz and
                                          the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 16, 2024, the foregoing Reply Memorandum in Support of

the Motion for Class Certification was filed through the CM/ECF system, which will send notice

electronically to the registered participants identified below and identified on the Notice of

Electronic Filings (NEF):

Daryl J. Lapp (BBO No. 554980)
daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
617.230.0100

Dale A. Evans, Jr.
dale.evans@lockelord.com
LOCKE LORD LLP
777 South Flagler Drive – East Tower Suite 215
West Palm Beach, FL 33401
561.820.0248

Michael J. McMorrow
michael.mcmorrow@lockelord.com
LOCKE LORD LLP
111 S. Wacker Drive
Chicago, IL 60606
312.443.0246

/s/ Patrick T. Egan