UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons,<br><br>*Plaintiff*,<br><br>v.<br><br>SABA UNIVERSITY SCHOOL OF MEDICINE; and R3 EDUCATION, INC.,<br><br>*Defendants* | Case No. 1:23-cv-12002-WGY |

## DECLARATION OF WILLIAM W. PINSKY, MD

I, Dr. William W. Pinsky, declare:

1. I make and offer this declaration in support of Plaintiff's Motion for Class Certification in *Natalia Ortiz, on behalf of herself and a class of similarly situated persons v. Saba University School of Medicine and R3 Education, Inc.*, Case Number 1:23-cv-12002-WGY, pending in the United States District Court for the District of Massachusetts.

2. I am a U.S. citizen, and Chief Executive Officer Emeritus for Intealth, the parent 501(c)(3) company of the Educational Commission for Foreign Medical Graduates ("ECFMG") and the Foundation for Advancement of International Medical Education and Research ("FAIMER"). I am the past Chief Academic Officer of the Ochsner Health System, serving from April 1999 through April 2016. I have also served as the Associate Dean for Clinical Affairs, Professor of Pediatrics, Chief of Pediatric Cardiology, and Vice-Chair for the Department of Pediatrics at Wayne State University School of Medicine (1986-1999); as the Chief Quality Officer, Regional Executive Sinai, Senior Vice President for Clinical Affairs, and other roles at

1

the Detroit Medical Center (1993-1998); and as a faculty member for Baylor College of Medicine (1978-1983), University of Nebraska Medical Center (1986-1993), Tulane University Medical Center (1999-2016), and University of Queensland School of Medicine (2009-2016).

3. My training is in Pediatrics and Pediatric Cardiology. I obtained my Bachelor of Science from the University of Akron in 1969 and my Doctorate of Medicine from St. Louis University of Medicine in 1973. As my career advanced, I took on leadership positions focusing on the general operations of healthcare facilities and the development of competitive medical school education and research programs. Most recently, I have dedicated significant efforts towards advancing the quality of health care worldwide through my leadership role at Intealth. Promoting the external quality assurance of medical schools (accreditation) as part of my leadership role with the World Federation of Medical Education, I have worked with domestic state and federal legislators as well as global government officials to create effective rules and policies regarding medical school programs. For the Court's more complete reference, I have attached my full curriculum vitae as **Exhibit 1** to this declaration.

4. I have testified as an expert witness in various medical malpractice cases and a worker's compensation matter. These matters were litigated many years ago, and I have not testified as an expert in any matters, at trial or by deposition, in the previous four years.

5. In addition to independent research, I have reviewed materials supplied by Plaintiff's counsel. A list of the materials reviewed is attached as **Exhibit 2**.

6. My currently hourly rate is $400.00. My compensation is not contingent on the outcome of this litigation or the substance of my conclusions.

7. Plaintiff's counsel have asked me to review certain arguments made in Defendants' Memorandum of Law In Opposition to Plaintiff's Motion For Class Certification (ECF. No. 69).

Specifically, I have assessed the background and importance of the United States Medical Licensure Examination ("USMLE") to prospective medical students, particularly at Caribbean medical schools as well as the value of any partial education at Saba University School of Medicine ("Saba"). This declaration presents my methodology, findings and conclusions.

8. My work in this matter is ongoing, I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my conclusions.

9. The ECFMG serves as the entry point and registration for International Medical Graduates ("IMGs") and students for the USMLE.

10. The USMLE is a three-step examination, owned jointly by the National Board of Medical Examiners ("NBME") and the Federation of State Medical Boards ("FSMB"). For allopathic physicians to be licensed for patient care, they must pass all three steps and complete at least one year of graduate medical education ("GME") training, or its equivalent. Physicians trained in Osteopathic medicine are required to pass a separate licensing exam.

11. The USMLE Step 1 exam consists of 280 multiple-choice questions administrated over an eight-hour period.

12. Many countries have a uniform "end of medical school" exam for all graduates. With that type of exam, one can compare scores among graduates. The United States has no such exam. Thus, GME program directors have co-opted the USMLE exam in order to facilitate the comparability and desirability of applicants for their training programs.

