UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons,<br><br>       Plaintiff,<br><br>  v.<br><br>SABA UNIVERSITY SCHOOL OF MEDICINE; AND R3 EDUCATION, INC.,<br><br>       Defendants. | Civil Action No.: 1:23-cv-12002-WGY |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, DR. WILLIAM PINSKY**

**INTRODUCTION**

Plaintiff brings claims on behalf of herself and a putative class of former Saba University School of Medicine students. Plaintiff alleges Saba's advertising to prospective students is unfair and deceptive because it did not disclose its allegedly high "attrition rate" – a term which is neither defined nor required to be disclosed by any entity having jurisdiction over Saba. In support of her claims, Plaintiff has designated Dr. William Pinsky as her purported expert witness to opine on the propriety of Saba's marketing and the damages allegedly suffered by Saba students who were dismissed before graduating.

Dr. Pinsky is a physician whose career includes experience as a hospital administrator, a medical school faculty member, and chief executive of the Educational Commission on Foreign Medical Graduates ("ECFMG"), a non-profit organization which certifies international medical graduates for practice in the United States. But Dr. Pinsky has no substantive training or experience in marketing or economics. Moreover, his opinions about those issues in this lawsuit are not based on sufficient facts or data, are not the product of reliable principles and methods, and do not reflect a reliable application of the principles and methods to the facts of the case.

1

Instead, Dr. Pinsky's opinions are admittedly supported by only vague references to his experience in the medical field and medical school industry. Perhaps most importantly, Dr. Pinsky's opinions are not specifically addressed to Saba or based on observations or analyses of Saba, but instead are based on his purported observations and conclusions about medical schools in the Caribbean generally.

Accordingly, Saba seeks an order excluding Dr. Pinsky from testifying at trial.

**RELEVANT BACKGROUND**

Plaintiff was a student at Saba University School of Medicine ("Saba"). ECF 16, Ex. A. At Saba, students must successfully complete the "Basic Sciences Curriculum" before proceeding to the final five semesters of clinical education at the school. ECF 1, ¶¶ 24, 94. Plaintiff attended the first five semesters of instruction, which make up the coursework for the "Basic Sciences Curriculum." *Id.* ¶ 94. Students must also pass the capstone course Foundations of Clinical Medicine ("FOCM") to progress to the final five semesters. *Id.* ¶¶ 53, 54, 88, 95-96. To pass the FOCM course, students must pass a comprehensive basic sciences examination ("Comp Exam"). *Id.* At Saba, a student must pass the Comp Exam to sit for the United States Medical Licensing Examination ("USMLE") Step 1—which is the first of three USMLE exams that are required for licensure as a physician in the United States. *Id.* ¶¶ 87-88. Plaintiff failed in four attempts to pass the Comp Exam. *Id.* ¶¶ 95-96. As a result, Plaintiff was academically dismissed from the program pursuant to Saba's policies on satisfactory academic progress. *Id.* ¶ 96.

Plaintiff brings claims against Saba and R3 Education, Inc. ("R3") for violations of the Massachusetts Consumer Protection Act, Massachusetts General Laws Ch. 93A, and the Massachusetts Unfair Practices Act, Ch. 266, § 91. *Id.* ¶¶ 114-133. Plaintiff alleges that she was

deceived by Saba's advertisements concerning its students' USMLE Step 1 pass rate because Saba did not expressly disclose the attrition rate of its students prior to reaching the USMLE Step 1 exam. *Id.* ¶¶ 5-9, 114-126. Plaintiff argues that, because of Saba's failure to disclose its attrition rate, the two years of instruction and coursework that she received while at Saba is somehow valueless. *Id.*

Saba and R3 maintain that they are not liable because, among other reasons: (i) the first-time USMLE Step 1 pass rate Saba advertised is accurate and is calculated in accordance with U.S. Department of Education ("DOE") regulations; (ii) there are no rules or regulations setting forth a defined standard for calculation of an attrition rate, no rules or regulations requiring disclosure of such a figure, and Saba did not maintain an attrition rate for publication to students; (iii) any reasonable prospective student understands that a first-time pass rate necessarily includes only those students who actually attempt the exam; (iv) Saba provided Plaintiff with what she bargained for—instruction, coursework, and other academic resources; and (v) Plaintiff received value for the partial education that she received from Saba. ECF 16; ECF 32.

