**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons, | |
| *Plaintiff,* | Case No. 1:23-cv-12002-WGY |
| v. | **CLASS ACTION** |
| SABA UNIVERSITY SCHOOL OF MEDICINE; and R3 EDUCATION, INC., | |
| *Defendants.* | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT DR. PRZEMYSLAW JEZIORSKI

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD ............................................................................................................ 3

ARGUMENT ........................................................................................................................ 4

    I.    Dr. Jeziorksi's opinions on the "value of partial education" are untethered to medical education and are irrelevant, unreliable, and unduly prejudicial. ................................. 4

        A.    Lacking experience in medical education, Dr. Jeziorski clings to irrelevant data about lottery entrants for admission to Dutch medical school. ......................................... 5

        B.    Data about U.S. medical graduates is irrelevant to whether dismissed or withdrawn Saba students might resume their medical education. .......................................... 8

        C.    The "sheepskin effect" is not relevant and, even if it were, Dr. Jeziorski's only support for calling it into question is an unpublished working paper. ............................... 10

        D.    Sources addressing undergraduate degrees are inadequate to support Dr. Jeziorski's opinions on the value of a partial medical education. .......................................... 11

    II.    Dr. Jeziorski's opinion that attrition does not matter to prospective medical students ignores contrary conclusions from his own sources, dismisses the words of actual prospective medical students, and lacks support. ....................................................... 12

    III.    Dr. Jeziorski's opinion on the purported complexities of calculating attrition is baseless and ignores contrary evidence. ................................................................. 16

        A.    The AAMC calculates attrition rates at U.S. medical schools, data which Dr. Jeziorski relies on in his report. ................................................................................ 16

        B.    Institutions of higher education track student enrollment data necessary to calculate attrition. ........................................................................................................... 17

        C.    With no knowledge of medical education, admissions, or retention, Dr. Jeziorski's sweeping opinions are mere *ipse dixit*. .......................................................... 18

CONCLUSION ................................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abarca v. Franklin Cnty. Water Dist.,*
   761 F. Supp. 2d 1007 (E.D. Cal. 2011) ........................................................................ 15

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
   303 F.3d 256 (2d Cir. 2002) ............................................................................... 12, 15

*Bleiler v. Coll. of Holy Cross*, No. 11-cv-11541-DJC,
   2013 WL 4714340 (D. Mass. Aug. 26, 2013) ........................................................ 12

*Boucher v. U.S. Suzuki Motor Corp.,*
   73 F.3d 18 (2d Cir. 1996) .................................................................................... 9

*Damon v. Sun Co.,*
   87 F.3d 1467 (1st Cir. 1996) ................................................................................ 4

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ................................................................................ 3-4, 12, 20

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ................................................................................ 4, 12, 19

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) ........................................................................................ 3

*McGovern ex rel. McGovern v. Brigham & Women's Hosp.,*
   584 F. Supp. 2d 418 (D. Mass. 2008) ........................................................... 4, 12

**Rules**

Fed. R. Evid. 702(a) ........................................................................................ 15

Fed. R. Evid. 702(b) .................................................................................... 3, 4

**Statutes**

26 U.S.C. § 118(c)(3) ........................................................................................ 7

Pursuant to Federal Rule of Evidence 702, Class Representative Natalia Ortiz, on behalf of the Class ("Plaintiffs"), hereby files this memorandum of law in support of her Motion to Exclude Defendants Saba University School of Medicine and R3 Education's ("Defendants" or "Saba") Expert, Dr. Przemyslaw Jeziorski.

## INTRODUCTION

In a case about unfair and deceptive advertising by a Caribbean medical school, Plaintiffs proffer William W. Pinsky, MD, an expert with decades of experience in medical education: as a faculty member and administrator, a board member of organizations that oversee medical education, and as CEO of an organization that certifies international medical graduates. To rebut a portion of Dr. Pinsky's opinions, Defendants put forth a business school professor who lacks any modicum of expertise or experience with medical education. Without it, Dr. Jeziorski is left to rely on general academic literature to reach his opinions that there is value associated with a partial medical education, that prospective medical students do not care about attrition, and that medical school attrition rates are too complex to calculate. But these studies—none of which address medical school value, admissions, or enrollment—are not enough to support Dr. Jeziorski's opinions, and he lacks the knowledge to reliably fill in the gap.

Equally important, his report ignores contradictory evidence, fails to disclose critical distinguishing facts in the studies he cites, and relies on undisclosed, unjustified assumptions. Asked about such issues, Dr. Jeziorski testified that he "rel[ies] on the reader to . . . go and look up the details in the relevant paper" if they are "concerned" about aspects of his work. November 4, 2024 Deposition Transcript of Przemyslaw Jeziorski, Ph.D. ("Jeziorski Tr."), attached as Exhibit A to the Declaration of Patrick T. Egan ("Egan Decl.") at 113:19-114:9. This approach is entirely inappropriate for an audience of nonacademic jurors, and admitting Dr. Jeziorski's testimony

1

would unduly prejudice Plaintiffs. With nothing more than his say-so, Dr. Jeziorski's opinions are unreliable and should be excluded.[1]

## BACKGROUND

Plaintiffs allege that Defendants violated Massachusetts Chapter 93A by deceptively advertising, among other things, that 98%-100% of Saba students pass the United States Medical Licensing Examination Step 1 ("USMLE Step 1" or "Step 1 exam") without disclosing that over half of Saba's students never even sit for the exam. ECF No. 1 ¶¶ 5, 53-66, 119-120.

