**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATALIA ORTIZ, on behalf of herself and a Class of similarly situated persons, | Civil Action No.: 1:23-cv-12002-WGY |
| *Plaintiff* | |
| v. | |
| SABA UNIVERSITY SCHOOL OF MEDICINE; and R3 EDUCATION, INC., | |
| *Defendants.* | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**MAYNARD NEXSEN PC**
Margaret M. Siller (admitted *pro hac vice*)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

John R. Alford, Jr. (admitted *pro hac vice*)
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1847
jalfordjr@maynardnexsen.com

**NATIONAL STUDENT LEGAL DEFENSE NETWORK**
Alexander S. Elson (admitted *pro hac vice*)
Daniel A. Zibel (admitted *pro hac vice*)
Madeline Wiseman (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org
dan@defendstudents.org
madeline@defendstudents.org

**BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Christina Fitzgerald (BBO #709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cfitzgerald@bermantabacco.com

## **TABLE OF CONTENTS**

BACKGROUND ................................................................................................................ 1

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT .................................................................................................................... 6

   I.    Chapter 93A Governs Ms. Ortiz's Claim ............................................................ 6

   II.   Defendants' USMLE Representations are Actionable under Chapter 93A ...................... 12

      A.   Summary Judgment is Improper Because a Factfinder Must Determine Whether Defendants' Step 1 Representations Had the Capacity to Mislead Reasonable Consumers ........................................................................................................... 12

      B.   There is a Genuine Dispute of Material Fact as to Whether Defendants' USMLE Step 1 Representations Were Material ............................................ 16

   III.   Ms. Ortiz Suffered a Cognizable Injury that has a Causal Connection to Defendants' Deception ................................................................................................................. 18

CONCLUSION............................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                        **PAGE(S)**

*Arthur D. Little, Inc. v. Dooyang Corp.*,
  147 F.3d 47 (1st Cir. 1998) ................................................................. 15

*Aspinall v. Philip Morris Cos.*,
  813 N.E.2d 476 (Mass. 2004) ................................................ 15, 16, 17, 20

*Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*,
  17 N.E.3d 1066 (Mass. 2014) ............................................................... 14

*Boos v. Abbott Labs.*,
  925 F. Supp. 49 (D. Mass. 1996) ......................................................... 10

*Bushkin Assocs., Inc. v. Raytheon Co.*,
  473 N.E.2d 662 (Mass. 1985) ..................................................... 10, 11, 12

*Casavant v. Norwegian Cruise Line, Ltd.*,
  919 N.E.2d 165 (Mass. App. Ct. 2009) ................................................ 19

*Comerica Bank & Tr., N.A. v. Brown & Rosen, LLC*,
  195 N.E.3d 432 (Mass. App. Ct. 2022) ................................................ 11

*Cristostomo v. New Balance Athletics*,
  647 F. Supp. 3d 1 (D. Mass. 2022) ...................................................... 10

*Drakopoulos v. U.S. Bank Nat. Ass'n*,
  991 N.E.2d 1086 (Mass. 2013) ............................................................ 14

*Dumont v. Reily Foods Co.*,
  934 F.3d 35 (1st Cir. 2019) ............................................................. 15, 18

*Fed. Home Loan Bank of Bos. v. Ally Fin., Inc.*,
  2013 WL 5466628 (D. Mass. Sept. 30, 2013) ................................... 11, 13

*Foisie v. Worcester Polytechnic Inst.*,
  967 F.3d 27 (1st Cir. 2020) ................................................................ 11

*Geis v. Nestlé Waters N. Am.*,
  321 F. Supp. 3d 230 (D. Mass. 2018) ................................................... 10

*Goebel v. Schmid Bros.*,
  871 F. Supp. 68 (D. Mass. 1994) ......................................................... 11

*Hershenow v. Enter. Rent-A-Car Co. Of Bos., Inc.*,
    840 N.E.2d 526 (Mass. 2006) .................................................................. 20

*Holbrook v. Bos. Sci. Corp.*,
    487 F. Supp. 3d 100 (D. Mass. 2020) ................................................. 13, 14

*In re Int'l Harvester Co.*,
    104 F.T.C. ................................................................................................ 18

*In re M3*,
    270 F.R.D. 45 (D. Mass. 2010) ......................................................... 19, 20

*Kannavos v. Annino*,
    247 N.E.2d 708 (Mass. 1969) ................................................................ 17

*Nei v. Burley*,
    446 N.E.2d 674 (Mass. 1983) ................................................................ 12

*Nightingale v. Nat'l Grid USA Serv. Co.*,
    107 F.4th 1 (1st Cir. 2024) ..................................................................... 22

*Purity Supreme, Inc. v. Att'y Gen.*,
    407 N.E.2d 297 (Mass. 1980) ................................................................ 14

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ................................................................................. 9

*Resolute Mgmt. Inc. v. Transatlantic Reinsurance Co.*,
    29 N.E.3d 197 (Mass. App. Ct. 2015) ................................................... 10

*Shaulis v. Nordstrom*,
    865 F.3d 1 (1st Cir. 2017) ................................................................. 22, 23

*Smith v. Zipcar, Inc.*,
    125 F. Supp. 3d 340 (D. Mass. 2015) .................................................... 16

*Tomasella v. Nestlé USA, Inc.*,
    962 F.3d 60 (1st Cir. 2020) ............................................... 15, 17, 18, 20

*UBS Fin. Servs. v. Aliberti*,
    133 N.E.3d 277 (Mass. 2019) ................................................................ 14

*Wolski v. Gardner Police Dep't*,
    560 F. Supp. 3d 387 (D. Mass. 2021) ...................................................... 9

