## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NATALIA ORTIZ, on behalf of herself and a Class of similarly situated persons, | Civil Action No.: 1:23-cv-12002-WGY |
| *Plaintiff* | |
| v. | |
| SABA UNIVERSITY SCHOOL OF MEDICINE; and R3 EDUCATION, INC., | |
| *Defendants.* | |

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

### I.  RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

#### A.  The Parties

1.  **DEFENDANTS' STATEMENT**: Saba University School of Medicine ("Saba") is a for-profit medical school located in the Caribbean and owned by R3 Education, Inc. ("R3"), which provides administrative and support services to Saba. (Compl. ¶¶ 1, 13—attached to the Declaration of Dale Evans ("Evans Decl.") as **Exhibit 1**).[2]

**PLAINTIFF'S RESPONSE: Undisputed** that Saba is a for-profit medical school owned by R3 and that R3 provides administrative and support services to Saba, but **Disputed** that Saba is located in the Caribbean. Saba's campus is located on the Caribbean island also named Saba, but Saba operates out of Devens, Massachusetts: "Saba's only office is in Devens[, Massachusetts]."

---

[1] As used herein "PCMF" refers to Plaintiff's Counterstatement of Material Facts, which follows Plaintiff's Response To Defendants' Statement of Undisputed Material Facts. References to the "Siller Decl. Ex." are to the exhibits attached to the Declaration of Margaret M. Siller in Support of Plaintiff's Opposition To Defendants' Motion For Summary Judgment, filed herewith.

[2] For the convenience of the Court, the Response to Defendants' Statement of Undisputed Material Facts also contains Defendants' original statements of material fact. Any Exhibits referenced in a section marked "Defendants' Statement" refers to the Evans Declaration filed on November 15, 2024.

PCMF ¶¶ 1, 2. Saba has routinely reported to its regulators that Saba's "administrative offices are located in Devens, MA" and lists its location as Devens, Massachusetts on advertisements. PCMF ¶ 3. Further **Disputed** that R3 only provides administrative and support services to Saba, as it owns, operates, and provides additional resources to Saba. PCMF ¶ 4.

2. **DEFENDANTS' STATEMENT**: R3 is a Delaware corporation domiciled in Devens, Massachusetts, that operates from various places of business, including Colorado, Connecticut, Florida, Massachusetts, New Jersey, Canada, and its three campus locations in Saba, Dutch Caribbean, Nevis, West Indies, and Grand Cayman, Cayman Islands. Most R3 employees operate remotely. (**Ex. 1**, ¶¶ 12–13, 40; Donnellan Dep. at 54:19–21, 61:10–11, 95:20–25, 306:3–5, 330:2–6—attached to Evans Decl. as **Exhibit 2**; Russell Dep. at 191:18–21—attached to Evans Decl. as **Exhibit 4**; Wargo Dep. at 52:1–2, 79:7–11—attached to Evans Decl. as **Exhibit 5**).

**PLAINTIFF'S RESPONSE: Undisputed** that R3 is a Delaware corporation but **Disputed** as to where R3 operates. R3's headquarters are located in Devens, Massachusetts. PCMF ¶ 4. Many departments within R3 are run from Devens, Massachusetts, including its financing functions (receivables and payables), its clinical functions (overseeing the second two years of the medical education), the financial aid department, admissions, marketing, and registrars (maintaining student records). PCMF ¶ 5.

3. **DEFENDANTS' STATEMENT**: As a Dutch Caribbean medical school, Saba is accredited by Nederlands-Vlaamse Accreditatieorganisatie ("NVAO") and approved by the Inspectorate of the Netherlands Ministry of Education. Saba is also licensed in Florida, approved in New York, and recognized in California. (**Ex. 1**, Compl., ¶ 23; **Ex. 2**, Donnellan Dep. at 331:12–21; **Ex. 5**, Wargo Dep. at 150:2–19; Pathway to GUS Health Medical Schools, R3S00016502—attached to Evans Decl. as **Exhibit 6**).

**PLAINTIFF'S RESPONSE: Undisputed.**

4. **DEFENDANTS' STATEMENT**: Saba is also eligible to participate in U.S. student financial aid programs under Title IV of the Higher Education Act, which allows U.S. students to obtain student loans. (**Ex. 1,** Compl., ¶ 33; **Ex. 2**, Donnellan Dep. at 42:20–43:3; Rodger Dep. at 176:21–177:9—attached to Evans Decl. as **Exhibit 7**).

**PLAINTIFF'S RESPONSE: Undisputed.**

5. **DEFENDANTS' STATEMENT**: Saba's conduct is regularly reviewed by the Inspectorate of the Netherlands Ministry of Education pursuant to that accreditation. (**Ex. 2**,

Donnellan Dep. at 331:14–21).

**PLAINTIFF'S RESPONSE: Undisputed** that Saba is reviewed by the Inspectorate of the Netherlands Ministry of Education, but **Disputed** as to how "regularly" such reviews occur. In discovery, Saba produced evidence of only one such review occurring during the October 2021. There was no other evidence of any other visit or review, despite producing other records prior to 2017 to the present. Moreover, former Executive Dean, Dr. Clifton, testified that another Dutch entity, NVAO, only conducted one onsite visit during Dr. Clifton's ten years at Saba/R3. (**Siller Decl. Ex. 1**, Deposition of Maurice Clifton, M.D. taken September 20, 2024 ("Clifton Dep.") at 79:3–12.)

6.    **DEFENDANTS' STATEMENT**: Saba is compliant with all the accrediting and approving governmental bodies' requirements. (**Ex. 2**, Donnellan Dep. at 345:20–24, 349:14–16; Donnellan Indiv. Dep. at 58:12– 59:5—attached to Evans Decl. as **Exhibit 9**).

**PLAINTIFF'S RESPONSE: Disputed** that Saba is compliant with all the accrediting and approving governmental bodies' requirements given the substantial misrepresentations and/or omissions Saba made to potential students. The Department of Education may revoke an institution's program participation agreement for such misrepresentations and/or omissions. *See* 34 CFR § 668.71. The facts demonstrate that Saba is not compliant with this and other standards.

7.    **DEFENDANTS' STATEMENT**: Saba students can practice medicine in all fifty (50) states of the United States and throughout Canada. (**Ex. 5**, Wargo Dep. at 150:10–12). Saba has graduated over 3,000 doctors. (**Ex. 2**, Donnellan Dep at 376:17–377:14, 240:22–241:4; Saba advertising email—attached to Evans Decl. as **Exhibit 8**).

**PLAINTIFF'S RESPONSE: Undisputed.**

8.    **DEFENDANTS' STATEMENT**:  Plaintiff Natalia Ortiz is a resident of Tampa, Florida, and has been a Florida resident at all times relevant to this litigation. (Pl. Dep. at 14:24– 17:10—attached to Evans Decl. as **Exhibit 10**). She has never resided in Massachusetts. (*Id.* at 17:7–10).

**PLAINTIFF'S RESPONSE: Undisputed** that Plaintiff is a resident of Tampa but

**Disputed** as to the statement that she has been a Florida resident at all times relevant to this litigation, as Plaintiff also lived on the island of Saba. (**Siller Decl. Ex. 2**, Deposition of Natalia Ortiz taken on June 28, 2024 ("Pl. Dep.") at 17:11–17.) **Undisputed** that Plaintiff has never resided in Massachusetts.

9.    **DEFENDANTS' STATEMENT**: Plaintiff was enrolled as a medical student at Saba from July 2019 to August 2022. (**Ex. 10**, Pl. Dep. at 111:1-2). Plaintiff was dismissed from Saba for her failure to maintain satisfactory academic performance. (*Id.* at 162:11-13).

**PLAINTIFF'S RESPONSE: Disputed.** Plaintiff was enrolled as a medical student at Saba from September 2019 to August 2022. PCMF ¶ 6. **Undisputed** that Plaintiff was dismissed from Saba on academic grounds for failing to pass the required "comprehensive exams" after completing her course work.

10.    **DEFENDANTS' STATEMENT**:  Plaintiff is the representative of a class of individuals who enrolled at Saba from September 1, 2017 to October 1, 2024 but are no longer enrolled and did not sit for the United States Licensing Examination ("USMLE") Step 1. Excluded from the class are students who transferred to another school or who are no longer enrolled due to having failed a majority of their Saba courses. (Dkt. 98, Class Cert. Hr.'g 13:12-21—attached to Evans Decl. as **Exhibit 11**).

**PLAINTIFF'S REPONSE:  Disputed.**  In light of this Court's November 26, 2024 Memorandum and Order (ECF No. 134) there is no certified class.

11.    **DEFENDANTS' STATEMENT:**  The class is comprised of former Saba students who reside in forty (40) different states and thirteen (13) foreign countries. (Saba Enrollment from September 2017 to August 2023, R3S00011799—attached to Evans Decl. as **Exhibit 12**; Dkt. 70, Decl. Terry Moya, ¶ 4— attached to Evans Decl. as **Exhibit 13**). Plaintiff is unaware of any class member who resides in Massachusetts. (**Ex. 10**, Pl. Dep.  at 207:14-16).

**PLAINTIFF'S REPONSE:  Disputed.**  In light of this Court's November 26, 2024 Memorandum and Order (ECF No. 134) there is no certified class.  Further, **Disputed** that the previous class was comprised of residents of thirteen (13) foreign countries, as Saba's produced records are limited only to "Citizenship" data, not residency. (*See* Evans Decl. Ex. 12 (ECF No. 128-2).) **Undisputed** that Plaintiff was not aware of any former class member who resides in

Massachusetts.

**B.     Saba's Basic Sciences Curriculum and the Comprehensive Basic Sciences Exam**

12.     **DEFENDANTS' STATEMENT:**  Saba's medical program is composed of a Basic Sciences curriculum, which entails a five-semester program with various science courses, and a Clinical Medicine curriculum that consists of an eighty-week program comprising research and clinical clerkship rotations through various medical specialties focused on practical experience. (Saba Course Catalog 2018– 2020 ("Saba Catalog"), pp. 11, 16—attached to Evans Decl. as **Exhibit 14**; **Ex. 10**, Pl. Dep. at 117:8–15).

**PLAINTIFF'S RESPONSE: Undisputed.**

13.     **DEFENDANTS' STATEMENT:**  In order to complete the Basic Sciences curriculum and advance onto the Clinical Medicine curriculum, students must pass all Basic Sciences courses and the USMLE Step 1 Exam.  (**Ex. 14**, Saba Catalog, p. 17).

**PLAINTIFF'S RESPONSE: Undisputed.**

14.     **DEFENDANTS' STATEMENT:**  A medical student's performance in the USMLE Step 1 Exam is important because it predicts the student's level of competency to practice medicine in the United States and it impacts a student's residency opportunities, which is the ultimate statistic of Saba's success. (**Ex. 2**, Donnellan Dep. at 169:20–170:7; **Ex. 5** at 151:13–152:12).

