UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons,<br><br>        Plaintiff,<br><br>    v.<br><br>SABA UNIVERSITY SCHOOL OF MEDICINE; AND R3 EDUCATION, INC.,<br><br>        Defendants. | Civil Action No.: 1:23-cv-12002-WGY |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE DEFENDANTS' EXPERT, DR. PRZEMYSLAW JEZIORSKI**

**INTRODUCTION**

Plaintiff designated Dr. William Pinsky as her purported expert witness to opine on the propriety of Saba's marketing and her alleged damages. Dr. Pinsky's Report was limited to the general principles that a partial education is *per se* valueless and that schools should publish attrition rates. Dr. Pinsky, however, is a physician and medical school administrator; he has no formal training or experience in economics or marketing and cites no articles, studies, or data supporting his opinions. In response, Saba designated Dr. Przemyslaw Jeziorski to rebut Dr. Pinsky's marketing and damages opinions. Dr. Jeziorski is an economist and marketing professor at University of California-Berkley's Haas School of Business whose career includes faculty posts at University of California-Berkley's Haas School of Business and John Hopkins University where he taught economics and marketing. He has a PhD in economics from Stanford Graduate School of Business and has duties related to the admission and retention of PhD candidates at Hass School of Business. Based on his experience and numerous academic articles and studies, Dr. Jeziorski opined that Dr. Pinsky's declaration and report was deficient in several areas, including Dr. Pinsky's opinions on the value of partial education, and the factors

considered by prospective students in making enrollment decisions.

Plaintiff does not directly challenge Dr. Jeziorski's overall opinions that a partial medical education has value and that a school's "attrition" rate is not a major factor considered by prospective students in enrollment decisions. Instead, Plaintiff attempts to cut at the edges of Dr. Jeziorski's opinion by complaining that certain of the many articles and studies to which Dr. Jeziorski cited in support of his opinions do not involve the precise demographics of the student population at issue in this case (ignoring the obvious irony that Plaintiff's purported expert cited *zero* articles, studies or data) and complaining that certain arithmetic results of such studies would not correspond precisely to the student population in this case were such a study performed. These arguments find little support in the case law, which clearly authorizes reliance on analogous studies. Moreover, while Plaintiff attempts to distinguish certain articles or studies, she makes no rationale showing why such purported differences would render the conclusions of those articles and studies inapplicable to the student population in this case. Saba requests that this Court deny Plaintiff's Motion in Limine to exclude Dr. Jeziorski's testimony.

ARGUMENT

## I.  Legal Standard

Experts may testify in the form of an opinion or otherwise if the proponent of the expert demonstrates that it is more likely than not that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702. "Courts interpret Rule 702 liberally in favor of the admission of expert testimony." *Levin v. Dalva Brothers, Inc.*, 459 F.3d

68, 78 (1st Cir. 2006). It is "not intended to provide an excuse for an automatic challenge to the testimony of every expert." FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendments (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151-52 (1999)). "*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). Courts do not "determine whether the…expert did everything that an expert could do in coming to his conclusion, or whether every piece of information he relied upon was indisputably true and accurate," because "[t]hese are considerations that may influence the jury's determination as to which expert to believe at trial..." *L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.,* 121 F. Supp. 2d 147, 155 (D. Mass. 2000).

Experts may rely on data and studies discussing analogous situations. *United States ex rel. Dyer v. Raytheon Co.*, 2013 WL 5348571, *8 (D. Mass. Sep. 23, 2013). Experts may utilize different populations of data, even from another country, if that data would be helpful. *Metabolife Int'l v. Wornick*, 264 F.3d 832, 842-43 (9th Cir. 2001). In *Wornick*, the court explained use of animal data to opine about human health can be helpful for Rule 702 purposes. *Id.* at 842. The Court also explained that data derived from studies performed outside the United States was reliable because "[w]hile regulation of experimentation in the United States may bolster the reliability of results generated domestically, there is no reason to assume that experimentation abroad…would not meet those regulations or is unreliable despite deviancies." *Id.* at 843.

## II.    Dr. Jeziorski Has the Requisite Knowledge, Skill, Experience, Training, and Education to Render his Opinions.

Dr. Jeziorski is eminently qualified to opine on the value of partial education, students' choice of schooling, and reporting of graduation and attrition rates. Under Rule 702, "'[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may

testify in the form of an opinion….'" *United States v. Jordan*, 813 F.3d 442, 445-46 (1st Cir.