13. A student's performance on the USMLE Step 1 and 2 has a significant impact on their ability to achieve a residency position. If a student has a low score and/or does not pass any Step, it lowers their ability to obtain a position. A second failure can completely preclude their

opportunity for a position. Therefore, the USMLE becomes a significant factor in a student's ability to continue to pursue their career in medicine as a physician.

14.    In recognition of this, medical schools will use their students' performance on the Steps to promote the quality of the institution's education and the ability of its students to secure residency positions. They use this information to promote their school in order to market their programs and to compete with other schools. This is particularly true among the schools in the Caribbean.

15.    Through my time at the ECFMG, I have had substantial experience working with medical schools around the world, including schools in the Caribbean; I have also interacted with the medical students that attend these institutions.

16.    In order to participate in a residency program and eventually become a licensed physician in the United States, students attending Caribbean medical schools must receive ECFMG certification. Before it will issue a certification, the ECFMG requires such students to pass the USMLE Step 1 and Step 2 exams. In fact, every states' licensing boards require all allopathic physicians to submit proof of successful completion of the USMLE exams.

17.    Based upon my research and expertise, I believe that medical students attending a Caribbean medical school desire to either practice as a physician within the United States immediately upon graduation or to have the option to practice in the United States later in their careers. Accordingly, the USMLE Step 1 and 2 exams are of the utmost importance to such a medical student's ability to continue towards the path of becoming a licensed physician in the United States. Therefore, an institution's first-time passage rate on the USMLE is one of the most important factors for students when choosing a medical school.

18. In my experience, I believe essentially all students that enroll in a medical school do so for the purpose of obtaining their medical degree. Furthermore, a partial medical education, specifically from a Caribbean medical school, has little to no economic value by itself. Based on my research and expertise, medical students that attend a Caribbean institution have no real viable options to transfer their credits to another medical school of equal or greater reputation. The transfer opportunities for students that have partially completed a medical program at one Caribbean institution are limited to lower-tiered Caribbean schools that are widely considered to provide a lower quality medical education. Students from these schools have an even higher degree of difficulty in matching. Moreover, students with a partial medical education from Caribbean schools are often left with significant debt and forced to change their career trajectories, leaving them fiscally vulnerable.

19. Based on my review of documents, I know that since at least 2017 and continuing to the present, Defendants Saba University School of Medicine ("Saba") and R3 Education, Inc. ("R3") have advertised Saba's first-time USMLE Step 1 exam passage rates at 98% to 100%, which they market as "higher than many U.S. medical schools" and as a testament of "the quality of [the Saba] education." They further advertise that, for over 25 years, Saba has "built a reputation as one of the world's leading international medical schools, based on our commitment to providing future physicians with a top-quality medical education. It's a mission we've lived up to, with a 100% USMLE Step 1 first-time pass rate."

20. I also understand from my review that Saba has very high attrition, and Defendants intentionally do not publish any information about Saba's attrition.

21. Based on my research, an average of over 90% of medical students who enroll at institutions within the United States sit for and pass the USMLE Step 1 exam. The average attrition

5

rate for American medical schools is less than 10%. The records produced by Defendants show Saba's attrition rates are far higher than the average attrition rate of medical schools within the United States. For instance, based on representations made to me by Plaintiff's counsel, the attrition rate for students that matriculated at Saba from Spring 2018 through Fall 2019 appears to have been 51.75%.

22. This over 50% attrition rate wholly undermines Defendants' advertisements that Saba's 98% USMLE Step 1 first-time pass rate evidences a "top-quality medical institution." A prospective medical student would need to know Defendants' unanticipated—and unpublished—high attrition rates and true USMLE performance in order to make an informed decision to attend Saba.

23. Based upon my expertise and experience with medical schools, Defendants' marketing strategy was designed to attract as many students as possible to Saba. More specifically, the marketing strategy was designed to convince prospective medical students that Saba had a uniquely high-quality program that was able to have lenient admission standards yet also maintain a USMLE Step 1 exam passage rate on par with, or even better than, United States medical schools. This further would have prospective students believe they would have an excellent opportunity to match into a US residency program. Defendants' failure to disclose the truth about the number of students who do not sit for the USMLE Step 1 exam required prospective medical students to make a decision in choosing Saba without knowing all of the material facts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 5 day of August, 2024, in New Orleans, Louisiana.

_____
William W. Pinsky, MD

7