Plaintiff designated Dr. William Pinsky as her purported expert witness, who offers the following opinions on U.S. and Caribbean medical schools:

(a) an overview of the USMLE and why it is critical for aspiring doctors;

(b) an overview of Caribbean medical schools, the students they attract, and how they differ from U.S. medical schools;

(c) why USMLE passage rates are critical to prospective medical students, especially those considering enrolling in a Caribbean medical school;

(d) the issue of attrition prior to taking the USMLE Step 1 at Caribbean medical schools compared to U.S. medical schools;

(e) how prospective students are harmed when a school obfuscates data, advertises high USMLE passage rates, and does not disclose that most students do not advance far enough through the program to take the exam; and

3

>   (f) the lack of value in completing two years or less of a medical education at a Caribbean medical school.

Ex. A, Dr. Pinsky Report, ¶ 3. Saba filed a Rebuttal Expert Report (Ex. B, Defendants' Rebuttal Report), to which Dr. Pinsky responded in a Reply Expert Report (Ex. C, Reply Report). Saba deposed Dr. Pinsky on October 1, 2024 (Ex. D, Pinsky Transcript).

## ARGUMENT

### I. LEGAL STANDARD

Federal Rule of Evidence 702 provides that an expert may testify in the form of an opinion or otherwise if the proponent of the expert demonstrates that it is more likely than not that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702.

The Court must determine whether Dr. Pinsky's qualifications are sufficient to permit him to testify. *Hasted v. United States*, 2022 WL 17404918, *2 (D. Mass. Dec. 2, 2022). The Court must also determine whether Dr. Pinsky's testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002). To do so, the Court must assess whether Dr. Pinsky employs "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The relevance inquiry requires that Dr. Pinsky's opinion, if admitted, will likely assist the trier of fact to understand or determine a fact in issue. *Cipollone v. Yale Indus. Prod., Inc.*, 202 F.3d 376, 380

(1st Cir. 2000).

## II. Dr. Pinsky is Not Qualified to Offer His Opinions Concerning Marketing or Economic Damages

Although Dr. Pinsky has experience in the practice of medicine and with medical schools generally, it is undisputed that Dr. Pinsky is not an expert in medical school marketing, economics, or the calculation of economic damages. But these are precisely the subjects on which Dr. Pinsky purports to opine.

The Court, in its gatekeeping function, must determine whether Dr. Pinsky's qualifications are sufficient to permit him to testify before proceeding to the remaining Rule 702 factors. *Hasted*, 2022 WL 17404918, at *2. Under Rule 702, "[t]he court must…consider whether [Dr. Pinsky] is qualified in the specific subject for which his … testimony is offered." *Id.* (internal quotations omitted). Moreover, although "'a witness qualifies as an expert with respect to certain matters or areas of knowledge, [it] does not mean that he or she is qualified to express expert opinions as to other fields.'" *Id.* (quoting *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006). In effect, when "there [is] a mismatch between the expert's knowledge and qualifications and h[is] ability to helpfully opine on the specifics of this case," the expert is not qualified to testify. *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 48 (1st Cir. 2009).

Dr. Pinsky's opinions on medical school marketing, economics, and economic damages are far afield from his areas of experience and should therefore be excluded.

### A. Dr. Pinsky is Not Qualified to Opine on Marketing Practices or the Harm That Follows Allegedly Deceptive Advertising.

Dr. Pinsky concedes he is not an expert on the marketing practices of United States or Caribbean medical schools. Ex. D, Pinsky Dep. at 154:7-20. Instead, he is merely "aware of the marketing that goes on." *Id.* at 154:18-19. Yet, in his report, Dr. Pinsky offers opinions on

5

prospective students' perceptions of medical schools' advertisements and whether an advertisement is misleading. Ex. A, ¶¶ 34-37. Specifically, Dr. Pinsky opines:

> When a Caribbean medical school with high attrition rates runs a marketing campaign that touts high USMLE passage rates but does not disclose information about high attrition, it leaves out critical information necessary for prospective students to make an informed enrollment decision. For example, prospective students reading an advertisement stating that a school has a 99% USMLE Step 1 passage rate would likely believe that the advertising institution will provide a quality medical education that will position them to succeed on the Step 1 exam, and ultimately, to match into a U.S. residency program. Such prospective students would have reason to think otherwise, however, if they were told that over half the students who enroll do not continue beyond their second year in the program.