Plaintiffs' expert, Dr. Pinsky, has over 40 years of experience working as a doctor, educator, academic medical program administrator, and board member and CEO of medical education oversight bodies. Pinsky Rep. ¶¶ 4-17.[2] Dr. Pinsky opines on six topics:

(1) An overview of the USMLE and why it is critical for aspiring doctors;
(2) An overview of Caribbean medical schools, the students they attract, and how they differ from U.S. medical schools;
(3) Why USMLE passage rates are critical to prospective medical students, especially those considering enrolling in a Caribbean medical school;
(4) The problem with attrition prior to taking the USMLE Step 1 at U.S. medical schools compared to Caribbean medical schools;
(5) How prospective students are harmed when a school advertises high USMLE passage rates but does not disclose that most students do not advance far enough through the program to take the exam; and
(6) The lack of value in completing two years or less of a medical education at a Caribbean medical school. Pinsky Rep. ¶¶ 20-40.

---

[1] Defendants also submitted Dr. Jeziorski's report with a "Notice" improperly seeking to add sur-reply evidence following class certification. *See* ECF No. 103. Dr. Jeziorski's opinions should also be excluded or disregarded from any consideration of class certification.

[2] Dr. Pinsky's Expert report ("Pinsky Rep.") is attached as Egan Decl. Ex. B. Dr. Pinsky's Reply Report ("Pinsky Reply") is attached as Egan Decl. Ex. C.

Attempting to rebut Dr. Pinsky's opinions, Defendants proffer Dr. Jeziorski, a professor in marketing and economics. *See* Rebuttal Expert Report of Przemyslaw Jeziorski, PhD ("Jeziorski Rep.") ECF No. 103-1. Dr. Jeziorski does not challenge most of Dr. Pinsky's report.[3]

Dr. Jeziorski has never been to medical school, worked at a medical school, conducted marketing for a medical school, or worked with enrolled or prospective medical students. Jeziorski Tr. 19:21-24:4, 27:3-11, 169:13-15. None of his academic research relates to the economics or marketing of medical education. *See id.* at 54:14-19, 54:20-55:4. When asked, he did not know what "USMLE" stands for, *id.* at 69:16-18, and incorrectly believed that students "need to complete the medical school to complete that exam," *id.* at 70:22-23.

Dr. Jeziorski offers the following rebuttal opinions: (1) students may get economic value from a partial medical education by returning to complete their degree or by using knowledge gained in pursuit of another degree or career,[4] (2) attrition rates are not a major factor considered by prospective students when selecting a medical school, and (3) attrition rates involve complex calculations, and there is no uniform standard for measuring attrition. Jeziorski Rep. ¶¶ 10-38.

## LEGAL STANDARD

Under Rule 702(b), expert testimony is admissible only if it is "based on sufficient facts or data." Fed. R. Evid. 702(b). The district court's "gatekeeping obligation" is designed to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The court has "broad latitude" as to both the manner of assessing reliability and its ultimate conclusion on reliability. *Id.* at 142; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

---

[3] Dr. Jeziorski does not challenge Dr. Pinsky's first, second, third, and fourth opinions listed above. *See* Pinsky Reply ¶ 3; *see also* Jeziorski Tr.  77:12-19, 78:13-15, 284:23-85:4, 181:11-82:2, 285:15-22.

[4] Because the Court excluded from the class students who successfully transferred Saba credits to other schools, this brief omits discussion of this form of value. *See* ¶ 10ii.

579, 594 (1993) ("The inquiry envisioned by Rule 702 is . . . a flexible one."). The proponent of the testimony bears the burden of establishing by a preponderance of the evidence that it is reliable and relevant such that it satisfies Rule 702's requirements. *McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 422–23 (D. Mass. 2008) (Young, J.).

"[A]n expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotation marks omitted). Rule 702 does not require a district court to admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Instead, the district court may properly exclude proposed expert testimony if "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see McGovern*, 584 F. Supp. 2d at 426 (excluding expert opinions due to an analytical gap).

## ARGUMENT

Dr. Jeziorski's rebuttal opinions are not based on sufficient facts and data as required by Rule 702(b). The academic papers he relies on do not support his opinions, and Dr. Jeziorski lacks the knowledge or experience necessary to reliably bridge the analytical gap between the two. *See Joiner*, 522 U.S. at 146. The Court should exercise its gatekeeping function and exclude Dr. Jeziorski's testimony.

### I.     Dr. Jeziorksi's opinions on the "value of partial education" are untethered to medical education and are irrelevant, unreliable, and unduly prejudicial.