*Zimmerman v. Kent*,
   575 N.E.2d 70 (Mass. App. Ct. 1991) ................................................ 23

**STATUTES**

Mass. Gen. Laws ch. 93A, 9 .................................................................. 10

**RULES**

Fed. R. Civ. P. 56(a) ............................................................................ 8

**REGULATIONS**

34 C.F.R. § 668.71 ............................................................................. 18

34 C.F.R. §§ 600.55(d)(1) and (f)(1) ..................................................... 18

940 Mass. Code Regs. 3.16(2) ............................................................. 15

940 Mass. Code Regs. 6.01 .................................................................. 20

**OTHER AUTHORITIES**

*From Rancid to Reasonable: Unfair Methods of Competition Under State Little FTC Acts*,
   73 Am. U. L. Rev. 857 (2024) ............................................................ 12

*The Multistate Problem in Consumer Class Actions and Three Solutions*,
   17 Harv. L. & Pol'y Rev. 301 (2022) ................................................... 12

Plaintiff Natalia Ortiz ("Ms. Ortiz") respectfully submits this Memorandum of Law in Opposition to the Motion for Summary Judgment ("Motion," ECF No. 120) filed by Defendants Saba University School of Medicine and R3 Education, Inc. (collectively referred to as "Saba" or "Defendants").

## BACKGROUND[1]

From their corporate headquarters and administrative offices in Massachusetts, Defendants devised and implemented a scheme to mislead prospective students about one of the most critical indicators of a medical school's record of success—the percentage of students who pass Step 1 of the USMLE.

Defendants' USMLE passage rate representations are carefully crafted, reviewed, and approved by executive leadership at R3, including CEO Steven Rodger.[2] The focus of these representations—posted prominently across Defendants' digital footprint—is not just on the 97% to 100% passage rate, but also on that statistic's significance: that Saba's USMLE performance is "higher than many US medical schools," and that the high rates are a testament to "the quality of [the Saba] education."[3] Defendants' intense focus on USMLE rates is based on internal data showing that they are "the selling points" for prospective students deciding whether to enroll.[4]

As Defendants knew, the USMLE Step 1 "is the key 'pivot point' in med school" and a medical school's "[f]irst-time pass rate is critical" to students evaluating medical schools.[5] Recognizing the importance of the USMLE passage rates to prospective students, Saba widely and consistently touts this rate, including on its website, in marketing emails, in search engine ads, on

---

[1]    As used herein "PCMF" refers to Plaintiff's Counterstatement of Material Facts, which follows Plaintiff's Response To Defendants' Statement of Undisputed Material Facts.
[2]    PCMF ¶ 16.
[3]    PCMF ¶¶ 13, 25.
[4]    PCMF ¶ 9.
[5]    PCMF ¶ 10.

YouTube, at the top of its Facebook, Twitter, and LinkedIn profiles, in brochures, and at open houses and webinars.[6] Saba boasts that its USMLE passage rate is an "unprecedented achievement" that is "unmatched by any other international medical school," "**exceeds** most US medical schools and ALL international medical schools," and a "testament to the quality" of Saba's education.[7] Saba assures prospective students that "***virtually every Saba student*** passes the USMLE on their first attempt"[8] and that its "99% USMLE Step 1 first-time pass rate speaks for itself."[9]

In reality, these advertisements were designed to mislead prospective students, like Plaintiff, into believing that if they chose to attend Saba, they would be obtaining the kind of quality medical education that would prepare them to pass the Step 1 exam to the same extent as – if not better than – the top U.S. medical schools. But the numbers reported in these advertisements were inflated in an effort to increase Saba's profitability. In fact, the quality of a Saba education was such that roughly 50% of Saba students chose to, or were unable to, reach (let alone sit for) the Step 1 exam.[10] And the evidence demonstrates this was intentional. Internally, Defendants carefully tracked Saba's attrition data, which they used to calculate profitability, make revenue forecasts, and provide updates to the board.[11] As each student departed, this information was immediately logged by the Registrar into the school's Phoenix database, which senior management had direct access to.[12] This data—closely held and guarded by only a few senior executives—reveals that Saba has long had a serious attrition problem, which Defendants

---

[6]      PCMF ¶ 11.
[7]      PCMF ¶ 12, 14.
[8]      *Id.* (emphasis added).
[9]      *Id.*
[10]     Compl., ECF No. 1, ¶¶ 79-80; PCMF ¶ 17.
[11]     PCMF ¶ 19.
[12]     PCMF ¶ 20.

were determined to hide from prospective students.[13]

While Defendants would like the public and this Court to believe (as they explicitly represented to this Court early in this litigation) that Saba's attrition numbers are "both self-evident and easily ascertained," ECF No. 16 at 5, the evidence tells a different story. The attrition problem was deliberately hidden from prospective students. As the Executive Vice President for Marketing and Enrollment acknowledged, Defendants would not provide any information about attrition to students and deliberately did not publish information about it on Saba's website.[14] In response to an internal question about the number of students attending Saba, Donald Donahue (formerly a Senior Vice President of Marketing and Enrollment at Defendant R3 Education, Inc.) wrote: "I'm always a bit leary [*sic*] to say. If somebody does the math then attrition assessment becomes easier."[15] In a separate communication with marketing staff, Mr. Donahue explained that "[w]e do not publish anything on this number."[16]

In one email between marketing executives about how to answer questions from prospective students about Saba's "retention challenge," R3's director of enrollment for North America (Jennifer Bosco) explained: "We want to ensure we can respond to the question in a way that does not give too much information and subsides the concern."[17] In another, R3's VP of Marketing (Melissa Kushner) asked: "Who has the ability to pull attrition rates based upon upcoming scores. I'm sure Patrick [Donnellan] and Steve [Rodger] have it, but will they share it?"[18] In response, R3's EVP for Marketing and Enrollment (Gerald Wargo) wrote: "Melissa – go ahead and ask. He may want to know why you want the info as I think they are trying to protect