**PLAINTIFF'S RESPONSE: Disputed** as the USMLE Step 1 Exam does not predict

competency, it is a requirement to practice medicine in the United States. **Disputed** as to residency

being the ultimate statistic of Saba's success, as the former Executive Dean testified that Saba does

not focus on advancing students through its medical program and into residence, but rather Saba's

efforts—and money—are used for marketing. PCMF ¶ 15.

15.     **DEFENDANTS' STATEMENT:**  It is particularly important to pass the USMLE Step 1 Exam on the first time, as it will show on students' records to potential residency directors. (**Ex. 5**, Wargo Dep. at 152:17– 153:7).

**PLAINTIFF'S RESPONSE: Undisputed.**

16.     **DEFENDANTS' STATEMENT:**  Amongst its efforts to prepare its students to achieve passing scores on the USMLE Step 1 Exam, Saba requires students to first pass the Comprehensive Basic Science Exam ("CBSE") sponsored by the National Board of Medical Examiners ("NBME") as part of Saba's Foundations of Clinical Medicine Course ("FOCM") that students take at the conclusion of their Basic Sciences curriculum. (**Ex. 2**, Donnellan Dep. at

183:14–20; **Ex. 14**, Saba Catalog, p. 14; Saba Teaching and Examination Regulations 2018-2020 ("OER 2018") § 4.3(c)—attached to Evans Decl. as **Exhibit 15**).

      **PLAINTIFF'S RESPONSE: Undisputed.**

      17.    **DEFENDANTS' STATEMENT:**   The CBSE is a full-length simulated comprehensive practice test designed for students planning to take the USMLE Step 1 Exam, as it features multiple-choice questions on content typically covered during basic science medical courses.  (https://www.nbme.org/examinees/nbme-self-assessments/comprehensive-basic-science-self-assessment, accessed November 15, 2024—attached to Evans Decl. as **Exhibit 16**).

      **PLAINTIFF'S RESPONSE: Undisputed.**

      18.    **DEFENDANTS' STATEMENT:**  Saba requires its students to pass the CBSE because it helps them evaluate their readiness to take the USMLE Step 1 Exam and obtain an estimate of their probability of passing that exam. (**Ex. 2**, Donnellan Dep. at 183:1–184:24, 192:11–193:2). Most other Caribbean medical schools require their students to take the CBSE. (*Id.* at 184:7–15).

      **PLAINTIFF'S RESPONSE: Disputed** as to the reasons why Saba requires its students

to pass the CBSE. As alleged, Saba requires students to pass the CBSE to ensure that 75% of their

students pass the USMLE in order that Saba can maintained its access to Title IV funding from

the Department of Education. (**Evans Decl. Ex. 1**, Compl. ¶¶ 86–92.) Accordingly, Saba's

requirement that students must pass the CBSE allows Saba to promote a higher passage rate to

prospective students than it would without the barrier, and the CBSE allows Saba to systematically

cull out weaker test-takers to ensure Saba remains Title IV eligible while continuing to profit from

two years of tuition by students who will be ultimately dismissed from the program because of this

barrier. (*Id.*)

      19.    **DEFENDANTS' STATEMENT:**  Since at least 2018 through Plaintiff's enrollment, Saba has disclosed the requirement to pass the Basic Sciences curriculum and the FOCM course in the Saba Course Catalog, which is available online. (**Ex. 2**, Donnellan Dep. at 338:9–11; Clifton Dep. at 185:10– 13—attached to Evans Decl. as **Exhibit 17**; **Ex. 10**, Pl. Dep. at 117:13–20). During this relevant time period, the Saba Course Catalog has included a reference to the CBSE as the "comprehensive exam" administered at the end of the FOCM course and also references "shelf exam" fees as part of the tuition and fees. (**Ex. 14**, Saba Catalog, pp. 14, 29).

      **PLAINTIFF'S RESPONSE: Undisputed** that Saba's Course Catalog is available online

but **Disputed** that the referenced information is readily available to prospective students because

Saba intentionally removed the relevant information regarding the "comprehensive exam" from

its website. PCMF ¶ 8.

20.    **DEFENDANTS' STATEMENT:**  Saba also discloses the requirement to take and
pass the CBSE in the Teaching and Examination Regulations ("OER"), which is also available
online. (**Ex. 2**, Donnellan Dep. at 186:10–23; **Ex. 15**, OER 2018 § 4.3(c)).

**PLAINTIFF'S RESPONSE: Undisputed** that OER is available online but **Disputed** that

the referenced information is readily available to prospective students because Saba intentionally

removed the relevant information regarding the "comprehensive exam" from its website. PCMF

¶ 8.

## C.    Saba's USMLE Step 1 Exam First-Time Pass Rates

21.    **DEFENDANTS' STATEMENT:**  Pursuant to rules and regulations promulgated
by the U.S. Department of Education, 34 C.F.R. § 600.55(d)(1)(iii) and 34 C.F.R. §
600.55(f)(1)(ii), Saba annually reports its first-time USMLE Step 1 Exam pass rates to the
Department of Education. (**Ex. 2**, Donnellan Dep. at 147:3–15; 270:12–17). Saba is also required
to report its Step 2 passage rates and "on- time graduation rate" to the U.S. Department of
Education. (2023 Department of Education Letter—attached to Evans Decl. as **Exhibit 18**).

**PLAINTIFF'S RESPONSE: Undisputed**.

22.    **DEFENDANTS' STATEMENT:**  Saba submits similar information to its other
accrediting and government regulators, such as the NVAO and the New York State Department of
Education. (2017 NVAO Doctor of Medicine (M.D.) Programme Extensive Accreditation Critical
Reflection—attached to Evans Decl. as **Exhibit 19**; 2021 NYSED Self-Study—attached to Evans
Decl. as **Exhibit 20**).

**PLAINTIFF'S RESPONSE: Undisputed**.

23.    **DEFENDANTS' STATEMENT:**  As required by the U.S. Department of
Education, Saba calculates its students' first-time pass rates as the number of Saba students who
pass the USMLE Step 1 Exam on their first attempt divided by the total number of Saba students
making that first attempt. (**Ex. 2**, Donnellan Dep. at 144:12–24; 34 C.F.R. § 600.55(d)(1)(iii); 34
C.F.R. § 600.55(f)(1)(ii)).

**PLAINTIFF'S RESPONSE: Undisputed**.

24.    **DEFENDANTS' STATEMENT:**  The Educational Commission for Foreign
Medical Graduates ("ECFMG") also calculates and reports USMLE Step 1 Exam scores to medical

schools, including Saba. (**Ex. 2**, Donnellan Dep. at 145:11–18).

**PLAINTIFF'S RESPONSE: Undisputed**.

25.    **DEFENDANTS' STATEMENT:**  At all times relevant to Plaintiff's Complaint, Plaintiff's purported expert witness, Dr. William Pinsky, was the CEO of ECFMG and reported the USMLE passage rates of Saba's students to Saba. (Pinsky Dep. at 9:13–22—attached to Evans Decl. as **Exhibit 21**).

**PLAINTIFF'S RESPONSE: Undisputed** except to the **Disputed** statement that

Dr. Pinsky was the CEO for ECFMG at all times relevant to Plaintiff's Complaint. Dr. Pinksy was

no longer the President and CEO of ECFMG as of December 2023.  (*See* William W. Pinsky

Curriculum Vitai (ECF No. 83-1), at 1.)

26.    **DEFENDANTS' STATEMENT:**  From 2017 to the present, 96-100% of Saba medical students who took the USMLE Step 1 Exam passed the exam on their first attempt. For example, in 2017, 2021 and 2022, 100% of Saba medical students who took the USMLE Step 1 Exam passed on the first attempt. (**Ex. 1**, Compl, ¶¶ 60-61; **Ex. 6**, Pathway to GUS Health Medical Schools). In 2018 and 2019, Saba's first-time Step 1 pass rate was 98% and in 2020, it was 96%. (**Ex. 20**, 2021 NYSED Self-Study).

**PLAINTIFF'S RESPONSE: Undisputed**.

27.    **DEFENDANTS' STATEMENT:**  These are the same rates Saba reported to the Department of Education for the respective years. (**Ex. 2**, Donnellan Dep. at 144:16–24).

**PLAINTIFF'S RESPONSE: Undisputed**.

**D.    Saba's Advertisements to Prospective Students**

28.    **DEFENDANTS' STATEMENT:**  Saba's admissions and marketing teams prepare advertisements for prospective students to promote various aspects of Saba's program, such as its residency placement rates, faculty-to-student ratio, accreditation and approvals, Title IV funding eligibility, USMLE pass rates, among others. (**Ex. 5**, Wargo Dep. at 146:18–148:4; **Ex. 2**, Donnellan Dep. at 199:7– 202:11).

**PLAINTIFF'S RESPONSE: Undisputed** as to Saba, but **Disputed** because R3 and

Global University Systems prepare and/or approve advertisements for prospective students. (**Siller**

**Decl. Ex. 3**, Deposition of Gerald Wargo taken on August 23 2024 ("Wargo Dep.") at 67:2–68:8

("Most of—much of the marketing when I first started was centralized through Global University

Systems in our United Kingdom office. As time has happened over the last three years and with different reorganizations, our marketing has become more owned by R3 and Saba.").)

29. **DEFENDANTS' STATEMENT:** Saba advertises its first-time USMLE Step 1 pass rates because they are very strong compared to other institutions, which data can be found in the U.S. News and World Report. (**Ex. 4**, Russell Dep. at 103:2–7; **Ex. 2**, Donnellan Dep. at 172:6–15).

**PLAINTIFF'S RESPONSE: Undisputed** that Saba advertises its first-time USMLE Step 1 pass rates but **Disputed** as to why this figure is advertised and the notion that the rates are "very strong." Saba, R3, and Global University Systems advertises Saba's USMLE Step 1 first time passage rates because this figure is a "selling point" that prospective students focus on when applying to medical schools. PCMF ¶ 9. The notion that the USMLE Step 1 pass rates are "very strong" is not accurate considering the number of students who are not allowed to sit for the exam.

30. **DEFENDANTS' STATEMENT:** Saba advertises the same first-time Step 1 pass rates it receives from the ECFMG and that it reports to the U.S. Department of Education. (**Ex. 2**, Donnellan Dep. at 145:11– 147:15).

**PLAINTIFF'S RESPONSE: Disputed** as the notion that advertisements regarding Saba's medical program merely state the first-time Step 1 pass rates it receives. The vast majority of advertisements generated by Saba, R3, and Global University Systems including additional language, such as "[v]irtually every student passes the USMLE Step 1 on their first attempt"; "virtually **every Saba student passes the USMLE** on their first attempt"; and "Saba offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1". PCMF ¶ 11.