2016) (quoting FED. R. EVID. 702) ("[Expert]'s curriculum vitae belies the defendant's self-

serving assertion that [expert] lacked the relevant knowledge, experience, or education to proffer

an expert valuation."). Plaintiff contends that Dr. Jeziorski may not offer his opinions simply

because he does not have experience in medical education. Pl. Br. at 4-12, 15, 18-19. The

expertise required to offer opinions on the value of education, students' choice of schooling, and

the reporting of graduation and attrition rates, however, does not require specialized medical

education. Rather, these types of opinions fundamentally fall within the domain of labor

economics and marketing, not medicine. *See* Ex. 1, Jeziorski Report, ¶¶ 2, 10-14, 18, 21-37

(demonstrating that Dr. Jeziorski's opinion is premised on economic and marketing principles,

data, and sources). On the other hand, Dr. Pinsky does not possess specialized training in

economics or marketing, which he admitted during his deposition. Ex. 2, Pinsky Dep. at 76:7-12,

154:7-20, 201:15-202:9, 219:17-220:6; ECF 124-2, Pinsky Report, Ex. 1 (curriculum vitae).

Dr. Jeziorski is a professor of marketing at the University of California-Berkley Haas

School of Business and has a PhD in Business Administration with a focus in Economics from

Stanford Graduate School of Business. Ex. 1, Jeziorski Report, Ex. 1 (curriculum vitae). His

research focuses on quantitative marketing, industrial organizations, and digital marketing. *Id.*

He is an associate editor at *Management Science*, *Quantitative Marketing and Economics*, and

has published several papers on economics and marketing. *Id.* Thus, Dr. Jeziorski is perfectly

equipped to opine about the issues in this case.

Throughout her brief, Plaintiff argues that Dr. Jeziorski does not have the experience or

qualifications to opine about retention or admissions at Caribbean medical schools. Pl. Br. at 15,

18-19. Dr. Jeziorski's testimony demonstrates otherwise. For example, Dr. Jeziorski serves on

the admissions committee for the marketing PhD program at Berkley and is also responsible for retention as a member of the Berkley faculty. ECF 124-1, Jeziorski Dep. at 28:24-29:2, 30:3-7. Plaintiff concedes these facts but contends Dr. Jeziorski's experience is irrelevant because it did not take place within a medical school and the marketing PhD program at Berkley is comparatively small. Pl. Br. at 18-19. Dr. Jeziorski, however, explained that "there are certain common factors that are common when students consider schools" and "what drives choice of students, even the ones in the medical field, [is] an economic question" (ECF 124-1, Jeziorski Dep. at 179:17-19, 180:21-24). Plaintiff offers no logical argument or case law supporting its conclusory position that Dr. Jeziorski's experience should be disregarded outright simply because he has not worked for a medical school. Dr. Jeziorski is qualified to opine on the admissions and retention processes and the value of partial education.

III.    **Dr. Jeziorski's Value of Partial Education Opinion**

In his report, Dr. Jeziorski demonstrated the invalidity of Dr. Pinsky's opinion that "a partial medical education, specifically from a Caribbean medical school, has little to no economic value by itself" (quoting ECF 124-2, Pinsky Report ¶ 39), because it "contradicts a body of economic research, which demonstrates that students may still derive value from the knowledge, skills, and experiences gained during their education, even without completing a degree." Ex. 1, Jeziorski Report, ¶ 10. Plaintiff challenges most, but not all, of Dr. Jeziorski's opinions related to the value of a partial education but these challenges do not require exclusion of Dr. Jeziorski's testimony under Rule 702.

### A.  Dr. Jeziorski's "Value of Partial Education" Opinions Are Relevant, Reliable, and Not Unduly Prejudicial.

Plaintiff, whose expert offered *zero* articles, studies, or data supporting his conclusory opinion that a partial education is worthless (ECF 124-2, Pinsky Report), asserts that the articles

and studies cited by Dr. Jeziorski are wholly inapplicable because they did not involve the precise set of facts presented in this lawsuit—the value of a partial education from a Caribbean medical school. Pl. Br. at 5-12. But Plaintiff cites no studies or articles more closely aligned with the facts of this case (indeed she cited none at all) nor does she explain why differences in the populations examined in the studies and articles cited by Dr. Jeziorski would render them wholly inapplicable to this case. As set forth in more detail below, the articles and studies to which Dr. Jeziorski cites are sufficient, Dr. Jeziorski's testimony is the product of reliable principles and methods set forth in those articles and studies, and Dr. Jeziorski's opinion reflects a reliable application of those principles and methods to the facts of the case. *See* FED. R. EVID. 702.