Ex. A, ¶ 37. When asked for the basis for this opinion, Dr. Pinsky stated that it is "based on experience" and "observation," and that he has "talked to students." Ex. D, Pinsky Dep. at 149:23-151:4-9. However, Dr. Pinsky had no recollection of any specific students with whom he spoke. *Id.* at 151:10-18.

When Dr. Pinsky was asked if he "ever reviewed any literature, scholarly articles, or white papers that analyze factors that students consider when selecting a medical school," he testified "I'm sure I have," but he admitted that he "can't name them," and he has "not done a literature review in preparation for this activity," because he "had experience" and had "been involved with so many students in so much different ways." *Id.* at 151:19-152:14.

Dr. Pinsky has never served on any marketing or advertising committee as a faculty member of the medical schools where he was employed. *Id.* at 63:24-65:7. Moreover, although Dr. Pinsky has been an expert in other cases, he has never testified about marketing practices in those cases. *Id.* at 76:7-9. Additionally, Dr. Pinsky has never published any statistical analyses on marketing. *Id.* at 219:17-220:3. According to his CV, Dr. Pinsky does not have a degree in marketing. Ex. A, Ex. 1.

6

Dr. Pinsky has shown no expertise in the field of marketing or advertising. He simply is not "qualified in the specific subject for which his … testimony is offered." *Hasted*, 2022 WL 17404918 at *2 (internal quotation omitted). In *Hasted*, the Court held that a proposed expert was unqualified because, although he was a clinical psychologist, he could not opine on issues related to psychiatry or standards of care in psychiatric facilities. *Id*. The Court reasoned that the proposed expert's "expertise in [clinical psychology] therefore cannot justify admitting his testimony regarding a wholly different subject." *Id.* Here, the subjects are even more unrelated. Dr. Pinsky is a medical doctor attempting to opine on marketing and advertising. His medical knowledge "does not mean that he … is qualified to express expert opinions as to [marketing or advertising].'" *Id.* (quoting *Levin, Inc.*, 459 F.3d at 78).

In sum, there is "a mismatch between [Dr. Pinsky's] knowledge and qualifications" and "h[is] ability to helpfully opine on" whether Saba's advertisements were misleading. *Chadwick*, 561 F.3d at 48. Thus, this Court should exclude Dr. Pinsky's opinion on this issue because he is not qualified under Rule 702.

### B.  Dr. Pinsky is Not Qualified to Offer an Opinion on Economic Damages.

Dr. Pinsky does not have a degree or any formal training in economics or statistics. Ex. A, Ex. 1. Dr. Pinsky has never published any statistical analyses about the value of a medical education. Ex. D, Pinsky Dep. at 219:17-220:6. He has never testified as an expert witness on the calculation of damages. *Id.* at 76:7-12. Dr. Pinsky is not aware of any articles or literature that support his opinion. *Id.* at 202:18-203:1. However, in his report, Dr. Pinsky opines that the "economic value" of a partial medical education is nothing. Ex. A, ¶¶ 38-40. Specifically. Dr. Pinsky opines:

> Nearly all students who enroll in medical school do so for the purpose of obtaining their medical degree. A partial medical education, specifically from a Caribbean medical school, has little to no economic value by itself. Medical

7

> students who attend a Caribbean institution typically have no meaningful options to transfer their credits to another medical school of equal or greater reputation. The transfer opportunities for students that have partially completed a medical program at one Caribbean institution are typically limited to lower-tiered (i.e. graduates are less competitive for residency positions) Caribbean schools that are widely considered to provide a lower quality medical education. Students from these schools have an even higher degree of difficulty in matching for a residency. Moreover, students who attended a Caribbean medical school but do not sit for the USMLE are often left with significant debt and forced to change their career trajectories.