Attempting to rebut Dr. Pinsky's opinion that a partial medical education from a Caribbean medical school has little or no economic value, Dr. Jeziorski asserts that it "contradicts a body of economic research." Jeziorski Rep. ¶ 10. Despite this sweeping claim, Dr. Jeziorski presents no such "body" of research, instead citing only data from studies with critical distinguishing

characteristics and studies addressing the generic value of college education, without any effort to tie it to medical education. According to Dr. Jeziorski, students who are dismissed or withdraw from Saba could resume their medical education there or elsewhere and ultimately obtain a degree, or they could use knowledge gained in medical school classes in pursuit of a different degree or career. Jeziorski Rep. ¶¶ 10i, 10iii. To support these opinions Dr. Jeziorski relies only on data from a study about individuals who applied to medical school via a lottery system in the Netherlands, data about U.S. medical graduates, conclusions from an unpublished working paper, and data from narrow populations of undergraduate students. The discussion that follows addresses each one in turn.

**A.  Lacking experience in medical education, Dr. Jeziorski clings to irrelevant data about lottery entrants for admission to Dutch medical school.**

The first form of value Dr. Jeziorski ascribes to a partial medical education is the possibility that students could "resum[e] their degrees following the initial set back." Jeziorski Rep. ¶ 10i. To make his point, Dr. Jeziorski relies on a study of medical school *applicants* (not students) in the Netherlands in the 1980s and 1990s who applied to eight nationally funded medical schools through the Dutch national lottery system, but were not admitted because they lost the lottery. *See* "The Returns to Medical School: Evidence from Admission Lotteries" American Economic Journal: Applied Economics, 8(2), 225-254 (2016) ("Dutch Lottery Study"), Egan Decl. Ex. D; Jeziorski Tr. 112:19-21.

Findings from applicants rejected through a lottery system shed no light on the likelihood that students who withdraw or are dismissed from Saba prior to the Step 1 exam will ever return to medical school and obtain a degree. As Dr. Jeziorski agreed, "in a lottery system some qualified candidates, even highly qualified candidates, might not be admitted." Jeziorski Tr. 104:13-16.

Asked about the difference in admissions systems,[5] Dr. Jeziorski testified that he "did like a little side analysis for [himself]" to determine whether the data from the Dutch lottery system would be applicable to medical school admissions systems that do not use lotteries. *Id.* at 105:15-19. This "side analysis" was critical to Dr. Jeziorski's conclusions about value—if the result of the analysis suggested significant differences between the Dutch lottery system and Saba's admissions system, he testified that he would not have relied on it. *Id.* at 115:1-4. Yet his report is silent on this "side analysis," which alone is grounds to dismiss this manufactured opinion as unreliable.[6]

The Dutch Lottery Study includes a finding that 41% of students aged 19 and under who lost their first lottery subsequently reapplied, were admitted via a later lottery, enrolled in and ultimately completed Dutch medical school. Dutch Lottery Study at 233. Despite these many distinguishing features, Dr. Jeziorski cites the study for the broad proposition that "41% of students who are initially not admitted to medical schools eventually complete their degree." Jeziorski Rep. ¶ 10i. When asked what he meant by "students," Dr. Jeziorski clarified that the study was about Dutch high school students. Jeziorski Tr. 98:21-99:1. When asked whether it would be more accurate to say 41% of *Dutch* students, Dr. Jeziorski conceded it would be. Jeziorski Tr. 99:2-7; *see also id.* at 113:11-15 ("I agree with you that putting Dutch there -- because the paper is from Denmark [sic], obviously. That -- that wouldn't be a -- that would make it more -- more accurate where it's coming from, yes.").

Dr. Jeziorski relies on this same study as support for the second form of value he believes

---

[5] Dr. Jeziorski was not specifically aware of whether Saba admits students by lottery but believed not. Jeziorski Tr. 104:17-105:11.

[6] Dr. Jeziorski testified that he started from the proposition that data from any given academic paper was generalizable to Caribbean medical students and then assessed whether there were reasons not to generalize it. Jeziorski Tr. 124:13-17. Where not one of the studies he cites address Caribbean medical schools, that assessment is inherently faulty given Dr. Jeziorski's lack of experience with medical education.

students may obtain from a partial medical education—use of the knowledge gained in pursuit of a related degree or career. Jeziorski Rep. ¶ 10iii. Relying again on data about Dutch lottery losers who are not admitted to medical school, Dr. Jeziorski proclaims that "students who are admitted but do not graduate from medical schools predominantly pursue other medical-related fields." *Id.*; *see* Dutch Lottery Study at 235; Jeziorski Tr. 131:17-25, 138:13-19. But Dr. Jeziorski stretches the study's data beyond recognition to settle on the use of the word "predominantly" (which he defines as more than 50%), explaining none of his reasoning in the report. Jeziorski Tr. 129:14-17. According to the study, 32% of lottery losers went into health-related fields and 15% went into sciences (for a total of 47%). Dutch Lottery Study at 235. To that, Dr. Jeziorski added 4.5%—half of the 9% of lottery losers who went into economics—to trigger his use of the word "predominantly."[7] Jeziorski Tr. 134:9-12. Dr. Jeziorski included half of the 9% of lottery losers in economics because he has worked with "at least four or five" economics students with medical backgrounds, and those four or five students pursued health-related economics.[8] *Id.* at 134:13-135:9.

Dr. Jeziorski's report lacks an explanation of the "judgment" he made to add these figures together or the facts purportedly justifying that exercise of judgment (the four of five students he has taught). *See id.* at 132:13-21. Instead, the report leaves the reader with the understanding that the cited source (about Dutch high school graduates not admitted to medical school) provides direct support for Dr. Jeziorski's opinion (about students admitted to medical school). And because Dr. Jeziorski omits mention of the Dutch lottery admissions system with the exception of the

---

[7] "Majority" seems a more apt description for a figure barely over half. One section of the U.S. Code defines "predominantly" as more than 80%. *See* 26 U.S.C. § 118(c)(3).