---

[13]      PCMF ¶ 21.
[14]      PCMF ¶ 22.
[15]      PCMF ¶ 23.
[16]      PCMF ¶ 24.
[17]      PCMF ¶ 27.
[18]      PCMF ¶ 28.

that number from getting out. I think it's really bad."[19]

> To ensure that the truth did not leak, Defendants trained admissions staff to evade questions about attrition by stating that "it varies," that "online information is not always accurate," or that (despite Defendants' close tracking of attrition) the numbers were not available, and to pivot to topics like the USMLE passage rate or small class sizes.[20] Dozens of actual conversations with prospective students confirm that Defendants routinely misled prospective students who simply wanted to know how many students made it through the program.[21] Perhaps the only time that the truth was uncovered was by the Dutch Inspectorate of Education, who wrote in their notes from an online 2021 site visit with Rodger, Donnellan, and others that "[a]pproximately 25% of the students pass USMLE Step 1 at the end of year 2 directly."[22] However, this information was never made available to students. Despite Defendants keeping a close watch over Saba's attrition data, several of Defendants' executives have claimed they do not know what attrition means.[23] Ultimately, when Defendants' Rule 30(b)(6) representative was asked how Defendants could closely scrutinize "attrition" when they have no definition for it, he conceded that "attrition" refers to the number of students who fail to make it through the program.[24]

> Ms. Ortiz is a victim of Defendants' deceptive advertising. In researching medical schools, she visited Saba's website and social media accounts where she saw the USMLE passage rates and requested additional information about Saba's medical education.[25] In response to her request for information, she received standardized solicitations from Saba touting its high USMLE Step 1

---

19    *Id.*
20    PCMF ¶ 25.
21    PCMF ¶ 30.
22    PCMF ¶ 31.
23    PCMF ¶ 32.
24    PCMF ¶ 33.
25    PCMF ¶ 38.

passage rates (including the claim that "virtually every Saba student passes the USMLE on their first attempt—an unprecedented achievement unmatched by any other international medical school.").[26] She also attended an open house, where Saba reiterated its USMLE Step 1 statistics.[27] At no point during her enrollment did Saba inform her that around 50% of Saba's students do not sit for the exam.[28] Impressed by Saba's USMLE Step 1 representations, Ms. Ortiz enrolled in September 2019.[29] Ms. Ortiz was dismissed from Saba before she had the opportunity to take the USMLE Step 1 exam.[30]

Ms. Ortiz is just one story of what happens when schools focus on deceptively marketing false hope to prospective students, as opposed to focusing on student education. As for the former Executive Dean – who sat directly below Saba's President – testified, the schools entire focus shifted from education to marketing. "Prior to [the acquisition of R3 by Global University Systems], everything was about focusing on student success, getting them through the program and into residence [sic]. And after that, it was all marketing."[31] He complained, "they were wasting millions of dollars that could have been used to improve the education program."[32]

## LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At this procedural juncture, the Court "must draw all reasonable inferences in favor of the nonmoving

---

[26]    PCMF ¶ 12, 39.
[27]    PCMF ¶ 40.
[28]    PCMF ¶ 45.
[29]    PCMF ¶ 44, 46.
[30]    PCMF ¶ 47.
[31]    PCMF ¶ 15.
[32]    *Id.*

party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "This Court must also 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Wolski v. Gardner Police Dep't*, 560 F. Supp. 3d 387, 393 (D. Mass. 2021) (Young, J.) (quoting *Reeves*, 530 U.S. at 151).

## ARGUMENT

Defendants claim they are entitled to summary judgment on Ms. Ortiz's Chapter 93A claim for three reasons, each of which should fail. *First*, Ms. Ortiz should be permitted to proceed under Chapter 93A. Although the Court held, in the context of the predominance inquiry under Rule 23(b)(3), that because Plaintiff did not analyze possible variations among the consumer protection laws of various states, Plaintiff failed to meet her burden to demonstrate that common issues predominate,  ECF No. 134 at 12-23, the Court did not hold that Chapter 93A does not apply to Ms. Ortiz's claims and it should not do so here given the law and facts discussed below.[33] *Second*, the record evidence easily defeats Defendants' argument that there is no material issue of fact as to whether the contested representations are deceptive, unfair, or material. *Third*, Ms. Ortiz was injured by Defendants' USMLE Step 1 representations because she enrolled in Saba believing it was a school where "virtually every student" passed that critical exam. The Court should deny summary judgment.

## I.    CHAPTER 93A GOVERNS MS. ORTIZ'S CLAIM

Defendants contend that Chapter 93A should not apply to Ms. Ortiz's claim because "the law of the state in which a plaintiff took action in reliance on a defendant's representations" should apply. ECF No. 121 at 9. But under Massachusetts choice of law principles, a plaintiff's place of

---

[33]    In a Memorandum and Order entered on November 26, 2024, this Court decertified the Class because "the laws of multiple jurisdictions apply." Doc. 134 at 25. Ms. Ortiz respectfully disagrees with the Court's ruling and intends to challenge this decision at the appropriate time.

"reliance" is not the dispositive factor. Massachusetts' choice-of-law rules favor the application of Chapter 93A to Ms. Ortiz's claims against the Massachusetts-based malefactors who deceived her.