31. **DEFENDANTS' STATEMENT:** Saba does not advertise an "attrition rate" because there is no standard or definition for that term, and it is not required by any of Saba's accrediting or approving government bodies. (**Ex. 2**, Donnellan Dep. at 270:4–17; **Ex. 4**, Russell Dep. at 197:12–198:13; **Ex. 7**, Rodger Dep. at 115:23–116:17, 117:5–7, 186:5–8).

**PLAINTIFF'S RESPONSE: Undisputed** that Saba does not advertise an "attrition rate"

but **Disputed** that Saba does not publish attrition rates based on lack of standardized definitions or requirements from governing bodies. Saba does not report their attrition rates because they are protecting that figure from getting out into the public. PCMF ¶¶ 20-28. As to the definition of "attrition," Defendants' corporate representative made it clear that attrition is simply an assessment of "whether people make it through the program or not." PCMF ¶ 33.

32.    **DEFENDANTS' STATEMENT:**   None of Saba's competitors publish or are required to publish an attrition rate. (**Ex. 2**, Donnellan Dep. at 177:10–178:6).

**PLAINTIFF'S RESPONSE: Undisputed** that, as known, Saba's competitors are not required to publish attrition rate by their governing entities but **Disputed** that none of Saba's competitors publish attrition rates. St. George's University's School of Medicine, a for-profit medical school in the Caribbean and direct competitor of Saba, publishes its attrition rates conspicuously on its website for all prospective students to view. PCMF ¶ 34.

33.    **DEFENDANTS' STATEMENT:**   Attrition may be calculated in multiple different ways, depending on the variables factored into the equation. At Saba, the term "attrition" was used in the context of making enrollment assumptions for future revenue projections. (**Ex. 2**, Donnellan Dep. at 272:22– 273:17; **Ex. 7**, Rodger Dep. at 119:18–23).

**PLAINTIFF'S RESPONSE: Undisputed** that attrition may be analyzed using different variables such as time of attendance, but **Disputed** that Saba uses the term "attrition" to mean anything more than the number of students that entered the program compared to the number of students that failed to complete the program. Defendants' corporate representative made it clear that attrition is simply an assessment of "whether people make it through the program or not." PCMF ¶ 33.

34.    **DEFENDANTS' STATEMENT:**   If a prospective student asked about attrition, it would typically be due to the students' concerns of not doing well in medical school, which is what Saba's staff would focus on addressing. (**Ex. 4**, Russell Dep. at 142:5–143:2; Donahue Dep. at 67:15–68:2—attached to Evans Decl. as **Exhibit 22**).

**PLAINTIFF'S RESPONSE: Disputed** that prospective students typically asked about

attrition due to concerns of not doing well in medical school. Prospective students regularly asked about attrition in the context of generalized questions regarding medical school, without expressing any concern about doing well in medical school. PCMF ¶ 29.

### E.    Plaintiff's Application and Admission to Saba

35.    **DEFENDANTS' STATEMENT**: Before applying to medical school, Plaintiff researched various schools in Florida and in the Caribbean by looking at their websites and conducting general research on Caribbean schools.  (**Ex. 10**, Pl. Dep. at 54:1–57:8).

**PLAINTIFF'S RESPONSE**: **Disputed**.  Plaintiff submits that Paragraph 35 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  While in the process of considering attending medical school, Plaintiff looked into the following non-exhaustive list of schools: University of Central Florida, University of South Florida, the University of Florida, Florida International University, Medical Universities of America, Ross University School of Medicine, the University of Arizona, and Saba. PCMF ¶ 35.  Plaintiff also may have looked into St. George's University. PCMF ¶ 36. In researching these schools, Plaintiff looked at the materials posted on the schools' websites, visited the University of Arizona campus, and broadly researched Caribbean medical schools using Google and subsequent web results. PCMF ¶ 37.

36.    **DEFENDANTS' STATEMENT**: Plaintiff applied to Saba in June 2019. (Plaintiff's student application to Saba— attached to Evans Decl. as **Exhibit 23**). Plaintiff applied to no other medical school. (**Ex. 10**, Pl. Dep. at 62:9–10).

**PLAINTIFF'S RESPONSE: Undisputed.**

37.    **DEFENDANTS' STATEMENT**: One of the things Plaintiff considered when looking at Saba was its ongoing admissions three times a year. (**Ex. 10**, Pl. Dep. at 55:13–23). The most important factor in Plaintiff's decision to attend Saba was "starting early." (*Id.* at 95:23–96:2).

**PLAINTIFF'S RESPONSE**: **Undisputed** that Plaintiff gave this testimony during her deposition, but Plaintiff submits that Paragraph 37 of Defendants' Statement of Facts is incorrect or otherwise incomplete, as Plaintiff has testified to a number of important factors, including the

facilities, education, and USMLE pass rate. PCMF ¶ 41.  Plaintiff testified that "[o]ne of the biggest things for [her] was the USMLE pass rate that they were advertising," which she explained "indicated an idea about their education. So I thought that if they have such good pass rates that means their education is really good."  PCMF ¶ 42. Plaintiff was clear that "to [her] [the high USMLE rates] spoke on their education, and that was important to [her] … [She] took this as our education is this good, that we have a hundred percent or 98 percent or 99, whatever [she] read, percent first-time pass rate." PCMF ¶ 43.

38.    **DEFENDANTS' STATEMENT**: Having a high USMLE Step 1 first-time pass rate was not specifically important to Plaintiff.  (**Ex. 10**, Pl. Dep. at 91:21–22). Plaintiff testified, that it "wasn't important to [her], because to [her] what was important is the education you are getting in order to take this exam. Because that education is what you use to actually take the exam. So that's what was important." (*Id.* at 92:17–22).

**PLAINTIFF'S RESPONSE: Undisputed** that Plaintiff gave this testimony, but the quotation misses the full context of her testimony.  **Disputed** that Plaintiff's opinion as stated in this quoted material accurately reflects Plaintiff's thoughts regarding the importance of passing the USMLE Step 1 test to becoming a licensed medical practitioner.  Plaintiff submits that Paragraph 38 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Plaintiff testified that "[o]ne of the biggest things for [her] was the USMLE pass rates that [Saba was] advertising."  PCMF ¶ 42. Plaintiff testified that Saba's USMLE pass rate was important to her because "[i]t indicated an idea about their education. So [she] thought that if they have such good pass rates that means their education is really good."  PCMF ¶ 44.

39.    **DEFENDANTS' STATEMENT**: Plaintiff was accepted to Saba for the Spring 2019 semester. (**Ex. 23**, Plaintiff's Saba Application).

**PLAINTIFF'S RESPONSE**: **Disputed** that Plaintiff was accepted to Saba for the Spring 2019 semester.  Plaintiff was accepted to and enrolled at Saba for the semester commencing September 2019. PCMF ¶ 46.

**F.      Plaintiff's Knowledge and Exposure to USMLE Step 1 Exam Pre-Enrollment**

39.      **DEFENDANTS' STATEMENT**: Before applying to Saba, Plaintiff did not research any medical school's requirements for sitting for the USMLE Step 1 Exam. (**Ex. 10**, Pl. Dep. at 59:14–16, 66:21–23). Plaintiff does not know whether any other schools advertise their USMLE Step 1 pass rate. (*Id.* at 68:5–9).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

40.      **DEFENDANTS' STATEMENT**: Plaintiff thought the only prerequisite for the USMLE was to "be attending school." (**Ex. 10**, Pl. Dep. at 59:14–19).

**PLAINTIFF'S RESPONSE**: **Disputed.**      Plaintiff submits that Paragraph 40 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Plaintiff testified that "the only prerequisite [she] thought you needed was to attend … be attending school.  You get basic sciences and then you start taking your Step 1." (**Siller Decl. Ex. 2**, Pl. Dep. at 59:18–21.)  Further, Plaintiff testified to her understanding that the USMLE Step 1 was an exam that was taken after completing the basic science portion of the curriculum.  (*Id.* at 114:13–16.)

41.      **DEFENDANTS' STATEMENT**: Plaintiff attended an open house before enrolling at Saba, but she does not remember having asked any questions about the USMLE Step 1. (**Ex. 10**, Pl. Dep. at 78:17–19). Plaintiff had the opportunity to ask questions during her Saba admissions interview, but she does not recall having asked questions about the USMLE Step 1. (**Ex. 10**, Pl. Dep. at 82:5–16).

**PLAINTIFF'S RESPONSE**: **Undisputed**, but Plaintiff submits that Paragraph 41 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Plaintiff has testified that the USMLE pass rates were provided during the open house. PCMF ¶ 40.

42.      **DEFENDANTS' STATEMENT**: When Plaintiff visited Saba before enrolling, she spoke only with some students in a taxi about finishing their exams and did not discuss anything else with them. (**Ex. 10**, Pl. Dep. at 83:5–23).

**PLAINTIFF'S RESPONSE**: **Disputed.**      Plaintiff submits that Paragraph 42 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  When Plaintiff visited Saba before enrolling, she received a tour of the campus from Saba housing coordinator Pat Nation—

including stepping into a classroom and a visit to the anatomy lab. (**Siller Decl. Ex. 2**, Pl. Dep. at 102:14–105:9.) She also met with Dean of Students Vaughn Huckfeldt. (*Id.* at 103:8–16.) Plaintiff testified that while visiting the island she got into a taxi with some students enrolled at Saba who she believes were finishing some exams, saying, "I don't remember if they were speaking to me exactly or if I just overhead them in the car." (*Id.* at 83:9–20.)

43.    **DEFENDANTS' STATEMENT**: Plaintiff never asked anyone at Saba about preparation for the USMLE Step 1. (**Ex. 10**, Pl. Dep. at 85:7–12).

**PLAINTIFF'S RESPONSE**: **Disputed**. Plaintiff submits that Paragraph 43 of Defendants' Statement of Facts is incorrect or otherwise incomplete. <u>Prior</u> to attending Saba as a student, Plaintiff never asked anyone at Saba about preparation for the USMLE Step 1. (**Siller Decl. Ex. 2**, Pl. Dep. at 85:7–12.)

44.    **DEFENDANTS' STATEMENT**: At the time prior to her enrollment, Plaintiff understood that Saba's "Step 1 pass rate" meant "the amount of students that are passing on their first time taking this." That it was "the people that took the exam on their first time and passed it." (**Ex. 10**, Pl. Dep. at 114:4–12).

**PLAINTIFF'S RESPONSE**: **Disputed** that Plaintiff made the quoted statements but **Undisputed** that she answered in the affirmative to questions containing those quotes.

45.    **DEFENDANTS' STATEMENT**: Plaintiff also understood that "Step 1 was an exam that you took after completing the basic science portion of the degree" and that "[n]ot everyone completes the basic science program." (**Ex. 10**, Pl. Dep. at 114:13–19). Plaintiff conceded that this is "true at every university." (*Id.* at 114:17–22).