### 1.  The Returns to Medical School article is relevant.

Dr. Jeziorski observes that "economic research indicates that students demonstrate persistence in obtaining a medical education, often resuming their degrees following the initial setback." Ex. 1, Jeziorski Report, ¶ (10)(i). In support, Dr. Jeziorski notes a 2016 study published in the American Economic Journal: Applied Economics, which found that 41% of students who are initially not admitted to medical school in the Netherlands eventually complete their degree. *Id.* (citing ECF 124-4, "The Returns to Medical School: Evidence from Admission Lotteries" American Economic Journal: Applied Economics, 8(2), 225-254 (2016)). Plaintiff argues that the reference to The Returns to Medical School should be rejected outright because in the Netherlands, admission to medical school is determined by admission lotteries. Plaintiff claims, without any support, that "[f]indings from applicants rejected through a lottery system shed no light on the likelihood that students who withdraw or are dismissed from Saba prior to the Step 1 exam will ever return to medical school and obtain a degree." Pl. Br. at 5. But the authors of The Returns to Medical School explained why a study of applicants to Dutch medical schools is helpful, explaining that "[t]he admission lotteries provide true randomization and allow us to

eliminate bias arising from students self-selecting into medical school on the basis of unobservables such as ability and motivation." ECF 124-4 at 4 (p. 226 of article). Dr. Jeziorski expanded on this in his deposition:

> [T]here was a reason why lottery system was chosen for this paper. It was because it's easier to establish causality when the lottery is present….[W]hen one does research on these topics, like, value of education, most of these papers would put out certain confounds that limit us from understanding what that value is, for example, students self-selection and differences in admission standards. So we would want to gain understanding of how much value that American medical schools have, but because of these confounds we are unable to study these questions directly on that data because we don't have the lottery in America. So instead what we do, and that's very common in research and very top research is to go into a setting where causality can be established easier. We call in internal validity, and then take these numbers and – [] try to extrapolate them to settings where causality cannot be established really easily….So…I just followed a general way how we learn and try to value…the deals. We just combine these different results with different levels of internal and external validity into a conclusion….[A]nd I admit that it requires assumptions. But …that's how research gets done. So I didn't depart … from a standup process I would do as a referee or tenure evaluator….
>
> this is an American journal, so this research was published there and – and these journals are published by American Economic Association, which I think some of the mission is to study American markets and -- and this is a very high -- very -- very top journal. So they also thought that -- the editor of the journal made the conclusion that this is relevant for American audience and it would be with that conclusion me -- me and him.

ECF 124-1, Jeziorski Dep. at 106:3-108:6; 116:8-116:17. Thus, the fact that this paper studies a lottery system actually makes the study *more reliable* because in the lottery setting, causality can be established more easily by eliminating bias arising from students self-selecting into medical school on the basis of unobservables such as ability and motivation.[1]

Plaintiff calls attention to Dr. Jeziorski's testimony that he performed a "side analysis" (Pl. Br. at 6), but his testimony clearly shows that the "side analysis" just meant determining whether the difference in admissions systems in the Netherlands would render invalid the

---

[1] Plaintiff also claims that Dr. Jeziorski was not specifically aware of whether Saba admits students by lottery, but his testimony proves otherwise. ECF 124-1, Jeziorski Dep. at 105:1-2 ("So my understanding was that Saba does not use lottery.").

proposition for which he cites The Return to Medical School—that students demonstrate persistence in obtaining medical education, often resuming their degrees following the initial set back—and he concluded it would not. ECF 124-1, Jeziorski Dep. at 106:3-108:6.

Plaintiff complains that Dr. Jeziorski cites The Return to Medical School for the broad proposition that 41% of students who are initially not admitted to medical schools eventually complete their degree even though it involved a study of Dutch medical students. Pl. Br. at 6. As described above, the admission lotteries actually enhanced the value of the study because it provided "true randomization and allow us to eliminate bias arising from students self-selecting into medical school on the basis of unobservables such as ability and motivation." ECF 124-4 at 4 (p. 226 of article). Moreover, Plaintiff's argument misses Dr. Jeziorski's point. Dr. Jeziorski did not set out to determine the precise arithmetical percentage of students who are initially not admitted to Caribbean medical schools that eventually complete the degrees. Instead, and as he testified, The Return to Medical School was generally supportive of his conclusion that a partial medical education has value because studies support the notion that students often complete medical school after an initial set back:

> [M]y conclusion was that the significant number of students would eventually finish, because I found 41 percent to be [an] extremely high number from…my experience as an educator….So this number was actually strikingly high for me and indicated that medical degrees actually have a much higher rate of persistence than compared, for example, to the PhD in marketing. So that's why I cited this number…as indicating persistence to continue and eventually complete the degree.