Ex. A, ¶¶ 38-40. When asked for the basis of this opinion, Dr. Pinsky stated that it was "40 years in academics" and "counseling students professionally…." Ex. D, Pinsky Dep. at 197:19-198:12. When Dr. Pinsky was asked whether the partial education that Plaintiff received from Saba would have value if Plaintiff planned to enroll in an anesthesiologist assistant's program, Dr. Pinsky testified that he "[i]t could have some value. I think it could add value to her personally. I'm *not sure* there's any economic value to it." *Id.* at 200:3-18 (emphasis added). Dr. Pinsky also testified that he was not familiar with other economic valuation theories on the economic returns to education such as the human capital earnings function, the sheepskin effect hypothesis, or the Mincer earnings function. *Id.* at 201:15-202:9.[1] He also testified that he is not aware of any literature or studies supporting his theory in particular. *Id.* at 202:18-203:1.

Dr. Pinsky has shown no expertise in the field of economics that enables him to opine on the "economic value" of a partial education. *Hasted*, 2022 WL 17404918 at *2 (holding that clinical psychology and psychiatry were two different subjects for qualification purposes). His

---

[1] Ex. B, Defendant's Rebuttal Report ¶¶ 11-14 n. 7-13 (citing Card, D. "The Causal Effect of Education on Earnings." *Handbook of Labor Economics,* 1801-1863 (1999); Hungerford, Thomas and Gary Solon, "Sheepskin Effects in the Return to Education," *Review of Economics and Statistics* 69: 175-177 (1987); Belman, Dale and John Heywood, "Sheepskin Effects in the Return to Education," *Review of Economics and Statistics* 73: 720-724 (1991); Park, Jin Heum, "Returns to Schooling: a Peculiar Deviation from Linearity," Working Paper No. 335 (1994); Mincer, Jacob, "Schooling, Experience, and Earnings" (Columbia University Press, New York (1974); Carneiro, P., Heckman, J.J., & Vytlacil, E.J., "Estimating Marginal Returns to Education," *American Economic Review*, 101(6), 2754-2781 (2011).

medical knowledge derived from his education, duties administering healthcare facilities, and administrative roles at universities does not mean that he is qualified to express expert opinions as to the economic value of a partial education. *Id.*; *Chadwick*, 561 F.3d at 48.

Because Dr. Pinsky is not qualified to discuss the economic value of a partial education, this Court should exclude Dr. Pinsky's opinion on this issue.

### III. Dr. Pinsky's Opinions Do Not Meet *Daubert's* Standards of Reliability

Dr. Pinsky's opinions "must meet *Daubert's* 'exacting standards of reliability' . . . which require 'more than subjective belief or unsupported speculation.'" *United States v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2015 WL 10002943, at *3 (D. Mass. Aug. 17, 2015) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000); *Daubert*, 509 U.S. at 590). If Dr. Pinsky "'is relying solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* (quoting FED. R. EVID. 702, Notes of Advisory Committee on 2000 amendments).

In *Organon*, the Court excluded an expert from offering most of his opinions (except for general opinions about a regulatory framework) because he did "not explain the methodology that he used" to reach his opinion, and only relied on his "'experience'…to provide the basis for his testimony." *Id.* at *4. The Court explained that the proposed expert "offer[ed] no explanation of how his experience leads to his conclusions, as Daubert and Rule 702 require." *Id.* The proposed expert "merely prefac[ed] each of his opinions with a reference to his 'experience,'" and "ask[ed] the court (and, presumably, the jury) to 'take his word for it,' which the rules of evidence do not allow him to do." *Id.* This aptly describes Dr. Pinsky's opinions.

The Court may also exclude Dr. Pinsky's opinions when they are "based on conjecture or

speculation from an insufficient evidentiary foundation." *Id.* at *3 (quoting *Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, No. CIV.A. 09–40089–FDS, 2014 WL 7330777, at *5 (D. Mass. Dec. 19, 2014) (internal quotations omitted)). Courts find expert testimony unreliable when it is not based on adequate facts or data. *Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable.") Moreover, courts "must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." FED. R. EVID. 702, Notes of Advisory Committee on 2000 amendments. Accordingly, while Dr. Pinsky "himself claim[s] that his method [is] accurate, … 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Kumho Tire Co.*, 526 U.S. at 157 (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)). Dr. Pinsky's relies on his experience in the medical field and medical education system to support his opinions. But he fails to explain how that experience leads to the conclusions he reached in his Report, why that experience is a sufficient basis for his opinions, and how his experience is reliably applied to the facts of this case.