[8] These four or five students come from a total of the over 1,000 marketing MBA and PhD students Dr. Jeziorski has mentored at Berkeley. *See* Jeziorski Rep. ¶ 4.

paper's title in the footnote, a reader would surely understand him to be discussing a merit-based system of admissions as relevant to this case.[9] According to Dr. Jeziorski, this source provides the best support for his opinion on the value of a partial medical education—and it is the only source he cites for the contention that students who withdraw or are dismissed from Saba could gain value by using their knowledge in another degree or career. *Id.* at 131:1-10; *see* Jeziorski Rep. ¶ 10iii. It provides no such support.

> **B.**      **Data about U.S. medical graduates is irrelevant to whether dismissed or withdrawn Saba students might resume their medical education.**

The only other source Dr. Jeziorski cites for the possibility that dismissed or withdrawn Saba students might resume their medical education, and therefore obtain some value from their partial education, is a data snapshot from the Association of American Medical Colleges ("AAMC"). Jeziorski Rep. ¶ 10i n.4; Egan Decl. Ex. E. He cites the snapshot for the proposition that "over 10% of students do not complete their medical degree within the standard four years but go on to finish it within six years." Jeziorski Rep. ¶ 10i. Dr. Jeziorski's report does not limit the proposition to students "at U.S. medical schools," even though the data snapshot is limited to U.S. students, and Dr. Jeziorski agreed that the qualifier would make the sentence more accurate. Jeziorski Tr. 118:8-119:10.

Dr. Jeziorski's citation to the AAMC data is unreliable. The qualifier he omits is no mere throwaway—the demographic differences between U.S. and Caribbean medical students render data about the former population inapplicable to the latter, particularly when it comes to predicting graduation rates and timelines. *See* Jeziorski Tr. 186:2-14 (testifying that demographic differences

---

[9] And Dr. Jeziorski's phrasing—"students who are admitted but do not graduate from medical schools"— seems to collapse being admitted with matriculating. Jeziorski Rep. ¶ 10iii. Dr. Jeziorski's opinion does not differentiate between students who in fact began their medical education, like the class members here, and students who were merely admitted.

are one factor to consider before generalizing data from one population to another). Dr. Jeziorski fully credits (and cites in his own report) Dr. Pinsky's opinions that Caribbean medical schools have lower admissions standards than U.S. schools, and that attrition is higher as a result. *See id.* at 77:12-19, 78:9-12; Jeziorski Rep. ¶ 27. This evidence creates an irreconcilable analytical gap between the AAMC data and Dr. Jeziorski's opinion that Saba students who are dismissed or withdrawn could return to medical school, complete their degree, and thereby obtain value from their partial Saba education. Dr. Jeziorski lacks any expertise to fill this gap or otherwise show how data about U.S. medical students could support his rebuttal opinions.

When asked about his reliance on data limited to U.S. students, Dr. Jeziorski testified that he made an assumption, which was not disclosed in his report. Crediting Dr. Pinsky's opinion that Caribbean medical schools experience higher attrition, Dr. Jeziorski assumed that it would correspond with a higher rate of continuation at Caribbean medical schools and a higher six-year graduation rate. Jeziorski Tr. 119:14-121:13. This assumption—that a higher rate of attrition would mean a higher rate of continuation—"represent[s] a complete break" with the evidence in this case, in addition to Dr. Jeziorski's other opinions. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (finding an abuse of discretion where the district court permitted an expert to testify about the plaintiff's future earnings capacity "based on [an] unrealistic and speculative assumption" that departed from his work history). Where admissions standards are lower and attrition rates are higher, there is no reliable basis for Dr. Jeziorski to assume that Saba students who withdraw or are dismissed will ever return to school to complete their degree. The far more plausible assumption is quite the opposite—that those students will never return to medical

school.[10] Without the Dutch Lottery Study and without the AAMC data, Dr. Jeziorski's opinions in paragraph 10 are entirely without support.

### C. The "sheepskin effect" is not relevant and, even if it were, Dr. Jeziorski's only support for calling it into question is an unpublished working paper.

Dr. Jeziorski contends that Dr. Pinsky "attributes the entire value of education to the so-called 'sheepskin' effect—the wage premium associated with completing the final year of a degree." Jeziorski Rep. ¶ 13; Jeziorski Tr. 145:23-146:8. As Dr. Pinsky explains in his reply report, the "sheepskin effect" hypothesis has no bearing on his opinions. Pinsky Reply Rep. ¶¶ 16-17. A medical degree is not a feather in one's cap that increases earning power relative to non-degreed peers; it is a barrier to entry into the medical profession.