Massachusetts courts permit out-of-state consumers to assert Chapter 93A claims against in-state defendants. *See, e.g.*, *Boos v. Abbott Labs.*, 925 F. Supp. 49, 55 (D. Mass. 1996) (noting the 1979 amendment to Chapter 93A, which removed any geographic restriction on consumer actions); *Cristostomo v. New Balance Athletics*, 647 F. Supp. 3d 1, 14 (D. Mass. 2022) (explaining that Section 9 of Chapter 93A "provides sufficient basis for a nationwide claim against a Massachusetts company because it does not require a plaintiff to reside in Massachusetts or for the allegedly deceptive activity to have primarily and substantially occurred in Massachusetts."); *Geis v. Nestlé Waters N. Am.*, 321 F. Supp. 3d 230, 241 (D. Mass. 2018) ("[T]he Court declines to hold that Massachusetts residents are the only consumers who can bring chapter 93A actions, particularly when a consumer is harmed by a fraudulent statement that was made in Massachusetts.").[34]

Thus, and as a starting point, Defendants' proposed categorical approach of applying the law of a plaintiff's home state no matter the facts, is wrong as a matter of law. Indeed, Massachusetts courts are clear that a "functional approach" that "eschew[s]" such categorical rules, is appropriate. *Resolute Mgmt. Inc. v. Transatlantic Reinsurance Co*., 29 N.E.3d 197, 202 (Mass. App. Ct. 2015) (citation omitted); *see also Bushkin Assocs., Inc. v. Raytheon Co*., 473 N.E.2d 662, 670 (Mass. 1985) ("No simple and objective test can provide an acceptable choice-of-law answer in this case, nor should it."). The "functional choice-of-law approach . . . responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs.*, 473

---

[34]    In *Geis* the plaintiff—a resident of Florida—brought a nationwide class action based on fraudulent representations of the Connecticut-headquartered defendant that emanated from its Massachusetts call center. *Geis,* 321 F. Supp. 3d at 240. The district court held that Geis had standing under Mass. Gen. Laws ch. 93A, 9, to bring an action. *Id.* at 241.

N.E.2d at 668; *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 41–42 (1st Cir. 2020) ("Regardless of the particular flavor of the underlying action, it is pellucid that Massachusetts would apply the law of the state with the 'most significant relationship' to the parties.") (citations omitted). In other words, "rather than simply adding up the parties' various contacts with each State," courts "focus [their] attention on the considerations particularly relevant to the case before [them]." *Comerica Bank & Tr., N.A. v. Brown & Rosen, LLC*, 195 N.E.3d 432, 437 (Mass. App. Ct. 2022) (citing *Bushkin Assocs.*, 473 N.E.2d at 669–70) (cleaned up). Because this inquiry requires careful scrutiny of case-specific interests, the Supreme Judicial Court has cautioned that the result in one case often "provide[s] little guidance for anticipating the 'fair result' in other cases." *Bushkin Assocs.*, 473 N.E.2d at 668.[35]

Defendants' categorical approach – which relies on the assumption that Section 148 of the *Restatement (Second) of Conflict of Laws* is dispositive – is not only generally wrong, but it is particularly erroneous in the Chapter 93A context, for two reasons. *First*, courts have rejected the invitation to "mechanically apply[] Section 148" in the Chapter 93A context because it fails to account for the case-specific, choice-influencing considerations required by Massachusetts's choice-of-law rules. *Fed. Home Loan Bank of Bos. v. Ally Fin., Inc.*, 2013 WL 5466628, at *1 (D. Mass. Sept. 30, 2013); *see Goebel v. Schmid Bros.*, 871 F. Supp. 68, 76 (D. Mass. 1994) (finding Section 148 deficient under Supreme Judicial Court precedent because Section 148 did not determine which state had "the more significant relationship to the transaction or parties").[36]

---

[35] As a result, the handful of decisions cited by Defendants (Doc. 121 at 9) and this Court (Doc. 134 at 20) in which courts declined to certify nationwide Chapter 93A classes are of limited persuasive value.
[36] Although the *Restatement* is a "source of guidance," the Supreme Judicial Court has clarified that it does not wish "to tie Massachusetts conflicts law to any specific choice-of-law doctrine" and that it "feel[s] free . . . to borrow from any of the various lists" proposed by legal scholars "to help focus [its] attention on the considerations particularly relevant to the case before [it]." *Bushkin Assocs.*, 473 N.E.2d at 668–70. Additionally, when the Supreme Judicial Court has consulted the *Second Restatement*, it has

*Second*, Section 148's guidance is focused on common law fraud and misrepresentation claims rather than "little FTC Acts" like Chapter 93A. *See* Milner, *From Rancid to Reasonable: Unfair Methods of Competition Under State Little FTC Acts*, 73 AM. U. L. REV. 857, 857 (2024), These little FTC Acts are designed to enable private plaintiffs to target a wider range of deceptive conduct than was possible under the common law; for example, Chapter 93A "dispenses with the need to prove many of the essential elements" of common law claims like fraud and deceit. *Nei v. Burley*, 446 N.E.2d 674, 678 (Mass. 1983). Further, they are "ideal for class certification" because of their focus on the defendant's conduct, and they typically do not require a showing of reliance. *See* Elias, *The Multistate Problem in Consumer Class Actions and Three Solutions*, 17 HARV. L. & POL'Y REV. 301, 317–18 (2022). Little FTC Acts, including Chapter 93A, were created with a purpose and function that is distinct from the common law claims that Section 148 was designed to address, counseling against the application of Section 148 here.

A functional choice-of-law inquiry favors application of Chapter 93A because Massachusetts has the most significant relationship to the parties and this litigation. Saba and R3 chose to operate out of Massachusetts, are familiar with its laws, and seek the protection of its laws when they believe doing so will benefit them.[37] Moreover, from their headquarters in Massachusetts, Defendants: (i) crafted the misleading USMLE representations—down to the

---

"emphasize[d] the choice-influencing factors listed in § 6(2)," which require an analysis of the policies underlying a particular field of law and the interests of the states and parties involved. *Id.* at 670.