**PLAINTIFF'S RESPONSE: Disputed**. Plaintiff submits that Paragraph 45 of Defendants' Statement of Facts is incorrect or otherwise incomplete. When asked whether Plaintiff understood that "Step 1 was an exam that you took after completing the basic science portion of the degree" and that "[n]ot everyone completes the basic science program," Plaintiff responded in the affirmative. When asked whether "that's true at every university," Plaintiff responded in the affirmative. (**Siller Decl. Ex. 2**, Pl. Dep. at 114:13–22.) Also **disputed** that

Plaintiff conceded anything.

46.    **DEFENDANTS' STATEMENT**: Plaintiff similarly understood that "if someone doesn't complete the basic science program, then necessarily they wouldn't reach the Step 1." (**Ex. 10**, Pl. Dep. at 114:23–115:2).

**PLAINTIFF'S RESPONSE**: **Disputed**.    Plaintiff submits that Paragraph 46 of Defendants' Statement of Facts is incorrect or otherwise incomplete.   When asked "if someone doesn't complete the basic science program, then necessarily they wouldn't reach the Step 1," Plaintiff responded affirmatively.  (**Siller Decl. Ex. 2**, Pl. Dep. at 114:23–115:2.)

47.    **DEFENDANTS' STATEMENT**: Plaintiff acknowledged that "those folks wouldn't be part of the pass rate because they never got there." (**Ex. 10**, Pl. Dep. at 115:3–5).

**PLAINTIFF'S RESPONSE**: **Disputed**.    Plaintiff submits that Paragraph 47 of Defendants' Statement of Facts is incorrect or otherwise incomplete.   When asked whether "those folks wouldn't be part of the pass rate because they never got there," Plaintiff responded affirmatively.  (**Siller Decl. Ex. 2**, Pl. Dep. at 115:3–5.)

48.    **DEFENDANTS' STATEMENT**: Plaintiff does not recall seeing the ads included in her Complaint prior to the filing of the Complaint, other than emails sent directly to her. (**Ex. 10**, Pl. Dep. 176:9–181:23). All of the public advertisements in the Complaint postdate Plaintiff's enrollment at Saba. (*Id.*; **Ex. 1**, Compl., pp. 15–25).

**PLAINTIFF'S RESPONSE**: **Disputed** and ambiguous. Plaintiff had seen several of the advertisements cited in her complaint. Further, Plaintiff testified about the consistent nature of the representation, including how statements conveyed by Saba at the open house Plaintiff attended mirrored emails she had received.  (**Siller Decl. Ex. 4**, Declaration of Natalia Ortiz Lopez in Support of Her Motion for Class Certification, filed herein on June 7, 2024 ("Ortiz Decl.") at ¶¶ 3–4.) Further, **Disputed** that "[a]ll the public advertisements in the Complaint postdate Plaintiff's enrollment at Saba."   Several advertisements were from prior to Plaintiff's enrollment and, moreover, the representations were identical to those received by Plaintiff directly.  (**Evans Decl.**

**Ex. 1**, Compl. ¶¶ 61A; 61B; 61C; and 61D; *see also* **Siller Decl. Ex. 2**, Pl. Dep. at 218:1–220:20.)

49.     **DEFENDANTS' STATEMENT**: Plaintiff also admitted that she did not "know if Saba says that, the near certain to succeed part," (**Ex. 10**, Pl. Dep. at 173:16–17), or "where it says that, 'near certain to succeed.'" (*Id.* at 173:18–20).

**PLAINTIFF'S RESPONSE**: **Disputed**.    Plaintiff submits that Paragraph 49 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Referencing language in the Complaint, Defendants asked Plaintiff at her deposition: "Where did Saba say that students are near certain to succeed?"  (**Siller Decl. Ex. 2**, Pl. Dep. at 173:7–22.)  In response to that question, Plaintiff testified: "I don't know if Saba says that, the near certain to succeed part. I don't know how to answer that question.  I don't know where it says that, "near certain to succeed."  But my lawyers helped put this together.  And I agree that the representations communicate that taking a substantial debt will be worth the risk."  (*Id.*)  Plaintiff's testimony was clear that the advertisements concerning the Step 1 passage rates were "misleading."  (*Id*. at 115:15–21.)

50.     **DEFENDANTS' STATEMENT**: Plaintiff could not identify any USMLE Step 1 advertisements that any class members may have seen. (**Ex. 10**, Pl. Dep. at 197:15–18).

**PLAINTIFF'S RESPONSE**: **Disputed**.    Plaintiff submits that Paragraph 50 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  When asked whether Plaintiff was "aware of the ads that potential class members did or did not see as it relates to Step 1," Plaintiff responded "No." (**Siller Decl. Ex. 2**, Pl. Dep. at 197:15–18.)  However, Plaintiff stated that that the advertisements provided were misleading (*id*. at 115:15–21) and further testified to the consistency of Saba's messaging both via email and in the open house setting (**Siller Decl. Ex. 4**, Ortiz Decl. ¶¶ 3-4).

G.     **Plaintiff's Knowledge and Exposure to Attrition Rate Pre-Enrollment**

51.     **DEFENDANTS' STATEMENT**: Plaintiff did not research the attrition rates of Saba or any other medical school. (**Ex. 10**, Pl. Dep. at 68:10–13; 68:20–69:3). She had no understanding of what the attrition rate was at Saba when she applied, (*id*. at 74:2–5), or for any of

the years she attended, (*id.* at 74:21– 75:8).

**PLAINTIFF'S RESPONSE**: **Undisputed** that Plaintiff did not research the attrition rates of Saba or any other medical school. **Disputed** because prior to submitting her application, Plaintiff researched Saba, including visiting its website that, had Saba been forthcoming with disclosing information, would have provided Plaintiff information regarding Saba's attrition to review and to consider. *See* PCMF ¶ 38. **Disputed** as to Plaintiff's understanding of the Saba attrition rate. Plaintiff submits that Paragraph 51 of Defendants' Statement of Facts is incorrect or otherwise incomplete. When asked about the attrition rate at Saba, Plaintiff testified that "what [she] saw was that a lot less than half [of students] made it to the point where you take the fifth semester class, Foundations of Clinical Medicine, and even less of those actually took the Step 1." (**Siller Decl. Ex. 2**, Pl. Dep. at 165:9–13.)

52.    **DEFENDANTS' STATEMENT**: Plaintiff never asked what Saba's attrition rate was. (**Ex. 10**, Pl. Dep. at 82:20–22; 168:14–16).

**PLAINTIFF'S RESPONSE**: **Undisputed** that prior to commencing this litigation, Plaintiff did not ask for Saba's attrition rate, otherwise **Disputed** because prior to submitting her application, Plaintiff researched Saba, including visiting its website that, had Saba been forthcoming with disclosing information, would have provided Plaintiff information regarding Saba's attrition to review and to consider. *See* PCMF ¶ 38.

53.    **DEFENDANTS' STATEMENT**: Plaintiff does not know whether any other medical schools publish attrition rates, (**Ex. 10**, Pl. Dep. at 168:11–13), but she agrees that "attrition happens in all medical schools." (**Ex. 10**, Pl. Dep. at 184:14–16).

**PLAINTIFF'S RESPONSE**: **Undisputed** that Plaintiff does not know whether any other medical schools publish their attrition rates. **Disputed** otherwise. Plaintiff submits that Paragraph 53 of Defendants' Statement of Facts is incorrect or otherwise incomplete. When asked whether Plaintiff would "agree with the notion that attrition happens in all medical schools," Plaintiff

responded in the affirmative.  (**Siller Decl. Ex. 2**, Pl. Dep. at 184:14–16.)  Plaintiff further testified

that a small degree of attrition is expected at any educational institution, but there is a dramatic

difference between the typical attrition rate at a U.S. medical school (less than 10%) and the

approximately 50% attrition rate at Saba. PCMF ¶ 45.

**H.    Plaintiff's Academic Performance and Dismissal from Saba**

54.    **DEFENDANTS' STATEMENT**: Saba has established a series of satisfactory academic progress policies and regulations with which students must comply during their enrollment. (2017 Saba Student Handbook, pp. 13–15—attached to Evans Decl. as **Exhibit 24**).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

55.    **DEFENDANTS' STATEMENT**: Students at Saba are subject to dismissal if they fail (1) a course worth six or more credits while on academic probation for failing a course worth six or more credits; or (2) the same course or competency a second time whether by remediation or otherwise while on probation. (**Ex. 24**, 2017 Saba Student Handbook, p. 14).

**PLAINTIFF'S RESPONSE**: **Disputed**.  Students at Saba are subject to dismissal if they:

(1) fail one two or more courses while on academic probation; (2) fail one course worth six or

more credits while on academic probation if any one of the course(s) failed or dropped resulting

in academic probation was worth six or more credits; (3) fail one clinical clerkship while on

academic probation; (4) fail a second competency (excluding Medical Knowledge 2a) in the same

category (*e.g.* Patient Care or category 1) while on academic probation; (5) fail the same course or

the same competency (or sub-competency) a second time whether by remediation or otherwise

(excluding Medical Knowledge 2a) while on probation; (6) fail three or more courses during the

same semester; or (7) fail two courses worth six or more credits each, or two clinical clerkships

during the same semester.  (**Siller Decl. Ex. 5**, RS00002135-2182 at RS00002151.)

56.    **DEFENDANTS' STATEMENT**: Students may be placed on probation for (1) failing one course; (2) dropping one or more courses; or (3) being a transfer student admitted with advanced standing. (**Ex. 24**, 2017 Saba Student Handbook, p. 13).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

57.    **DEFENDANTS' STATEMENT**: Students may appeal academic probation and dismissal decisions. (**Ex. 24**, 2017 Saba Student Handbook, pp. 14–15).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

58.    **DEFENDANTS' STATEMENT**: During her time at Saba, Plaintiff missed class the maximum "allowed amount of times more than once throughout [her] Saba time." (**Ex. 10**, Pl. Dep. at 127:12–15).

**PLAINTIFF'S RESPONSE**: **Disputed**.  During Plaintiff's deposition, Defendants' counsel stated to Plaintiff, "So I think I understand. So you missed some classes but never more than you were allowed to miss?"  Plaintiff responded, "Correct."  Defendants' counsel continued, "Okay.  And you missed those classes for personal reasons as well as to rest and study?"  Plaintiff responded, "Correct."  (**Siller Decl. Ex. 2**, Pl. Dep. at 127:23–128:5.)

59.    **DEFENDANTS' STATEMENT**: In August 2021, at the end of the FOCM course, Plaintiff failed the CBSE the first time. (**Ex. 10**, Pl. Dep. at 128:18–23).

**PLAINTIFF'S RESPONSE**:  **Undisputed**.

60.    **DEFENDANTS' STATEMENT**: Plaintiff chose to not "take an actual review course" before retaking the CBSE, and instead did "a self-directed study." (**Ex. 10**, Pl. Dep. at 129:10–13).