ECF 124-1, Jeziorski Dep. at 110:6-111:2. Thus, while Dr. Jeziorski relied on this statistic for the general proposition that medical students have a persistence to continue and eventually complete their degree, he did not attempt to determine whether this particular statistic would apply precisely to a population of Caribbean medical students.

Finally, Plaintiff splits hairs with Dr. Jeziorski's use of the word "predominantly" in his opinion that "it has been documented that students who are admitted but do not graduate from medical schools predominantly pursue other medical-related fields." Pl. Br. at 7 (citing Ex. 1, Jeziorski Report, ¶ 10(iii)). The Returns to Medical School reported that of the students who are admitted but do not graduate from medical schools, 32% of students go into health-related fields, 15% go into sciences, and 9% go into economics. *Id.* (citing ECF 124-4, the Returns to Medical School). Of the 9% of former medical students that go into economics, Dr. Jeziorski estimated that approximately half of them, or 4.5%, would go into health-based economics based on his experience advising students who had a partial medical education. ECF 124-1, Jeziorski Dep. at 134:9-12. Plaintiff claims that this calculation is unreliable because Dr. Jeziorski only referenced four or five students during his deposition which he could recall who went into health-based economics. Pl. Br. at 7. However, Dr. Jeziorski also testified that his 4.5% estimate was conservative because "I've never seen a student that had medical experience that did not pursue topics in health economics." ECF 124-1, Jeziorski Dep. at 135:15-23.

Plaintiff complains that it would have been more accurate to use the term "majority" instead of "predominantly" to describe the percentage of former medical-students who pursue other medical-related fields but offers no resistance to Dr. Jeziorski's overall conclusion that former medical students enter medical-related fields and that a partial medical education has value in those pursuits. *See* Pl. Br. at 7, n.7. Plaintiff also complains that Dr. Jeziorski's report did not explain the calculations that went into his conclusion, but Dr. Jeziorski cited the study supporting this conclusion in his report (Ex. 1, Jeziorski Report, ¶ 10(iii)), and Plaintiff is free to cross-examine Dr. Jeziorski about this study and how he calculated this number. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993).

In sum, Plaintiff nitpicks Dr. Jeziorski's references to The Returns to Medical School but offers no serious rebuttal to the overall conclusions for which Dr. Jeziorski cites the study: (i) that students demonstrate persistence in obtaining a medical education, often resuming their degrees following the initial set back; and (ii) it has been documented that students who are admitted but do not graduate from medical schools predominantly pursue other medical-related fields. Significantly, Plaintiff offers not one alternative study that casts any doubt on The Returns to Medical School or Dr. Jeziorski's opinions based thereon. To the extent Plaintiff raises "disputes over the facts on which an expert bases his opinions," these "go to the weight of the testimony, not its admissibility." *Dyer*, 2013 WL5348571, at *9. And Dr. Jeziorski is permitted to rely on analogous situations under Rule 702. *Id* at *8; *Wornick*, 264 F.3d at 842.

### 2. The AAMC Data Snapshot supports Dr. Jeziorski's opinion that students demonstrate persistence in obtaining a medical education.

Dr. Jeziorski supports his opinion that a partial medical education has value in the form of the option value of continuing the medical degree by observing that students demonstrate persistence in obtaining a medical education. Ex. 1, Jeziorski Report, ¶ 10(i). In support, Dr. Jeziorski cites a data snapshot from the Association of American Medical Colleges ("AAMC") that reflects that over 10% of students that do not complete their medical degree within the standard four years go on to finish it within six years. Ex. 1, Jeziorski Report, ¶ 10(i) (citing ECF 124-5, AAMC Data Snapshot). Plaintiff claims that that the AAMC Data Snapshot, which relates to students at American medical schools, is inapplicable to Caribbean medical students due to demographic differences between American and Caribbean medical students, particularly the lower admissions standards of Caribbean medical schools. Pl. Br. at 8-9.

However, Dr. Jeziorski explained during his deposition that he would anticipate that continuation rates among Caribbean medical school students would actually be *higher*, stating

"the higher the graduation rates…,then…the number of people that continue would be smaller," and under the assumption that Saba's graduation rates are lower, it would mean that "if there's a lot of people dropping out, …then there's more room for continuation." ECF 124-1, Jeziorski Dep. at 120:4-16. In fact, Dr. Jeziorski stated that he thought his estimate for Caribbean medical students continuation was conservative. *Id.* at 120:14-16. Though he anticipated the continuation rates at Caribbean medical schools would be higher, Dr. Jeziorski clarified that neither "Dr. Pinsky's report, nor the documents I reviewed…would indicate that [Caribbean and U.S. medical schools'] continuation rates would be significantly different." *Id.* at 123:25-124:2. In reality, Plaintiff merely disagrees that the continuation rate at Caribbean medical schools is the same 10% that is present among students at American medical schools but does not challenge Dr. Jeziorski's overall opinion that students demonstrate persistence in medical continuation and often resume their degrees following the initial set back. To the extent Plaintiff merely disagrees with Dr. Jeziorski's opinion based on the data, "disputes over the facts go to the weight of the testimony, not its admissibility." *Dyer*, 2013 WL5348571, at *9. "Vigorous cross-examination," and "presentation of contrary evidence" are the means Plaintiff must use to attack Dr. Jeziorski's testimony. *Daubert*, 509 U.S. at 596.