### C. Dr. Pinsky's Opinion on the Meaning or Weight Students Give to a Medical School's Advertisements About First-Time USMLE Step 1 Pass Rates is Unreliable.

Dr. Pinsky's opinion that USMLE passage rates are critical to prospective medical students or that advertising high USMLE passage rates creates an impression in prospective students that a school's quality is akin to that of a U.S. medical school is not sufficiently supported by reliable facts, data, or sound methods and principles. Specifically, Dr. Pinsky testified:

> For prospective students deciding whether it is worth the financial risk to attend a Caribbean medical school, the link between the quality of a school's program and its USMLE passage rate becomes especially pronounced when a school explicitly advertises that a high Step 1 passage rate is evidence of the quality of a school's educational program or that the Step 1 passage rates are akin to those of U.S. based medical schools. As a result, institutions can create an impression that students will receive a top-quality education on par with U.S. based institutions that will lead to obtaining a medical residency position.

Ex. A, ¶ 31. In his report, Dr. Pinsky cited no data or articles to support these statements. *Id.* He stated that the basis for his opinion concerning how students view the posting of first-time USMLE Step 1 passage figures was his "experience in dealing with students, [his] experience dealing with program directors, over many decades." Ex. D, Pinsky Dep. at 91:20-10. Dr. Pinsky testified that he did not conduct a survey of prospective or current students to support this opinion. *Id.* at 92:15-22. He also testified that he had not interviewed any former students of Saba in connection with the preparation of his report. *Id.* at 99:21-100:1.

Dr. Pinsky fails to "'explain how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Organon USA Inc.*, 2015 WL 10002943, at *3 (quoting Fed. R. Evid. 702, Notes of Advisory Committee on 2000 amendments). He admittedly reached his conclusions based solely on his experience generally and purported historical conversations with unidentified students and program managers, which is not sufficient. Much like in *Organon*, Dr. Pinsky is asking the court and the jury to "'take his word for it', which the rules of evidence do not allow him to do." *Id.* at *4.

Moreover, his testimony about how students perceive USMLE Step 1 passage rates is nothing more than "conjecture or speculation from an insufficient evidentiary foundation.'" *Id.* at *3 (quoting *Abbott Biotechnology*, 2014 WL 7330777, at *5). He did not conduct any surveys of or interviews with students. Accordingly, Dr. Pinsky's opinion "'is connected to existing data

11

only by the *ipse dixit* of the expert.'" *Kumho Tire Co.*, 526 U.S. at 157 (quoting *Joiner*, 522 U.S. at 146). Thus, Dr. Pinsky's opinion, stating why first-time USMLE Step 1 passage rates are critical to prospective medical students, especially those considering enrolling in a Caribbean medical school, should be excluded as unreliable.

### D. Dr. Pinsky's Opinions Concerning the Causes of Attrition and Marketing Regarding Attrition Are Unreliable.

Dr. Pinsky offers several opinions concerning the causes of attrition and marketing regarding attrition that are not supported by reliable facts, data, sound methods, or principles. In fact, he conceded in his deposition he has never conducted any investigation into the causes of attrition at Caribbean medical schools. Ex. D, Pinsky Dep. at 131:17-20.

#### 1. Dr. Pinsky opines that the causes of attrition at Caribbean medical schools are attributable to a lack of support from the school, inadequate faculty and curriculum, and failure to successfully educate students. Ex. A, ¶¶ 34-36.