Attempting to rebut Dr. Pinsky's supposed reliance on the "sheepskin effect," Dr. Jeziorski calls it a "contested hypothesis" and cites a source he characterizes as "refuting" its existence. Jeziorski Rep. ¶ 13 n.10. But this source—an unpublished working paper—has no relevance to the value of a partial medical education from a Caribbean medical school, and Dr. Jeziorski conceded that the working paper is of limited or no reliability. Jeziorski Tr. 158:11-159:10. Without the scrutiny of peer review, he "would not be confident" in a paper's conclusions and would therefore give that source a "lower weight . . . by a lot actually." Jeziorski Tr. 90:14-18, 160:11-15 (further testifying that it provides "weaker evidence"). But none of this caution appears in the report, where Dr. Jeziorski fails to warn his nonacademic audience about the paper's lower degree of reliability.[11]

---

[10] And Dr. Jeziorski does not know and did not investigate whether any Saba students who transferred went on to graduate from another medical school. Jeziorski Tr. 128:11-15.

[11] Dr. Jeziorski also ignores a statement from one of his own sources: "Students and their parents have an obvious interest in retention, since attending college is of little value in career development unless the student is able to persist through completion of some degree." Egan Decl. Ex. F at 1; *see* Jeziorski Tr. 264:21-265:1. This conclusion contradicts Dr. Jeziorski's opinion that each year of schooling has separate value for students. ¶ 17, 266:12-19.

And Dr. Jeziorski relied on this unpublished working paper to form his own opinion about value in this case, rendering that opinion unreliable. The study is also irrelevant: it explicitly excludes medical students and instead addresses white male college dropouts, comparing individuals who have 15 versus 16 years of education.[12] *See* Egan Decl. Ex. G.

### D. Sources addressing undergraduate degrees are inadequate to support Dr. Jeziorski's opinions on the value of a partial medical education.

To support his opinion that a partial medical education has value, Dr. Jeziorski cites studies addressing the generic value of undergraduate education. But there are clear differences between these two levels of education—most significantly, the career opportunities available upon receiving an undergraduate degree versus a medical degree. Yet Dr. Jeziorski makes no effort to explain how analysis of the value of undergraduate education can reliably apply to the value of partial medical education at Saba.[13] *See* Jeziorski Rep. ¶ 14; Jeziorski Tr. 166:21-24 (acknowledging that "there are differences between an undergraduate degree and a professional degree like an MD").

There is a clear gap between these studies addressing the value of undergraduate education and the opinions Dr. Jeziorski offers on the value of a partial Caribbean medical education. And Dr. Jeziorski lacks the knowledge or expertise to fill that gap, rendering his opinions unreliable

---

[12] The study ultimately concludes that: "15 years of schooling may send a negative signal to employers. Since it usually takes 16 years to complete a four-year college program, many of those with 15 years of schooling may be college drop-outs. With limited information on the productivity of workers, employers may offer lower wages to drop-outs than to completers." *See* Egan Decl. Ex. G at 11-12.

[13] These studies have features that further limit their relevance. One relies on data about white male high school students gathered in 1979 and addresses only college education. *See* Jeziorski Tr. 162:20-23; Jeziorski Rep. ¶ 14 n.13. Dr. Jeziorski relies on a figure from another study limited to data from men aged 40 to 45 between the years 1994 and 1996. Egan Decl. Ex. H, Figure 2 at 1807; Jeziorski Rep. ¶¶ 11-12. That data is censored: years of schooling above 18 years were all counted as 18. Jeziorski Tr. 149:13-22. Most medical students would have at least 20 years of schooling. Jeziorski Tr. 149:23-150:3; *see id.* at 154:1-7 (acknowledging that the "censoring or data limitation . . . probably does" affect the conclusion that the returns to education would be linear).

*ipse dixit*. *See Joiner*, 522 U.S. at 146; *McGovern*, 584 F. Supp. 2d at 426  (Young, J.) (excluding testimony where the expert failed to connect his experience to the opinions offered). The data and studies described above are "simply inadequate to support the conclusions reached," and "*Daubert* and Rule 702 mandate the exclusion of [this] unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *see Joiner*, 522 U.S. at 137 (noting that it was not an abuse of discretion to reject expert reliance on studies that "were so dissimilar to the facts presented" in that case).[14]

## II. Dr. Jeziorski's opinion that attrition does not matter to prospective medical students ignores contrary conclusions from his own sources, dismisses the words of actual prospective medical students, and lacks support.

Responding to Dr. Pinsky's opinion about the importance of attrition rates to prospective Caribbean medical students,[15] Dr. Jeziorski asserts that he "found no evidence" to suggest attrition rates are a "major factor" considered by those students. Jeziorski Rep. ¶¶ 17, 19. Yet the second sentence of one of his central studies provides: "Students and their parents have an obvious interest in retention, since attending college is of little value in career development unless the student is able to persist through completion of some degree." *See* Egan Decl. Ex. F at 1. Dr. Jeziorski deemed this the "most reliable of the studies" he found about attrition. Jeziorski Tr. 264:22-265:1.

---

[14] Dr. Jeziorski's last "opinion" in this section on the value of partial education is not proper rebuttal. He broadly states that a university's "primary educational product" is the chance to pursue a degree, which the university does not "sell or promise" unless students meet academic standards. *See* Jeziorski Rep. ¶ 16. Nowhere does Dr. Pinsky suggest that tuition entitles students to a degree whether or not they meet academic standards. And Dr. Jeziorski agreed with the statement from his own source that a plaintiff's tuition payments "surely came with the expectation that in the normal course [he] would receive a college diploma." *See Bleiler v. Coll. of Holy Cross*, No. 11-cv-11541-DJC, 2013 WL 4714340, at *18 (D. Mass. Aug. 26, 2013); Jeziorski Rep. ¶ 16 n.14 (citing *Bleiler*); Jeziorski Tr. 175:14-22; *see also id.* at 47:11-12 ("I would never encourage a student not to graduate with a degree.").