[37]    Defendants publicly tout that disputes regarding terms of use of its website "will be resolved in accordance with, the laws of Massachusetts, without regard to its conflicts of law provisions." *Terms of Service*, Saba University, https://www.saba.edu/terms-of-use. Although these terms of use do not control this dispute, they provide strong support for the application of 93A here. The terms of use show that, to the maximum extent possible, Defendants want the law of their home state—Massachusetts—to govern claims asserted against them by users of Saba's website, regardless of residency. Applying Chapter 93A to Ms. Ortiz's claim can come as no surprise to Defendants and is in accord with their wishes and expectations. *See Bushkin Assocs.*, 473 N.E.2d at 670–71 (noting that the parties' "justified expectations" are an important consideration in Massachusetts's choice-of-law calculus).

precise turn of phrase that would best sell their school—and posted them throughout Saba's online footprint; (ii) drafted training materials directing admissions staff to evade questions about attrition; and (iii) misled and lied to countless prospective students seeking basic information about attrition.[38] In addition, students, including Ms. Ortiz, were required to send all checks and other tuition payments, to Defendants' headquarters in Massachusetts.[39] No other state has such a connection to the issues in this case. For these reasons, at least one other court has applied Massachusetts law to Defendant R3, even when the incident at issue in the litigation occurred outside of Massachusetts.[40]

Massachusetts also has the strongest interest in applying Chapter 93A to Ms. Ortiz's claim. As this Court has explained, Massachusetts has a "'significant interest' in seeing a resident defendant . . . 'be held accountable for its conduct, which took place in Massachusetts, and which allegedly caused the plaintiff's injury.'" *Holbrook v. Bos. Sci. Corp.*, 487 F. Supp. 3d 100, 106 (D. Mass. 2020) (Young, J.) (citation omitted); *see also Fed. Home Loan Bank of Bos.*, 2013 WL 5466628, at *2 (applying Massachusetts's functional approach in a case involving rating agencies' misrepresentations to find that, for "the sake of uniformity and predictability," the law of the state where the corporate defendant conducted its business should apply, "rather than the law of the various and numerous States to which the ratings ended up being disseminated"). By contrast, the

---

[38]    PCMF ¶¶ 4-5, 16, 19-30.

[39]    PCMF ¶ 5.

[40]    In *Balasanyan v. R3 Educ. Inc.*, No. 2085CV01052 (Mass. Super. Mar. 29, 2022), a wrongful death case, R3 argued that the laws of the Caribbean island where the incident occurred should apply. Rejecting this argument, the court found that Massachusetts had a "significant interest in seeing a resident defendant like R3 be held accountable for its conduct, which took place in Massachusetts, and which allegedly caused the plaintiff's injury." Doc 84-42 at 4. The court further explained that Massachusetts had a "dominant interest" in applying its law because "much of R3's alleged negligence with regard to its decisions regarding hiring, selection, and retention . . . involved in the management of [the school's] dormitories occurred in Massachusetts, at the facility in Devens." *Id.*

interest of Ms. Ortiz's home state is "less compelling" where, as here, it has no defendants that face liability. *Holbrook*, 487 F. Supp. 3d at 106 (Young, J.).

Further, the Supreme Judicial Court has repeatedly recognized that Chapter 93A "is a broad remedial statute; the Legislature's manifest purpose in enacting it was to deter misconduct, and to encourage vindicative lawsuits." *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co*., 17 N.E.3d 1066, 1078 (Mass. 2014) (citations omitted); *UBS Fin. Servs. v. Aliberti*, 133 N.E.3d 277, 291 (Mass. 2019) (noting that Chapter 93A "seeks to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace by impos[ing] liability on persons seeking to profit from unfair practices") (citation omitted); *Purity Supreme, Inc. v. Att'y Gen*., 407 N.E.2d 297, 306–07 (Mass. 1980) ("The overall purpose of c. 93A is that of providing proper disclosure of information and a more equitable balance in the relationship of consumers to persons conducting business activities.") (citation omitted). In addition, the Supreme Judicial Court "interprets consumer protection statutes" like Chapter 93A "broadly to effectuate their remedial purposes." *Drakopoulos v. U.S. Bank Nat. Ass'n*, 991 N.E.2d 1086, 1097 n.20 (Mass. 2013) (citation omitted). Massachusetts has a significant interest in allowing out-of-state consumers like Ms. Ortiz to invoke Chapter 93A against resident defendants who deceive them.[41]

//

//

//

---

[41]    Even if a state law other than 93A applies, *see* Doc. 134 at 13-23, Defendants have not met their burden to show there is no genuine dispute as to any material fact such that they are entitled to judgment as a matter of law.

11

## II.   DEFENDANTS' USMLE REPRESENTATIONS ARE ACTIONABLE UNDER CHAPTER 93A

### A. Summary Judgment is Improper Because a Factfinder Must Determine Whether Defendants' Step 1 Representations Had the Capacity to Mislead Reasonable Consumers

Defendants ask this Court to declare, as a matter of law, that their USMLE Step 1 representations do not have the capacity to mislead reasonable consumers. This question cannot be resolved on summary judgment, as the factfinder must decide whether Defendants' representations are deceptive. *See Dumont v. Reily Foods Co*., 934 F.3d 35, 40 (1st Cir. 2019).