**PLAINTIFF'S RESPONSE**: **Undisputed** that during Plaintiff's deposition, Defendants' counsel asked Plaintiff, "So you didn't take an actual review course.  You did a I guess we would call it like a self-directed study?"  Plaintiff responded to this, "Correct." (**Siller Decl. Ex. 2**, Pl. Dep. at 129:10–13.)

61.    **DEFENDANTS' STATEMENT**: Plaintiff failed the CBSE a second time in December 2021 and had to retake the FOCM course.  (**Ex. 10**, Pl. Dep. at 132:4–8; 133:3–5; Plaintiff's Saba Academic Transcript— attached to Evans Decl. at **Exhibit 25**).

**PLAINTIFF'S RESPONSE**:  **Undisputed**.

62.    **DEFENDANTS' STATEMENT**: Plaintiff acknowledged she didn't study as hard as she could have. On December 9, 2021, Plaintiff had texted her schoolmate stating, "I didn't pass. I knew I wasn't going too [sic] because honestly I didn't study like I should have and I contemplate leaving the program." (**Ex. 10**, Pl. Dep. at 133:6–7, 134:6–16; Plaintiff's Text

Messages—attached to Evans Decl. as **Exhibit 26**).

      **PLAINTIFF'S RESPONSE**: **Disputed** as to whether Plaintiff acknowledged anything.

**Undisputed** that during Plaintiff's deposition, Defendants' counsel asked Plaintiff, "You say: 'So I didn't pass. I knew I wasn't going to because honestly I didn't study like I should have and I contemplate leaving the program.' … Did I read that correctly?" Plaintiff responded "Yes." Defendants' counsel responded, "So you felt when you got your results that you didn't study as hard as you could have?" Plaintiff responded, "I think like any student who fails something, yeah." (**Siller Decl. Ex. 2**, Pl. Dep. at 134:6–16.) Later, Defendants' counsel asked, "Again you were given an option of retaking Foundations of Clinical Medicine or a review course of your choice. Which option did you utilize on this occasion?" Plaintiff responded, "I used the review course on my own." Defendants' counsel asked, "And what was that course?" Plaintiff responded, "The same materials I used before." Later, Plaintiff further explained the difference in her approach to studying, saying, "I used the same materials to study. But this time I took a different approach when it came to my study techniques." When Defendants' counsel asked, "And what was that approach?" Plaintiff responded, "I went out of the house. I went to the library. I dedicated more time this time. I tried to time myself in these moments." (*Id*. at 135:5–24.)

      63.   **DEFENDANTS' STATEMENT**: Plaintiff failed the CBSE a third time in April 2022. (**Ex. 10**, Pl. Dep. at 134:20–135:4).

      **PLAINTIFF'S RESPONSE**: **Undisputed**.

      64.   **DEFENDANTS' STATEMENT**: After failing the third time, Plaintiff again chose not to retake the FOCM, but "used the review course on [her] own" which was "t[]he same materials [she] used before." (**Ex. 10**, Pl. Dep. at 135:5–11).

      **PLAINTIFF'S RESPONSE**: **Undisputed**.

      65.   **DEFENDANTS' STATEMENT**: In August 2022, after having failed the CBSE a fourth time, Plaintiff was notified that she "did not pass Foundations of Clinical Medicine and that [she] was dismissed from the basic sciences program." (**Ex. 10**, Pl. Dep. at 136:23–137:7;

Dismissal Letter from Saba— attached to Evans Decl. as **Exhibit 27**).

       **PLAINTIFF'S RESPONSE**: **Undisputed**.

      66.     **DEFENDANTS' STATEMENT**: Plaintiff did not appeal Saba's decision to dismiss her. (**Ex. 10**, Pl. Dep. at 138:15–139:1; No Intent to Appeal Email—attached to Evans Decl. as **Exhibit 28**).

       **PLAINTIFF'S RESPONSE**: **Undisputed**.

      67.     **DEFENDANTS' STATEMENT**: Plaintiff did not feel that Saba failed to follow its guidelines or curriculum in dismissing her. (**Ex. 10**, Pl. Dep. at 137:16–18; 138:8–14).

       **PLAINTIFF'S RESPONSE**: **Undisputed** that during Plaintiff's deposition, Defendants' counsel asked Plaintiff, "Did you feel like in dismissing you Saba didn't follow its guidelines or curriculum?" Plaintiff responded to this, "No." (**Siller Decl. Ex. 2**, Pl. Dep. at 137:16–18.)

**I.**     **Tuition Payments and Education Received**

      68.     **DEFENDANTS' STATEMENT**: Saba has not offered private student loans at any point during the class period. (Donnellan Dep. Vol. II at 410:1–8—attached to Evans Decl. as **Exhibit 3**).

       **PLAINTIFF'S RESPONSE**: **Undisputed** that Patrick Donnellan was asked during his deposition: "So it's your testimony that students that attended Saba University School of Medicine from 2017 to present did not take out private loans?" Patrick Donnellan responded, "Not that we're directly aware of, no." (**Siller Decl. Ex. 6**, 30(b)(6) Deposition of Patrick Donnellan, Vol. II, taken on November 6, 2024 ("Donnellan, 30(b)(6) Dep. Vol. II") at 410:4–8.) **Disputed** as to whether Patrick Donnellan's statement that Saba did not offer private student loans during the proposed relevant Class Period is accurate.

      69.     **DEFENDANTS' STATEMENT**: Plaintiff did not pay for her Saba education; her mother did—and Plaintiff has not paid her back. (**Ex. 10**, Pl. Dep. at 172:8–19). Plaintiff also obtained federal student loans, which she used to pay living accommodations. (*Id.* at 214:11–23).

       **PLAINTIFF'S RESPONSE**: **Undisputed** that Plaintiff's mother paid approximately $57,970 to Saba University School of Medicine on Plaintiff's behalf. (**Siller Decl. Ex. 2**, Pl. Dep.

at 172:8–10.) **Disputed** as to whether Plaintiff has paid her mother "back." During Plaintiff's

deposition, Defendants' counsel asked Plaintiff: "Did you agree with [your mother] that you would

pay back that money or did she pay that tuition and those fees as a gift to you essentially?" Plaintiff

responded, "No, that's not a gift. It is an investment. I always planned on repaying my mom back

whether through care, through money, whatever it is." (*Id.* at 172:13–19.) **Disputed** as to whether

Plaintiff has taken steps to "pay her mother back" in any manner since the taking of her deposition.

**Undisputed** that Plaintiff obtained federal student loans. **Disputed** as to whether Plaintiff only

used those loan funds to pay for her living accommodations. The testimony is clear that the federal

loans were first and foremost used to cover tuition. (*Id.* at 214:11–18; 171:13–172:2; 173:24–

175:9.)

70. **DEFENDANTS' STATEMENT**: Plaintiff has not reached an understanding with her mother as to whether or how to repay her mother and has not paid any of her student loans back. (**Ex. 10**, Pl. Dep. at 171:11– 172:2, 172:20–22).

**PLAINTIFF'S RESPONSE**: **Disputed**. During the taking of Plaintiff's deposition,

Defendants' counsel asked Plaintiff: "Did you have any definite understanding with your mother

as to how you would pay her back?" to which Plaintiff responded "No." (**Siller Decl. Ex. 2**, Pl.

Dep. at 172:20–22.) Defendants' counsel then posed to Plaintiff, "So it might be in money. It

might be via taking care of her later on down the road, in some other fashion?" to which Plaintiff

responded "Yes. I love my mom." (*Id.* at 172:23–173:3.) **Disputed** as to whether Plaintiff's

testimony during the taking of her deposition accurately reflects the current state of any

understanding with her mother.

71. **DEFENDANTS' STATEMENT**: Plaintiff submitted to the U.S. Department of Education a Borrower Defense to Repayment Application, which was denied. (**Ex. 10**, Pl. Dep. at 143:4–144:11; DOE Denial of Defense to Repayment Application letter—attached to Evans Decl. as **Exhibit 29**).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

72.     **DEFENDANTS' STATEMENT**: Plaintiff admits she received the classes she paid for and course credits for the classes she passed. (**Ex. 10**, Pl. Dep. at 174:15–21).

**PLAINTIFF'S RESPONSE**: **Undisputed** that at the time of Plaintiff's deposition, Plaintiff was asked: "You received the classes you paid for, right?" to which Plaintiff responded, "correct." (**Siller Decl. Ex. 2**, Pl. Dep. at 174:15–21.) **Undisputed** that at the time of Plaintiff's deposition, Plaintiff was asked, "And you received course credits for the classes you passed, correct?" to which Plaintiff responded "Correct." (*Id.*) **Disputed** as to Plaintiff's opinions regarding what she received regarding the substance or content of her courses at Saba. As she testified, when asked "Do these classes have any value to you?", Plaintiff responded: "It's hard to answer that because it is very broad." (*Id.* at 189:2–5.)

73.     **DEFENDANTS' STATEMENT**: Plaintiff also learned the materials in the classes she passed. (**Ex. 10**, Pl. Dep. at 174:22–175:3).

**PLAINTIFF'S RESPONSE**: **Disputed** as to the varying degrees of content and materials Plaintiff may or may not have learned in her courses while attending Saba. **Disputed** as to the definition of "learned" in this context.

74.     **DEFENDANTS' STATEMENT**: Plaintiff admits that "because of the knowledge [she] obtained at the time of these courses" that she passed, "there was an educational value." (**Ex. 10**, Pl. Dep. at 188:14–189:15).

**PLAINTIFF'S RESPONSE**: **Undisputed** that during Plaintiff's deposition, Defendants' counsel asked Plaintiff, "Do these classes [at Saba] have any value to you?" to which Plaintiff responded, "It's hard to answer that because it is very broad." (**Siller Decl. Ex. 2**, Pl. Dep. at 189:2–15.) Defendants' counsel continued by asking Plaintiff, "Let's talk about the classes you got As and Bs in, which I have listed as clinical skills 1 through 4, ethics, systems and disease 4. (*Id.*) You got As and Bs in those courses. Obviously those had some educational value; is that correct?" (*Id.*) Plaintiff responded by testifying, "Again, that I obtained knowledge around the

time of these courses—because of the knowledge I obtained at the time of these courses, yes, there was an educational value." (*Id.*) **Disputed** as to whether Plaintiff "admitted" anything.

75.    **DEFENDANTS' STATEMENT**: Plaintiff concedes that if she "had actually passed Foundations of Clinical Medicine and passed Step 1, [she] obviously wouldn't say [Saba's] basic sciences course work was worthless." (**Ex. 10**, Pl. Dep. at 176:4–8). She also testified that if she was able to transfer her credits to another medical school, "that would save her money." (*Id.* at 175:22–176:2).