### 3. Studies evaluating the "sheepskin" effect support Dr. Jeziorski's opinion that a partial medical education has value.

The "sheepskin" effect is the wage premium associated with completing the final year of a degree. *See* Ex. 1, Jeziorski Report, ¶ 13. Dr. Pinsky opines that a partial medical education has zero value, therefore attributing the entire value of medical education to the sheepskin effect. *Id.* Plaintiff claims that the sheepskin effect hypothesis has no bearing on Dr. Pinsky's opinion because a "medical degree is not a feather in one's cap that increases earning power relative to non-degreed peers; it is a barrier to entry into the medical profession." Pl. Br. at 10. "Barrier to

entry into the medical profession," however, is the epitome of a wage premium associated for completing a medical degree. Ex. 1, Jeziorski Report, ¶ 13. In any event, Plaintiff misses Dr. Jeziorski's point. Dr. Jeziorski observes that the sheepskin effect is a contested hypothesis within labor economics, but even studies finding substantial sheepskin effects *still* document *significant value* of partial education. *Id.*[2]

### 4. Sources addressing undergraduate degrees are adequate to support Dr. Jeziorski's valuation opinions.

Plaintiff claims that studies that analyze undergraduate students are not applicable to medical school students. Pl. Br. at 11-12. Plaintiff fails to mention that Card, D., "The Causal Effect of Education on Earnings," *Handbook of Labor Economics*, 3, 1801-1863 (1999) directly applies to medical schools. ECF 124-8, at 8-9, (pp. 1807-08 of the article). The study references MD students in its data and graphs and shows the consistent and robust pattern of partial value of education through the variety of degrees, from undergraduate, through professional degrees such as MD, JD, and PhD. *Id.* This wide-ranging applicability underscores the study's extensive external validity, affirming its relevance to Caribbean medical schools as well.

Moreover, as Dr. Jeziorski explained, the Card study follows the model set forth by Jacob Mincer in "Schooling, Experience and Earnings (Columbia University Press, New York (1974)). ECF 124-1, Jeziorski Dep. at 161-64; *see* Ex. 1, Jeziorski Report, ¶¶ 11-14. The Mincer Model suggests that the marginal value of an additional year of education is heterogenous across individuals and may depend on factors such as demographic characteristics, years of experience,

---

[2] For this reason, Plaintiff's complaint that one of the studies that refuted the existence of the sheepskin effect was not peer-reviewed is a red-herring that does not impact the validity of Dr. Jeziorski's opinion. Pl. Br. at 10-11. Plaintiff does not attempt to dispute the other two sources that Dr. Jeziorski cited that support the sheepskin effect and still found value in a partial education. Ex. 1, Jeziorski Report, ¶ 13.

and student ability. Ex. 1, Jeziorski Report, ¶ 14. Plaintiff did not challenge Dr. Jeziorski's reliance on the Mincer Model which underlies his value of partial education opinion. *See* Pl. Br.

Finally, and as the Court observed in its memorandum and order on class certification, the case law supports Dr. Jeziorski's position and recognizes that failure to account for the partial value of education would overcompensate the plaintiff and ignore any benefit she may have derived from the education she received. Dkt. 134 at 24 (citing *Spangler v. Nat'l Coll. of Tech. Instruction*, No. 14-CV-3005, 2016 WL 11772282, at *9-10 (S.D. Cal. May 19, 2016); *Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631, 634 (S.D. Cal. 2015)).[3]

## IV.    Dr. Jeziorski's Choice of Schooling Opinion

Dr. Pinsky opined that a medical school's attrition rates are "critical information necessary for prospective students to make an informed enrollment decision" citing no data or studies in support of the conclusion. ECF 124-2, Pinsky Report, ¶ 37. Dr. Jeziorski explained that this is incorrect because "[s]tudents take a variety of factors into account when choosing their education," including "employment prospects, the incremental value of both partial and complete education, as well as admission and graduation rates." Ex. 1, Jeziorski Report, ¶ 17. Dr. Jeziorski noted that "[a]fter reviewing the literature on student self-selection," he "found no evidence to suggest that attrition rates are a *major factor* considered by students when choosing an academic institution." *Id.* ¶ 19 (emphasis added).