When asked for the basis for his statement that high attrition rates are caused by a school's failure to provide necessary support, resources, or instruction, Dr. Pinsky cited only his "40 years of academics…." Ex. D, Pinsky Dep. at 122:5-16.  Dr. Pinsky also testified "when one looks at outcomes, process is important, but what's important is the end result and the outcomes. . . . And that's why even if there's a process in place, if students are not successful, th[e]n [that] means the outcomes are not successful." *Id.* at 125:16-126:6. According to Dr. Pinsky, schools "should do a root cause analysis to understand what their processes are and what their execution is and why it's not successful." *Id.* at 126:11-21. However, Dr. Pinsky did not know if Saba had done such an analysis. *Id.* at 126:22-127:2. Moreover, he conceded that he was unfamiliar with the support, resources, or instruction that Saba provides to help its students succeed. *Id.* at

12

125:16-23.[2] When asked, Dr. Pinsky was unable to provide any examples of Caribbean medical schools that failed to provide necessary support, resources, or instruction to help students succeed. *Id.* at 127:3-7.

When asked for the basis for his propositions in Paragraph 35 of his Report, that a "[h]igh attrition rate can also be a sign that a school's faculty are not adequately qualified, experienced, or dedicated to support students' success," or "that a school's curriculum or program structure is not effective when preparing students for medical practice," Dr. Pinsky testified "[m]y whole career in academics and knowing, again, what the variables are for success." *Id.* at 127:8-20. Dr. Pinsky conceded, however, that he has not evaluated the qualifications, experience, or dedication of the faculty at Saba or other Caribbean medical schools with high attrition rates. *Id.* at 127:24-128:8. He conceded that he could not even identify a single Caribbean medical school that lacked adequately qualified faculty. *Id.* at 128:9-12.

When asked for the basis of his statement in Paragraph 36 of his Report that "[n]o matter the cause, high attrition in Caribbean medical school is a sign that— unlike U.S. medical schools, where nearly all students who enroll sit for and pass the USMLE Step 1—the school is not successfully educating large portions of the students who enroll," Dr. Pinsky testified it was "[t]he statement on knowing what rates are in the U.S. schools and what the publicly available information was for the other schools." *Id.* at 129:4-17. When asked to identify Caribbean medical schools that were not preparing their students, Dr. Pinsky did not identify a single Caribbean medical school failing to prepare its students, and only testified in a conclusory fashion that he was aware of "a large number of students that are not successful" from his review

---

[2] There was an error in the transcription discovered in connection with preparing this motion. It says "you're familiar" instead of "you're not familiar." Defendants will submit an errata statement to the reporter simultaneously with this filing.

13

of transcripts. *Id.* at 130:23-131:10. He testified that he did not recall reviewing any transcripts of Saba students. *Id.* at 131:12-16. Dr. Pinsky also testified that he had never conducted investigation into the causes of attrition at Caribbean medical schools. *Id.* at 131:17-20. Dr. Pinsky also agreed that attrition could be caused by other factors such as voluntary withdrawals. *Id.* at 132:15-133:3.[3]

Dr. Pinsky made sweeping statements on the causes and significance of attrition. He conceded, however, that he was unfamiliar with Saba's admissions standards, and could not even identify a single Caribbean medical with lax admission standards, lower caliber faculty, or curriculum. He also could not say whether Saba failed to provide the necessary support to students, or that failed to educate their students, or even identify a single Caribbean medical school with such failures. He also had not done any kind study of the causes of attrition at Saba, or any other Caribbean medical schools.

In sum, there is no reliable basis for Dr. Pinsky's speculative conclusions about the causes and significance of attrition. *Kumho Tire Co.*, 526 U.S. at 152; *Organon USA Inc.*, 2015 WL 10002943, at *3; *Irvine*, 194 F.3d at 320-21. Dr. Pinsky failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. He failed to identify any principles, methods, facts or data that he applied to his experience that would render his opinions reliable. This is the exact reason that the

---

[3] Defendant's rebuttal expert, Przemyslaw Jeziorski, PhD, a tenured professor in the field of marketing at University California Berkley with a postdoctoral degree in economics and a member of the university's admission's committee, has explained that the correlation between attrition and the quality of education received is weak. Ex. B, ¶¶ 25-30. In fact, Dr. Jeziorski explained that admissions standards were the primary predictor of attrition rates rather than the quality of the school. *Id.* ¶ 29. Dr. Jeziorski explained that attrition also can be influenced by a variety of factors beyond admissions standards that may not reflect the quality of the institution itself, including that students leave due to financial hardship, for personal reasons, or because they transfer to another school. *Id.* at ¶ 25.