[15] Dr. Pinsky opines, "When a Caribbean medical school with high attrition rates runs a marketing campaign that touts high USMLE passage rates but does not disclose information about high attrition, it leaves out critical information necessary for prospective students to make an informed enrollment decision." Pinsky Rep. ¶ 37.

Asked about the finding quoted above, Dr. Jeziorski tried to distance himself from it, suggesting that it lacked empirical evidence, *id.* at 269:12-16, that the peer review process should have caught it, *id.* at 269:22-270:8, that the authors "maybe overstepped a bit" due to an interest in "sell[ing] their results," *id.* at 270:15-21, and that he, as an experienced academic, "can siphon through" a study and discount statements that are not supported, *id.* at 271:2-15. But Dr. Jeziorski's report makes no mention of his decision to disregard this sentence or of his justifications for doing so. Because Dr. Jeziorski's finding that there is "no evidence" to suggest attrition rates are a major factor considered by prospective medical students is contradicted by the opening lines of one of the "most reliable of the studies" he cites, his opinion is not reliable.

Dr. Jeziorski's opinion that attrition does not matter also ignores the wealth of evidence documenting that prospective Saba students considered attrition in their choice of medical school. *See* ECF No. 82 at 3-4, n.12-13. At his deposition, Dr. Jeziorski recalled Plaintiffs' citations to student questions about attrition in the class certification briefing. Jeziorski Tr. 204:11-21; *see also* ECF No. 103-3 (stating that Dr. Jeziorski reviewed the class certification briefing prior to his rebuttal report). Reviewing a series of emails from a prospective student asking about Saba's attrition rate, Dr. Jeziorski acknowledged that "information [on attrition rates] seem[ed] to be important to this student" and that he "[could not] refute that that person care[d] about attrition rates." Jeziorski Tr. at 207:20-22, 211:3-6. But this evidence (and the other emails from prospective students cited in class certification briefing) did not lead Dr. Jeziorski to revisit his opinion or rephrase the strength of his "no evidence" claim. Jeziorski Rep. ¶ 19; *see* Jeziorski Tr. 210:21-213:2. Finally, Dr. Jeziorski's own report undermines his opinion: he notes that students may consider graduation rates when choosing a school, Jeziorski Rep. ¶ 17, and Dr. Jeziorski agrees that graduation rates and attrition rates are two sides of the same coin, Jeziorski Tr. 200:20-22,

201:4-9; *see also id.* at 201:12-202:2 ("[I]f you have zero chance to graduate from an institution and there's a comparable institution that you have a very high chance to graduate from, it's a fair assessment that you would consider that.").

The two studies Dr. Jeziorski cites provide no meaningful support for his opinion that prospective Caribbean medical students do not care about attrition rates. The first is irrelevant on its face because its authors concede that "the special nature of this sample makes it impossible to extrapolate this result to the entire population." Egan Decl. Ex. I at S29; *see* Jeziorski Tr. 185:20-186:1 (acknowledging that the data was limited to male World War II veterans who applied for the Army Air Corp and were choosing an institution for their undergraduate education in the 1950s). Dr. Jeziorski had no reason to disagree with the author's assessment of the study's limitations; his justification for relying upon it notwithstanding the author's admonition was simply its publication in "an extremely prestigious journal." Jeziorski Tr. 187:13-188:5.

The second study addresses a similarly narrow set of data, namely the matriculation decisions of high school students admitted to Williams College from 2008 to 2012. Jeziorski Tr. 198:6-9; Egan Decl. Ex. J at 1, 5 (examining factors such as alumni grandparents, fundraising potential, religion, and athletics that were likely to drive talented high school students to choose Williams). The factors that mattered to that narrow population of high school students selecting elite private colleges have no bearing on the factors that matter most to prospective Caribbean medical students. In any event, put together with Dr. Jeziorski's testimony, insight from this study in fact supports Dr. Pinsky's opinion that prospective Caribbean medical students consider attrition rates an important factor in their school selection. The study discusses investment utility, which is the economics concept that people considering an investment analyze the expected return, including the risk that the return will not come to be. Jeziorski Tr. 198:20-199:8. Dr. Jeziorski

14

testified that the "precision" of people's risk assessment "depends on the accuracy of information about the risk," *id.* at 199:9-19, and agreed that attrition rates would bear on investment utility, *id.* at 233:17-24. If attrition rates are relevant to prospective students' investment and risk analysis, it cannot also be true that those attrition rates are unimportant to prospective students.

Dr. Jeziorski's lack of knowledge about medical students prevents him from reliably opining on factors that would or would not be significant to that population of students. He testified that factors considered by prospective students would vary depending on the degree pursued, Jeziorski Tr. 178:25-179:5, and he admits that because of his own lack of experience with prospective medical students, he "would be unaware of certain medical-specific factors that they would consider," *id.* at 180:9-16.[16] With studies that say nothing about medical school and no expertise to fill in that gap, Dr. Jeziorski's opinions necessarily lack foundation.[17] *See Amorgianos*, 303 F.3d at 266 (describing exclusion as "mandate[d]" where the underlying data, methodology, or studies are "simply inadequate to support the conclusions reached"); *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D. Cal. 2011) ("[A] reliable expert would not ignore contrary data, misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted." (internal quotation marks omitted)).