A representation "is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." *Aspinall v. Philip Morris Cos*., 813 N.E.2d 476, 488 (Mass. 2004). "The spectrum of liability for deceptive acts or practices spans from affirmative misrepresentations, . . . to certain kinds of nondisclosures, such as 'advertising [that] may consist of a half truth, or even may be true as a literal matter, but still create[s] an over–all misleading impression through failure to disclose material information.'" *Tomasella v. Nestlé USA, Inc*., 962 F.3d 60, 71 (1st Cir. 2020) (citing *Aspinall*, 813 N.E.2d at 487); 940 MASS. CODE REGS. 3.16(2) ("[A]n act or practice is a violation of [Chapter 93A] if . . . [a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.").

Whether conduct is deceptive under Chapter 93A is a "question . . . of fact." *Dumont*, 934 F.3d at 40; *see also Arthur D. Little, Inc. v. Dooyang Corp*., 147 F.3d 47, 55 (1st Cir. 1998) ("Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the fact-specific nature of the inquiry.") (citation and quotation marks omitted). "As

with any question of fact, [the Court's] role is limited to defining the outer boundaries of its answer—i.e., the point at which a juror could reasonably find only one way." *Dumont*, 934 F.3d at 40. Thus, this Court need only determine that "a factfinder could reasonably regard" Defendants' USMLE Step 1 representations "as having the capacity to mislead."[42] *Id*.

Defendants' USMLE Step 1 marketing easily clears this threshold. When Ms. Ortiz was discerning whether to enroll, Defendants advertised that, *inter alia*, "virtually every Saba student passes the USMLE on their first attempt—an unprecedented achievement unmatched by any other international medical school" and that Saba students consistently achieve a 96–100% passage rate.[43] Defendants acknowledge that USMLE passage rates are one of their biggest "selling points" and that a medical school's "[f]irst-time pass rate is critical" to prospective students.[44] But the truth is that approximately half the students who enroll at Saba do not even sit for the Step 1 exam. At U.S. medical schools, attrition rates are far lower—typically less than 10%.[45] And as discovery has revealed, Defendants were keenly aware of Saba's high attrition and took steps to conceal it from the public, training their admissions staff to evade prospective students who inquired about attrition.[46] A factfinder certainly could determine that Defendants created an "over-all misleading impression through failure to disclose material information." *Aspinall*, 813 N.E.2d at 487.

Neglecting any mention of the foregoing legal principles, Defendants' arguments boil down to the following: (1) the Step 1 representations are true, and "[t]rue statements are . . . [not]

---

[42]    Defendants incorrectly claim that "a duty requiring disclosure" is an element of Ms. Ortiz's claim. (Doc. 121 at 11.) The Chapter 93A case law discussed above—which Defendants omit entirely—makes clear that an affirmative "duty requiring disclosure" is not an element of a Chapter 93A deception claim. Defendants err in relying on *Smith v. Zipcar, Inc.*, 125 F. Supp. 3d 340 (D. Mass. 2015)—a decision that involved claims for common law fraud and misrepresentation, *not* Chapter 93A. For this reason, the *Zipcar* decision has no applicability to this case.

[43]    PCMF ¶ 12.

[44]    PCMF ¶ 10.

[45]    Doc. 83 ¶ 21 ("The average attrition rate for American medical schools is less than 10%")

[46]    PCMF ¶¶ 16, 19-30.

deceptive" (ECF No. 121 at 11); (2) their failure to qualify their Step 1 representations with an attrition rate is a non-actionable "pure omission" or "bare nondisclosure" (*Id.* at 14); (3) the regulatory bodies that oversee Saba do not require it to report an attrition rate (*Id.* at 13); (4) "[t]here is no commonly understood definition of what an 'attrition rate' is, and Plaintiff provides none" (*Id.* at 13.); and (5) Ms. Ortiz understood when she enrolled that not every student sits for the Step 1 exam. (*Id.* at 15–16.)  These arguments can be quickly dispatched.

      *First*, Defendants argue that their USMLE Step 1 representations are not deceptive because they are true. The record reveals otherwise. The statement that "virtually every Saba student passes the USMLE on their first attempt" is false and deceptive when over half of Saba students do not sit for the exam. So too with Defendants many other representations, including that Saba's USMLE rate is an "unprecedented achievement" that is "unmatched by any other international medical school," "exceeds most US medical schools and ALL international medical schools," and is a "testament to the quality" of Saba's education. At best, it is for the trier of fact to determine whether these representations are deceptive.

      Even if the Court determined that Defendants' representations were somehow truthful on their face, statements that are literally true can be deceptive, as Chapter 93A prohibits "true" and "half-truth" statements that "create an over-all misleading impression through failure to disclose material information." *Aspinall*, 813 N.E.2d at 487; *see also Tomasella*, 962 F.3d at 72 (explaining that it is deceptive "to tell only half the truth, and to omit the rest," or stated differently, one cannot "fail[] to disclose qualifying information necessary to prevent one of his affirmative statements from creating a misleading impression"); *Kannavos v. Annino*, 247 N.E.2d 708, 711–12 (Mass. 1969) ("Fragmentary information may be as misleading as active misrepresentation, and half-truths may be as actionable as whole lies."). Saba cannot evade Chapter 93A liability by

contending that the percentage passage rates contained within their broader USMLE representations were technically accurate.

*Second*, Defendants' failure to qualify their Step 1 representations by explaining that over half of enrolled students do not sit for the Step 1 exam is *not* a "pure omission" or "bare nondisclosure." Again, a defendant is liable if he "fails to disclose qualifying information necessary to prevent one of his affirmative statements from creating a misleading impression." *Tomasella*, 962 F.3d at 72 (quoting *In re Int'l Harvester Co.*, 104 F.T.C. at 1057). To encourage enrollment, Defendants made many "affirmative statements" about Saba's Step 1 rates yet failed to disclose critical "qualifying information" about the number of students who do not sit for the test.