**PLAINTIFF'S RESPONSE**: **Disputed**.  During the taking of her deposition, counsel for Defendants asked Plaintiff, "If you had actually passed Foundations of Clinical Medicine and passed Step 1, you obviously wouldn't say your basic sciences course work was worthless, right?" (**Siller Decl. Ex. 2**, Pl. Dep. at 176:4–8.)  Plaintiff responded to this, "correct." (*Id.*) **Disputed** as to whether Plaintiff conceded anything with that response.  Separately, during the taking of her deposition, counsel for Defendants asked Plaintiff, "[I]f you were able to transfer your credits that you earned at Saba to another medical school, that would save you money at that medical school, correct?" (*Id.* at 175:22–176:2.)  Plaintiff responded to this, "correct." (*Id.*)

76.    **DEFENDANTS' STATEMENT**: Many of Plaintiff's fellow students completed or are completing their education at Saba and are doctors or on their way to becoming doctors licensed in the United States. (**Ex. 10**, Pl. Dep. 197:9–14, 203:4–9; **Ex. 13**, Decl. of Terry Moya, ¶ 4).

**PLAINTIFF'S RESPONSE**: **Disputed**.  **Disputed** as to the definition of "many." **Disputed** as to who qualifies as Plaintiff's "fellow students."

## J.    Post-Saba

77.    **DEFENDANTS' STATEMENT**: After being dismissed from Saba, Plaintiff enrolled at University of South Florida for a post-bachelor's degree in biology in the spring of 2023. (**Ex. 10**, Pl. Dep. at 44:13–24, 45:22–23, 46:12–14).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

78.    **DEFENDANTS' STATEMENT**: Some of Plaintiff's post-bachelor biology program courses were similar to courses she took at Saba. (**Ex. 10**, Pl. Dep. at 48:11–21). Plaintiff graduated from University of South Florida in the spring of 2024. (*Id.* at 47:5–6).

**PLAINTIFF'S RESPONSE**: **Undisputed**.

79.    **DEFENDANTS' STATEMENT**: Plaintiff did not look to see whether her Saba credits would transfer to a U.S. or Caribbean medical school. (**Ex. 10**, Pl. Dep. at 49:17–19). She has not applied to any medical schools, nor intends to do so. (*Id.* at 43:22–24, 51:19–23).

**PLAINTIFF'S RESPONSE**: **Disputed** as to whether Plaintiff looked to see whether her Saba credits would transfer to a U.S. or Caribbean medical school.  Plaintiff submits that Paragraph 79 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  At the time of Plaintiff's deposition, when asked why none of the credits she earned at Saba transferred to her biology program at University of South Florida, Plaintiff responded "I have it understood that you cannot transfer credits from a Caribbean university to an American school."  (**Siller Decl. Ex. 2**, Pl. Dep. at 47:10–16.)  When asked where she learned that Caribbean medical schools' credits would not transfer to U.S. schools, Plaintiff responded "Google."  (*Id.* at 47:23–48:2.)  When asked whether this was an article or a website, Plaintiff responded "I don't remember.  I just remember seeing a few things that said that most schools don't accept credits from a Caribbean school."  (*Id.* at 48:3–7.)  **Disputed** as to whether Plaintiff has applied to any medical schools or intends to do so.  At the time of Plaintiff's deposition, when asked whether she applied to any other medical schools after being dismissed from Saba, Plaintiff responded "no."  (*Id.* at 43:22–24.)  Later in the deposition, when asked whether Plaintiff has any intent of applying to medical school *at this time*, Plaintiff responded "no."  (*Id.* at 51:19–23.)  **Disputed** as to whether this remains Plaintiff's intention.

80.    **DEFENDANTS' STATEMENT**: Plaintiff is interested in pursuing a degree as an anesthesiologist assistant and plans to apply to two different schools: South University and Nova Southeastern University. (**Ex. 10**, Pl. Dep. at 49:24–50:14).

**PLAINTIFF'S RESPONSE**: **Disputed**.  At the time of Plaintiff's deposition, when asked what advanced degree Plaintiff was interested in pursuing, Plaintiff responded "anesthesiologist

assistant." (**Siller Decl. Ex. 2**, Pl. Dep. at 49:24–50:4.) When asked what schools she was looking into for that particular course of study, Plaintiff responded, "I believe it is called South University and Nova University." (*Id.* at 50:5–10.) **Disputed** as to whether Plaintiff remains interested in pursuing a degree as an anesthesiologist assistant or still plans to apply to school for such a degree.

81.    **DEFENDANTS' STATEMENT**: Plaintiff has not applied for any other jobs since leaving Saba. (**Ex. 10**, Pl. Dep. at 20:18–20.)

**PLAINTIFF'S RESPONSE: Undisputed** that when asked during Plaintiff's deposition whether she had applied to any other jobs besides Medsys since dismissal from Saba, Plaintiff responded "no." (**Siller Decl. Ex. 2**, Pl. Dep. at 20:18–20.) **Disputed** as to whether Plaintiff has since applied to any other jobs following the taking of her deposition.

\* \* \*

## II.    PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

### A.    The Parties

1.    Saba University School of Medicine ("Saba") is a for-profit medical school owned by R3 Education, Inc. ("R3"), which provides administrative and support services to Saba. (**Evans Decl. Ex. 1**, Compl. ¶¶ 1, 13.)

2.    Saba University School of Medicine ("Saba") operates out of Devens, Massachusetts. (**Siller Decl. Ex. 3**, Wargo Dep. at 79:22 ("Saba's only office is in Devens.").)

3.    Saba has routinely reported to its regulators that Saba's "administrative offices are located in Devens, MA," that it "maintains services for admissions as well as financial aid at the U.S. administrative offices in Devens, MA," and lists its location as Devens, Massachusetts on advertisements. (**Siller Decl. Ex. 7**, R3S00018357-688 at R3S00018367 & R3S00018373; **Siller Decl. Ex. 8**, R3S00012037-66 at R3S00012039, R3S00012041).

4.    R3, headquartered in Devens, Massachusetts, owns, operates, and provides

additional resources to Saba. (**Siller Decl. Ex. 9**, 30(b)(6) Deposition of Patrick Donnellan, Vol. I, taken on November 5, 2024 ("Donnellan, 30(b)(6) Dep. Vol. I")  at 54:7–8 ("Q. [W]here is R3's headquarters located? A. Devens, Massachusetts"); *id.* at 88:2–7 ("To the extent that that school requires additional resources or from R3, it has to interact with R3 Education, Inc."); **Siller Decl. Ex. 3**, Wargo Dep. at 16:17-19 ("I'm employed by R3 Education which owns and operates several different medical schools including Saba University.").)

5.    Many departments within R3 are run from Devens, Massachusetts, including its financing functions (receivables and payables), its clinical functions (overseeing the second two years of the medical education), the financial aid department, and registrars (maintaining student records). (**Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 54:15-55:22.)

6.    Ms. Ortiz was enrolled as a medical student at Saba from September 2019 to August 2022. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶2.)

**B.    Saba's Basic Sciences Curriculum and the Comprehensive Basic Sciences Exam**

7.    Prior to sitting for the USMLE Step 1 exam, Saba's students must complete and pass the Basic Science Curriculum, including the class, Foundations of Clinical Medicine, which requires that students pass a "comprehensive examination." (**Siller Decl. Ex. 10**, Defendants' Answer and Jury Demand, ¶¶ 87–88.)

8.    On or around March 9, 2017, at the direction of its Executive Vice President, Saba intentionally removed information regarding the "comprehensive exam" from its website and hid any reference to such an exam within the Teaching and Examination Regulations ("OER").  **Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 187:23–198:10 ("Q. Is there anywhere else on your website other than the OER where you notify students of the comp exam in order to sit for the USMLE Step 1? A. Not that I'm aware of.").)

C.    **Saba's Advertisements to Prospective Students**

9.    Saba advertises its USMLE Step 1 first time passage rates because this figure is a "selling point" that prospective students focus on when applying to medical schools. (**Siller Decl. Ex. 11**, R3S00024119-120 (listing residency placement rates, USMLE pass rate, and retention rate as the "selling points" for agents that are recruiting students; *see also* **Siller Decl. Ex. 12**, R3S00016462-478 at R3S00016464 (a 2022 "Saba Acceptance Survey" revealing that USMLE passage rates and residency placements were the most important factors for prospective medical school students); *see also* **Siller Decl. Ex. 3**, Wargo Dep. at 111:2–6, ("the couple of items that students really like to know are the USMLE pass rates because you cannot pass—you cannot move forward at different points of your education without passing the USMLE.").)

10.    The USMLE Step 1 "is the key 'pivot point' in med school" and that an institution's "[f]irst-time pass rates is critical" to prospective students. (**Siller Decl. Ex. 13**, R3S00000081-128 at R3S00000096 ("USMLE is the key 'pivot point' in med school"); **Siller Decl. Ex. 14**, R3S00003900-944 at R3S00003914 (same); **Siller Decl. Ex. 15**, R3S00003702-720 at R3S00003709 ("USMLE is the key 'pivot point' in med school. Taken midway in med school—before clinical rotations. First-time pass rate is critical."); **Siller Decl. Ex. 3**, Wargo Dep. at 112:1–17 ("many students do want to see that you have a track record of success with USMLE and residency attainment rate").)

11.    Saba advertises its USMLE passage rates in marketing emails, in search engine ads, on YouTube, at the top of its Facebook, Twitter, and LinkedIn profiles, in brochures, and at open houses and webinars. (**Siller Decl. Ex. 16**, P-000838 (Saba's website: "Virtually every student passes the USMLE Step 1 on their first attempt. 100% USMLE Step 1 Exam first-time pass rate"); **Siller Decl. Ex. 17**, P-000359 (advertising email from Saba: "virtually **every Saba student passes**

the USMLE on their first attempt") (emphasis in original); **Siller Decl. Ex. 18**, R3S00012265 at R3S00012275 (sponsored Google search result: "You have until Aug 4 to apply – 98% USMLE Step 1 Pass Rate"); **Siller Decl. Ex. 19**, R3S00012418 at R3S00012421 (Facebook: "the first-time pass rate among Saba students was 100% on the USMLE Step 1"); **Siller Decl. Ex. 20**, P-000835 ("Saba offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1"); **Siller Decl. Ex. 8**, R3S00012037 at R3S00012064 (YouTube: "Students achieve a 99% USMLE Step 1 first-time pass rate"); **Siller Decl. Ex. 21**, R3S00001083 at R3S00001084 (prospectus: "99% USMLE Step 1 first time pass rate"); **Siller Decl. Ex. 22**, R3S00018045 at R3S00018049 (open house presentation: "USMLE Test Results >99% First Time Pass Rate, Step 1").)

12.     Saba's advertisements state that "virtually every Saba student passes the USMLE on their first attempt" and that its "99% USMLE Step 1 first-time pass rate speaks for itself." (**Evans Decl. Ex. 1**, Compl. ¶¶ 58, 70; **Siller Decl. Ex. 23**, R3S00004463 ("Each year, virtually **every Saba student passes the USMLE** on their first attempt – an unprecedented achievement unmatched by any other international medical school.") (emphasis in original); **Siller Decl. Ex. 24**, R3S00012773 at R3S00012776 ("In short, Saba University is committed to doing everything possible to help ensure your success on this all-important exam [(the USMLE Step 1)]. Saba University students' 99%* [(2015-2019 average)] USMLE Step 1 first-time pass rate speaks for itself."); **Siller Decl. Ex. 25**, R3S00004229 at R3S00004230 ("Saba University students' 99% USMLE Step 1 first-time pass rate speaks for itself").)