Plaintiff argues that the Court should exclude Dr. Jeziorski's opinion because one of the studies that Dr. Jeziorski relied on for a separate opinion in his report stated in the opening

---

[3] Plaintiff also did not challenge Dr. Jeziorski's opinion from paragraph 10(ii) of his report that students receive value for partial education because they can transfer their credits. Pl. Br. p. 4 n. 4. Plaintiff claims this opinion is irrelevant because the class (which has now been decertified) excluded transfer students. This argument misses the point, which is that the option to transfer credits, regardless of whether actually exercised, provides value to the students.

paragraph that "'[s]tudents and their parents have an obvious interest in retention, since attending college is of little value in career development unless the student is able to persist through completion of some degree.". Pl. Br. at 12 (quoting ECF 124-6 at 13 (p. 1 of article)). However, Dr. Jeziorski's opinion did not claim that attrition is not a factor that any students consider, but instead that it is not a "*major factor*." Ex. 1, Jeziorski Report ¶ 19 (emphasis added). Additionally, the single cherry-picked statement does not state that students' interest in retention is a major factor they consider pre-enrollment, and as Dr. Jeziorski testified, the article did not "cite anything" supporting that statement. ECF 124-1, Jeziorski Dep. at 267:24-25. Indeed, the article did not examine or study factors in students' enrollment decisions—the focus was on degree attainment rates at American colleges and universities and the factors influencing them. ECF 124-6. After Dr. Jeziorski testified that he does not agree with the statement, Plaintiff's counsel asked if he believed that the study was still reliable, and Dr. Jeziorski explained that he thought that the study "is the most reliable study that starts to decompose the variation in attrition rates," but that it was not clear to him whether the quote about retention was discussing the individual retention of a prospective student, retention for the whole student body, or attrition rates. ECF 124-1, Jeziorski Dep. at 267:20-22, 268:1-269:16. Thus, Plaintiff's strawman argument based on one cherry-picked quote does not invalidate Dr. Jeziorski's opinion.

Plaintiff also claims that Dr. Jeziorski disregarded emails showing that a few students across a seven-year time horizon asked about attrition rates when considering Saba. Pl. Br. at 13. Dr. Jeziorski testified that these few emails did not change his opinion because "I did not find [that] there's no student out there [who] wouldn't be asking for attrition numbers, but I didn't find evidence that that number is important or for a significant population of students…." ECF 124-1, Jeziorski Dep. at 210:5-9. He further testified that his "research was trying to identify

what are the major factors considered by students…. [I]s there a small percentage of students that

care about [attrition] rates? Probably, yes….Whether it's a major factor considered by students,

by looking at, you know, [a] number of emails asking about attrition that you can count on one

hand, … that would not pass the scrutiny of being a major factor considered by students…." *Id.*

210:23-211:14. Thus, Dr. Jeziorski's opinion that attrition rate is not a major factor students

consider is not invalidated by an insignificant number of students that asked about attrition.

Moreover, "Rule 702 does not demand that experts rely on all data that could be deemed

relevant," and "[i]t does not even require the expert to seek out the best possible source of

relevant information." *Lawes*, 963 F.3d 72 at 101.

Plaintiff also claims that Dr. Jeziorski opined that students rely on graduation rates which

undermines his opinion that students do not consider attrition rates a major fact, because Dr.

Jeziorski testified that attrition rates and graduation rates are two sides of the same coin. Pl. Br.

at 13. However, in his report Dr. Jeziorski explained that "[w]hile graduation and attrition rates

are generally inversely related, they capture different aspects of students dynamics." Ex. 1,

Jeziorski Report ¶ 21. Thus, this testimony does not undermine his opinion as Plaintiff claims.

Next, Plaintiff challenges two studies on which Dr. Jeziorski relied to form his choice of

schooling opinion. Pl. Br. at 14-15. First, Plaintiff claims one study was irrelevant because it

studied male World War II veterans who were choosing an undergraduate institution for their

undergraduate education in the 1950s, and because the authors stated that "the special nature of

this sample makes it impossible to extrapolate this result to the entire population." *Id.* at 14

(citing ECF 124-9). However, Dr. Jeziorski testified:

> I think one needs to think about what the word "extrapolate" means here. I think there's
> two type[s] of extrapolations that…in any scientific field…people apply. I think there is
> qualitative and quantitative extrapolation. This paper is published in an extremely
> prestigious journal…it's a journal that gives you tenure in most of the schools in the world

in economics, probably number three journal in the world. The article would not be published…if it [was][4] informing us about a narrow population of male veterans. Because, frankly, that study would not be influential enough or general interest enough to be published in this kind of outlet….And it's called a general interest journal which means practitioners and scientists would be interested reading articles there. So I think the authors were referring to…that the number, the point estimate cannot be taken and just transferred to another population since there's selection bias. What do we learn from this article? Do we learn about general population in the qualitative fashion? I think we must, because otherwise it would not be published in this outlet.