14

*Organon* court excluded a proposed expert. *Organon USA Inc.*, 2015 WL 10002943, at *3 (holding that merely citing to his experience to support his opinions without anything more was not sufficient).

> **2. Dr. Pinsky opined that when a Caribbean medical school with high attrition rates runs a marketing campaign that touts high USMLE passage rates but does not disclose information about high attrition, it leaves out critical information necessary for prospective students to make an informed enrollment decision. Ex. A, ¶ 37.**

When asked to identify the basis for this proposition, Dr. Pinsky testified "I think it's pretty obvious. Without knowing what the denominator is, I think the information is – is not forthcoming." Ex. D, Pinsky Dep. at 149:23-150:13. Dr. Pinsky said his opinion was based on experience and observation. *Id.* at 150:14-19. Dr. Pinsky conceded he had not done any survey or analysis of the factors students consider when they enroll in medical schools but that he had talked to unidentified students at some unidentified time in the past (but he could not remember the name of any specific students). *Id.* at 151:4-18. Dr. Pinsky believed he had read literature on what students consider when enrolling in medical school, but could not recall specific literature he had seen, and he did not review any literature in connection with rendering this opinion. *Id.* at 151:19-152:14; *supra* at 6. Dr. Pinsky provided no support for the proposition that failing to disclose attrition is critical information prospective students need. He offered only that this conclusion was based on experience and observation, but he could not point to specific conversations with students or any specific literature he had read supporting this assertion. In other words, the only basis for his conclusion is speculation and because he says so. This does not suffice. *Kumho Tire Co.*, 526 U.S. at 157; *Organon USA Inc.*, 2015 WL 10002943, at *3.

Significantly, Dr. Pinsky could not name a single Caribbean medical school that posts an attrition rate. Ex. D, Pinsky Dep. at 153:1-4. Dr. Pinsky also was not aware of any requirement

that Caribbean medical schools publish an attrition rate. *Id.* at 157:7-158:15. When Dr. Pinsky was asked whether he could point to an organization that defines attrition rate, he testified that he did not do so "[b]ecause it's a known factor." *Id.* at 163:24-164:4. He claimed that it is not difficult to calculate attrition, but he conceded the calculation could include numerous variables, such as students who voluntarily withdraw or transfer, are dismissed for nonacademic reasons, and fail to advance to further semesters at a school. *Id.* at 164:21-165:11. Moreover, when Dr. Pinsky was asked what authority supported including those metrics, he testified that "[y]ou know, frankly, it's an accepted way to calculate it." *Id.* at 165:12-17. Dr. Pinsky was not sure whether there was an accreditor or regulator that specifies what information should be included in an attrition rate but speculated that "it would be standard operating procedure…." *Id.* at 166:2-8. When asked whose standing operating procedure, Dr. Pinsky proclaimed, "[t]he world." *Id.* at 166:9-10. This testimony is the definition of *ipse dixit. Kumho Tire Co.*, 526 U.S. at 157; *Organon USA Inc.*, 2015 WL 10002943, at *4.

### E. Dr. Pinsky's Opinion that a Partial Medical Education is Worthless is Unreliable.

Dr. Pinsky's opinion that a partial medical education is worthless is not supported by reliable facts, data, sound methods, or principles. Specifically, Dr. Pinsky opined:

> Nearly all students who enroll in medical school do so for the purpose of obtaining their medical degree. A partial medical education, specifically from a Caribbean medical school, has little to no economic value by itself. Medical students who attend a Caribbean institution typically have no meaningful options to transfer their credits to another medical school of equal or greater reputation. The transfer opportunities for students that have partially completed a medical program at one Caribbean institution are typically limited to lower-tiered (i.e. graduates are less competitive for residency positions) Caribbean schools that are widely considered to provide a lower quality medical education. Students from these schools have an even higher degree of difficulty in matching for a residency. Moreover, students who attended a Caribbean medical school but do not sit for the USMLE are often left with significant debt and forced to change their career trajectories.