---

[16] One need not scour unrelated academic papers to understand why prospective Caribbean medical students care about the number of students who enroll but do not advance far enough to sit for the USMLE: students only obtain a license to practice medicine in the United States by passing the USMLE. As prospective students assess whether to risk paying hundreds of thousands of dollars in tuition, they would of course want to know whether, year after year, half of a medical school's students do not advance far enough to even sit for the Step 1 exam.

[17] To the extent Defendants argue that Dr. Jeziorski should be able to offer opinions about student selection of schools in general, such opinions would not be relevant or helpful to the jury in this case. *See* Jeziorski Tr. 179:13-180:8; Fed. R. Evid. 702(a) (requiring Defendants to demonstrate that Dr. Jeziorski "will help the trier of fact to understand the evidence or to determine a fact in issue").

**III.    Dr. Jeziorski's opinion on the purported complexities of calculating attrition is baseless and ignores contrary evidence.**

Dr. Jeziorski next opines that calculating attrition is simply too complicated. But that opinion lacks foundation because Dr. Jeziorski fails to grapple with contrary evidence and because his own professional experience has nothing to do with medical school. Jeziorski Rep. ¶¶ 22, 25. First, Dr. Jeziorski fails to reconcile his opinion with the AAMC's ability to calculate attrition at U.S. medical schools, despite citing that very data in his report. Jeziorski Rep. ¶ 24. Second, Dr. Jeziorski acknowledges that any institution would have ready access to student enrollment data and that Saba would have access to information on which students sit for the Step 1 exam, giving them all of the information necessary to determine which matriculated students withdraw or are dismissed prior to that exam. *See* Jeziorski Tr. 254:2-15. Third, Dr. Jeziorski's work as a professor supporting up to ten marketing PhD students gives him no reliable basis to opine on attrition calculations in the medical school context.

**A.    The AAMC calculates attrition rates at U.S. medical schools, data which Dr. Jeziorski relies on in his report.**

Dr. Jeziorski's opinion that attrition is too complex to calculate lacks support and is undermined by citations in his own report. Without citing any authority, he raises factors that he says complicate attrition calculations: the possibility that students may return to resume a degree, the academic and nonacademic reasons that cause student departures, and variation in rates by year.[18] Jeziorski Rep. ¶ 22. But beyond simply listing these factors, he does no work to explain how they would complicate attrition. None of these factors apparently posed barriers for the AAMC's calculation of attrition rates at U.S. medical schools—rates that Dr. Jeziorski cited in his

---

[18] He also questions whether students who transfer into a non-MD program at the same school would be included in an attrition rate, Jeziorski Rep. ¶ 22, but admits that Saba has no such option, meaning that factor would not complicate Saba's attrition calculation, Jeziorski Tr. 247:14-25.

own report. *See* Jeziorski Rep. ¶ 24. Dr. Jeziorski agreed that AAMC is equipped to calculate attrition rates and that based on the published data, "[t]hey chose one" manner of doing so. Jeziorski Tr. 262:7-263:1; *see* Egan Decl. Ex. E (describing attrition rates by matriculation year and separating academic and nonacademic reasons for attrition).

And despite Dr. Jeziorski's criticism of Dr. Pinsky for stating that "the average attrition rate for American medical schools is less than 10%," he admitted at his deposition that the AAMC's attrition-rate graph supports Dr. Pinsky's opinion. *See* Jeziorski Rep. ¶ 24; Jeziorski Tr. 257:25-262:6. Dr. Jeziorski provides no support for his criticism of Dr. Pinsky. His own opinion is both unsupported and in fact undermined by his own source, making it nothing more than *ipse dixit*.

### B. Institutions of higher education track student enrollment data necessary to calculate attrition.

Dr. Jeziorski's opinion that attrition is too difficult to calculate is also inconsistent with his testimony that the information relevant to calculating attrition is readily available to academic institutions like Saba. According to Dr. Jeziorski, institutions track the number of students enrolled and the identity of those students, meaning they would know which students are no longer in attendance after two years. Jeziorski Tr. 246:9-23. And Saba would know the identities of the students who matriculated each year, *id*. at 254:2-9, and which students sat for the USMLE Step 1 exam, *id.* at 254:10-13; *see also id.* at 254:10-255:16 (calculating a 50% attrition rate based on a hypothetical of 100 students enrolling and only 50 taking the Step 1 exam).

Dr. Jeziorski's opinions are also contrary to the record evidence showing that Defendants carefully tracked Saba's attrition data, which they used to calculate profitability, make revenue forecasts, and provide updates to the board. *See* Dkt. 82 at 1-2, n.5. Emails between marketing officials at Saba and R3 refer to attrition rate as "that number." *See* Egan Decl. Ex. K; Jeziorski Tr. 222:4-12. Further, a top executive at Saba was "leary" [sic] of publishing the number of enrolled

students because "then [the] attrition assessment becomes easier." Egan Decl. Ex. L; Jeziorski Tr. 224:23-225:1, 225:12-15. According to this email, the attrition calculation is simple enough that prospective students could perform it if empowered with accurate enrollment figures. Dr. Jeziorski makes no effort to reconcile this evidence with his attempts to complicate attrition calculations, rendering his opinion unreliable.[19]

### C. With no knowledge of medical education, admissions, or retention, Dr. Jeziorski's sweeping opinions are mere *ipse dixit*.