*Third*, for purposes of determining whether representations are deceptive under Chapter 93A, it is irrelevant whether any regulatory entities, such as the U.S. Department of Education, require Saba to disclose an attrition rate. The focus should be on the fact that Defendants misrepresented and omitted material facts to prospective students, which the U.S. Department of Education expressly prohibits. *See* 34 C.F.R. § 668.71 (providing that the U.S. Department of Education may, among other things, revoke an institution's program participation agreement if the institution makes substantial misrepresentations or omissions to prospective students or the public). Regardless, government regulators do not define what is deceptive under Chapter 93A, a task reserved to the factfinder.[47] *See Dumont*, 934 F.3d at 40 (explaining that the relevant inquiry is whether "a factfinder could reasonably regard" a defendant's representations "as having the capacity to mislead.").

---

[47]    Relatedly, Defendants contend that their Step 1 rates cannot be deceptive because they report them to the U.S. Department of Education. But the Department's reporting regulations say nothing about how institutions can advertise USMLE rates to the public, *see* 34 C.F.R. §§ 600.55(d)(1) and (f)(1), and they specifically prohibit substantial misrepresentations, 34 CFR § 668.71.

*Fourth*, Defendants claim that there is no common definition of attrition and that they do not calculate or even "have" an attrition rate. ECF No. 121 at 13-14. The definition of attrition and the different ways that it might be calculated are not at issue in this case. There is no dispute that Defendants know the number of students who matriculate at Saba but do not make it to sit for the USMLE.[48] That number was concealed from the public, and is all that matters here.

*Fifth*, Defendants contend that their representations cannot be deceptive because any reasonable consumer would understand that not every single student will sit for the exam. Obviously, a small degree of attrition is expected at any educational institution, but there is a dramatic difference between the attrition rate at U.S. medical schools (less than 10%) and the attrition at Saba.[49] Furthermore, a reasonable consumer would interpret the claim that "virtually every Saba student passes the USMLE on their first attempt" to mean precisely what it implies: almost all students who enroll pass Step 1. A factfinder must determine whether such conduct violates Chapter 93A.

### B. There is a Genuine Dispute of Material Fact as to Whether Defendants' USMLE Step 1 Representations Were Material

Defendants next contend that their representations regarding Step 1 passage rates were immaterial even if deceptive. ECF No. 121 at 17-18. As a threshold matter, materiality is not an independent element of a Chapter 93A claim premised on deceptive conduct. Rather, in this context, courts have treated materiality as "a proxy for causation"—not a separate element. *See, e.g.*, *Casavant v. Norwegian Cruise Line, Ltd*., 919 N.E.2d 165, 169–70 (Mass. App. Ct. 2009), *aff'd*, 952 N.E.2d 908 (Mass. 2011). For all practical purposes, materiality and causation are thus interchangeable terms. *In re M3*, 270 F.R.D. 45, 60 (D. Mass. 2010) ("Materiality and causation

---

[48]    PCMF ¶¶ 17-22.
[49]    PCMF ¶ 45.

are established by a showing that the deceptive representation could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.").

Regardless, this semantic distinction is irrelevant because Chapter 93A's causation/materiality inquiry is objective. *See id.*; *Hershenow v. Enter. Rent-A-Car Co. Of Bos., Inc.*, 840 N.E.2d 526, 535 (Mass. 2006) (holding that "causation [is] established" under Chapter 93A where "deceptive advertising 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'") (citation omitted); *Tomasella*, 962 F.3d at 72 (noting that deceptive advertisements are "material" if they are "likely to affect consumers' conduct or decision with regard to a product.") (citation omitted); 940 MASS. CODE REGS. 6.01 ("Material Representation means any . . . claim or statement, the disclosure of which has the tendency or capacity to influence the decision of reasonable buyers or reasonable prospective buyers whether to purchase the product."). Whether under causation or materiality, Chapter 93A does not require a showing of individual reliance or any assessment of a consumer's subjective motivations.[50]

Ms. Ortiz readily meets Chapter 93A's objective standard. In their Rule 23(f) interlocutory petition, Defendants conceded that their Step 1 marketing campaign was "intended to encourage enrollment of prospective students." ECF No. 115-1 at 8. They also have acknowledged that USMLE passage rates are one of their biggest "selling points" and that a medical school's "[f]irst-time pass rate is critical" to students evaluating medical schools, with make-or-break ramifications for a prospective student's entire medical career.[51] Defendants' advertisements boasting of Saba's

---

[50] In a footnote, Defendants falsely suggest that reliance is an element of a Chapter 93A claim. Doc. 121 at 18 n.10. Defendants previously conceded that reliance is not at issue. Doc. 115-1 at 46, 12:19-21 ("THE COURT: "But she's right though, under 93A reliance is not an element? MR. McMORROW: Reliance is not"); *Aspinall*, 813 N.E.2d at 486. This Court also has noted that reliance is not an element of a Chapter 93A claim. Doc. 134 at 15, 18.
[51] PCMF ¶¶ 9-10.

supposedly "near perfect" Step 1 pass rate would have influenced the decision of any reasonable applicant because, as Defendants themselves stated, it is a "testament to the quality" of Saba's education and is comparable to top-ranked U.S. medical schools.[52]

Defendants cherry pick Ms. Ortiz's deposition testimony to suggest that the USMLE Step 1 misrepresentations were "not a meaningful factor in her decision to attend Saba." ECF No. 121 at 17. As discussed above, causation/materiality is an *objective* inquiry, so Defendants' argument quickly runs aground. Moreover, even if subjective motivations were at issue (and they are not), Ms. Ortiz repeatedly testified that ***"[o]ne of the biggest things for [her] was the USMLE pass rates*** that they were advertising," which she explained "indicated an idea about their education. So I thought that if they have such good pass rates that means their education is really good."[53] Ignoring this testimony, Defendants focus on her statement that "[h]aving a high USMLE Step 1 first-time pass rate, that specifically was not important to me" (ECF No. 121 at 17), but fail to provide the full context, which reveals— like her testimony above—that the high USMLE rates were important to her because, in her words (which Defendants omit): "to me it spoke on their education, and that was important to me . . . I took this as our education is this good, that we have a hundred percent or 98 percent or 99, whatever I read, percent first-time pass rate."[54] When Ms. Ortiz's testimony is placed in context, it is clear that Defendants' Step 1 representations were material to her enrollment decision.