13.     In addition to Saba's advertisements referencing a 97% to 100% passage rate, Saba also claims that the high rates are a testament to "the quality of [the Saba] education." (**Siller Decl. Ex. 26**, R3S00017443; **Siller Decl. Ex. 27**, R3S00028831.)

14.    Saba claims that its USMLE passage rate figures are an "unprecedented achievement" that is "unmatched by any other international medical school," "**exceeds** most US medical schools and ALL international medical schools," and a "testament to the quality" of Saba's education. (**Evans Decl. Ex. 1**, Compl. ¶¶ 58, 63, 70 & Ex. 1, thereto; **Siller Decl. Ex. 23**, R3S00004463 ("Each year, virtually **every Saba student passes the USMLE** on their first attempt—an unprecedented achievement unmatched by any other international medical school.") (emphasis in original); **Siller Decl. Ex. 28**, R3S00012091 at R3S000012095 ("In 2021, the first-time pass rate among Saba students was 100% on the USMLE Step 1. This is a testament to the quality of our [education]"); **Siller Decl. Ex. 29**, R3S00003945 at R3S00003952 ("Saba's first time pass rate **exceeds** most US medical schools and ALL international medical schools.") (emphasis in original); **Siller Decl. Ex. 22**, R3S00018045 at R3S00018049 ("When you look at two key measures of medical school performance, USMLE results and residency attainment, there are few international medical schools that can match Saba's results."); **Siller Decl. Ex. 30**, R3S00003653 ("Each year, virtually every Saba student passes the USMLE Step 1 on their first attempt. In 2017, Saba's first-time pass rate was a perfect 100%. That's an achievement unmatched by any other international medical school."); **Siller Decl. Ex. 31**, R3S00012588 at R3S00012595 ("Passing [the USMLE Step 1] with a high score on first attempt is key to residency. Saba's first-time pass rate **exceeds** most US medical schools and ALL international schools.") (emphasis in original); **Siller Decl. Ex. 21**, R3S00001083 at R3S00001096 ("Each year, virtually every Saba student passes the USMLE Step 1 on their first attempt. Between 2015 and 2019, the first time pass rate averaged 99% - a consistently strong performance."); **Siller Decl. Ex. 20**, P-000835 ("Saba University offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1."); **Siller Decl. Ex. 32**, R3S00012527

at R3S00012540 ("98% USMLE Step 1 & 2 First-Time Pass Rate (avg. 2018-2022). Strong USMLE Track Record. Passing the USMLE Step exams help you to become a successful doctor in the U.S. and Canada.").)

15.     As to Saba's marketing strategy, the Executive Dean for Saba testified that Saba's focus shifted from education to marketing: "[P]rior to [2020], everything was about focusing on student success, getting them through the program and into residence. And after that, it was all marketing." He continued, "they were wasting millions of dollars that could have been used to improve the education program." (**Siller Decl. Ex. 1**, Clifton Dep. at 45:4–46:1.)

16.     Saba's USMLE Step 1 messaging was carefully crafted by R3 and Saba leadership. (**Siller Decl. Ex. 33**, R3S00024071 (Patrick Donnellan emails Donald Donahue saying "This [USMLE Step 1] data is VERY easy manipulated and written with appropriate footnotes."); **Siller Decl. Ex. 34**, R3S00014670 at R3S00014673 (Donald Donahue discussing with a marketing consultant that the PowerPoint "need[s] to [s]ay that USMLE test score averages are comparable to US allopathic schools."); **Siller Decl. Ex. 35**, R3S00014946 at R3S00014949 (executives at R3 and Global University Systems discussing the use of "approved language" for USMLE Step 1 advertisements; **Siller Decl. Ex. 36**, R3S00016284-85 at R3S00016284 (email from Donald Donahue to R3 marketing staff member ordering him to change the Step 1 representations on the website. "Change paragraph 2 'In recent years, Saba University students have achieved a 99% USMLE Step One first-time pass rate, outpacing students at 89% of U.S. medical schools.' TO THE FOLLOWING: 'For the past several years Saba University students have achieved a 99% Step One first-time past rate.  In 2017, this rate was a perfect 100%, placing Saba's results in the top echelon of medical schools in the country.'"); **Siller Decl. Ex. 37**, R3S00015838 (Donald Donahue instructs GUS marketing team, "We should use the five year average with date range.

Verbiage such as: Saba—Virtually every student passes the USMLE Step 1 on their first attempt. Between 2015 and 2019, the first time pass rate averaged 95%—a consistently strong performance.").

17.    Saba's advertised success of its students on the USMLE Step 1, however, did not disclose that roughly 50% of matriculating students do not complete the Basic Science Portion of Saba's medical program.    (**Evans Decl. Ex. 1**, Compl. ¶¶ 79–80; **Siller Decl. Ex. 38**, R3S00037434 at R3S00037435 (percentage of enrolled students completing the Basic Science Portion of the Program averaged 54.83% from 2017 to 2022, with an average of 47% from 2018 to 2021).)

18.    Saba's attrition rate, or "whether people are successful through the program or not" is tracked by Defendants. (**Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 359:8–23); **Siller Decl. Ex. 39**, R3S00029536 (email from Saba's Registrar with the subject line "Attrition List" attaching a document titled "TRANSCRIPT, ATTRITION & GRADS.xls").

19.    Defendants systematically tracked Saba's attrition data, which they used to calculate profitability, make revenue forecasts, and provide updates to the board. (**Siller Decl. Ex. 40**, R3S00022067-96 (Donnellan, R3's SVP of Marketing and Enrollment, receiving a dataset of Saba's attrition rates from 2000 to 2011); **Siller Decl. Ex. 41**, R3S00022097 at R3S00022101 (Terry Moya ("Moya"), R3's CFO, asks for help calculating attrition to determine profitability); **Siller Decl. Ex. 42**, R3S00022289-R3S00022290 at R3S00022289 (Moya explains: "Once we have that subset of the total we then need to place our attrition rate to the number to get close to a real return on marketing dollars."); **Siller Decl. Ex. 43**, R3S00022360 (Moya explains: "One thing to point out on your analysis, you have no attrition baked in to your assumptions. The attrition rate on these classes lately have been much higher than … in the past."); **Siller Decl. Ex. 44**,

R3S00022280 (Moya stating: "We have the next BOD meeting in less than 2 weeks and they are expecting the answer on the attrition. I sent you the attrition breakdown with no attrition assumption so I am going to assume you are addressing this in the next meeting.").)

20.    Attrition information, specifically a students' withdrawal or academic dismissal from Saba's medical program, was logged by the Registrar into the school's Phoenix database, which Senior Management had direct access to.  (**Siller Decl. Ex. 45**, Deposition of Paula Boisseau Taken on November 21, 2024, at 48:4–16, 71:10–72:15.)

21.    Saba's senior executives ensured that the attrition data was not available to the public, or even non-executive members of Saba, as the data reveals that Saba has long had a serious attrition problem. (**Siller Decl. Ex. 46**, R3S00021917-27 at R3S00021919 ("high attrition rates" pose a "potential threat to accreditation" and lead to "unreliable revenue from tuition fees"); **Siller Decl. Ex. 47**, R3S00022132 ("[O]ur retention is a challenge"); **Siller Decl. Ex. 48**, R3S00012697 ("Why is the attrition rate so high?" and Donahue replies "Let's discuss."); **Siller Decl. Ex. 49**, R3S00021829 (Wargo summarizing a board meeting: "Attrition is high."); **Siller Decl. Ex. 50**, R3S00022125 (Rodger says: "The Saba numbers are 1/8th of what they used to be and the quality is down significantly. Patrick and I have done an attrition analysis and the numbers are quite clear."); **Siller Decl. Ex. 51**, R3S00030717 at R3S00030739 (the NY State Board of Education explained in a 2022 Site Visit Report that: "There should be concern about the reported high attrition rate of students who attend Saba. This should be analyzed and discussed with the admissions committee with a goal to decrease this percentage."); **Siller Decl. Ex. 3**, Wargo Dep. at 261:7–15, 262:13–263:5 (noting that the attrition number was being protected because he heard there were problems with attrition from an accreditation visit.)

22.    As the Executive Vice President for Marketing and Enrollment acknowledged, the

school would not provide attrition data to students and intentionally avoided posting these closely guarded figures on Saba's website.  (**Siller Decl. Ex. 3**, Wargo Dep. at 128:20–129:9 ("A. [Attrition is] not on our website, so—and I don't think I've told any students what they might—they are or might be . . . . A. Attrition rates for Caribbean medical schools are traditionally higher than what you find at US med schools or US DO schools, so it's not something that we put on our websites.").)

23.    In response to an internal question about the number of students attending Saba, Donald Donahue (formerly a Senior Vice President of Marketing and Enrollment at Defendant R3 Education, Inc.) wrote: "I'm always a bit leary [*sic*] to say. If somebody does the math then attrition assessment becomes easier." (**Siller Decl. Ex. 52**, R3S00012685.)

24.    In a separate communication with marketing staff regarding attrition rates, Mr. Donahue explained that "[w]e do not publish anything on this number." (**Siller Decl. Ex. 53**, R3S00012689.)

25.    Saba's admissions staff were also trained to avoid questions about attrition by stating that "it varies," that "online information is not always accurate," or that the numbers were not available and to pivot to topics like the USMLE passage rate or small class sizes.  (*See, e.g.*, **Siller Decl. Ex. 54**, R3S00012691 (providing a scripted answer to a question about attrition that stated "[u]nfortunately online information is not always accurate so we think it is important to stick with facts," and then failing to provide any information about attrition); **Siller Decl. Ex. 55**, R3S00012696 (in a correspondence titled "Admissions FAQs," the stock response for questions about attrition was that "it varies" followed by statements about Saba's small class size and ability to give students "constant feedback"); **Siller Decl. Ex. 26**, R3S00017443 (in response to a prospective student's question about attrition rates, Saba's admissions coordinator states: "I do not

have those specific numbers" and then goes on to explain that Saba has "a 99% pass rate for the USMLE step 1 which is higher than any other school in the Caribbean and, in fact higher than many US medical schools," and further assures the prospective student that Saba students "felt that they were very prepared for the USMLE step 1 test and that it was almost easy.")).

26.     R3's Senior Vice President of Marketing and Enrollment (Donald Donahue) made clear that "[w]e do not publish anything on this number" and closely guarded even basic enrollment data because "[i]f somebody does the math then attrition assessment becomes easier." (**Siller Decl. Ex. 56**, R3S00012689; **Siller Decl. Ex. 57**, R3S00012685.)