ECF 124-1, Jeziorski Dep. at 187:22-189:1. Dr. Jeziorski explained that the quantitative numbers

may have limitations when applied, for example, to females, because the study considered males,

but:

because the study is so well executed, we have very strong evidence for these people, that they have a very high self-selection number. That…would lead me to believe that other populations [beyond male World War II veterans] have self-selection. It may not lead me to conclude how large it is, but I think the editor of JPE [the Journal of Political Economy], that journal, must have…taken [this] into account. Because I know how the editorial process works in these journals. It must have general application.

*Id.* at 189:9-23. Plaintiff cites no data or authority indicating that the premise for which Dr.

Jeziorski relies on this article—self-selection of students into colleges based on institutions'

incremental impact on students' wages—would not apply to prospective Caribbean medical

students. In the absence of a study on this issue involving the exact population at issue, Dr.

Jeziorski may rely on analogous studies and data. *Wornick*, 264 F.3d at 842; *Dyer*, 2013

WL5348571, at *8.

Second, Plaintiff claims that another study upon which Dr. Jeziorski relies is irrelevant

because it addresses the matriculation decisions of high school students admitted to Williams

College from 2008 to 2021, and according to Plaintiff (without any factual or legal support)

---

[4] The transcript states Dr. Jeziorski used the word "was" here, but the errata sheet signed by Dr. Jeziorski and served contemporaneously with this brief reflects that he actually used the word "was."

"[t]he factors that mattered to that narrow population of high school students selecting elite private colleges have no bearing on the factors that matter most to prospective medical students." Pl. Br. at 14 (citing ECF 124-10). Plaintiff's assertion is wholly conclusory, and she identifies no reason why Dr. Jeziorski to rely on this data given that the inherent similarities in applying to higher education programs. *Wornick*, 264 F.3d at 842; *Dyer*, 2013 WL5348571, at *8.

Plaintiff argues that the article undermines Dr. Jeziorski's opinion that attrition is not a major factor to students, because the article states that students care about investment utility when selecting a school. Pl. Br. at 14-15. Plaintiff's claims Dr. Jeziorski testified that investment utility included consideration of attrition rates. *Id.* But this was not his testimony. Plaintiff's counsel asked Dr. Jeziorski whether attrition rates say something about investment utility. ECF 124-1, Jeziorski Dep. at 233:2-23. Dr. Jeziorski testified:

> That's correct….[T]hat's where it gets really complicated because what…an individual student that enters a school should be concerned with is their graduation rate. I agree with that….The problem is that these attrition rates, they don't really convey your graduation rates. That's the problem. Because my graduation rate is dependent on two factors: … my quality entering the school, which is the same no matter which school I go to, right. That's kind of an invariant factor. I come with certain human capital, so now that's fixed. It doesn't change across schools because it's still me, right. Now, there's the value added which acts on top of that human capital right. It compounds with it and results in an individual graduation rate. Now, obviously, the attrition rate of a school, if that does not convey the value-added, it just conveys how stringent the admissions policy is, it may be actually completely uninformative about my individual graduation rate.

*Id.* at 233:22-235:12. Thus, Dr. Jeziorski testified that graduation rates, not attrition rates, are considered in the investment utility the latter of which are driven primarily by a schools' admissions policy rather than quality of instruction. And posting an attrition rate may be misleading because students may perceive it as a graduation rate. *Id.* at 235:18-24.

**V.    Plaintiff Does Not Dispute the Facts that No Accrediting Agency Promulgates an Official Definition or Calculation for Attrition and No Other Comparable Caribbean Medical Schools Publish an "Attrition" Rate.**