Ex. A, ¶¶ 38-40. When asked for the basis of this opinion, Dr. Pinsky stated that it was "40 years in academics" and counseling students professionally…." Ex. D, Pinsky Dep. at 197:19-198:12. Dr. Pinsky did not run any economic models for Plaintiff or any of the class to evaluate the return they got for their investment. *Id.* at 201:3-14. Dr. Pinsky did not interview any Saba students to determine their post-Saba career trajectories. *Id.* at 202:11-16. Dr. Pinsky did not review any records regarding whether students transferred from Saba. *Id.* at 203:22-204:3. Dr. Pinsky was also not aware of any literature or articles supporting his partial value opinion. *Id.* at 202:18-203:1. He did not evaluate Plaintiff or the class member's post-Saba career prospects. He did not evaluate whether those students transferred from Saba. He ran no economic models for those career prospects. He also was not aware of, and did not cite, any literature supporting his opinion. His opinion about partial value is devoid of support of facts or data and should be excluded under Rule 702. *Kumho Tire Co.*, 526 U.S. at 157; *Organon USA Inc.*, 2015 WL 10002943, at *3; *Irvine*, 194 F.3d at 321.

### IV. Dr. Pinsky's Remaining Opinions Will Not Aid the Trier of Fact

"Expert testimony does not assist where the [trier of fact] has no need for an opinion because it easily can be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic." *United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6264 (2005)) (alterations in original).

Dr. Pinsky's opinion, offering an "[o]verview of the USMLE and why it is critical for aspiring doctor" (Ex. A, ¶¶ 20-25), does not require expert assistance for the trier of fact to understand. Dr. Pinsky spends this portion of his report explaining that students need certification from USMLE, which requires that students pass two USMLE exams. *Id.* He

17

explains that students who do not pass the USMLE exams cannot practice medicine in the United States. *Id.* These foundational facts have been recited by both parties numerous times in this litigation. In its Answer to Plaintiff's Complaint, Saba admitted that "[a]ll medical school graduates seeking to practice in the United States are required to pass a series of USLME exams before obtaining a medical license." ECF 1, ¶ 53, ECF 32, ¶ 53. Given that this fact is not in dispute, the jury will not need an expert to explain it to them.

Dr. Pinsky's opinion, offering an "[o]verview of Caribbean medical schools, the students they attract, and how they differ from U.S. medical schools," (Ex. A, ¶¶ 26-27) does not require expert assistance for the trier of fact to understand. Dr. Pinsky opines that getting into U.S. medical school is hard, so students will apply to Caribbean medical schools if they cannot get into U.S. medical schools. *Id.* The notion that getting into medical school is hard falls squarely into knowledge that is "derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic." *Zajanckauskas*, 441 F.3d at 39. For the same reasons, the fact students who want to be doctors will look elsewhere if they cannot get into a United States medical school is common sense. Moreover, any aid this opinion would be to the trier of fact is eliminated if Dr. Pinsky's other opinions discussed in the previous sections are excluded. There would be simply no reasons the trier of fact would need to know this information. Thus, these opinions should be excluded.

## CONCLUSION

The reports and testimony of Dr. Pinsky should be excluded from trial.

| | |
|---|---|
| November 15, 2024 | SABA UNIVERSITY SCHOOL OF MEDICINE, R3 EDUCATION, INC. |
| | /s/Daryl J. Lapp<br>Daryl J. Lapp (BBO #554980)<br>daryl.lapp@lockelord.com |

18

>LOCKE LORD LLP
>111 Huntington Avenue
>Boston, MA 02199
>T: 617-239-0100
>
>Michael J. McMorrow (*pro hac vice*)
>michael.mcmorrow@lockelord.com
>LOCKE LORD LLP
>111 South Wacker Drive, Suite 4100
>Chicago, IL 60606
>T: 312-443-0700
>Dale Evans (*pro hac vice*)
>
>dale.evans@lockelord.com
>LOCKE LORD LLP
>777 South Flagler Drive
>Suite 215 East Tower
>West Palm Beach, FL 33401
>T: 561-833-7700

## CERTIFICATE OF SERVICE

I certify that on November 15, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

>/s/ Daryl J. Lapp
>Daryl J. Lapp

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I hereby certify that counsel for Defendants conferred with counsel for Ms. Ortiz via telephone on November 12, 2024, in a good-faith effort to narrow or resolve the issues raised in this Motion.

>/s/ Daryl J. Lapp
>Daryl J. Lapp