Dr. Jeziorski's opinions on attrition calculations find no reliable foundation in his experience as a professor. Although Defendants' Rule 23(f) petition describes Dr. Jeziorski as "responsible" for PhD admissions yield and retention, he disclaimed any direct or formal responsibility at his deposition. Jeziorski Tr. 30:3-13 (ascribing responsibility to the director of the PhD program), 33:25-34:14 (same). Moreover, his work on retention is limited: between three and ten students are in the marketing PhD program at Berkeley's Haas School of Business at any given time, and he aims to retain them alongside all of the other professors in the program.[20] *Id.* at 42:10-21, 39:5-9, 39:16-19 (noting that his work is not judged by specific retention numbers).

Even if Dr. Jeziorski's work in admissions and retention was more robust, it has nothing to do with the medical education context of this case. As Dr. Jeziorski acknowledges, his lack of experience in admissions or retention at a medical school makes him unaware of the specifics of those contexts, *see id.* at 180:14-17, and opinions based on his experience are "necessarily limited

---

[19] As support for his opinion on the complexity of calculating attrition, Dr. Jeziorski also notes that the ECFMG does not publish attrition rates. Jeziorski Rep. ¶ 31. This fact provides no such support. As Dr. Pinsky explains in his reply report, such calculations are "beyond ECFMG's mandate," which is focused not on evaluating schools but on certifying international medical school graduates for practice in the United States. Pinsky Reply Rep. ¶ 15.

[20] His experience in admissions is equally limited: he serves on the admissions committee for applicants to the marketing PhD program at Berkeley's business school, which typically admits one to two students each year. Jeziorski Tr. 29:12-20, 30:18-24.

*by* [his] experience as an educator," *id.* at 172:16-24.[21]

## CONCLUSION

The problems outlined above make Dr. Jeziorski's opinions not just shaky but fundamentally unreliable. Questioned about the relevance of data about lottery entrants for admission to Dutch medical school, Dr. Jeziorski explained that he followed the practice in academic research of "rely[ing] on the reader as well to -- if they are concerned about the number to go and look up the details in the relevant paper." Jeziorski Tr. 114:2-9; *see also id.* at 144:10-15 (noting that he "[left] the reader to judge, you know, to which extent that [number from the Dutch admissions lottery study] transfers"). Questioned about his citation to an unpublished working paper, Dr. Jeziorski explained that he "think[s] it's fair to bring in a range of perspectives, even if some of these perspectives are not as strong just to be more balanced in the -- in the opinion and then the reader can sort of aggregate these." *Id.* at 160:13-18.

Such an approach may be appropriate for academic publications that will undergo the peer-review process or for a trained academic audience, but it is not sufficient for expert testimony before a jury of laypeople. Admitting this testimony would pose a prejudicial risk that jurors will credit the opinions of a tenured professor from a prestigious university, assuming they result from a rigorous analysis of the cited studies and are grounded in the relevant context. Dr. Jeziorski's report does not reflect such rigorous analysis. *See Joiner*, 522 U.S. at 146–47 (holding it was "within the District Court's discretion to conclude that the studies upon which the experts relied were not sufficient, whether individually or in combination"). Here, the likelihood that these

---

[21] This point is underscored by, among other things, (i) Dr. Jeziorski's lack of understanding of what the ECFMG does, *see supra* note 19; (ii) his lack of familiarity with the Liaison Committee on Medical Education or its tracking of attrition, Jeziorski Tr. 245:15-246:1; and (iii) his lack of knowledge about the USMLE, including the meaning of the acronym and when medical students take it, *id.* at 69:16-18; 70:22-23.

opinions will confuse and unfairly prejudice the jury significantly outweighs any probative value

they might have. *See Daubert*, 509 U.S. at 595 ("[I]n weighing possible prejudice against probative

force under Rule 403 . . . [the Court] exercises more control over experts than over lay witnesses."

(citation omitted)).

      Plaintiffs respectfully ask that the Court exclude Dr. Jeziorski's testimony.


Dated: November 15, 2024              Respectfully submitted,

                     */s/ Patrick T. Egan*
                     **BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Christina L. G. Fitzgerald (BBO #709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cfitzgerald@bermantabacco.com

**MAYNARD NEXSEN PC**
Margaret M. Siller (admitted *pro hac vice*)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

John R. Alford, Jr. (admitted *pro hac vice*)
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1847
jalfordjr@maynardnexsen.com

**NATIONAL STUDENT LEGAL DEFENSE NETWORK**
Alexander S. Elson (admitted *pro hac vice*)
Daniel A. Zibel (admitted *pro hac vice*)
Madeline D. Wiseman (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org
dan@defendstudents.org
madeline@defendstudents.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

<u>*/s/ Patrick T. Egan*</u>
Patrick T. Egan