### III.    MS. ORTIZ SUFFERED A COGNIZABLE INJURY THAT HAS A CAUSAL CONNECTION TO DEFENDANTS' DECEPTION

Defendants claim that Ms. Ortiz (1) suffered no injury or, alternatively, (2) if she did suffer an injury, that there is no causal connection between that injury and Defendants' Step 1

---

[52]    PCMF ¶ 12.
[53]    PCMF ¶ 42.
[54]    PCMF ¶ 43.

representations. ECF No. 121 at 19–21. These issues present genuine disputes of material fact.

Relying on *Shaulis v. Nordstrom*, 865 F.3d 1 (1st Cir. 2017), Defendants argue that Ms. Ortiz cannot establish a cognizable injury because "she bargained for a medical education" and "she received [] a medical education." ECF No. 121 at 19. But Defendants mischaracterize *Shaulis*'s holding and import. *Shaulis* stands for the uncontroversial principle that "legally cognizable injuries under Chapter 93A must involve objective, 'identifiable' harm that goes beyond the deception itself." *Shaulis*, 865 F.3d at 10. "In other words, a mere violation . . . does not automatically give rise to an actionable injury." *Nightingale v. Nat'l Grid USA Serv. Co.*, 107 F.4th 1, 5 (1st Cir. 2024). The *Shaulis* plaintiff could not meet this low threshold because she provided only conclusory and subjective allegations that the sweater she purchased was "not of 'high quality,'" and she could not "identify any bargained-for characteristic of the sweater that she [did] not receive[]." *Shaulis*, 865 F.3d at 12; *see also id.* ("Shorn of its conclusory allegations, the complaint adequately alleges only that [defendant] violated the Massachusetts Code of Regulations and that Shaulis purchased a sweater for $49.97 that she no longer wants."). By way of contrast, *Shaulis* explained that "falsely advertising a watch as a 'Rolex' is an actionable misstatement about the watch's quality," sufficient to establish injury. *Id.* Thus, it would not matter that the ersatz "Rolex" looked expensive and displayed the correct time.

Defendants miss the point when they assert that Ms. Ortiz was not injured because she purportedly received some classes and course credit. (*See* ECF No. 121 at 19–20.) Unlike the *Shaulis* plaintiff, Ms. Ortiz alleges a clear, objective injury traceable to her enrollment at Saba: she "bargained for" a medical school where "virtually every Saba student passes the USMLE on their first attempt," a feat that is "an unprecedented" and "unmatched by any other international medical school." But Ms. Ortiz received something very different—a medical school where approximately

half of the matriculants do not even sit for the Step 1 exam, and where executive leadership conceals this truth to boost enrollment. This is certainly enough to establish injury.[55]

For their causation argument, Defendants provide only a short reprise of their materiality argument—namely, that the Step 1 passages "were unimportant to" Ms. Ortiz. ECF No. 121 at 21. For the reasons discussed above, that argument fails. *See supra* at 16-19.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment.[56]

Dated: December 6, 2024                    Respectfully submitted,


                                           /s/ Patrick T. Egan
                                           **BERMAN TABACCO**
                                           Patrick T. Egan (BBO #637477)
                                           Christina L. G. Fitzgerald (BBO #709220)
                                           One Liberty Square
                                           Boston, MA 02109
                                           (617) 542-8300
                                           pegan@bermantabacco.com
                                           cfitzgerald@bermantabacco.com

                                           **MAYNARD NEXSEN PC**
                                           Margaret M. Siller (admitted *pro hac vice*)
                                           1131 4th Avenue South, Suite 320
                                           Nashville, TN 37210
                                           (629) 258-2553
                                           msiller@maynardnexsen.com

---

[55]     Defendants are wrong to suggest that Ms. Ortiz's injury is premised on "statements of opinion" that are "not objective statements." *See* Doc. 121 at 20. By deceptively advertising that "virtually every Saba student" passes Step 1 on their first attempt and that the first-time passage rate was 96%–100%, Defendants were not merely offering an opinion or engaging in puffery. Rather, by touting ostensibly remarkable statistics on par with top-ranked U.S. medical schools, Defendants were making objective statements about the quality and prestige of Saba's medical education that were "susceptible of knowledge." *Zimmerman v. Kent*, 575 N.E.2d 70, 75 (Mass. App. Ct. 1991) (citation omitted). Even if Defendants were correct, however, they fail to cite any case law indicating that a Chapter 93A claim cannot be premised on a deceptive "statement of opinion."

[56]     Ms. Ortiz does not contest Defendants' Motion for Summary Judgment with respect to her Chapter 266, § 91 claim. *See* Doc. 121 at 21–24.

John R. Alford, Jr. (admitted *pro hac vice*)
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1847
jalfordjr@maynardnexsen.com

NATIONAL STUDENT LEGAL DEFENSE NETWORK
Alexander S. Elson (admitted *pro hac vice*)
Daniel A. Zibel (admitted *pro hac vice*)
Madeline D. Wiseman (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org
dan@defendstudents.org
madeline@defendstudents.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

*/s/ Patrick T. Egan*
Patrick T. Egan