27.     In one email between marketing executives about how to answer questions from prospective students about Saba's "retention challenge," R3's director of enrollment for North America (Jennifer Bosco) explained: "We want to ensure we can respond to the question in a way that does not give too much information and subsides the concern." (**Siller Decl. Ex. 47**, R3S00022132.)

28.     In another communication, R3's VP of Marketing (Melissa Kushner) asked: "Who has the ability to pull attrition rates based upon upcoming scores. I'm sure Patrick [Donnellan] and Steve [Rodger] have it, but will they share it?" In response, R3's EVP for Marketing and Enrollment (Gerald Wargo) wrote: "Melissa – go ahead and ask. He may want to know why you want the info as I think they are trying to protect that number from getting out. I think it's really bad." (**Siller Decl. Ex. 58**, R3S00021747-52 at R3S00021747-48.)

29.     Prospective students regularly asked about attrition in the context of generalized questions regarding Saba's medical school. (**Siller Decl. Ex. 47**, R3S00022132 (the Regional Director of Enrollment, North America asking for an "approved standard response" to questions regarding attrition because they "are asked this question a lot . . . . [and] want to ensure we can

respond to the question in a way that does not give too much information and subsides the concern"); **Siller Decl. Ex. 54**, R3S00012691 (providing a scripted answer to a question about attrition that stated "[u]nfortunately online information is not always accurate so we think it is important to stick with facts," and then failing to provide any information about attrition); **Siller Decl. Ex. 55**, R3S00012696 (in a correspondence titled "Admissions FAQs," the stock response for questions about attrition was that "it varies" followed by statements about Saba's small class size and ability to give students "constant feedback"); **Siller Decl. Ex. 26**, R3S00017443 (in response to a prospective student's question about attrition rates, Saba's admissions coordinator states: "I do not have those specific numbers" and then goes on to explain that Saba has "a 99% pass rate for the USMLE step 1 which is higher than any other school in the Caribbean and, in fact higher than many US medical schools," and further assures the prospective student that Saba students "felt that they were very prepared for the USMLE step 1 test and that it was almost easy.").

30.     Actual conversations with prospective students confirm that Defendants routinely misled prospective students who simply wanted to know how many students made it through the program. (**Siller Decl. Ex. 26**, R3S00017443-45 at R3S00017443-44 (Saba has "an attrition rate comparable to U.S. schools" and "I do not have those specific [attrition] numbers" and pivoting to explain that Saba has "a 99% pass rate for the USMLE"); **Siller Decl. Ex. 59**, R3S00026497 ("Our attrition rate is similar to those at US medical schools. Schools with a high attrition rate lose their accreditation and ours is in good standing"); **Siller Decl. Ex. 60**, R3S00026543 ("[W]e are comparable to US med school numbers and our accreditation relies on low attrition numbers—we are in very good standing with this."); **Siller Decl. Ex. 61**,  R3S00029159-161 at R3S00029160-61 (when a prospective student says he heard attrition was "around 40 percent," the response was that the attrition rate is "20-25%" and that the "numbers you are hearing or reading about on blogs

are all hearsay from no school officials"); **Siller Decl. Ex. 62**, R3S00026552 ("I do not have the answer as to why this information is not posted on the website…. My understanding is that our attrition rate hovers around 10-12%.").

31.     The only documents Plaintiff has located regarding Saba's attrition rates being known to any third-party is when the Dutch Inspectorate of Education wrote in their notes from an online 2021 site visit with Rodger, Donnellan, and others that "[a]pproximately 25% of the students pass USMLE Step 1 at the end of year 2 directly." (**Siller Decl. Ex. 63**, R3S00026081-83 at R3S00026082.)

32.     As of the date of their depositions, several of Defendants' executives testified in this matter that they do not know what attrition means. (**Siller Decl. Ex. 64**, Deposition of Steven Rodger taken on September 5, 2024 at 115:23–116:9 (when asked about Saba's tracking of attrition, "People threw that term around but the answer is no. People threw that term around and it would be a continual irritant to many of us at the organization, one, because they had no idea what they were talking about; and two, because the institution itself had never defined what such a term would mean."); **Siller Decl. Ex. 65**, Deposition of Donald Donahue taken on October 31, 2024 at 122:23–25 ("And so it just became a very—it's an impossible number to—to identify what attrition really meant.").)

33.     Defendants' corporate representative testified that Saba "always focus[es]" on attrition rates and determines attrition by assessing "whether people are successful through the program or not." (**Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 359:8–23 ("Q. So there's no heightened concern given the NYSED's comments on high attrition rates? A. It's something we always focus on. Q. But how do you always focus on something you don't have a definition for? A. There's no defined definition of what attrition rate is, no. Q. Yeah. But how do you always

focus on it then? A. Well, whether people are successful through the program or not. Q. So whether or not they withdraw or dismissed? . . . . A. And -- well, some die.").

34.     While Defendants intentionally choose to not publish or advertise their attrition rates, St. George's University's School of Medicine, a for-profit medical school in the Caribbean and direct competitor of Saba, publishes its attrition rates conspicuously on its website for all prospective students to view:

# **Graduation & Attrition**

### SGU's School of Medicine graduation rate is 80% for all students who began in 2018.

Based on the number of students who have completed the Doctor of Medicine (MD) program as of May 2024.

*Stats*, St. George's University School of Medicine, https://www.sgu.edu/stats/.

## D.    Plaintiff's Application and Admission to Saba

35.     While in the process of considering attending medical school, Ms. Ortiz looked into the following non-exhaustive list of schools: University of Central Florida, University of South Florida, the University of Florida, Florida International University, Medical Universities of America, Ross University School of Medicine, the University of Arizona, and Saba.  (**Siller Decl. Ex. 2**, Pl. Dep. at 54:1–19, 64:5–65:6.)

36.     Ms. Ortiz also may have looked into St. George's University.  (**Siller Decl. Ex. 2**, Pl. Dep. at 54:23–55:3.)

37.     In researching these schools, Ms. Ortiz looked at the materials posted on the schools' websites, visited the University of Arizona campus, and broadly researched Caribbean medical schools using Google and subsequent web results.  (**Siller Decl. Ex. 2**, Pl. Dep. at 64:24–65:6; 56:4–57:13.)

38.    Ms. Ortiz visited Saba's website and social media accounts where she saw the USMLE passage rates and requested additional information about Saba's medical education. (**Siller Decl. Ex. 4**, Ortiz Decl.at ¶ 3.)

39.    In response to her request for information, Ms. Ortiz received standardized solicitations from Saba touting its high USMLE Step 1 passage rates. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶ 3; **Siller Decl. Ex. 66**, P-000222-224 at P-000222 (99%); **Siller Decl. Ex. 67**, P-000234-241 at P-000237 (99%); **Siller Decl. Ex. 68**, P-000293-295 at P-000293 (99%); **Siller Decl. Ex. 69**, P-000296-298 at P-000296 (99%); **Siller Decl. Ex. 70**, P-000315-318 at P-000315 (100%); **Siller Decl. Ex. 71**, P-000319-322 at P-000319 (100%); **Siller Decl. Ex. 72**,  P-000359 ("virtually every student"); **Siller Decl. Ex. 73**,  P-000393-398 at P-000393 (100%); **Siller Decl. Ex. 74**, P-000399-404 at P-000399 (100%); **Siller Decl. Ex. 75**, P-000405-410 at P-000405 (100%); **Siller Decl. Ex. 76**, P-000799-804 at P-000799 (100%).)

40.    Ms. Ortiz also attended an open house, where Saba reiterated its impressive pass rate for the USMLE Step 1 exam. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶ 4; **Siller Decl. Ex. 67**, P-000234-241 at P-000237 ("The average USMLE Step 1 pass rate for the past five years for Saba Students is >99%").)

41.    Ms. Ortiz considered a number of factors when looking at Saba, including facilities, education, USMLE pass rate, and ongoing admissions three times a year. (**Siller Decl. Ex. 2**, Pl. Dep. at 55:13–23, 58:3–14; *see also* **Siller Decl. Ex. 4**, Ortiz Decl. at ¶¶ 3.)

42.    Ms. Ortiz testified that "[o]ne of the biggest things for [her] was the USMLE pass rate that they were advertising," which she explained "indicated an idea about their education. So I thought that if they have such good pass rates that means their education is really good." (**Siller Decl. Ex. 2**, Pl. Dep. at 66:9-20; *see also id.* at 58:3–17 (when asked to recall what she viewed on

the website that was important, she explained: "it was the USMLE pass rates that they were advertising" which "kind of give you an idea of like their education, how they are better or how they compete with other schools and stuff like that"); *id.* at 80:2–6 (explaining that "such good numbers for the USMLE pass rates" indicated to her that the Saba education "is really good").)

43.    Ms. Ortiz testimony was clear that "to [her] [the high USMLE first-time pass rates] spoke on their education, and that was important to [her] … [She] took this as our education is this good, that we have a hundred percent or 98 percent or 99, whatever [she] read, percent first-time pass rate." (**Siller Decl. Ex. 2**, Pl. Dep. at 91:15–93:9.)

44.    Ms. Ortiz testified that Saba's USMLE pass rate was important to her because "[i]t indicated an idea about their education. So [she] thought that if they have such good pass rates that means their education is really good." (**Siller Decl. Ex. 2**, Pl. Dep. at 66:18–20; *see also* **Siller Decl. Ex. 4**, Ortiz Decl. at ¶¶ 3-5.)

45.    Ms. Ortiz testified that a small degree of attrition is expected at any educational institution, but there is a dramatic difference between the typical attrition rate at a U.S. medical school (less than 10%) and the approximately 50% attrition rate at Saba. (**Siller Decl. Ex. 2**, Pl. Dep. at 186:20–188:3.)

46.    Ms. Ortiz enrolled at Saba in September 2019. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶¶ 2, 6; *see also* **Siller Decl. Ex. 5**, R3S00002135 at R3S00002143 ("First Day of Enrollment – September 2, 2019").)

47.    Ms. Ortiz was dismissed from Saba before she had the opportunity to take the USMLE Step 1 exam. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶ 7.)

Dated: December 6, 2024

Respectfully submitted,

_/s/ Patrick T. Egan_

**BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Christina L. G. Fitzgerald (BBO #709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cfitzgerald@bermantabacco.com

**MAYNARD NEXSEN PC**
Margaret M. Siller (admitted _pro hac vice_)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

John R. Alford, Jr. (admitted _pro hac vice_)
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1847
jalfordjr@maynardnexsen.com

**NATIONAL STUDENT LEGAL DEFENSE NETWORK**
Alexander S. Elson (admitted _pro hac vice_)
Daniel A. Zibel (admitted _pro hac vice_)
Madeline D. Wiseman (admitted _pro hac vice_)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org
dan@defendstudents.org
madeline@defendstudents.org

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

/s/ Patrick T. Egan
Patrick T. Egan