Dr. Jeziorski observed that "schools typically do not emphasize graduation and attrition rates in their informational and promotional materials." Ex. 1, Jeziorski Report, ¶ 30. He explained that "[r]eporting a single graduation rate might oversimplify the data, and schools may prefer not to publish incomplete or misleading information." *Id.* Dr. Jeziorski opined that "[g]iven the lack of standardization of the term attrition, there is also a risk that schools would calculate these rates differently." *Id.* Dr. Jeziorski noted that the measurement of attrition and graduation rates is complex due to several factors, including that students may take leaves of absence, dropouts or dismissal may occur for academic or non-academic reasons, and attrition rates can vary significantly by year. *Id.* ¶¶ 22-25. He also noted that two-thirds of the variation among institutions in their completion rates can be attributed to differences in the characteristics of entering classes, rather than the effectiveness of retention programs. *Id.* ¶ 26. He also explained that comparing institutions based solely on their completion rates can be highly misleading if the academic preparation and other characteristics of students are not considered. *Id.* In support of his opinion that schools do not generally promote attrition rates, Dr. Jeziorski identified a group of Caribbean medical schools comparable to Saba and found that none of these institutions advertise an "attrition rate." *Id.* ¶¶ 33, 37. Plaintiff does not challenge these opinions or the studies on which they are based. Plaintiff's Motion in Limine should be denied based on these concessions. Instead, Plaintiff challenges Dr. Jeziorski's opinion on two grounds, that the AAMC publishes attrition rates, and universities track student enrollment data necessary to calculate attrition, and therefore Saba should publish an attrition rate.

### A. Plaintiff's Misunderstands Dr. Jeziorski's Opinion.

Plaintiff misleadingly suggests that Dr. Jeziorski's opinion is that "attrition is too complex to calculate," then attempts to knock down this strawman argument by pointing to the fact that the AAMC calculates an attrition rate. Pl. Br. at 16-17. Dr. Jeziorski never said attrition calculations are "too complex to calculate." Instead, he notes that the measurement of attrition is complex due to the potential inclusion or exclusion of numerous factors and given the lack of standardization of the term "attrition" in the academic context, there are numerous variables that a university could choose to include or omit in any calculation of an attrition rate. *See* Ex. 1, Jeziorski Report, ¶ 22. Plaintiff also takes issue with the fact that Dr. Jeziorski did not explain how these factors (leaves of absences, dropouts or dismissal for academic or non-academic reasons, and attrition rates varying significantly by year) impact attrition. Pl. Br. at 16. It is self-evident how these factors may affect attrition calculation. For example, an institution may decide to include only students who left for academic reasons while another institution may also include students who left for non-academic reasons in its calculation. Additionally, if attrition rates are calculated on a year-by-year basis, the data would not include students who return after a leave of absence, which would be misleading because the attrition rate would include students who completed their degree.

### B. That the AAMC Calculates *an* Attrition Rate and Data May Be Available to Calculate *an* Attrition Rate also is Inconsequential.

Plaintiff claims that because the AAMC calculates an attrition rate, Dr. Jeziorski opinion that calculating attrition rates is complex should be excluded. Pl. Br. at 16-17 (citing ECF 124-5). This misses the point. Dr. Jeziorski noted "I believe there [are] many different attrition rates that could be computed." ECF 124-1, Jeziorski Dep. at 262:7-13. Dr. Jeziorski testified that AAMC merely "chose one" way to calculate attrition. *Id.* 262:18-263:1. Notably, while the

AAMC specified when it was including or excluding *certain* variables (e.g., academic dismissals v. non-academic withdrawals), the AAMC Data Snapshot does not specify the precise formula or all the variables it included in its attrition calculations. ECF 124-5. Similarly, Plaintiff's argument that data to calculate an attrition rate may be available to Saba (Pl. Br. at 17) does not impact Dr. Jeziorski's opinion, because he opines that there are multiple ways to calculate attrition. And Plaintiff does not refute the fact that no accrediting body with authority over Saba has promulgated a definition or calculation of attrition or any requirement to report attrition. Moreover, Plaintiff did not refute the fact that no comparable Caribbean medical schools report such information either. Ex. 1, Jeziorski Report, ¶ 37.

## CONCLUSION

The testimony of Dr. Jeziorski should not be excluded from trial.

December 9, 2024

SABA UNIVERSITY SCHOOL OF MEDICINE, R3 EDUCATION, INC.

/s/Daryl J. Lapp
Daryl J. Lapp (BBO #554980)
daryl.lapp@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
T: 617-239-0100

Michael J. McMorrow (*pro hac vice*)
michael.mcmorrow@lockelord.com
LOCKE LORD LLP
111 South Wacker Drive, Suite 4100
Chicago, IL 60606
T: 312-443-0700
Dale Evans (*pro hac vice*)

dale.evans@lockelord.com
LOCKE LORD LLP
777 South Flagler Drive
Suite 215 East Tower
West Palm Beach, FL 33401
T: 561-833-7700

**CERTIFICATE OF SERVICE**

I certify that on December 9, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

/s/ Daryl J. Lapp
Daryl J. Lapp