# Exhibit 2

Pages 1-227
Exhibits 27-41

_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


NO. 1:23-CV-12002-WGY



NATALIA ORTIZ, on behalf of herself
and a class of similarly situated persons,
                Plaintiff,

v.

SABA UNIVERSITY SCHOOL OF MEDICINE
and R3 EDUCATION, INC.,
                Defendants.


_____




VIDEOCONFERENCE AUDIO-VISUAL DEPOSITION

OF WILLIAM W. PINSKY, M.D.

TAKEN OCTOBER 1, 2024

APPEARING REMOTELY FROM

NEW ORLEANS, LOUISIANA




Reporter:  Rebecca J. DeCarlo

FARMER ARSENAULT BROCK LLC

```
APPEARANCES:



Representing the Plaintiff:
NATIONAL STUDENT DEFENSE COUNSEL
1701 Rhode Island Avenue NW
Washington, D.C. 20036
BY:  DANIEL ZIBEL, ESQ.
     MELISSA PADILLA, ESQ.
202.734.7495
dan@defendstudents.org
melissa@defendstudents.org



Representing the Defendants:
LOCKE LORD, LLP
777 South Flagler Drive
Suite 215 East Tower
West Palm Beach, Florida 33401
BY:  DALE EVANS, ESQ.
     MICHAEL J. McMORROW, ESQ.
561.833.7700
dale.evans@lockelord.com
michael.mcmorrow@lockelord.com



Also In Attendance:
Jake Before, Videographer
```

```
INDEX:

                                                 PAGE

WITNESS:  WILLIAM W. PINSKY, M.D.

Examination by Mr. Evans ................. 8

Examination by Mr. Zibel ................. 220


EXHIBITS:

EXHIBIT    DESCRIPTION                       PAGE

No. 27     ECFMG Certification Overview      23

No. 28     World Directory of Medical        26
           Schools, Saba University School
           of Medicine

No. 29     Intealth Recognized Accreditation 27
           Policy

No. 30     NVAO Website Printout, M Medicine 30

No. 31     WFME Agencies with Recognition    31
           Status

No. 32     NCFMEA Comparability Decisions    32

No. 33     The New York Times Article, It's  36
           Tough to Get Out:  How Caribbean
           Medical Schools Fail Their
           Students

No. 34     Form 990, Ochsner Health Systems, 51
           2009
```

```
EXHIBITS:  (continued)

No. 35      Form 990, Ochsner Health Systems, 55
            2010

No. 36      Expert Report of William W.      77
            Pinsky, MD

No. 37      Declaration of William W. Pinsky, 78
            MD

No. 38      Modern Healthcare, Commentary:   82
            Trump's Immigration Policies
            Could Exacerbate Physician
            Shortage

No. 39      Saba Database, Bates Stamp       173
            R3S00022350

No. 40      Class Action Complaint           178

No. 41      The University Match Rates and   192
            Locations
```

William Pinsky, M.D. - 10/1/2024

S T I P U L A T I O N S

It is agreed by and between the parties
that all objections, except objections as to the
form of the questions, are reserved and may be
raised at the time of trial for the first time.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are reserved and may be raised at the
time of trial for the first time.

It is further agreed by and between the
parties that the sealing of the original
deposition transcript is hereby waived.

It is further agreed by and between the
parties that the notification to all parties of
the receipt of the original deposition
transcript is hereby waived.

William Pinsky, M.D. - 10/1/2024

```
 1                   *    *    *    *    *

 2        WILLIAM W. PINSKY, M.D., Deponent, having

 3   produced satisfactory identification by means of

 4   Louisiana Driver's License, was duly sworn,

 5   deposes and states as follows:

 6        (Deposition commences at 10:03 a.m.)

 7                   THE VIDEOGRAPHER:  We are on

 8        the record.  The date is October 1, 2024.

 9        The time on the monitor is 10:03 a.m.

10        This is the video-recorded deposition of

11        William W. Pinsky, MD, being taken in the

12        matter of Natalia Ortiz versus Saba

13        University School of Medicine, Case No.

14        1:23-CV-12002-WGY.

15                   This matter is being heard in

16        the United States District Court for the

17        district of Massachusetts.  This

18        deposition is being held remotely and is

19        being taken by the counsel for the

20        defendant.

21                   My name is Jake Before.  I'm a

22        videographer representing The Varallo

23        Group.  The court reporter is Rebecca

24        DeCarlo representing The Varallo Group.
```

FARMER ARSENAULT BROCK LLC

William Pinsky, M.D. - 10/1/2024

```
1                  Counsel will introduce
2     themselves for the record beginning with
3     Plaintiff's counsel.  Counsel, will you
4     introduce yourselves for the record?
5                  MR. EVANS:  Dan, do you want
6     to make your appearance.  I think they
7     wanted Plaintiffs to go first.
8                  MR. ZIBEL:  This is Dan Zibel
9     from the National Student Legal Defense
10    Network.  I represent the plaintiff in
11    this matter.
12                 MS. PADILLA:  Melissa Padilla
13    with National Student Legal Defense
14    Network on behalf of Plaintiff.
15                 MR. ELSON:  And Alex Elson
16    also with the National Student Legal
17    Defense Network on behalf of the
18    plaintiff.
19                 MR. EVANS:  I'm Dale Evans on
20    behalf of the defendants from Locke Lord,
21    LLP.  And I also have with me today my
22    colleague, Michael McMorrow, from Locke
23    Lord, LLP.
24                 THE VIDEOGRAPHER:  Would the
```

```
 1        court reporter please swear in the witness
 2        and we can proceed?
 3        (Witness sworn)
 4   EXAMINATION BY MR. EVANS:
 5        Q.     Good morning, Dr. Pinsky.  My name
 6   is Dale Evans.  As you just heard, I represent
 7   the defendants, R3 Education, Incorporated, and
 8   Saba University School of Medicine.  Dr. Pinsky,
 9   I know we spoke a little bit about this off the
10   record, but just for the record, where are you
11   currently?
12        A.     I'm currently in New Orleans,
13   Louisiana, my home.
14        Q.     Okay.  And I understand that your
15   attorney, Dan Zibel, is in the room with you as
16   well?
17        A.     Correct.
18        Q.     Is anyone else in the room with you
19   right now?
20        A.     Just my dog.
21        Q.     I saw your canine friend earlier.
22   That's no problem either.
23               Do you have any documents related
24   to this case with you today, Dr. Pinsky?
```

```
 1        A.      No, I don't.
 2        Q.      Okay.  And just to make sure that
 3   the deposition goes smoothly, may I ask that you
 4   refrain from communicating with anyone on your
 5   computer besides me while we're on the record?
 6        A.      Yes.
 7        Q.      And other than your computer
 8   through which you're communicating right now and
 9   your personal cellular phone, do you have any
10   other electronic devices with you capable of
11   communicating?
12        A.      No.
13        Q.      Dr. Pinsky, you are the CEO of
14   Emeritus, Intealth; is that correct?
15        A.      Correct.
16        Q.      Generally speaking, what is
17   Intealth?
18        A.      So Intealth is really the oversight
19   corporation for ECFMG and FAIMER.  When I joined
20   in -- almost eight years ago, ECFMG and FAIMER
21   were separate corporations, and we combined them
22   together into a single 501(c)(3) corporation.
23        Q.      And when you say that Intealth is
24   the oversight corporation, is that akin to the
```

William Pinsky, M.D. - 10/1/2024

1  parent corporation or does it fulfill a

2  different role?

3          A.      So I'm not sure of the legal

4  implications, but I would call it a parent.

5          Q.      Okay.  And just in discussing these

6  two subentities separately for a moment, the

7  ECFMG -- and I understand that stands for the

8  Educational Commission for Foreign Medical

9  Graduates; is that correct?

10         A.      Correct.

11         Q.      And generally speaking, what does

12 the ECFMG do?

13         A.      It was founded to be the agency

14 that certifies international medical graduates

15 who wish to come to the United States to further

16 their training and/or practice.

17         Q.      And is the ECFMG a nonprofit

18 organization?

19         A.      It's a 501(c)(3), yes.

20         Q.      How does the ECFMG generate

21 research?

22         A.      Through the -- primarily through

23 the certification process, fees charged to

24 individuals opining for certification as well as

William Pinsky, M.D. - 10/1/2024

```
 1   registering for the USMLE exam.
 2        Q.     Okay.  So those are fees that are
 3   paid by the student; is that correct?
 4        A.     Yes, the applicants.
 5        Q.     And generally speaking, what are
 6   those fees in terms of an amount?
 7               And I understand there's
 8   probably -- it sounds like there's a couple of
 9   different types of fees, so let's talk about the
10   different types of fees.  For a student to
11   obtain certification, is there a single fee
12   that's paid?
13        A.     There's a series of fees, including
14   initial application for certification.  There's
15   fees to apply for a USMLE exam.  Frankly, since
16   I'm no longer working full-time, I don't really
17   remember the exact amount of the fees, but
18   it's -- several thousand dollars is what
19   eventually it will all add up to.
20        Q.     And I understand that the ECFMG
21   makes some sort of determination as to whether
22   the actual medical schools meet the requirements
23   of the ECFMG; is that correct?
24        A.     So yes, there are some decisions
```

1    made about that.

2        Q.      And does the ECFMG charge medical

3    universities a fee for being part of its, for

4    lack of a better term, network?

5        A.      No.

6        Q.      So is it safe to conclude that the

7    sole source of fees by the ECFMG is from

8    applicants?

9        A.      Yes.

10       Q.      Does the ECFMG receive any outside

11   investments?

12              MR. ZIBEL:  Objection to form.

13       A.      Residual monies are invested.

14   There's an investment portfolio.

15   BY MR. EVANS:

16       Q.      And does the ECFMG, as a 501(c)(3),

17   receive charitable donations?

18       A.      No.

19       Q.      And I presume that at least a

20   portion of the fees generated by the ECFMG went,

21   at least in part, to pay your salary while you

22   were the CEO?

23       A.      Yes.

24       Q.      I would like to talk about FAIMER

```
 1  for a moment.  I understand FAIMER stands for
 2  Foundations for Advancement of International
 3  Medical Education and Research; is that correct?
 4       A.     Correct.
 5       Q.     And broadly speaking, what does
 6  FAIMER do?
 7       A.     So the mission of FAIMER is to
 8  promote education and research related to health
 9  care globally and does this through an
10  establishment of institutes called FAIMER
11  institutes around the world.  And essentially,
12  that's -- it mostly involves educating the
13  educators -- faculty development is another way
14  to say that -- as well as doing various types of
15  research in terms of health outcomes.
16       Q.     And is there any interaction
17  between FAIMER and ECFMG as part of their
18  individual business models?
19       A.     Very much so.
20       Q.     And can you describe that for me?
21       A.     So prior to the establishment of
22  Intealth as the parent company, each
23  organization was a separate 501(c)(3) and FAIMER
24  basically had no infrastructure, so technically
```

1   speaking, it had purchased infrastructure,

2   meaning HR, IT, et cetera, through ECFMG and

3   ECFMG financially supported FAIMER.

4        Q.     And subsequent to both of those

5   companies coming under the Intealth umbrella, is

6   that still the way that the two companies

7   interact; it's just they're entered under the

8   same parent company now?

9        A.     So actually, they're not two

10  separate companies anymore.  So Intealth

11  operates, I think, using the 501(c)(3) status of

12  ECFMG.  The FAIMER 501(c)(3) status is dormant

13  currently.  So really ECFMG and FAIMER are more

14  like divisions of Intealth, is how I would

15  describe it.

16       Q.     Are you still employed by Intealth

17  as of today?

18       A.     No.

19       Q.     I understand your title is CEO of

20  Emeritus.  Do you have any duties or

21  responsibilities with respect to that title or

22  is that just an honorific?

23       A.     It's an honorary.

24       Q.     Okay.  What are you currently doing

William Pinsky, M.D. - 10/1/2024

1   for employment?

2        A.      I'm doing no employment right now.

3   I'm retired as of January.

4        Q.      Before you retired, what were your

5   duties and responsibilities at Intealth?

6        A.      I was a chief executive officer, so

7   I was ultimately responsible for all operational

8   and strategic activities for the organization.

9        Q.      And I want to ask you a question.

10  I'm asking the method, not the amount.  What was

11  your compensation method at Intealth?  Was it a

12  salary?

13       A.      So there was a salary and an

14  incentive plan to go with that.  And the

15  incentive plan basically worked so that the

16  salary was somewhere around 80 percent of what

17  the projected compensation should be, and the

18  other 20 percent is that risk.

19       Q.      And what were the factors that

20  placed in that risk?

21       A.      Well, it would change year to year

22  as compensation was reviewed by the board, but

23  it had to do with financial performance.  It had

24  to do with various strategic initiatives, for

1  example, putting in a new IT system.  It had to

2  do with citizenship, those sorts of things.

3      Q.    And what are the factors that would

4  affect the financial performance of a 501(c)(3)

5  like ECFMG?

6      A.    It would be the same as any other

7  business in terms of revenue generation versus

8  cost.

9      Q.    And I guess what I'm getting at is

10 the manner in which ECFMG would increase its

11 revenues, it sounds like it would be to increase

12 the number of applicants that are paying an

13 application fee?

14     A.    I suppose that's correct.  We did

15 not seek applicants.  It was -- it was -- we

16 didn't have to recruit people, so it was

17 whatever would come to us.

18     Q.    I guess that's my question.  Is --

19 you know, I understand that it's ultimately the

20 international medical schools that would

21 determine their enrollment, which would then

22 impact the number of applicants to the ECFMG,

23 but is there a way that ECFMG would try to

24 encourage that growth or facilitate it?

1                    MR. ZIBEL:  Objection to form.

2         A.    No, not at all.

3    BY MR. EVANS:

4         Q.    While you were CEO at Intealth, did

5    ECFMG ever raise the amount of fees that it

6    charged an applicant?

7         A.    Yes.

8         Q.    And when was that?

9         A.    I believe up till COVID the fees

10   probably went up somewhat close to cost of

11   living, so 3 to 5 percent.  I instituted a

12   policy when COVID came in to keep our fees flat,

13   and they remained flat until I retired in

14   January.

15        Q.    So if I'm understanding correctly,

16   there was a cost-of-living increase prior to

17   COVID, and then subsequent to COVID, the fees

18   remained the same?

19        A.    At approximately cost-of-living

20   index.

21        Q.    And when did that -- I'm just

22   unclear as to when that happened.  Did that

23   increase occur before or after COVID?

24        A.    You mean the fee -- annual fee

1   increase?  Is that what you're asking?  Yeah,

2   that was all pre-COVID.  Since COVID, the fees

3   were kept flat.

4        Q.    Okay.  And while at ECFMG, did you

5   notice an uptick in the number of applicants to

6   the ECFMG?

7        A.    Yes, there was a gradual increasing

8   trend.  Obviously, with COVID, there was a blip

9   in it, but when I left, I think the applications

10  were still increasing.

11       Q.    And so when you say there was a

12  blip during COVID, that would be a downward

13  blip, I assume?

14       A.    Yes.

15       Q.    Approximately how significant was

16  the blip?

17       A.    I don't really recall.

18       Q.    Was it a 10 percent --

19       A.    It wasn't material enough from a

20  budget perspective.

21       Q.    Did you receive any sort of

22  compensation or payout when ECFMG and FAIMER was

23  brought under the Intealth umbrella?

24       A.    No.

1    Q.    I asked about your duties and

2  responsibilities with Intealth in general, but

3  I'd like to ask the same question as far as

4  ECFMG.  What was your involvement with that

5  organization?

6    A.    Very similar, oversight, developing

7  strategy, performance, policies, procedures,

8  usual CEO-type things.

9    Q.    Did the ECFMG -- I assume the ECFMG

10 did not have a separate CEO then?

11   A.    I had an executive director that

12 reported up through to me.

13   Q.    And the executive director, that

14 was the title for the head of the ECFMG?

15   A.    Clarification.  You mean after

16 Intealth was developed?

17   Q.    Yes.

18   A.    So I think it was senior vice

19 president of Intealth and executive director of

20 ECFMG.

21   Q.    I see.  And did the ECFMG conduct

22 review of the medical schools for who students

23 the ECFMG certified?

24   A.    I'm not sure I understand what you

William Pinsky, M.D. - 10/1/2024

1  mean by "review."

2      Q.    So I understand that in order for

3  an international medical graduate to apply for

4  an ECFMG certification, they must come from a

5  medical school that has been deemed to meet the

6  requirements established by ECFMG; is that a

7  fair statement?

8      A.    Yes.

9      Q.    What did the ECFMG do to determine

10 whether a particular medical school met its

11 requirements?

12      A.    As I recall, the requirements were

13 that they needed -- the school needed to be

14 licensed in its home country.  Graduates of that

15 program needed to be eligible for medical

16 license in that country regardless of whatever

17 their home country is.  And those were the main

18 requirements.

19      Q.    And did you have personal

20 involvement in whether particular medical

21 schools met those requirements?

22      A.    Yes.  Occasionally, a school would

23 come up when there was some question of whether

24 they met that, and it would come to my attention

William Pinsky, M.D. - 10/1/2024

1    and would go to the board as well.

2         Q.     Do you recall having any

3    involvement in the evaluation of whether Saba

4    University School of Medicine met the

5    requirements established by the ECFMG?

6         A.     No, I don't.

7         Q.     Do you recall have any

8    involvement -- actually, let me back up before I

9    ask that question.

10              Did you have any involvement in the

11   evaluation or the certification of any

12   particular international medical graduates while

13   at the ECFMG?

14                   MR. ZIBEL:  Objection to form.

15        You can answer.

16        A.     Yes.

17   BY MR. EVANS:

18        Q.     Can you describe that involvement?

19   I guess the first question that I have is:

20   Would you review each applicant personally or

21   were there certain situations in which an

22   applicant would be brought to your attention?

23        A.     There would be certain situations.

24        Q.     And when would a certain applicant

1  be brought to your attention?

2        A.     It could be if there's some issue

3  that there was an irregular behavior activity.

4  "Irregular behavior" was an ECFMG term where

5  something was misrepresented in the application

6  or in some data aspect.  It could even be

7  identity as a possibility.  It could also be an

8  issue in terms of whether or not

9  documentation -- we did something called primary

10 source verification of credentials, and

11 sometimes that was difficult to accomplish,

12 particularly from countries that were in a civil

13 war or some sort of, you know, geopolitical

14 issue would come up.

15             Also, if a student was appealing a

16 decision about something, it would come to me.

17 Sometimes a decision would rest with me.  Many

18 times it would go to a board committee that

19 reviewed these situations.

20        Q.     And do you recall ever reviewing

21 the applications of the international medical

22 graduates of Saba?

23        A.     I don't recall.

24        Q.     According to your expert report,

```
 1  Dr. Pinsky, the ECFMG has unparalleled expertise
 2  on the world medical schools, the credentials
 3  they issue to their graduates, and the
 4  verification of those credentials.  Would you
 5  agree with that statement?
 6      A.    Yes.
 7      Q.    I'm going to show you an exhibit.
 8              MR. EVANS:  And, Dan, what I'm
 9      going to do -- I'm going to drop them, the
10      exhibits, into the chat box, and then I'm
11      also going to do a screen share so that
12      Dr. Pinsky can see it.
13              MR. ZIBEL:  Okay.
14              MR. EVANS:  And I'm starting
15      at Exhibit 27 because we ended at 26 with
16      Ms. Ortiz -- Ms. Ortiz's deposition.
17      (Exhibit 27, ECFMG Certification
18      Overview, marked for identification)
19  BY MR. EVANS:
20      Q.    Dr. Pinsky, I'm showing you what
21  we've marked as Defendants' Exhibit 27.  And by
22  the way, as I share documents with you today, if
23  you need me to zoom in, zoom out, or scroll
24  through them, please let me know and I'm happy
```

1    to accommodate that.

2              But Defendants' Exhibit 27, this is

3    a printout of a web page.  Do you recognize this

4    web page?

5         A.    Yes.

6         Q.    Okay.  And I'd like to direct your

7    attention to the bottom of page 2.  It's titled

8    "Medical School Requirements."

9              Do you see that section?

10        A.    Mm-hmm.  Yes.

11        Q.    All right.  And it says, "The

12   individual's medical school must meet

13   requirements established by ECFMG.  Schools that

14   meet all requirements will be listed in the

15   World Directory of Medical School (World

16   Directory) with an ECFMG note stating that the

17   school meets eligibility requirements for its

18   students and graduates to apply to ECFMG for

19   ECFMG certification and examination."

20              Do you see that?

21        A.    Yes.

22        Q.    And is that your understanding as

23   to how the ECFMG certification is typically

24   annotated with respect to medical schools?

```
 1         A.     Yes.
 2         Q.     Okay.
 3                MR. ZIBEL:  I'm sorry, can you
 4     repeat that, Dale?
 5                MR. EVANS:  Ms. DeCarlo, can
 6     you repeat that just to make sure I --
 7     (Question read by reporter)
 8         A.     Yes.  I think I answered the
 9  question too quickly because there's a nuance
10  here.  ECFMG does not certify medical schools,
11  so these are requirements for a graduate of a
12  medical school to be eligible to apply for
13  certification.
14         Q.     And just to be sure we're using the
15  same terminology, I understand that ECFMG
16  certifies students.  As to medical schools, it
17  determines whether they meet the requirements of
18  the ECFMG.  Is that a fair distinction?
19                MR. ZIBEL:  Objection to form.
20         A.     I think in essence that's correct.
21  BY MR. EVANS:
22         Q.     Okay.  And just -- I'm kind of
23  quoting from that first sentence here.  "The
24  individual's medical school must meet
```

William Pinsky, M.D. - 10/1/2024

```
 1  requirements" --
 2       A.     Yes.
 3       Q.     -- "established by the ECFMG."
 4       A.     Yes.
 5       Q.     Okay.  I'm going to share on my
 6  screen Defendants' Exhibit 28.
 7       (Exhibit 28, World Directory of Medical
 8       Schools, Saba University School of
 9       Medicine, marked for identification)
10  BY MR. EVANS:
11       Q.     Dr. Pinsky, I'm showing you a
12  printout of a web page.  Do you recognize the
13  website address in the header to belong to the
14  World Directory of Medical Schools?
15       A.     Yes.
16       Q.     And just below the header, Saba
17  University School of Medicine is listed; is that
18  right?
19       A.     Yes.
20       Q.     And if we look at the heading
21  titled "Educational Commission for Foreign
22  Medical Graduates (ECFMG), United States of
23  America," it states the students and graduates
24  of Saba are eligible to apply to ECFMG for ECFMG
```

1  certification.

2            Do you see that?

3      A.    Yes.

4      Q.    Okay.  And it appears that this

5  eligibility has been in effect from 1994 to the

6  date that web -- the web page was printed; is

7  that correct?

8      A.    Yes.

9      Q.    Okay.  I'm going to share Exhibit

10  29.

11      (Exhibit 29, Intealth Recognized

12      Accreditation Policy, marked for

13      identification)

14  BY MR. EVANS:

15      Q.    Dr. Pinsky, I understand that

16  Intealth is instituting what it calls its

17  Recognized Accreditation Policy at the end of

18  2024; is that correct?

19      A.    Yes.

20      Q.    Are you familiar with the policy?

21      A.    Yes.

22      Q.    And according to the first header

23  of Defendants' Exhibit 29 -- and I'm referring

24  to this second paragraph here -- "Recognized

1  accreditation means that the accrediting agency

2  of a medical school has itself been reviewed and

3  recognized by an external internal quality

4  assurance organization."

5          Do you see that?

6      A.    Yes.

7      Q.    And if we skip to the second page

8  of the Recognized Accreditation Policy, it

9  appears that as of late 2004, the policy will

10 consist of reporting which schools meet the

11 requirements of the Recognized Accreditation

12 Policy as described below and if -- let me

13 scroll down just a little bit here.  This is

14 where I wanted to be here.

15          It looks like as of 2024, the two

16 organizations for the recognition of medical

17 school accrediting agencies would be The World

18 Federation for Medical Education, which is the

19 WFME, and The National Committee on Foreign

20 Medical Education and Accreditation, which is

21 the NCFMEA; is that correct?

22              MR. ZIBEL:  Objection to form.

23      I just want to make clear that Dr. Pinsky

24      has testified that he's not -- his actual

 1          employment has ended, but to the extent he

 2          knows what happened there since -- if

 3          you're asking him about currently or

 4          previously, to the extent he understands

 5          or has an understanding of what's going on

 6          now, he can answer the question.

 7          A.     I am aware of the -- of what's

 8   written here.

 9   BY MR. EVANS:

10          Q.     And, Dr. Pinsky, do you know which

11   organization accredits Saba?

12          A.     Neither organization accredits

13   Saba.  Those organizations recognize the

14   accrediting body that accredits the medical

15   school.

16          Q.     I'm sorry, my question was unclear.

17   I understand that.  My question is, you know:

18   Do you know which organization, in general,

19   accredits Saba?

20          A.     I'm sorry, the Dutch accrediting

21   agency.

22          Q.     And is that the NVAO, which stands

23   for The Accreditation Organisation of the

24   Netherlands and Flanders?

```
1          A.      I believe so.

2          Q.      I'm going to share Exhibit 30.

3          (Exhibit 30, NVAO Website Printout, M

4          Medicine, marked for identification)

5   BY MR. EVANS:

6          Q.      Dr. Pinsky, I'm showing you a

7   printout from the NVAO website.  Are you

8   familiar with this website at all?

9          A.      I don't believe I ever visited the

10  website.

11         Q.      Do you see Saba University School

12  of Medicine is listed on this printout?

13         A.      I can't quite read it.

14         Q.      It's pretty small.  I'll try to

15  zoom in.

16         A.      Oh, I see it.  There it is, yeah.

17         Q.      If we look at the second page here,

18  it appears that Saba has had its accreditation

19  with the NVAO since October 31 of 2018.  Do you

20  see that?

21         A.      Yes, I do.

22         Q.      Okay.  And is that generally

23  consistent with your understanding that Saba is

24  accredited by the NVAO?
```

William Pinsky, M.D. - 10/1/2024

```
 1        A.     Yes.
 2        Q.     Do you know whether the WFME and/or
 3   the NCFMEA -- did I say that right?  That's a
 4   lot of words.  The NCFMEA.  Do you know whether
 5   those have reviewed and recognized the NVAO?
 6        A.     I believe they each have.
 7        Q.     Okay.  I'm going to share with you
 8   Defendants' Exhibit 31.
 9        (Exhibit 31, WFME Agencies with
10        Recognition Status, marked for
11        identification)
12   BY MR. EVANS:
13        Q.     I'm showing you a document titled
14   "Agencies with Recognition Status."  The
15   letterhead is from The World Federation for
16   Medical Education.  Have you seen this document
17   before or a document like it?
18        A.     Yes.
19        Q.     Okay.  And as I understand it, you
20   were a member of the executive counsel of the
21   WFME from 2016 to 2023; is that correct?
22        A.     Correct.
23        Q.     You worked to develop and implement
24   WFME's medical school accreditation standards,
```

1  which form the basis of the WFME recognition

2  program?

3        A.     I was a participant with it, yes.

4        Q.     And according to your report, the

5  WFME provides a transparent and rigorous method

6  of ensuring that accreditation of medical

7  schools worldwide is at an internationally

8  accepted and high standard; is that correct?

9        A.     That's the goal.

10        Q.     I'm going to direct your attention

11  to page 3 of this document.  And in the second

12  row, it appears that the NVAO is part of the

13  WFME recognition program; is that correct?

14        A.     Yes.

15        Q.     Okay.  I'm going to share Exhibit

16  32.

17        (Exhibit 32, NCFMEA Comparability

18        Decisions, marked for identification)

19  BY MR. EVANS:

20        Q.     Dr. Pinsky, I presume you're

21  familiar with the NCFMEA?

22        A.     Yes.

23        Q.     The first paragraph, in part,

24  states, "The countries listed below have been

William Pinsky, M.D. - 10/1/2024

```
 1   reviewed by the NCFMEA and found to use

 2   standards to accredit their medical schools that

 3   are comparable to the standards used to accredit

 4   medical schools in the United States."

 5            Did I read that correctly?

 6       A.    I think so, yes.

 7       Q.    Okay.  On page 2, there's a

 8   reference to the Netherlands and a reference to

 9   the Netherlands Flemish Accreditation

10   Organization with a website addressed for the

11   NVAO.  Do you see that?

12       A.    Yes.

13       Q.    Okay.  And so based on these

14   documents that we reviewed, the NVAO, as you

15   recall at the beginning of this exercise, is

16   recognized by both the WFME and the NCFMEA,

17   correct?

18       A.    Yes.

19       Q.    And so based on my review, it

20   appears that Saba not only meets the

21   requirements of the ECFMG currently, but it also

22   will meet the ECFMG's forthcoming recognized

23   accreditation policy, too?

24                MR. ZIBEL:  Objection to form.
```

1        A.      Yes, since they were accredited by

2   a recognized agency.

3   BY MR. EVANS:

4        Q.      Right.  And that recognized agency,

5   in turn, was recognized by the WFME and the

6   NCFMEA, correct?

7        A.      Correct.

8        Q.      Okay.  And why is it important that

9   an international medical school has these levels

10  of accreditation?

11       A.      So there's a lot of reasons.  This

12  is an essay question.  In 2010, prior to my

13  joining ECFMG, the board was concerned about the

14  rapid growth of the medical schools around the

15  world and whether or not they all had a

16  comparable type of education so that the

17  graduates who were applying for certification

18  would have had education that met the standards

19  that would be acceptable.

20              And because ECFMG did not have the

21  capability of accrediting 5,000 medical schools

22  around the world, the goal was to have the

23  accrediting agencies recognized instead of the

24  schools.  And likewise, ECFMG would not be able

1  to recognize accrediting agencies either, so

2  they -- WFME stepped up to develop standards,

3  which is what they do across all elements of

4  education to take on this recognition process.

5            And then subsequently, NCFMEA --

6  even though there's a lot -- as you can see

7  there's a lot of crossover in terms of agencies

8  being recognized, there is some that NCFMEA may

9  deal where WFME might not, and so that joined as

10 well.  The idea was to be able to have an

11 understanding of who was applying for

12 certification.

13      Q.    And is it fair to say that having

14 accreditation from an organization that's

15 recognized by the WFME and the NCFMEA -- that

16 gives ECFMG some level of comfort that that

17 student has been educated in accordance with the

18 standards of U.S. medical schools?

19      A.    They would -- so I want to be

20 careful how I answer this because WFME does not

21 set standards according to U.S. medical schools.

22 That would be presumptive for North America --

23 for the United States to set the standards

24 around the world.  It tells W- -- it tells ECFMG

William Pinsky, M.D. - 10/1/2024

```
 1   that the accrediting agency has met the
 2   standards of WFME, which are acceptable
 3   standards for ECFMG.
 4        Q.    I want to show you Defendants'
 5   Exhibit 33.
 6        (Exhibit 33, The New York Times Article,
 7        It's Tough to Get Out:  How Caribbean
 8        Medical Schools Fail Their Students,
 9        marked for identification)
10   BY MR. EVANS:
11        Q.    By the way, Dr. Pinsky, I didn't
12   mention this at the beginning of the deposition,
13   but if at any point you need a break, just let
14   me know.  I typically take breaks every hour,
15   hour and a half or so, but if you need water
16   earlier, just let me know.
17        A.    Sure.  That's fine.  Thank you.
18        Q.    I'm showing you what we've marked
19   as Defendants' Exhibit 33.  I'll zoom in, but
20   this is a New York Times article written by Emma
21   Goldberg titled "It's Tough to Get Out:  How
22   Caribbean Medical Schools Fail Their Students."
23   Do you recall this article, Dr. Pinsky?
24        A.    Yes.
```

William Pinsky, M.D. - 10/1/2024

1        Q.      You cited this article in your

2    expert report; is that correct?

3        A.      Yes.

4        Q.      And you were quoted in this

5    article, weren't you?

6        A.      Yes.

7        Q.      Okay.  I want to scroll to a

8    quote -- your quote in this article.  In the

9    third paragraph of page 3 --

10        A.      I'm sorry, Dale, could you make it

11    bigger for me?

12        Q.      Yeah, absolutely.

13        A.      Thank you.

14        Q.      In paragraph 3 on page 3, you say

15    that you were concerned about students being

16    taken advantage of by schools that may not give

17    them proper information as to how they're going

18    to learn and what their opportunities are going

19    to be when they finish school.  Do you see that?

20        A.      Yes.

21        Q.      And then you go on to say in the

22    following paragraph that you hope students would

23    be better protected in 2024 when accrediting

24    organizations plan to complete evaluations of

```
 1  all international medical schools through a more
 2  rigorous accreditation process.  Is this --
 3                    MR. ZIBEL:  Objection to form.
 4                    MR. EVANS:  Mr. Zibel, what's
 5       the form?
 6                    MR. ZIBEL:  It's not in
 7       quotes.  It's not a quotation from him.
 8                    THE VIDEOGRAPHER:  I'm still
 9       having a hard time hearing Mr. Zibel.
10                    MR. ZIBEL:  I'm sorry.  I
11       apologize for that.  I objected to the
12       form of the question and just noted that
13       the paragraph that begins with "he said he
14       hoped" is not a quotation.
15  BY MR. EVANS:
16       Q.   Dr. Pinsky, did the author of this
17  article accurately reflect your hopes in this
18  paragraph here?
19       A.      Probably reflected a thought.  I
20  don't mean to sound glib, but I rarely use the
21  term "hope" because I consider hope not a plan.
22       Q.      Understood.  And in this paragraph,
23  there's a reference to better protections by
24  2004.  Is this a reference to the
```

1  ECFMG-recognized accreditation policy?

2        A.     Yes.

3        Q.     And Saba is accredited through

4  the -- or will be accredited through the

5  recognized policy, as you testified a moment

6  ago, correct?

7        A.     Correct.

8        Q.     Does the ECFMG's accreditation

9  process define a standard for calculating

10  attrition -- excuse me, let me rephrase that.

11             So the ECFMG's recognition

12  process -- is there a standard for attrition?

13       A.     Again, ECFMG is not evaluating the

14  schools, and so the attrition -- references to

15  attrition would go to the accreditation body and

16  the body that's recognizing the accrediting

17  agencies.

18       Q.     And to your knowledge, does the

19  ECFMG set forth a standard for calculating

20  attrition?

21       A.     I don't recall if there's a

22  standard.  I think -- I'm very confident there's

23  an understanding.

24       Q.     And what is that understanding?

1      A.      That it's a simple calculation with

2  the denominator being the number of students

3  starting and the numerator being the number of

4  students finishing.   It could also be termed a

5  retention calculation as well, depending on

6  which direction you're looking at.

7      Q.      So we're talking -- just to make

8  sure we're on the same page, we're talking about

9  the WFME.   And your testimony is that there's a

10 generally understood standard of attrition by

11 the WFME; is that correct?

12                  MR. ZIBEL:  Objection to form.

13     A.      I think I said there's a general

14 understanding of how it would be calculated.

15 BY MR. EVANS:

16     Q.      And is that general understanding

17 published by the WFME?

18     A.      I really don't know.

19     Q.      But your understanding is that the

20 WFME's understanding is that attrition means the

21 number of students starting divided by the

22 number of students finishing?

23                  MR. ZIBEL:  Objection to form.

24     A.      I think that's just a general

 1  understanding of everyone involved in medical

 2  education -- or education.

 3  BY MR. EVANS:

 4      Q.     And what is the basis for your

 5  belief that everyone involved in education has

 6  the same understanding of attrition?

 7      A.     40-plus year -- years of academic

 8  medicine leadership.

 9      Q.     And is there any literature that

10  you're aware that sets forth how attrition

11  should be calculated in the medical school

12  context?

13      A.     No.

14      Q.     We were just talking about the

15  WFME.  Does the NCFMEA have a recognized

16  standard of attrition?

17      A.     I don't know.

18      Q.     Now, this article about Caribbean

19  medical schools, it doesn't reference Saba, does

20  it?

21      A.     I don't believe so.

22      Q.     And I can scroll through it if you

23  want.  I know it's sort of unfair to ask you to

24  remember the entire contents of an entire

William Pinsky, M.D. - 10/1/2024

1 article, but I went through it and I didn't

2 remember seeing Saba in the article.

3      A.    I don't remember that it did.

4      Q.    In Footnote 2 of your report -- and

5 I can pull it up.  I'm planning on getting to it

6 in a second, but in Footnote 2 of your report,

7 you state that the Caribbean Accreditation

8 Authority for Education and Medicine and other

9 health professions (CAAM-HP) is the principal

10 accrediting agency for many Caribbean medical

11 schools, but not for Saba.

12          What is the significance that the

13 fact that Saba, which is a Dutch island, has its

14 accreditation through the NVO [sic] rather than

15 CAAM-HP?

16      A.    My understanding, it's a political

17 situation, that Caribbean authority had assigned

18 the authority to CAAM-HP and they allowed

19 carve-outs in certain situations.

20      Q.    And so Saba has a carve-out because

21 it's a Dutch island with its own accrediting

22 agency?

23      A.    I don't know the reasons why, but I

24 just know they have it.

1      Q.      Now, the intent of this footnote,

2   it wasn't to suggest that CAAM-HP is a superior

3   accreditor than the NVAO, is it?

4      A.      No.  No.

5      Q.      Okay.  Were you the chief executive

6   officer of the Ochsner Health System, correct?

7      A.      Correct.

8      Q.      And I'm pronouncing it correct?

9   It's Ochsner?

10     A.      It's Ochsner or Ochsner, depending.

11   The family -- the Ochsner family calls it

12   Ochsner, so I've always said Ochsner.

13     Q.      All right.  I will adopt your

14   pronunciation as well as that of the Ochsner

15   family.

16             How long were you the chief

17   academic officer of Ochsner Health System?

18     A.      From 1999 till approximately April

19   of 2016.

20     Q.      And what were your duties and

21   responsibilities as the chief academic officer?

22     A.      So I was an executive on the

23   executive operating committee reporting to the

24   CEO.  I had -- my direct responsibilities were

1  for all the academic activities at Ochsner from

2  a strategy and operational perspective in

3  addition to other duties as assigned.

4        Q.    And I understand the Ochsner Health

5  System -- that is a health system located in

6  Louisiana, and then there's a separate

7  University of Queensland Ochsner Medical School;

8  is that correct?

9        A.    So the Ochsner Health currently is

10 in Louisiana, Mississippi, and, I think,

11 Alabama.  And the University of Queensland is a

12 university in Brisbane, Australia.

13       Q.    So as chief academic officer, did

14 that title encompass your role at the health

15 care facilities in Louisiana, Mississippi, and

16 Alabama?

17       A.    Only as far as if there's any

18 medical research going on.  And frankly, when I

19 left eight years ago, I'm not sure what our

20 involvement was in those states at the time.

21       Q.    I guess what I'm getting at is:

22 Did you have a role in the -- on the health

23 facility side as well as the university side or

24 was it limited solely to the university?

1      A.      It was intergrated across the

2    health systems.

3      Q.      Okay.  And the description that you

4    gave me a moment ago about your duty and

5    responsibility, was that a description of what

6    you did for the health system or for the

7    university?

8              I guess my confusion is your title

9    is chief academic officer.  Were you doing --

10   were you conducting academic research or

11   presiding for clinical rotations and residencies

12   at the health care facility?  Is that the source

13   of that title or was that intended to refer to

14   what you did for the school?

15              MR. ZIBEL:  Objection to form.

16     A.      So I was employed by Ochsner, not

17   by the University of Queensland.  The University

18   of Queensland didn't become a partner until

19   several years after I was there.  My

20   responsibilities encompassed all academic

21   activities that Ochsner Health System would be

22   involved in.

23   BY MR. EVANS:

24     Q.      And what were the academic

 1  activities that Ochsner Health System would be
 2  involved in?
 3       A.     Undergraduate medical education,
 4  graduate medical education, continuing medical
 5  education, basic science research, clinical
 6  research, somewhat in terms of outreach into
 7  school systems in terms of STEM activities,
 8  those kinds of things.
 9       Q.     And would all of that academic
10  work, for lack of a better term, be done in
11  conjunction with the University of Queensland or
12  were other institutions involved as well?
13       A.     Well, we partnered with Tulane
14  University; partnered with, at that time, LSU
15  New Orleans school; and then a variety of
16  one-offs both in terms of education and
17  research.
18       Q.     And you started, I believe you
19  said, in 1999?
20       A.     Mm-hmm.
21       Q.     When did -- when did the
22  partnership with University of Queensland begin?
23       A.     So I'm going to guess here.  I'm
24  guessing it was about 13 years, 12 or 13 years.

William Pinsky, M.D. - 10/1/2024

1      Q.     Okay.  And I believe your CV says
2   you created Ochsner Medical School in January of
3   2019.  Would that be --
4      A.     Yeah, I'm pretty sure that --
5   that's when it started.
6      Q.     And Ochsner Medical School, that's
7   the medical school campus for the University of
8   Queensland?
9      A.     Yes, it is.  It's really called
10  Ochsner Clinical School.  I think that's the
11  University of Queensland term.
12     Q.     Ochsner Clinical School?
13     A.     Yes.
14     Q.     And Ochsner is specifically for
15  American students; is that correct?
16     A.     The Ochsner UQ program?
17     Q.     Yes.
18     A.     Yes, it was designed to be for
19  U.S. citizens or permanent residents.
20     Q.     And you just said "UQ Ochsner."  Is
21  that the same thing as the Ochsner Clinical
22  School?
23     A.     Yes.  That's a UQ Ochsner
24  partnership with the clinical school.  The

William Pinsky, M.D. - 10/1/2024

1  University of Queensland has a variety of
2  clinical schools established in Australia as
3  well as -- there used to be one in Malaysia, I
4  think, if I'm remembering correctly, and that's
5  a terminology that they use.
6       Q.     And does University of Queensland
7  have a separate medical program for non-American
8  students?
9       A.     No.  It's a combined program.  It's
10  a single program accredited by the Australian
11  medical counsel.
12      Q.     Okay.  And would you consider --
13  I'll call it UQ Ochsner just for uniformity.
14      A.     Yes.
15      Q.     Would you consider UQ Ochsner to be
16  a competitor of Saba?
17      A.     Absolutely not.
18      Q.     And why is that?
19      A.     It's a different type of medical
20  program.  I don't see any overlap at all.
21  Ochsner's partnership with the University of
22  Queensland, the UQ Ochsner program, as you just
23  described, is for U.S. citizens or permanent
24  residents who seek a global experience and

 1  it's -- it's never considered any of the schools

 2  in the Caribbean to be a competitor for it.

 3        Q.    You understand Saba University

 4  educates a large number of American students as

 5  well, correct?

 6        A.    Correct.

 7        Q.    And that many of those students go

 8  on to apply for ECFMG certification in order to

 9  practice in the United States?

10        A.    Yes.

11        Q.    Do University -- or UQ Ochsner

12  students typically apply to the ECFMG for

13  certification for practice in the United States?

14        A.    Yes.

15        Q.    Okay.  And I think it's safe to

16  assume that the Ochsner meets the requirements

17  of the ECFMG?

18        A.    Yes.

19        Q.    Today, you hold the title of

20  honorary professor at UQ Ochsner; is that

21  correct?

22        A.    Honorary professor at University of

23  Queensland, yes.

24        Q.    Why the University of Queensland as

1  opposed to UQ Ochsner?

2       A.     Because University of Queensland is

3  the accredited academic institution.

4       Q.     Do you receive any income from UQ

5  Ochsner as of today?

6       A.     No.

7       Q.     You remain on the editorial board

8  of the Ochsner Journal; is that correct?

9       A.     No, I don't think so.  I think

10  my -- I've expired off of that.  I might be

11  listed as Emeritus, but I have no interaction

12  with the journal.

13       Q.     When was your last involvement with

14  the journal?

15       A.     When I left in 2016.

16       Q.     What is the Ochsner Journal?

17       A.     It's a peer-reviewed publication.

18  I believe it comes out quarterly with a variety

19  of the review articles, original research,

20  commentary, related to health care delivery and

21  education and research.

22       Q.     When you were involved with the

23  Ochsner Journal, did you receive any

24  compensation related to your position on the

William Pinsky, M.D. - 10/1/2024

1  board?

2      A.    I'm sorry, on the board of what?

3      Q.    The editorial board of the Ochsner

4  Journal.

5      A.    No.  It's just part of my job.

6      Q.    Okay.  I'm going to show you

7  Exhibit 34.

8      (Exhibit 34, Form 990, Ochsner Health

9      Systems, 2009, marked for identification)

10     Q.    Dr. Pinsky, I'm showing you Exhibit

11  34.  It's a Form 990 for the Ochsner Health

12  System for 2009, which is titled "Return of

13  Organization Exempt From Income Tax"?

14     A.    Yes.

15     Q.    In the upper right-hand corner,

16  there's a notation stating that this document is

17  open to public inspection.  Do you see that?

18     A.    Yes, I do.

19     Q.    I would like to direct your

20  attention to page 33 of this document.  And I'll

21  represent to you that I added the highlights for

22  ease of reference here.

23     A.    Yes.

24     Q.    Page 33, this is Part 7 of the Form

1  990 titled "Compensation of Officers, Directors,

2  Trustees, Key Employees, Highest Compensated

3  Employees, and Independent Contractors."  You're

4  listed here as of 2009 as the EVP/Chief Academic

5  Officer; is that correct?

6        A.     Correct.  That was my title.

7        Q.     And in Column E, your reportable

8  compensation for -- from related organizations

9  (W-2/1009-MISC) is $393,065.  Do you see that?

10       A.     I see that.

11       Q.     Is that number accurate?

12       A.     I don't remember.  It was too many

13 years ago.

14       Q.     Do you know -- when the term

15 "related organizations" is used in Column E, do

16 you have any understanding of what that might

17 mean?

18       A.     I really don't because I was

19 compensated by Ochsner.  That was my sole source

20 of income, so I'm not sure what the technical

21 aspect of that is.

22       Q.     And I understand you're not an

23 accountant --

24       A.     Yes.

1      Q.     -- but I'm going to ask this as far

2  as what your personal understanding was.  Who

3  issued your paychecks, what entity?

4      A.     Ochsner.

5      Q.     Ochsner Health System?

6      A.     I'm not sure what it was called

7  because there was -- it could be Ochsner

8  Clinical Foundation even because there was an

9  merger between the physician practice and the

10 hospitals after I came onboard, and I think

11 there was -- the hospital -- the physician

12 practice was for profit.  And I think that

13 everything was combined under a DEA, but I'm not

14 sure if it was under the foundation or what it

15 was.  I just don't remember.

16     Q.     And in Column F here, your

17 estimated amount of other compensation from the

18 organization and related organizations was

19 $27,399.  Do you see that?

20     A.     I do.

21     Q.     And to the best of your

22 recollection, is that number accurate?

23     A.     I have no idea what that number

24 even is.

1      Q.     You successfully predicted my last

2   question, which was to ask if you knew what that

3   number was comprised of.

4      A.     No.  I see that with the other

5   executives on the executive team there too, so I

6   don't know what the accounting aspects of that

7   are.

8      Q.     And if we go to the following page,

9   which I've also highlighted, there's columns

10  here for base compensation, bonus and incentive

11  compensation, other compensation, deferred

12  compensation, nontaxable benefits, and total of

13  Columns B(1) through (D)?

14     A.     Right.

15     Q.     And if we scroll down Column -- the

16  total column -- the total compensation column is

17  $420,464.  Do you see that?

18     A.     I see that.

19     Q.     Do you have any -- let me ask the

20  question.  I sort of asked it earlier, but is

21  this number accurate?

22     A.     Again, I can't remember.

23     Q.     Do you have any reason to believe

24  that it would be inaccurate, sitting here today?

```
 1        A.      No.

 2        Q.      Okay.  I'm going to share with you

 3   Exhibit 35.

 4        (Exhibit 35, Form 990, Ochsner Health

 5        Systems, 2010-2017, marked for

 6        identification)

 7   BY MR. EVANS:

 8        Q.      I'm sharing with you Defendants'

 9   Exhibit 35.  This is a composite exhibit

10   consisting of the Form 990 from the Ochsner

11   Health System from 2010 to 2017.  I'm going to

12   try to go through these quickly.  The first page

13   is the Form 990 for 2010.  And if we go to the

14   disclosure in 2010 for yourself, total

15   compensation is listed as 487,506.  Do you see

16   that?

17        A.      I do.

18        Q.      Is that consistent with your

19   recollection of your salary as of 2010?

20                    MR. ZIBEL:  Objection to form.

21        A.      I have no idea.

22   BY MR. EVANS:

23        Q.      Any reason to believe that number

24   would be inaccurate?
```

1          A.     No.

2          Q.     Moving to the Form 990 at 2011, if

3    we go to the same schedule, it lists the total

4    compensation of $563,959.  Is that consistent

5    with a recollection of your salary in 2011?

6                    MR. ZIBEL:  Objection to form.

7          A.     Again, I don't remember.

8    BY MR. EVANS:

9          Q.     Any reason to believe this number

10   is not accurate?

11         A.     No.

12         Q.     Okay.  Moving to the 2012 Form 990,

13   this lists the total compensation of 571,672.

14   Any reason to believe that number is inaccurate?

15         A.     No.

16         Q.     Moving to 2013, it lists a total

17   compensation of 478,882.  Any reason to believe

18   that number is inaccurate?

19         A.     No, except I'm not sure why I had a

20   pay cut.

21         Q.     Again, you have predicted my next

22   question.  I assume -- it sounds like you don't

23   know why there was a discrepancy there?

24         A.     No, but I will just comment that we

1  went through a series of iterations of

2  retention -- I don't know -- not a bonus, but it

3  was a way to hang on to the executives.  And

4  there was an extra deferred incentive, I think

5  is what it was called.  And it could be it got

6  paid out more one year than another.  We'd have

7  to go back and look at the -- you know, the

8  other columns, but that's what I would guess.

9        Q.    Okay.  And despite the pay cut in

10 2013, if we go to 2014, I'm happy to report that

11 your income rebounded.

12       A.    Okay.

13       Q.    It reflects a $615,932 salary, your

14 total compensation.  Any reason to believe that

15 that would be inaccurate?

16       A.    No.

17       Q.    Okay.  For the Form 990 in 2015,

18 the total compensation listed is $664,565.  Any

19 reason to believe that that was inaccurate?

20       A.    No.

21       Q.    Okay.  Just a couple more here.

22 Form 990 for 2016, if you'll notice, just the

23 clarity, the year box is cut off for some

24 reason, but if you look at the references to the

William Pinsky, M.D. - 10/1/2024

1  year this is 2016.  And if you scroll down,

2  there's references to the Form 990 for 2016,

3  just so that there's no confusion on that.

4          But if we go to the schedule in

5  2016, the total compensation listed is $730,771.

6  Any reason to believe that that number is

7  inaccurate?

8      A.    No.  And I can explain.  The

9  gradual increase was due to that retention

10 incentive program that I talked to you about.

11 It was supposed to pay out after five years.

12 Because I was over 65, apparently there was a

13 ruling that I had to receive it every year.

14     Q.    I see.

15     A.    I don't quite understand it, but

16 that's how I remember it.

17     Q.    Okay.  Moving on to the Form 990

18 for 2017, for your salary that year -- and

19 before we talk about the number, I understand by

20 2017, you had departed Ochsner Health System?

21     A.    Yes.

22     Q.    Okay.  And your salary -- your

23 total compensation for this year was $125,557.

24 Do you see that?

William Pinsky, M.D. - 10/1/2024

1      A.      I do.

2      Q.      And you're listed as a former key

3  employee.  Any reason why you received that

4  final payment after you left?

5      A.      It must have been a portion of a

6  year or it could have been an incentive from the

7  prior year that needed to be paid out.

8      Q.      I see.

9      A.      I don't really recall.

10      Q.      And if -- and I added the total sum

11  of salary for these years.  It adds up to

12  $4,659,308 -- excuse me, $4,459,308.  I don't

13  expect you to do the math on the fly here, but

14  does that number sound out of the bounds as to

15  what that -- your total salary might have been?

16                    MR. ZIBEL:  Object to the form

17      of the question.

18      A.      It could be.

19  BY MR. EVANS:

20      Q.      It could be wrong or it could be --

21      A.      No.  I mean, I don't know.

22      Q.      Fair enough.  Other than this

23  compensation that's listed on the Form 990s for

24  Ochsner Health System, did you receive any

```
 1  compensation from UQ Ochsner?
 2       A.    No.
 3       Q.    Do any -- do or did any of your
 4  family members work for Ochsner Health System?
 5       A.    My son currently does.
 6       Q.    And does he work for the health
 7  system or for UQ Ochsner?
 8       A.    He's a graphic designer in the
 9  marketing department for the health system.
10       Q.    And approximately how long has he
11  worked there?
12       A.    Oh, he's worked at Ochsner for
13  quite a while.  I'm guessing 12, 13, 14 years.
14  That's a guess, though.
15       Q.    Okay.  And I understand that you
16  served on the boards of The Accreditation
17  Counsel for Graduate Medical Education, The
18  Accreditation Counsel for Continuing Education,
19  and The Alliance of Independent Academic Medical
20  Centers; is that correct?
21       A.    Yes.
22       Q.    Are you still on the boards of
23  those organizations?
24       A.    No.
```

1      Q.      When did you leave the boards of

2  those organizations?

3      A.      I don't recall.  It's on my CV, I

4  suppose.  It's been a while.

5      Q.      How do these entities -- strike

6  that.

7              How are these agencies similar or

8  different from the NVAO?

9                  MR. ZIBEL:  Objection to form.

10     A.      None of these organizations

11  accredit medical schools -- educational programs

12  of medical schools.

13  BY MR. EVANS:

14     Q.      Okay.  So let's take it --

15     A.      Let me be precise, the

16  undergraduate medical education at any of these

17  schools.

18     Q.      None of these entities accredit the

19  undergraduate education of medical schools?

20     A.      Yes.

21     Q.      Okay.  Let me --

22     A.      Basically, the MD degree.  They're

23  not involved with that.

24     Q.      Okay.  So let's take it one by one.

1  What is the purpose or the function of The

2  Accreditation Counsel for Graduate Medical

3  Education?

4      A.    It accredits all the graduate

5  medical education programs in the United States.

6      Q.    Undergraduate medical education

7  programs?

8      A.    Graduate.

9      Q.    Graduate, I see?

10     A.    Meaning residencies and

11 fellowships.

12     Q.    And what is the function or the

13 purpose of The Accreditation Counsel for

14 Continuing Medical Education?

15     A.    The ACCME accredits organizations

16 and activities that are involved with what's

17 called CPD, which is Continuous Professional --

18 Continuing Professional Development.  And it

19 could be at medical schools or it could be an

20 independent organization.

21     Q.    What is the role or the function of

22 The Alliance of Independent Academic Medical

23 Centers?

24     A.    It's basically comparable to a

1   professional organization, but it's an

2   organization of academic hospitals and health

3   systems that are not university based.

4        Q.    Okay.  And in going back to The

5   Accreditation Counsel for Graduate Medical

6   Education, so my understanding of your

7   description there is this is an entity with some

8   sort of oversight over residency programs or

9   other programs that occur after a student

10  graduates with his or her MD?

11                  MR. ZIBEL:  Objection to form.

12       A.    Currently, MD or DO -- and/or DO,

13  yes.

14                  MR. EVANS:  Okay.  I think

15       this is a good time for a ten-minute break

16       if everyone's ready.

17                  MR. ZIBEL:  Fine with me.

18                  THE VIDEOGRAPHER:  The time is

19       11:16 a.m.  We're going off the record.

20       (A recess was taken)

21                  THE VIDEOGRAPHER:  The time is

22       11:29 a.m.  We're back on the record.

23  BY MR. EVANS:

24       Q.    Dr. Pinsky, I understand that

1   you've been on the faculty of other medical

2   schools beyond just UQ Ochsner; isn't that

3   correct?

4         A.      Correct.

5         Q.      While at these medical schools,

6   have you ever served on a committee or a board

7   or a group having anything to do with

8   advertising or marketing to prospective

9   students?

10        A.      I'm not sure I understand exactly

11  what you're asking.

12        Q.      No problem.  I'll try to rephrase

13  it.  Have you ever been on a committee that was

14  involved in either formulating or approving ads

15  to prospective students?

16        A.      Not on a committee, no.

17        Q.      On any other type of forum or

18  organization?

19                    MR. ZIBEL:  Objection to form.

20  BY MR. EVANS:

21        Q.      In other words, you said "not on a

22  committee."  Is there some other type of group

23  that you were having involvement with

24  advertising or marketing to prospective

1  students?

2      A.    I need to ask you again.  Are you

3  saying other than UQ Ochsner or are you

4  including UQ Ochsner?

5      Q.    At the moment, I'm asking about

6  other than UQ Ochsner.

7      A.    I don't believe so.

8      Q.    Okay.  While at UQ Ochsner, were

9  you involved in sort of committee or group that

10  had anything to do with advertising or marketing

11  to prospective students?

12      A.    I was involved in developing our

13  outreach to premed advisors and information to

14  students.

15      Q.    Developed outreach to medical

16  advisors and premed students, so let me break

17  that down.  It sounds like that's two separate

18  functions; is that correct?

19      A.    In my mind, it's all combined.

20  It's just information about, you know, what this

21  new program was and will be and that sort of

22  thing.

23      Q.    And in this involvement, were you

24  involved on a committee with a specific name?

```
 1          A.      No.
 2          Q.      Who all was involved in doing this?
 3          A.      I assume leadership at Ochsner as
 4   well as at UQ.
 5          Q.      And what was your specific
 6   involvement in this function?
 7          A.      You know, my role, you know, is the
 8   head of the Ochsner Clinical School, and so I
 9   helped to develop communications and strategies
10   and that sort of thing.
11          Q.      And these communications, they
12   were -- they targeted premed advisors as well as
13   prospective students directly?
14          A.      Yes.
15                  MR. ZIBEL:  Objection to form.
16          A.      Yes.
17   BY MR. EVANS:
18          Q.      And how often did this group meet?
19          A.      We weren't really a group.  That's
20   where I'm confused about what you're asking.
21   There wasn't a group doing something, as I
22   recall.
23          Q.      Understood, and that's helpful.
24   That helps me ask a little more targeted
```

1    questions.

2                Let me take a step back and ask a

3    more foundational question.  Take me through the

4    workflow of this information that was created

5    and sent to premed advisors and students --

6    prospective students.

7                MR. ZIBEL:  Objection to form.

8         A.    As I can recall, you know, with a,

9    you know, nascent program and something that was

10   very much different, there was an outreach

11   activity to inform people about this, as you can

12   imagine, you know, what University of Queensland

13   is in terms of being a top 25 or so university

14   in the world, Ochsner as top 5 academic health

15   center, independent health center in the United

16   States, and quality outcomes and what that could

17   mean for education of prospective students.

18                So information was put together

19   about that in terms of the beginning of it, but

20   the plan with the school was those types of

21   things.  I can't be any more specific about it.

22   Frankly, it was too long ago, but that was the

23   general direction.

24        Q.    And did UQ Ochsner have a

1  department that prepared these communications?

2       A.     Within each organization, there are

3  marketing departments.  I get a feeling that you

4  think that UQ Ochsner is an entity.  UQ Ochsner

5  is not an entity.  It's a partnership.  So

6  there's UQ, and there's Ochsner.  And then

7  various assets, you know, were used from each

8  organization.

9       Q.     And among those assets from each

10  organization, would that include marketing

11  personnel from UQ and from Ochsner?

12       A.     I assume so, yes.

13       Q.     Describe for me your role in that

14  process.  Did you review each, you know, ad or

15  marketing material that went out to premed

16  advisors and prospective students?  Were you

17  brought in for consultation on a particular

18  issue of marketing?  How did that work?

19                    MR. ZIBEL:  Objection for

20       from.  Compound.  Vague.

21  BY MR. EVANS:

22       Q.     You can answer if you understand.

23  If not, I'm happy to rephrase.

24       A.     Yes, I assume in the beginning I

1  saw almost everything.  And as time went on, I

2  probably saw less because I -- you know -- we --

3  there was a rhythm developed and a direction and

4  that sort of thing.

5       Q.    And I would assume that when UQ

6  Ochsner was still in its nascent phase, it did

7  not have an attrition rate that it could

8  disclose to prospective students; is that fair

9  to say?

10       A.    Yes.

11       Q.    As time went on, did UQ Ochsner

12  advertise its attrition rates?

13       A.    I don't recall.

14       Q.    So I would assume you don't recall

15  whether it advertised attrition rates alongside

16  first-time USMLE Step 1 pass rates?

17       A.    Correct, I don't recall.

18       Q.    Do you recall whether UQ Ochsner

19  advertised its attrition rate alongside other

20  milestone-related information from the

21  university, for example, Step 2, Step 3,

22  residency placement rates?

23       A.    I know that residency placement

24  rates were described in information that went

William Pinsky, M.D. - 10/1/2024

```
 1   out.  I don't recall the other metrics.
 2        Q.    And at the time that you were
 3   involved in this outreach, do you recall any
 4   legal or regulatory requirements to disclose
 5   attrition rates?
 6                  MR. ZIBEL:  Objection to form.
 7        A.    I do not.
 8   BY MR. EVANS:
 9        Q.    Okay.
10        A.    Dale, can I go back to that for a
11   second?
12        Q.    Certainly.
13        A.    From a regulatory perspective, the
14   program was accredited from the Australian
15   counsel.  And, in fact, the university had to be
16   reaccredited when this program came up because
17   it was such a significant part of the program in
18   Australia.  And I believe that retention rates
19   were -- or attrition rates were part of what was
20   looked at with the Australia medical counsel.
21        Q.    So any of the organizations in the
22   Australia medical counsel?
23        A.    Yeah, that's the accrediting body
24   for medical schools in Australia.
```

1        Q.      And it's your recollection that

2   some information about attrition or retention

3   rates were required as part of the accreditation

4   process?

5        A.      That's what I'm remembering.

6        Q.      And do you remember whether it was

7   an attrition rate or a retention rate

8   specifically?

9        A.      No.  It really doesn't make any

10  difference which, but I don't recall.

11       Q.      So is it your understanding of

12  attrition and retention is that the two of

13  synonomous or interchangeable?

14       A.      It's one end versus the other.

15       Q.      When you say "one end versus the

16  other," attrition is the folks who leave,

17  retention are the folks that stay?

18              One way or the other, those rates

19  didn't find themselves into the ads that UQ

20  Ochsner was making; is that correct?

21       A.      I don't believe, but I -- again,

22  it's been too long since I was doing that.

23       Q.      Prior to this case, you've been

24  retained as an expert witness on a few other

1  occasions, correct?

2      A.      A long time ago.

3      Q.      Do you recall how many times you've

4  been retained as an expert witness?

5      A.      I would guess four or five times

6  regarding malpractice cases.

7      Q.      When was the last time you

8  testified as an expert witness?

9      A.      I believe it has to be more than 25

10  years ago.

11      Q.      And paragraph 19 of your report

12  refers to various medical practice cases and a

13  workers' compensation matter.  Is that

14  consistent with your recollection?

15      A.      Yes.

16      Q.      Let's talk about the medical

17  practice cases.  Do you remember how many

18  medical practice cases you've testified on?

19      A.      It's either three or four.

20      Q.      And it's been at least 20 years

21  since you were involved in those cases?

22      A.      At least 25 years.

23      Q.      25.  What was the nature of the

24  medical malpractice at issue in those cases?

1          A.      It all had something to do with

2    pediatric heart problems.   I'm a pediatric

3    cardiologist.

4          Q.      And in those cases, do you recall

5    whether you testified on behalf of the plaintiff

6    or the defendant?

7          A.      I had one plaintiff case, and the

8    remaining were defense.

9          Q.      And do you recall whether those

10   were single plaintiff cases or class action

11   lawsuits?

12         A.      All single.

13         Q.      And can you generally describe the

14   nature of your testimony in those cases?   In

15   other words, were you opining on whether the

16   medical procedure at issue in those cases was

17   performed within the relevant standard of care?

18         A.      Yes.

19         Q.      And in any of those cases, did you

20   testify at trial?

21         A.      Yes.

22         Q.      And if you'll excuse me, I have a

23   cough drop.   I'm not here flippantly eating

24   candy during the deposition.   I'm just fighting

1    a little bit of a cold here.

2              So your testimony is that you

3    testified at trial in one or more of those

4    cases?

5         A.    Just one.

6         Q.    Did you testify in a deposition in

7    any of those cases?

8         A.    I assume in all of them.

9         Q.    Do you recall the outcome of those

10   cases?

11        A.    The one trial where I testified for

12   the defense, the decision -- I'm not sure what

13   the right terminology is -- was for the defense.

14   There was no malpractice found.  For the other

15   cases -- the one plaintiff case, I believe there

16   was something settled.  And the other ones for

17   the defense never went to trial and I don't

18   think were ever -- there's no payout for the

19   plaintiffs.

20        Q.    Were these cases in the United

21   States?

22        A.    Yes.

23        Q.    Can you describe your involvement

24   in the workers' compensation matter?

William Pinsky, M.D. - 10/1/2024

1          A.        Yes.   It was involved with a

2   patient who was a young adult that had

3   congenital heart disease and had been denied

4   workers' comp.

5          Q.        And what was your role in that

6   case?

7          A.        Describing the heart condition and

8   limitations to the heart, so the cardiac

9   function.

10          Q.        And you were retained by the

11   plaintiff in that matter?

12          A.        I would assume so.

13          Q.        Do you happen to recall your

14   compensation in those cases?

15          A.        No, not at all.

16          Q.        Do you recall whether it was an

17   hourly rate?

18          A.        Probably.

19          Q.        None of those cases involved a

20   claim by a medical student against his or her

21   former university?

22          A.        No.

23          Q.        None of those cases involves claims

24   for violations of Chapter 93A of the

William Pinsky, M.D. - 10/1/2024

```
 1   Massachusetts statutes?
 2        A.    I don't know what that is.
 3        Q.    And I assume none of those cases
 4   involved a statute related to consumer
 5   protection laws?
 6        A.    No.
 7        Q.    Have you ever testified as an
 8   expert witness on marketing practices?
 9        A.    No.
10        Q.    Have you ever testified as an
11   expert witness on damage calculations?
12        A.    No.
13        Q.    Have you ever been retained as an
14   expert witness by an attorney at the law firm of
15   Berman Tobacco prior to this case?
16        A.    No.
17        Q.    Prior to this case, have you been
18   retained by the law firm Maynard Nexsen?
19        A.    No.
20        Q.    Prior to this case, have you been
21   retained by the National Student Legal Defense
22   Network?
23        A.    No.
24        Q.    Your compensation in this case is
```

William Pinsky, M.D. - 10/1/2024

```
 1   $400 an hour, correct?

 2        A.      Yes.

 3        Q.      And how much have you been paid to

 4   date?

 5        A.      Zero.

 6        Q.      All right.  I'm going to bring up

 7   Exhibit 36.

 8        (Exhibit 36, Expert Report of William

 9        W. Pinsky, MD, marked for identification)

10   BY MR. EVANS:

11        Q.      Dr. Pinsky, I'm showing you what

12   we've marked as Exhibit 36.  It's entitled

13   "Expert Report of William W. Pinsky, MD."  Do

14   you see that?

15        A.      Yes, although I could see it better

16   if it were a little bigger.

17        Q.      No problem.

18        A.      Thank you.

19        Q.      And this is a report you prepared

20   in this case, correct?

21        A.      Correct.

22        Q.      If we go to the last page of this

23   document, there's a page called "Materials

24   Reviewed and Relied Upon."  Do you see that?
```

William Pinsky, M.D. - 10/1/2024

1       A.      Again, can you make it bigger?

2       Q.      Absolutely.  Is this a complete

3  list of all the documents that you reviewed in

4  preparation of this report?

5       A.      Of this report?

6       Q.      Yes.

7       A.      I believe so.

8       Q.      Did you receive assistance from

9  anyone other than the plaintiff or her counsel

10 in preparing this report?

11      A.      No.

12      Q.      I'm going to stop the share for

13 now, but we'll come back to this.  I'm going to

14 show you what we've marked as Exhibit 37.

15      (Exhibit 37, Declaration of William

16      W. Pinsky, MD, marked for identification)

17 BY MR. EVANS:

18      Q.      And while I'm pulling that up,

19 going back to payment, is your payment in this

20 case contingent in any way on the outcome of the

21 case?

22      A.      No.

23      Q.      And why haven't you been paid yet?

24      A.      I haven't asked to be.  I don't

```
 1   know.
 2        Q.     I'm showing you what we've marked
 3   as Exhibit 37.  It's titled the "Declaration of
 4   William W. Pinsky, MD."  Do you see that?
 5        A.     Again, a little bigger.  Thank you.
 6        Q.     And this is the declaration that
 7   you prepared in support of Plaintiff's motion
 8   for class certification?
 9        A.     Yes.
10        Q.     If we go to the last page, there's
11   a document titled "Documents reviewed by
12   Dr. Pinsky in connection with Natalia Ortiz on
13   behalf of herself and a class of similarly
14   situated persons versus Saba University School
15   of Medicine and R3 Education, Inc."
16               And I'll scroll through it briefly.
17   Is this a complete list of all the documents you
18   reviewed in connection with the preparation of
19   the declaration?
20        A.     Yes.
21        Q.     Did you receive assistance with
22   anyone other than Plaintiff or her counsel in
23   preparing the declaration?
24        A.     I did not.
```

William Pinsky, M.D. - 10/1/2024

1        Q.      Dr. Pinsky, have you ever met the

2   plaintiff in this case, Natalia Ortiz?

3        A.      No.

4        Q.      Have you received any written

5   correspondence from Ms. Ortiz in connection with

6   your engagement as an expert witness in this

7   case?

8        A.      No.

9        Q.      Did you meet with Plaintiff's

10  attorneys to prepare for your deposition today?

11       A.      Yes.

12       Q.      Are Plaintiff's attorneys

13  representing you for purposes of the deposition

14  today?

15       A.      I assume so.

16       Q.      How many times did you meet with

17  the plaintiff's attorney to prepare for your

18  deposition?

19       A.      Twice.

20       Q.      And for approximately how long each

21  time?

22       A.      Hour and a half, and then three

23  hours.

24       Q.      Other than the documents that we

1  just looked at and the documents review section

2  of your declaration report, have you reviewed

3  any other documents in preparation for your

4  deposition today?

5       A.    I've reviewed the Saba website, and

6  I've seen some of their advertising.  But I

7  think that was in the Complaint, so that's

8  probably not new.

9       Q.    Other than the plaintiff's

10  attorneys, did you discuss today's deposition

11  with anyone else?

12       A.    No.

13       Q.    All right.  I want to go back to

14  your expert report.  Are you able to see your

15  report on the screen?

16       A.    Yes.

17       Q.    I'm going to start at paragraph 27.

18  And this is part of Section B of your report

19  overview of Caribbean medical schools, the

20  students they attract, and how they differ from

21  U.S. medical schools.

22            In paragraph 27, you note that

23  U.S. medical schools reject approximately 50

24  percent of their applicants each year, correct?

William Pinsky, M.D. - 10/1/2024

```
 1          A.     Yes.
 2          Q.     And in the following paragraph, you
 3   say that the Caribbean medical schools are well
 4   known for having more relaxed admissions
 5   standards, place less emphasis on applicants'
 6   prior academic performance, and some even waive
 7   MCAT requirements.  Do you see that?
 8          A.     Yes.
 9          Q.     I'm going to stop the share, and
10   we're going to take a look at Defendants'
11   Exhibit 38.
12          (Exhibit 38, Modern Healthcare,
13          Commentary:  Trump's Immigration Policies
14          Could Exacerbate Physician Shortage,
15          marked for identification)
16                  MR. EVANS:  And before we do
17          that, I'd like to take just a five-minute
18          break recess.  I have to refill my water.
19          And as I said, I have a cold and my throat
20          is a little sore.
21                  THE VIDEOGRAPHER:  The time is
22          11:53 a.m., and we are off the record.
23          (A recess was taken)
24                  THE VIDEOGRAPHER:  The time is
```

```
 1          11:58 a.m., and we are back on the record.
 2   BY MR. EVANS:
 3          Q.     All right.  Dr. Pinsky, I'm going
 4   to share Defendants' Exhibit 38 on the screen.
 5   I'm showing you a September 2018 article titled
 6   "Commentary:  Trump's Immigration Policies Could
 7   Exacerbate Physician Shortage."  This is an
 8   article that you wrote, Dr. Pinsky; is that
 9   correct?
10          A.     I believe so.  I don't remember
11   where it was published, but I remember it.
12          Q.     This appears to be taken from
13   Modern Healthcare.
14          A.     Oh, okay.
15          Q.     In this article, if we go to page 2
16   of the article, first paragraph, there's a
17   statement that "by 2030, our nation could be
18   short more than 120,000 physicians.  In primary
19   care alone, the front lines of our healthcare
20   system, we could be shy some 49,000 needed
21   physicians by the end of next decade."
22                 Did I read that correctly?
23          A.     You read it correctly.
24          Q.     So if the time of publication was
```

1  2018, the 49,000 primary care physician shortage

2  by the end of next decade, that would be, you

3  know, by the end of 2029/2030, correct?

4      A.    Potentially.

5      Q.    In the second paragraph on page 2,

6  you say that "immigration is directly connected

7  to the physician shortage because meeting the

8  healthcare needs of our population would be

9  impossible without the continued contribution of

10  doctors educated abroad."

11          I assume you -- sitting here today,

12  you still believe that statement is true?

13      A.    Yes, I do.

14      Q.    And if we go to the fourth

15  paragraph, you say, "International graduates not

16  only are an important part of our existing corps

17  of physicians.  They also are crucial to our

18  physician pipeline.  Nearly one quarter of

19  physicians in U.S. medical education today are

20  international medical graduates.  Simply put, we

21  cannot maintain our current physician workforce

22  - let alone narrow our physician gap - without

23  these international graduates."

24          Wouldn't you agree then that

1   international medical schools fill a gap that's

2   missing due to the highly competitive nature of

3   U.S. medical school admissions?

4        A.     I not only agree with that.  I

5   promote that.

6        Q.     Now, going back to your report, on

7   the paragraphs that we were just looking at, you

8   complain that Caribbean medical schools have

9   more relaxed admission standards than the U.S.

10  and place less emphasis of academic performance,

11  but isn't that why they fill that gap by

12  U.S. medical schools?

13                  MR. ZIBEL:  Objection to the

14       form of the question.

15       A.     I -- I cannot agree with your

16  statement or your question.

17  BY MR. EVANS:

18       Q.     Why not?

19       A.     Because you're implying a cause and

20  effect there.

21       Q.     What do you mean by that?

22       A.     You're implying because of relaxed

23  standards, they supply more doctors or whatever,

24  and I -- I don't see that to be an accurate

1    statement.

2         Q.      Well, would you agree then that if

3    Caribbean medical schools had the same admission

4    standards as U.S. medical schools, that there

5    would be little incentive for U.S. medical

6    students to attend Caribbean medical schools?

7         A.      No.  It's a supply-and-demand

8    issue.  There's only so many seats in -- you

9    know, in the schools, and so they seek them

10   elsewhere.

11        Q.      While preparing your expert report

12   in this case, did you review Saba's admission

13   standards?

14        A.      I reviewed the information on the

15   website.

16        Q.      And did the information on the

17   website include the admission standards?

18        A.      I don't quite remember right now.

19        Q.      Sitting here today, do you recall

20   anything about Saba's admission standards?

21        A.      No.

22        Q.      Do you know whether Saba requires

23   the MCAT?

24        A.      I'm thinking they do not, but I'm

```
 1   just guessing on that.
 2        Q.    If sitting here right now you're
 3   not familiar with Saba's mission standards, I
 4   assume that you're unable to opine on how those
 5   admission requirements compare to U.S. medical
 6   schools?
 7                   MR. ZIBEL:  Objection to form.
 8        A.    Correct.
 9   BY MR. EVANS:
10        Q.    And similarly, I assume you're not
11   in a position to opine on how Saba's admission
12   requirements compare to those of other Caribbean
13   medical schools?
14                   MR. McMORROW:  I'm sorry, I
15        can't hear the witness.
16                   MR. EVANS:  I don't think he's
17        answered yet, Mike.
18                   THE WITNESS:  I said correct
19        on the last one, Dale.
20                   MR. EVANS:  Oh, I'm sorry.
21        Then, Mike, I didn't hear it either, I'm
22        sorry.
23                   THE WITNESS:  I'm not sure why
24        you didn't, but I'm still here.
```

```
 1                      MR. McMORROW:  Court Reporter,
 2          can you repeat the last question and
 3          answer just so the transcript is clear.
 4          (Question and answer read by reporter)
 5          A.     The answer was correct.
 6   BY MR. EVANS:
 7          Q.     All right.  I'm going to put your
 8   report back on the screen.  I would like to
 9   direct your attention to paragraph 29.  I'll
10   zoom in a little bit here.
11                  In paragraph 29, you say, "A
12   Caribbean medical school's first time U.S. and
13   Middle East Step 1 passage rate is one of the
14   most important factors for students to consider
15   in choosing whether to enroll."
16                  What is the basis for this
17   statement here, Dr. Pinsky?
18          A.     It's based on, you know, my almost
19   eight years' experience at Intealth and knowing
20   how Step 1 scores are utilized as well as my
21   prior experience being involved in leading
22   graduate medical education programs and knowing
23   what criteria program directors use to code
24   their list of the applicants.
```

1       Q.      And so is the Step 1 pass rate one

2   of the most important factors for universities

3   in evaluating?

4            I guess I don't understand the

5   answer because you're talking about, you know,

6   coding students.  Is the Step 1 pass rate

7   important to prospective students or to the

8   programs themselves?

9       A.      It goes together.  The students

10  know that part of their metrics in applying for

11  a residency program is going to be their Step 1

12  score when it was still being scored as well as

13  the number of attempts it takes to pass the

14  exam.

15      Q.      Did you conduct a survey of

16  prospective or current or former students in

17  preparing your declaration report?

18      A.      I did not.  I based it on many,

19  many interactions with students over the prior

20  seven and a half years as well as my 40 years of

21  being in academic medicine.

22      Q.      And you say here that the Step 1

23  passage rate is one of the most important

24  factors.  What are the other factors that are

William Pinsky, M.D. - 10/1/2024

1  considered important?

2      A.      Grade point average,

3  recommendations, interviews.  The Step 1 scores

4  in passing along with Step 2 are very important

5  variables that program directors use as to whom

6  they're going to interview.  In fact, in many

7  instances, that is the factor that they use.

8      Q.      And I'm sorry my question wasn't

9  very specific.  I was referring to -- in

10  paragraph 29, you mentioned the most important

11  factors for a student to consider in choosing

12  whether to enroll.  So aside from the U.S. and

13  Middle East Step 1 passage rate, what are some

14  important factors for students to consider when

15  choosing whether to enroll?

16      A.      Being able to get a residency

17  program, in particular.

18      Q.      Any other factors?

19      A.      I think there's a lot of other

20  factors that are -- probably all fall way below

21  the importance of those two, exposure for

22  clinical experiences, environmental factors,

23  cost.  I can imagine there's a lot of others,

24  time.

1     Q.     Would location be an important

2  factor?

3     A.     Location could be.

4     Q.     Would, you know, familial or friend

5  connection to alumni be important as well?

6     A.     It could be, but all of those pale

7  in comparison to the Step 1 passing.

8     Q.     And you mentioned speaking with

9  students over the years.  I don't imagine you

10  could recall names of specific students you've

11  spoken with or the dates you interacted with

12  them?

13     A.     No.  This was something just for --

14  ongoing.  And I've had the opportunity to speak

15  directly with students.  I was the featured

16  speaker for the white coat ceremony for a large

17  Caribbean medical school, and I had an

18  opportunity to meet the students in that

19  first-year class as well as many others.

20     Q.     I would like to talk about

21  paragraph 30 of your report.  Paragraph 30 says,

22  "High USMLE Step 1 passage rates are also

23  critical because prospective medical school

24  students view these figures as synonymous with a

William Pinsky, M.D. - 10/1/2024

1  quality medical education that prepares its

2  students for success.  High passage rates give

3  prospective students confidence that, like

4  nearly all students before them, they are likely

5  to succeed if they enroll."

6            What is the basis for this

7  statement?

8       A.    As before, my experience in dealing

9  with students, my experience dealing with

10  program directors, over many decades.

11       Q.    Program directors where?

12       A.    Across the United States in regards

13  to -- program directors refer to the people that

14  lead the residency programs.

15       Q.    And I asked this question before

16  with respect to the earlier paragraph of your

17  report, but I assume you did not conduct a

18  survey of prospective or current or former

19  medical students when --

20       A.    I did not.

21       Q.    -- preparing this paragraph?

22       A.    I did not.

23       Q.    Is it safe to assume that

24  prospective medical students know that medical

1  school is hard work?

2       A.    I would assume so.

3       Q.    And don't prospective medical

4  school students know that to pass the USMLE Step

5  1, they have to put in the necessary time and

6  effort to succeed both in medical school and on

7  the exam itself?

8       A.    Yes.

9       Q.    And isn't it also safe to assume

10 that prospective medical school students know

11 that a pass rate necessarily only includes those

12 students who actually took the exam?

13              MR. ZIBEL:  Objection to form.

14      A.    No, I do not think they assume

15 that.

16 BY MR. EVANS:

17      Q.    Do you think that students believe

18 that the pass rate includes students that never

19 attempted the exam?

20      A.    I think they believe that all the

21 students are allowed to take the exam.

22      Q.    Do you think that students are

23 aware that the USMLE Step 1 is administered at

24 the conclusion of the basic science portion of

```
 1   medical school?
 2                   MR. ZIBEL:  Dale, can you just
 3        repeat the question?  I didn't -- sorry.
 4                   MR. EVANS:  Yeah, no problem.
 5        Ms. DeCarlo, can you read that back?
 6        (Question read by reporter)
 7        A.    I believe that the schools counsel
 8   them that it's given by the end of that.
 9   Sometimes it's right before it ends, not
10   necessarily at the end.
11   BY MR. EVANS:
12        Q.    And do you believe that prospective
13   students understand that not all students will
14   make it through the first two years of medical
15   school?
16        A.    I really don't have any idea.
17        Q.    Do you think it's incumbent upon
18   prospective students to educate themselves as to
19   the curriculum of medical school and the
20   schedule of the curriculum when evaluating
21   potential medical schools?
22                   MR. ZIBEL:  Objection to form.
23        A.    I believe it's a responsibility to
24   the schools to make sure that they understand
```

1   this.

2   BY MR. EVANS:

3        Q.      And if that type of information is

4   published in the school's catalog, would you

5   agree that that's a sufficient disclosure?

6        A.      No.

7        Q.      Why not?

8        A.      Because people don't always read

9   everything carefully and understand it until

10  it's put into proper context, and that's where

11  the responsibility of the schools come in.

12       Q.      And what would be the proper

13  context be, in your opinion, if printed in the

14  catalog is not sufficient?

15                     MR. ZIBEL:  Objection to form.

16       A.      Direct contact with students to

17  assure that they understand what the

18  requirements are and how they will be able to

19  meet them.

20  BY MR. EVANS:

21       Q.      When you say "direct contact," I --

22  you mean speaking to the student?

23       A.      That's what I would assume.

24       Q.      And so in order for a medical

1  school to properly disclose its curriculum to

2  its students, it's your belief they should speak

3  to each student individually?

4      A.    That's been my experience in the

5  U.S. medical schools.  That's what the admission

6  committee does.

7      Q.    And if the university offers an

8  opportunity to meet with an admissions counselor

9  or a faculty member and the student doesn't take

10  advantage of that opportunity, then that would

11  be the student's prerogative, to speak?

12            MR. ZIBEL:  Objection.

13      A.    I would also say that, you know,

14  when I talk about the meeting or talking with

15  the students, it could be a webinar.  It could

16  be in a, you know, meeting that's held somewhere

17  for prospective students where they have an

18  opportunity to hear the details and ask

19  questions.

20            I think -- yes, I believe there's a

21  dual responsibility.  I'm pretty much an

22  advocate for students, and I believe that the

23  institutions, whether it's in the Caribbean, in

24  the United States, in other countries, have a

1    responsibility to look after their current and

2    prospective students.

3         Q.    Have you reviewed the deposition of

4    the plaintiff, Natalia Ortiz, in this case?

5         A.    Yes.

6         Q.    And are you aware of whether Saba

7    provided her with opportunities to meet -- take

8    webinars and meet with faculty members and the

9    campus before she matriculated?

10        A.    I do not know.

11        Q.    Do students at Ochsner believe that

12   they'll be able to take the USMLE Step 1

13   regardless of their performance in medical

14   school?

15                   MR. ZIBEL:  Objection to form.

16        A.    I'm not currently involved.  When I

17   was involved, yes, everybody was eligible to

18   take the exam.

19   BY MR. EVANS:

20        Q.    So even if they don't -- they

21   didn't pass all of their basic science courses,

22   UQ Ochsner permitted them to sit for the USMLE

23   Step 1?

24        A.    Yes.  And generally speaking, those

1  students would most likely have opted out until

2  they felt better prepared, but there was no rule

3  within the school as to who could take the exam.

4        Q.    Did students at UQ Ochsner require

5  certification by UQ Ochsner faculty in order to

6  sit for the Step 1 exam?

7        A.    I don't recall the technicalities,

8  but I think students need to be endorsed by

9  their schools to take the exam, and that's as

10 much as a protection for the integrity of the

11 exam to be sure these are students coming from

12 that institution.

13       Q.    Okay.  I want to talk about

14 paragraph 31.  And, Dr. Pinsky, just take a look

15 at it and let me know when you've had a chance

16 to review it.  It's a lengthy paragraph, so I'm

17 not going to bother reading the entirety into

18 the record.

19       A.    Yeah, I just looked at it.

20       Q.    In your experience, Dr. Pinsky,

21 would a student that is able to get admitted

22 into a U.S. medical school attend a Caribbean

23 medical school instead?

24                  MR. ZIBEL:  Objection to form.

1      A.      Yeah, I really don't understand the

2   question.

3   BY MR. EVANS:

4      Q.      In your experience, if a student is

5   admitted both into a U.S. medical school as well

6   as a Caribbean medical school, is it more likely

7   that that student would choose to attend the

8   U.S. medical school?

9      A.      More likely, I would assume.  I do

10  know that there's students admitted to UQ

11  Ochsner and a U.S. medical school and chose to

12  come to U.S. -- UQ Ochsner.

13     Q.      My question is limited to Caribbean

14  medical schools in particular.  Are you aware of

15  any students that have chosen to attend a

16  Caribbean medical school despite being offered

17  admission at a U.S. medical school?

18                  MR. ZIBEL:  Objection to form.

19     A.      I'm not aware.

20  BY MR. EVANS:

21     Q.      Did you interview any former

22  students of Saba in connection with the

23  preparation of your declaration report in this

24  case?

William Pinsky, M.D. - 10/1/2024

1          A.     I did not.

2          Q.     Okay.  I would like to take a look

3    at paragraph 33 here.

4          A.     Okay.

5          Q.     Can you describe the experience

6    through which you learned that a significant --

7    numbers of students at Caribbean medical schools

8    do not advance far enough into the program to

9    sit for the Step 1 exam?

10         A.     Through various communications with

11   students, various review of transcripts, of

12   reading student -- I'm forgetting what it's

13   called -- student chats online.  You know, it's

14   a code from combinations of all of the above.

15         Q.     But you don't recall having spoken

16   with any Saba students in particular, correct?

17         A.     I do not recall.

18         Q.     And this issue of significant

19   numbers of students not advancing to Step 1,

20   this is an issue with Caribbean medical schools

21   across the board?

22         A.     It seems to be more of an issue in

23   the Caribbean than in other geographical

24   locations.

1      Q.      And when you say "significant
2  numbers of students," what do you mean?
3      A.      In my -- let me just read my
4  statement here.  In my experience of multiple
5  decades and academic medicine as well as my
6  experience at Intealth, I would say anything --
7  for sure, anything above 10 percent of students
8  would be considered high.  And maybe even some
9  were less than 10 percent, but easily at 10
10  percent.  And anything that would approach
11  numbers like 30, 40, 50 percent would be very
12  outstanding.
13      Q.      And is this based on any sort of
14  regulatory guidelines or is this based on your
15  experience with the USMLE and academia?
16      A.      My opinion or the fact that there's
17  large numbers of students that don't progress?
18  I'm not sure which you're asking me.
19      Q.      Sure.  I'm referring to your
20  testimony about, you know, what constitutes
21  significant.  And you mentioned, you know, 10
22  percent, maybe less, certainly anything between
23  maybe 30 and 50 percent.
24              Is that based on your experience in

1    academics or is there some sort of published

2    guideline recommendation that talks about

3    attrition rates and when they become significant

4    or concerning?

5                    MR. ZIBEL:  Objection to form.

6         A.    So it's my experience.  I think

7    there's public information from the AAMC,

8    Association of Academic Medical [sic], AAMC, and

9    other public data that's out there.

10   BY MR. EVANS:

11        Q.    And that public data, does that

12   list attrition rates at Caribbean medical

13   schools?

14        A.    Yes.  Well, an approximation of it.

15        Q.    And which organization, in

16   particular, is that?

17        A.    I think that's information that

18   comes through the U.S. Department of Education

19   from the data that's submitted, probably through

20   NCFMEA.

21        Q.    And that information you consulted

22   in preparing your report?

23        A.    I did see that information.

24        Q.    I'm sorry?

```
 1        A.      Yes, I'm sorry.  I did see that
 2   information.
 3        Q.      Okay.  And if we go to page 34 of
 4   your report, would you be able --
 5        [Zoom technical difficulties]
 6   BY MR. EVANS:
 7        Q.      So I was asking Dr. Pinsky if he
 8   could identify, on page 34, the document that
 9   references attrition rates at Caribbean medical
10   schools.
11        A.      It was in the Complaint, the date
12   it was listed in there, with a footnote, as I
13   recall.
14        Q.      So you're --
15        A.      And I don't have that in front of
16   me.  So I can't tell you for sure, but that's
17   how I remember it.
18        Q.      And other than the Complaint, do
19   you recall any other document that discloses
20   attrition rates in the Caribbean for Caribbean
21   medical schools?
22        A.      No.  And once again, I think the
23   data you're referring to was Freedom of
24   Information data that was included in there.
```

William Pinsky, M.D. - 10/1/2024

1      Q.      And have you done anything to
2    verify that the information in the Complaint is
3    accurate?
4      A.      No.
5      Q.      Let's go back to paragraph 34, I
6    believe it was -- paragraph 33, rather.  Why do
7    you believe that higher attrition rates are
8    generally attributed to lower academic admission
9    standards?
10     A.      I think the admission standards try
11   to be able to predict who's going to be
12   successful in the rigorous curriculum of medical
13   schools.  Also, there's data that indicates that
14   individuals' performances on standardized tests
15   are predictable from prior experiences; thus,
16   somebody with a low MCAT test has a less likely
17   chance doing well on the USMLE exam or even
18   board certification exams.
19             And I think that there -- from my
20   experience, there are a lot of students who very
21   much want to become a doctor, but for one reason
22   or another really don't have the inherent
23   capabilites to do that.
24     Q.      And again, sitting here today,

1  you're not familiar with Saba's admission

2  standards?

3        A.    Correct.

4        Q.    And you don't know whether Saba

5  requires students to take the MCAT prior to

6  enrollment?

7        A.    I just don't recall.  And I don't

8  recall, if they do, what the scores need to be.

9        Q.    In paragraph 33, you also say,

10 "Caribbean schools enroll students who are often

11 not equipped to successfully complete their

12 medical degree and to apply for licensure in the

13 United States."

14        You touched on this a little bit in

15 your previous statement, but what's the basis of

16 this statement?

17        A.    Again, basis of having interaction

18 with students who have not been successful in

19 completing their education in the Caribbean

20 primarily and knowing what capabilities

21 individuals have to be able to get through this

22 arduous process.

23        Q.    And when you say they're not

24 equipped, is that at least, in part, because

```
 1  their undergraduate GPAs or MCAT scores are not
 2  high enough?
 3                  MR. ZIBEL:  Objection to form.
 4      A.    I think -- if one believes those
 5  are indicators of future capabilities, which
 6  they are in many cases, I think that's true as
 7  well as, you know, being able to evaluate
 8  individuals as to whether this is something that
 9  they can do or not do.  And that's part of the
10  interviewing process.
11  BY MR. EVANS:
12      Q.    Have you evaluated or reached an
13  opinion as to whether the plaintiff in this
14  case, Natalia Ortiz, was qualified to attend
15  medical school?
16      A.    I don't know anything about her
17  background.
18      Q.    Would you agree that some students
19  with GPAs or MCAT scores that are lower than
20  acceptable to a U.S. medical school are able to
21  get admitted to an international medical school
22  and go on to graduate and practice medicine?
23      A.    I believe students who receive
24  proper support and aid and, perhaps, their own
```

```
 1   maturity are able to do that.
 2        Q.      Even though their GPAs or their
 3   MCAT score standing alone wouldn't be sufficient
 4   to get them into a U.S. medical school?
 5        A.      Possibly.
 6        Q.      And wouldn't you agree that many
 7   students that enroll in Caribbean medical
 8   schools go on to pass the USMLE Step 1, complete
 9   their studies, and become physicians?
10        A.      Yes.  In fact, my own personal
11   primary care physician is a Caribbean graduate.
12        Q.      Do you know what school that --
13   your primary care physician graduated from?
14        A.      Yes.
15        Q.      And which school is that?
16        A.      Ross.
17        Q.      Is Ross considered one of the big
18   four in the Caribbean?
19        A.      In my opinion, it's considered one
20   of the big schools because you're going by
21   volume.
22        Q.      Are you familiar with the term or
23   phrase "big four"?
24        A.      A little bit.
```

William Pinsky, M.D. - 10/1/2024

1      Q.      Would you consider Saba to be part
2  of the big four?
3                    MR. ZIBEL:  Objection to form.
4      A.      Yeah, I don't really refer to that
5  at all.
6  BY MR. EVANS:
7      Q.      When speaking of Ross, you
8  mentioned -- you consider it one of the -- I
9  don't want to put words in your mouth, but you
10 said something like, you know, one of the big
11 schools.  Would you consider Saba one of the big
12 schools?
13     A.      When I say big, I meant larger in
14 terms of number of students.  And yes, Saba
15 would be considered large.
16     Q.      Would you agree that as a general
17 matter U.S. medical schools attract better
18 qualified students than international medical
19 schools?
20     A.      In general, I think the
21 U.S. medical schools attract individuals who, at
22 the time of application, appear to be better
23 quality.
24     Q.      Would those better qualifications

1  make those U.S.-based medical students more

2  likely to succeed in medical school?

3       A.     I think that's one variable.

4       Q.     Does better qualifications make it

5  more likely that those U.S.-based medical

6  students would be successful on a USMLE Step 1

7  exam?

8       A.     That's one variable.

9       Q.     And do those better qualifications

10  make it more likely that those U.S. medical

11  students will be qualified to become doctors?

12       A.     Can you repeat that?

13       Q.     Sure.  Do those better

14  qualifications make it more likely that those

15  U.S.-based medical students will be qualified to

16  become doctors?

17       A.     That's one variable.

18       Q.     And the variable you're referring

19  to in your last couple of answers is the GPA and

20  MCAT scores?

21       A.     Yes.

22       Q.     Do medical schools have a duty to

23  ensure that all of their graduates are qualified

24  to become doctors?

```
 1        A.      Yes.

 2                    MR. ZIBEL:  Objection to form.

 3        A.      Yes.

 4   BY MR. EVANS:

 5        Q.      Would it be appropriate for a

 6   medical school that takes lower qualified

 7   students to lower standards for their graduates

 8   to become doctors?

 9        A.      I think it's not proper for a

10   medical school to lower their admission

11   standards and have a high risk and actually high

12   rates of attrition because students cannot make

13   it through the curriculum.

14        Q.      And so is your opinion that

15   international medical schools should have the

16   same or similar attrition rates to U.S. medical

17   schools?

18                    MR. ZIBEL:  Objection to form.

19        A.      You're talking about all

20   international schools or are you talking about

21   the Caribbean?

22   BY MR. EVANS:

23        Q.      All international schools.

24        A.      I think that the standards for
```

FARMER ARSENAULT BROCK LLC

```
 1  schools have to be done in context to society in
 2  which they work, that there are differences in
 3  Africa versus South Asia versus U.S. versus
 4  Caribbean in terms of resources and cultural
 5  aspects of it.
 6          Q.      Would you agree that there are
 7  going to be differences in admission rates and
 8  admission requirements across medical schools in
 9  general?
10                      MR. ZIBEL:  Objection to form.
11       Vague.
12          A.      That's really a very vague
13  question.  I'm not sure how to answer this.
14  BY MR. EVANS:
15          Q.      Yeah, I mean, it's to -- it's sort
16  of a foundational question, but I assume it's
17  fair to assume that admission standards vary
18  across medical schools.  Is that a safe
19  assumption?
20          A.      Yes.
21          Q.      And so even though there's a
22  difference in admission standards, should the
23  standards that schools hold their students to in
24  order to graduate -- should that vary to mirror
```

 1  the difference in admission standards?
 2                  MR. ZIBEL:  Objection.
 3       A.    So again, Dale, what schools are we
 4  talking about?
 5  BY MR. EVANS:
 6       Q.    So let's do it this way.  I assume
 7  that -- I think we talked about this.  Part of
 8  the purpose of the ECFMG is to ensure that
 9  international medical graduates from across the
10  world are educated under similar conditions and
11  are prepared to practice medicine in the United
12  States in a similar manner to those students in
13  the U.S., correct?
14       A.     Not exactly.  So it's to ensure
15  their comparability because, remember, there's
16  cultural differences in terms of how people
17  might be educated, but there's certain standards
18  even within that that should be met.  And that's
19  what WFME, in particular, developed for the
20  accreditation bodies.
21             The other aspect of it is in many
22  countries around the world, tuition is at no
23  cost, and so the investment by the matriculants
24  differs across the world and the risk that's

William Pinsky, M.D. - 10/1/2024

Page 113

1    taken.

2        Q.    So if the academic standards should

3    have some uniformity or some similarity, isn't

4    it then fair to say that students with lower

5    admission standards will necessarily have a

6    higher attrition rate?

7                    MR. ZIBEL:  Objection to form.

8        A.    Say it one more time.

9                    MR. EVANS:  Ms. DeCarlo, can

10       you repeat that?

11       (Question read by reporter)

12   BY MR. EVANS:

13       Q.    So it was supposed to be that

14   schools should have -- should necessarily have a

15   higher attrition rate.

16       A.    So one would expect if their

17   students had lower academic performance coming

18   into the medical school, unless there's

19   something that has changed that trajectory, they

20   would continue to have lower academic

21   performance.

22       Q.    Would you agree that medical

23   schools owe a duty to rigorously test the

24   qualifications of their students even if

 1  they're -- even if they enroll students who are
 2  lower qualified than their U.S.-based
 3  counterparts?
 4       A.     So, once again, I am very much an
 5  advocate for students and for students to be
 6  treated fairly.  My experience -- when I was
 7  associate dean at Wayne State University in
 8  Detroit where we had a very active program to
 9  look for disadvantaged students who may not have
10  had the academic exposure and success of other
11  students but had a desire to become physicians,
12  and we had specific programs to work with those
13  individuals, to get them to meet the standards,
14  not to lower the standards but to meet the
15  standards for admission to medical school.
16            So I think the institutions have a
17  very big responsibility if they're going to look
18  for students who might otherwise not have
19  qualified but have a strong desire to assist
20  them through the process to make them
21  successful.  The success of a student -- the
22  responsibility and -- for the success of the
23  student is primarily on the institution, the
24  institution making the proper decisions as to

1  who is admitted, how they are dealt with as

2  students, and how they are actively supported to

3  be successful.

4      Q.    And so you're talking about the

5  support that the school gives, but at the end of

6  the day, those students should still have -- you

7  know, should still be judged by the same

8  guidelines as other students, right?

9      A.    Yes.

10      Q.    Okay.  And do you know how Saba

11  supports its students who were not meeting the

12  standards that are required?

13      A.    No, I do not.

14              MR. ZIBEL:  Objection to form.

15      A.    No, I do not.

16  BY MR. EVANS:

17      Q.    Are you aware of any adverse action

18  that the ECFMG, the NVAO, or any accrediting

19  body has ever taken against Saba with respect to

20  its academic admission standards?

21      A.    No.

22      Q.    Are you aware of any adverse action

23  that the Department of Education or the New York

24  State Education Department or any other

William Pinsky, M.D. - 10/1/2024

1  regulatory body has ever taken against Saba with

2  respect to its academic admission standards?

3      A.    I believe I'm aware through some

4  communication, internal communication, that was

5  provided to me that there was concern in New

6  York.  Whether they took action or not, I don't

7  know, but I know there was concern about it.

8      Q.    And you refer to internal

9  communication.  Who was that internal

10 communication with?

11     A.    I think that was one of

12 the Mr. Donahue e-mails, to or from.

13     Q.    And do you know whether, as a

14 result of that communication, Saba was deemed to

15 be either compliant or noncompliant with respect

16 to that particular issue?

17     A.    I do not.

18     Q.    We discussed this a little bit

19 earlier, but I want to circle back to it.  Has

20 the ECFMG adopted a standard definition of

21 attrition?

22     A.    No.

23     Q.    Does the ECFMG consider --

24     A.    So, remember, ECFMG does not set

1    standards for medical schools.

2        Q.    Thank you.  I appreciate that

3    clarification.  That's definitely helpful.

4            But I do understand that the ECFMG

5    determines whether a particular medical school

6    meets its requirements; is that correct?

7        A.    Whether it -- whether the

8    graduates -- it's sort of a little convoluted

9    direction.  ECFMG determines if the graduates

10   have come from a school that meets the

11   standards.

12       Q.    And when --

13       A.    It's not the schools that's

14   designated as graduates.

15       Q.    And when determining whether a

16   school meets the standards of the ECFMG, does

17   the ECFMG look at that school's attrition rate?

18       A.    No, because again, ECFMG doesn't

19   accredit the schools.

20       Q.    When you were the CEO of Intealth,

21   was there ever any discussion about looking at

22   the attrition rates of schools in determining

23   whether they meet the requirements?

24                MR. ZIBEL:  Do you mean

```
1          discussions within Intealth?
2                    MR. EVANS:  Yes.
3          A.    I know that we discussed that that
4   should be a variable that the accrediting bodies
5   look at.
6   BY MR. EVANS:
7          Q.    So you discussed they should be,
8   and I assume that discussion arose because the
9   accrediting bodies don't look at attrition
10  rates?
11         A.    Some do, and some don't.  And we
12  thought that should be a -- we've had discussion
13  and we thought should be a higher rise to a
14  higher level of concern.
15         Q.    And did those discussions ever
16  expand beyond the internal organization of
17  Intealth?
18         A.    I really don't recall.
19         Q.    You don't recall whether those
20  concerns were expressed to any particular
21  creditor -- accreditors?
22         A.    Correct.
23         Q.    You mentioned that some accreditors
24  do look at attrition.  Do the WFME or the ECFMG
```

1  have a standard definition of attrition?

2       A.      I'm really not sure.

3       Q.      You mentioned internal discussions

4  about, you know, accreditors needing to look at

5  attrition rates.  Who were those discussions

6  with?

7       A.      Leadership within the organization.

8       Q.      And who would that include?

9       A.      The leadership team, my executive

10  leadership team, which included executive

11  director of ECFMG.  I mean, just -- you know,

12  all the top executives.

13      Q.      Who were the top executives?

14      A.      So when I was there, the team, in

15  addition to myself, was the chief

16  administrative, officer chief of staff,

17  executive director of ECFMG, executive director

18  of FAIMER, CFO, and chief legal counsel.

19      Q.      And do you recall their names?

20      A.      I do, but...

21              MR. ZIBEL:  Dale, I think

22      you're going a little beyond the scope

23      here.

24      A.      I'm uncomfortable telling people's

1  names.  It's on the website.

2  BY MR. EVANS:

3       Q.    Well, if it's on the website, then

4  it's public information.  I'm just trying to

5  figure out -- you said that there were

6  discussions of attrition rate, and I would like

7  to know who those discussions were with.

8       A.    That's who they would have been

9  with, probably also with various members of our

10 board as well.

11      Q.    Let's take them one by one.  And

12 maybe we don't need every single person that was

13 involved, but who was the director of ECFMG?

14            I'm not using the exact

15 nomenclature, but the head of the ECFMG that was

16 involved in these discussions, who was that?

17      A.    Kara Owen.

18      Q.    Okay.  And you mentioned -- you

19 mentioned that certain accreditors do evaluate

20 attrition rates.  Which accreditors would those

21 be?

22      A.    I don't recall.

23      Q.    Are there any in particular that

24 require U.S. medical schools to disclose

1  attrition rate?

2         A.     I believe LCME does.

3         Q.     Are you aware of any accreditor

4  that requires Caribbean medical schools to

5  include attrition rates -- or to disclose

6  attrition rates?

7         A.     I'm not sure.

8         Q.     Are you aware of any accreditor

9  that requires Caribbean medical schools to

10 include attrition rates alongside or with

11 information about first-time USMLE Step 1 pass

12 rates?

13        A.     I'm not sure.  I am aware that

14 medical schools should be very transparent for

15 applicants for their programs.

16        Q.     That's your personal belief?

17        A.     That's my personal belief, my

18 personal very strong belief.

19        Q.     And LMCE, how do they require that

20 attrition rates be calculated?

21                   MR. ZIBEL:  Objection to form.

22        A.     I think pretty simply number of

23 students entering, number of students

24 graduating.

```
 1   BY MR. EVANS:
 2        Q.     Do you know if Wayne State
 3   discloses their attrition rates?
 4        A.     I don't know, but I assume they do.
 5        Q.     I want to take a look at paragraph
 6   34.  In paragraph 34, you say that high
 7   attrition is "often due to a range of factors,
 8   including that time schools admission standards
 9   are too lax or that it fails and provide
10   necessary support, resources, or instruction to
11   help students succeed."
12              What is the basis for these
13   statements?
14        A.     40 years of academics and, in
15   particular, in regards to the area we're talking
16   about, the last seven and a half years.
17        Q.     What are some of the examples of
18   Caribbean medical schools whose admission
19   standards are too lax?
20                   MR. ZIBEL:  Objection to form.
21         I just want to point out to Dr. Pinsky is
22         being asked to opine on admission
23         standards of any particular Caribbean or
24         other medical school.
```

William Pinsky, M.D. - 10/1/2024

1           MR. EVANS:  Dan, I'm having a

2    hard time hearing you.

3           MR. ZIBEL:  My apologies.  I'm

4    objecting to the scope of the question

5    because Dr. Pinsky is not here to testify

6    here today about the specific admission

7    standards of any particular medical

8    school.

9           MR. McMORROW:  It's in his

10   declaration.

11          MR. EVANS:  Well, and really

12   what I'm getting at here is the report

13   says that the high attrition rates are

14   often due to the range of factors.  And

15   the use of the term "often" presupposed

16   that this occurs with some regularity.  I

17   would like to know the basis of that

18   statement that this is why attrition often

19   occurs and what are examples of this

20   particular cause being a cause of

21   attrition, and so that's why I'm asking to

22   remember examples within the Caribbean

23   medical school environment in particular.

24   A.    So in my experience at Intealth,

1  I've seen transcripts of many, many students in

2  terms of what their entering qualifications

3  were, and then the difficulties they had

4  particularly as they failed at multiple

5  institutions.  I've seen that in other aspects

6  of 40 years of school -- of academic work.

7            You know, this is experience based.

8  I think it's factually based when you talk to

9  educators in terms of what the variables are for

10  students to succeed or not to succeed, and

11  that's what it's all based on.

12  BY MR. EVANS:

13       Q.    And sitting here today, can you

14  think of some Caribbean medical schools whose

15  standards are too lax and support this statement

16  in your report?

17       A.    No.  I'm not going to -- I'm not

18  going to think of that.

19       Q.    You don't know or you're refusing

20  to answer?

21            MR. ZIBEL:  Objection to form.

22       A.    I'm not sure I know accurately

23  enough to state it.

24  BY MR. EVANS:

1     Q.     Okay.  So the report says that high

2  attrition is --

3     A.     Sitting here right now, yes, I'm

4  sorry.

5     Q.     I'm sorry, I didn't catch that last

6  exchange.

7     A.     Sitting here right now, I can't

8  recall accurately enough to be able to state it.

9     Q.     Okay.  So high attrition is often

10  due to a range of factors, including schools'

11  admission standards, but sitting here right now,

12  you're not familiar with Saba's admission

13  standards or those of any other Caribbean

14  medical schools that you can identify right now?

15     A.     Correct.

16     Q.     Going to the next factor, which is

17  failure to provide necessary support, resources,

18  or instruction to help students succeed, if I

19  recall your previous testimony correctly, you're

20  familiar with the support, resources, or

21  instruction that Saba provides to help its

22  students succeed; is that correct?

23     A.     That's correct, and it's an issue

24  of -- you know, when one looks at outcomes,

1  process is important, but what's important is

2  the end result and the outcomes.  And I think

3  that all has to be taken together.  And that's

4  why even if there's a process in place, if

5  students are not successful, than it means the

6  outcomes are not successful.

7           Q.    And so if the students don't

8  succeed, that must indicate some deficiency in

9  the support, resources, or instruction of that

10 university.  Is that what I'm hearing?

11          A.    I think it all has to be taken into

12 consideration because, again, whenever anybody's

13 looking at a process of whatever it is, it's one

14 thing to have some -- have the process there,

15 and then there's also the execution of it so

16 that if the outcomes are not what is desired,

17 then one has to do -- one should do a root cause

18 analysis to understand what their processes are

19 and what their execution is and why it's not

20 successful.  That's the responsibility of the

21 institutions.

22          Q.    And do you know whether Saba has

23 undertaken that type of root cause analysis?

24          A.    I do not, but I am aware of e-mails

```
 1  with Mr. Donahue where there was concern about
 2  that.  I'm not sure what happened after that.
 3       Q.    And what are some examples of
 4  Caribbean medical schools that fail to provide
 5  necessary support, resources, or instruction to
 6  help students succeed?
 7       A.    I don't have that knowledge.
 8       Q.    Paragraph 35, you say, "High
 9  attrition rate can also be a sign that a
10  school's faculty are not adequately qualified,
11  experienced, or dedicated to support its
12  students' success.  It may also mean that a
13  school's curriculum or program structure is not
14  effective when preparing students for medical
15  practice."
16                 What is the basis for these
17  statements?
18       A.    My whole career in academics and
19  knowing, again, what the variables are for
20  success.  And this gets back to understanding
21  that there's a problem and looking for the
22  causation of the problem, and -- these are some
23  of the things that would need to be looked at.
24       Q.    And have you evaluated the
```

```
 1  qualifications, experience, and dedication of
 2  the faculty of Saba?
 3       A.    No, nor did I indicate that in my
 4  document.
 5       Q.    Have you evaluated the
 6  qualifications of the faculties of other
 7  Caribbean medical schools with high attrition?
 8       A.    No.
 9       Q.    Can you identify any Caribbean
10  medical schools that, in your opinion, lack
11  adequate -- adequately qualified faculty?
12       A.    No.
13       Q.    Have you evaluated Saba's
14  curriculum or program structure?
15       A.    No.
16       Q.    And so I presume you don't have an
17  opinion, sitting here today, as to the adequacy
18  of its curriculum or program structure?
19              MR. ZIBEL:  And I'll just say
20         for the record that he's not being offered
21         to you to have an opinion -- to provide an
22         opinion, but you can answer question.
23       A.    I was not asked to look at that.
24  BY MR. EVANS:
```

```
 1        Q.      And so you don't have an opinion on
 2   the topic?
 3        A.      Correct.
 4        Q.      Okay.  Paragraph 36, you say, "No
 5   matter the cause, the high attrition in
 6   Caribbean medical schools is a sign that -
 7   unlike U.S. medical schools, where nearly all
 8   students who enroll sit for and pass the USMLE
 9   Step 1 - the school is not successfully
10   educating large portions of the students who
11   enroll."
12               What is the basis for this
13   statement?
14        A.      The statement on knowing what the
15   rates are in the U.S. schools and what the
16   publicly available information was for the other
17   schools.
18        Q.      And we discussed earlier that
19   U.S. medical schools tend to have students with
20   higher undergraduate GPA and MCAT scores,
21   correct?
22        A.      Well, I would assume so.  I don't
23   know that for a fact, but I would assume that to
24   be true.
```

William Pinsky, M.D. - 10/1/2024

```
 1        Q.      You don't know whether U.S. medical
 2   schools typically have students with higher
 3   undergraduate GPAs and MCAT scores than
 4   Caribbean medical schools?
 5        A.      I thought I just answered that.
 6        Q.      I think your answer was I don't
 7   know, which was surprising to me.  That's why
 8   I'm rephrasing.
 9        A.      I'm sorry.  Maybe I didn't speak
10   clearly.  I said I assume that to be true.  I
11   have not looked at the data particularly for it.
12   I assume it to be true.
13        Q.      And if we assume that that's true,
14   isn't undergraduate GPAs and MCAT scores one
15   variable that is predictive of a higher level of
16   success of a medical school?
17                    MR. ZIBEL:  I object because I
18        think we've gone down this path already.
19        A.      Those are two variables.  And yes,
20   I think they're predictive.  They're not solely
21   predictive, but they're predictive.
22   BY MR. EVANS:
23        Q.      And sitting here today, can you
24   identify any Caribbean medical schools that are
```

1   not successfully educating large portions of the

2   students who enroll?

3                   MR. ZIBEL:  Objection.  You

4       can answer if you know.

5       A.    I am aware of -- again, because of

6   seeing transcripts and students come through

7   ECFMG, that there are schools that -- where

8   students are -- where it seems that there's a

9   large number of students that are not

10  successful.

11  BY MR. EVANS:

12      Q.    And if I recall your testimony

13  earlier, you don't have any specific

14  recollection of reviewing transcripts of Saba

15  students?

16      A.    Correct.

17      Q.    Have you ever conducted an

18  investigation into the causes of attrition at

19  Caribbean medical schools?

20      A.    No.

21      Q.    Is it possible that an attrition

22  rate is indicative of a rigorous curriculum?

23                  MR. ZIBEL:  Objection to form.

24      A.    I'm not sure of the implication of

1  your question.  It sounds like you're saying if

2  the curriculum is hard, that people aren't going

3  to -- if it's too hard, then they're not going

4  to be successful?  Is that what you're asking?

5  BY MR. EVANS:

6       Q.    Well, what I'm asking is -- your

7  report draws certain conclusions about the

8  causes of high attrition, but isn't it also true

9  that a difficult and rigorous curriculum may

10  also be one factor that leads to attrition?

11       A.    I think it -- only if students are

12  not capable of handling, and that gets back to

13  how they were admitted and the support they

14  receive.

15       Q.    Is it possible that some students

16  get to a small Caribbean island to commence

17  their medical school studies and immediately

18  decide living there for the next two years is

19  not for them?

20       A.    Sure.  Absolutely.

21       Q.    Is it also safe to assume that some

22  students drop out of Caribbean medical schools

23  within the first few weeks because of

24  homesickness or because they don't like the

```
 1  islands?
 2      A.    Yes.  And that, generally, is what
 3  would reflect in a small attrition rate.
 4      Q.    In these paragraphs we just
 5  discussed, you know, 34, 35, this is a
 6  discussion of causes of attrition generally,
 7  correct?  You don't mention a specific school?
 8      A.    Correct.
 9      Q.    Okay.
10              MR. EVANS:  It's -- I've got 1
11          o'clock Eastern Time.  Can we go off the
12          record for a second?
13              THE VIDEOGRAPHER:  The time is
14          1:03 p.m., and we're going off the record.
15          (A recess was taken)
16              THE VIDEOGRAPHER:  The time is
17          1:43 p.m., and we're back on the record.
18  BY MR. EVANS:
19      Q.    Dr. Pinsky, have you conducted an
20  evaluation of Saba's attrition rate
21  specifically?
22      A.    Can you ask me that question again,
23  Dale?
24      Q.    Sure.  And I'll rephrase it for the
```

William Pinsky, M.D. - 10/1/2024

Page 134

```
 1  sake of clarity.  Have you personally evaluated
 2  Saba's attrition rate?
 3       A.    I personally have not.
 4       Q.    Okay.  Have you received any
 5  information or documentation about Saba's
 6  attrition rate from other sources?
 7       A.    Yes.
 8       Q.    And what were those sources?
 9       A.    I received information from counsel
10  that indicated over a several-year-span
11  attrition rate at Saba.
12       Q.    And this was the spreadsheet
13  identified in your declaration?
14       A.    Yes.
15       Q.    Okay.  But you haven't conducted --
16       A.    I also saw the e-mails to and from
17  a Mr. Donahue that discussed the attrition rate.
18       Q.    Okay.  But you personally haven't
19  evaluated any source data to reach your own
20  conclusions about attrition rates?
21       A.    Correct.
22       Q.    Have you conducted an evaluation of
23  the underlying causes of Saba's attrition rate?
24       A.    No.
```

1        Q.      And we discussed earlier you
2   haven't evaluated Saba's admission standards or
3   the type of support they provide their students
4   or the qualifications of their faculty in any
5   detail?
6        A.      No, not in any detail.  I've read
7   what's on the website.
8        Q.      Okay.  Do you have any sense of how
9   Saba's attrition rate compares to other medical
10  schools?
11       A.      I have a sense.  It's not a -- it's
12  a sense from, you know, various conversations
13  with various types of people.  And I have a
14  sense that it's higher, and it's a sense.
15       Q.      And who are those conversations
16  with?
17       A.      You know, I can't really say
18  exactly.  You know, it's the kind of
19  conversations you have when you're at a, you
20  know, medical education meeting talking, you
21  know, among colleagues who are in the sphere of
22  medical education.  You know, one gets into
23  situations where you talk about issues and
24  future and things like that, and I -- you know,

1  that's the kind of topic that would come up.

2        Q.    And so when you say you can't say

3  who, is that because you don't remember or

4  there's sort of confidentiality concerns?

5        A.    No, no, I just can't remember who

6  it would have been.

7        Q.    Okay.  So is it fair to say that

8  your -- any knowledge you have about Saba's

9  attrition rate relative to other Caribbean

10  medical schools was -- is anecdotal in nature?

11       A.    Yes.

12       Q.    Sitting here today, are there any

13  Caribbean medical schools that you definitively

14  know their attrition rates for?

15       A.    Not definitively.

16       Q.    Do you have -- you know, stepping

17  back the precision scale a little bit and taking

18  definitively out of the equation, are you aware

19  of attrition rates at other Caribbean medical

20  schools?

21                  MR. ZIBEL:  Objection to form.

22       You can answer if you can.

23       A.    No.  And, Dale, I can tell you, you

24  know, at least one reason why.  There seems to

1  be a trend among the Caribbean schools to

2  obfuscate the data, and it's not clearly evident

3  for someone to be able to just go to a place and

4  find out what the attrition rate is.  And

5  because that data is obfuscated, it -- one can

6  only sort of glean something, you know, from

7  experiences and conversations.

8              And, you know, we've spent a lot of

9  time talking about attrition rate, which -- and

10  I understand that.  What we -- what's really

11  important as part of that discussion is being

12  forthright in disclosing it.  As I mentioned

13  earlier, you know, I'm obviously -- not

14  obviously.  I am a student advocate.  I'm mostly

15  an advocate for delivery of quality -- access to

16  quality health care, and so I care about the

17  whole medical education process.

18              And from my experience,

19  particularly in the last maybe 15 to 20 years in

20  the United States, and then after I joined

21  Intealth around the world, there's been more and

22  more emphasis placed on how students are dealt

23  with as part of that continuum that leads to

24  quality health care in terms of students able --

1   being able to be successful.

2             So it all comes together because I

3   think that medical education, while, you know,

4   students are one part of that as a consumer

5   group, it's about the delivery of quality health

6   care.

7        Q.    So when you say there's a trend of

8   obfuscation, what evidence is there of this

9   trend of obfuscation?

10       A.    From conversations I've had, you

11  know, over the years in terms of asking people

12  if they know what the data is and where's the

13  data, that sort of thing.

14       Q.    Conversations with whom?

15       A.    My peers in medical education, in

16  particular, and -- I think the data is just not

17  there and it's just not clear.

18       Q.    Who are these peers that you've

19  spoken with?

20       A.    I don't remember exactly.  You

21  know, as I said before, at medical educational

22  meetings and those sorts of things.

23       Q.    And what type of roles do these

24  individuals occupy that they're --

1      A.     Various roles from program

2  directors, deans, associate deans, people I run

3  across at meetings, whether it's a AAMC meeting,

4  which is attended by not just leadership from

5  U.S. medical schools but others around the

6  world, including the Caribbean, those types of

7  things.

8            It's -- you know, for somebody like

9  me that's been around for this much time, it's

10 the kind of thing, you know, you have a

11 discussion about over coffee or something.

12      Q.     And when you refer to program

13 directors and deans, you know, obviously, these

14 are program directors of residency programs at

15 medical facilities; is that correct?

16      A.     Yeah, medical education facilities,

17 the health care delivery systems, combinations.

18      Q.     And you refer to deans, I assume

19 you're not referring to deans of the Caribbean

20 medical schools themselves, right?

21      A.     Actually, I have spoken to -- I'm

22 sure -- I can't name anybody, but I am sure that

23 the discussion has come up.

24      Q.     And that dean said, We're

```
 1  obfuscating attrition rates?
 2       A.    So I've got a problem.  I need to
 3  ask somebody.
 4                 THE WITNESS:  I could be in a
 5        nondisclosure situation.
 6                 MR. ZIBEL:  Can we go off the
 7        record, Dale, for one second?
 8                 MR. EVANS:  If you need to go
 9        off the record to consult your attorney on
10        privilege, you can do that.
11                 THE VIDEOGRAPHER:  The time is
12        1:53 p.m., and we are off the record.
13        (A recess was taken)
14                 THE VIDEOGRAPHER:  The time is
15        1:54 p.m., and we are back on the record.
16        (Question read by reporter)
17  BY MR. EVANS:
18       Q.    Why don't we start, Dr. Pinsky --
19  go ahead and answer that last question that's
20  pending, and then from there, I can continue to
21  ask questions and we can address it.
22       A.    So answer -- I think it's yes then.
23       Q.    Okay.  So the follow-up question
24  is:  Who was that dean?
```

William Pinsky, M.D. - 10/1/2024

1        A.        So I mentioned earlier that I had

2    been the principal speaker for the white coat

3    ceremony at Ross University several years.  And

4    I met with the leadership of the university --

5    I'm sorry, the medical school itself, and they

6    had a variety of titles.  There was a dean,

7    there was a chancellor, and also somebody from

8    the corporate office in Chicago.

9                And they posed a question to me

10   about how could they become more competitive

11   with U.S. medical schools.  And my answer was,

12   First of all, you can be more clear on your

13   metrics including your attrition rate.

14                And their response was, This is a

15   competitive market; and if we disclose, then we

16   will be unfairly non competitive against the

17   other schools that don't disclose.

18                And I'm, obviously, paraphrasing

19   because this was many years ago.

20        Q.        And what was your response to them?

21        A.        Pretty much nonresponsive to that.

22   I didn't have any -- I might have said something

23   like, You know, that will then inhibit you of

24   being competitive or something like that to U.S.

 1  schools, but I really don't recall.  It -- I was

 2  surprised and not surprised with the answer.

 3      Q.    So if I understand the exchange

 4  correctly, the representatives of -- the

 5  representatives of Ross wanted to know how they

 6  could make themselves more competitive with

 7  U.S. medical schools.  Your response was to the

 8  effect of it could be more transparent in its

 9  reporting, one of the aspects of that would be

10  attrition.  And the respresentatives of Ross

11  expressed a concern that in doing so, that would

12  make them less competitive because their

13  competitors were not doing that?

14      A.    Less competitive to the other

15  Caribbean schools because their competitors were

16  not doing that.

17      Q.    And who was the person that

18  expressed that concern?

19      A.    It came from -- I don't recall

20  names, but it was whoever the senior person was

21  that would come in from Chicago as well as the

22  either chancellor or the dean.

23      Q.    Would that be Dr. Chumley?  Does

24  that ring a bell?

1        A.      I don't believe so.

2        Q.      Approximately when was this white

3   coat ceremony?

4        A.      It was while I was at Intealth.  So

5   it had to be after 2016 and before the pandemic

6   started, so somewhere 2016 and 2020.

7        Q.      And to your understanding, was

8   Ross's concern about disclosing an attrition

9   rate being a competitive disadvantage because

10  other schools in the Caribbean are not required

11  to disclose that information and do not

12  require -- and do not disclose it?

13              MR. ZIBEL:  Dale, let me just

14          object for a second on the grounds that

15          this is beyond the scope of his expert

16          report, but you can answer.

17              MR. EVANS:  Well, I think

18          that -- well, if you're not going to allow

19          him to answer, I'm not going to engage.

20          I'll let you make your objection.

21  BY MR. EVANS:

22        Q.      Go ahead, Dr. Pinsky.

23        A.      I surmise that there was concern

24  because the other schools were not disclosing it

1  and, therefore, they would be at a disadvantage.

2       Q.    And did that prompt you or anyone

3  at Intealth or ECFMG to investigate the

4  reporting of attrition rates in Caribbean

5  medical schools?

6       A.    No.  That's beyond our scope.

7       Q.    And why wouldn't the ECFMG be

8  interested in that type of information?

9       A.    Interested, but we don't -- when I

10  was there, we didn't, you know, have the

11  resources to be the police of the schools in the

12  Caribbean.  We took two schools to task and

13  charged them with irregular behavior because of

14  the egregious situations, and we couldn't go

15  after all of them.

16       We did report information to

17  various oversight bodies when appropriate, and

18  it -- it was not something that we could do

19  alone.  And I think -- I implied that, I think,

20  if I didn't say it that way in The New York

21  Times article.

22       Q.    And what were the two schools that

23  the ECFMG took to task?

24       A.    Yeah, so first one was AUSOM,

 1  Atlantic University School of Medicine.  And the

 2  second one was USAT, which was on the island

 3  Montserrat, I think.  Frankly, I'm sitting here

 4  right now not remembering what the U-S-A-T

 5  stands for.

 6      Q.    And what was the basis for bringing

 7  those two universities to task?

 8              MR. ZIBEL:  Objection.  This

 9         is -- I think you're getting well beyond

10         the scope of what Dr. Pinsky is here to

11         talk about.

12              MR. EVANS:  Dr. Pinsky is

13         opining on attrition rates and their role

14         in the Caribbean medical school

15         environment, and he was the representative

16         of Intealth.  And he has testified that

17         they have brought some sort of enforcement

18         action or some sort of complaint against

19         Caribbean medicals schools in the past,

20         and I'd like to explore what the grounds

21         for that was and whether it was attrition.

22      A.    They were not attrition rate

23  issues.

24  BY MR. EVANS:

1      Q.      And just so I understand at a high

2  level, you said that the ECFMG took them to

3  task.  What specifically was done?  What did

4  ECFMG do?  Was that a report to another entity

5  or was there some sort of sanctions process that

6  the ECFMG could initiate?

7      A.      Yes.  We initiated -- this was sort

8  of like a whistleblower situation where somebody

9  contacted us.  And we have -- there was a part

10  of the organization that was called special

11  investigations, and special investigations

12  looked into the issues at each of the schools,

13  actually a very thorough investigation,

14  including -- with students as well as faculty.

15            And the schools eventually were

16  charged with what I mentioned before that's

17  called irregular behavior, and they -- each

18  school lost their sponsor from us as a result of

19  that.  That's as big a sanction as legally we're

20  allowed to do.

21      Q.      And the sponsor note, that just

22  means the ECFMG is not taking the position that

23  they no longer meet the requirements of the

24  ECFMG?

1          A.      No.  It means their graduates are

2    no longer eligible to apply for certification.

3          Q.      Now, this whole conversation

4    started with a discussion of a trend of

5    obfuscation among Caribbean medical schools.

6    Other than what was expressed to you by Ross

7    University, what evidence of a trend of

8    obfuscation exists?

9          A.      Probably, you know, some casual

10   conversations with a variety of people that -- I

11   can't really tell you who it would be, but

12   people that have come in contact with students,

13   you know, that sort of thing.

14         Q.      I think you said "probably" there?

15         A.      Well, no, that's what it would have

16   been.

17         Q.      And when did those conversations

18   occur?

19         A.      During my tenure at Intealth.

20         Q.      And sitting here today, you're not

21   aware of any of the names of any of the

22   individuals you spoke with that would

23   corroborate that?

24         A.      No.  I mean, no, not at all.

1    Q.    And I think a moment ago -- a few

2    moments ago, you testified that you had learned

3    from others that Saba's attrition rate is higher

4    than other Caribbean medical schools; is that

5    correct?

6    A.    Yes.

7    Q.    And how much higher is Saba's

8    attrition rate than the other schools?

9                 MR. ZIBEL:  Objection to form,

10        but you can answer if you can.

11    A.    Yeah, I'm sorry, Dale, you said --

12    I don't think I listened to it carefully enough.

13    You said higher than other Caribbean schools?

14    Q.    Right.

15    A.    Yeah, I don't know if it's higher

16    than other Caribbean schools.  I know that it's

17    high.

18    Q.    And your knowledge of it being high

19    is based upon the information you've received

20    from Plaintiff's counsel in this case?

21    A.    Yes.  That would be the Donahue

22    e-mails, and then the calculations of the

23    publicly available data.

24    Q.    Anything else?

```
 1        A.      I don't think so.

 2        Q.      Okay.  And we'll get into those

 3  documents in a little bit here.

 4                Has the ECFMG ever initiated

 5  proceedings against Saba to remove its sponsor's

 6  note?

 7                     MR. ZIBEL:  Objection to form,

 8        but you can answer if you know.

 9        A.      I have no knowledge of it.

10  BY MR. EVANS:

11        Q.      And since you left the ECFMG, have

12  you learned or are you aware of any such action

13  against Saba?

14        A.      I'm not aware.

15        Q.      To your knowledge, has any

16  accreditor ever taken adverse action with

17  respect to Saba related to his attrition rate?

18        A.      I have no knowledge of that.

19        Q.      To your knowledge, has any

20  regulator taken any adverse action with respect

21  to Saba related to its attrition rate?

22        A.      I don't believe so.

23        Q.      I want to talk about paragraph 37.

24  I think I'm still sharing my screen here.  You
```

1  say, "When a Caribbean medical school with high

2  attrition rates runs a marketing campaign that

3  touts high attrition -- or, excuse me, touts

4  high USMLE passage rates but does not disclose

5  information about high attrition, it leaves out

6  critical information necessary for prospective

7  students to make an informed enrollment

8  decision."

9            What is the basis for that

10  statement?

11      A.    I think it's pretty obvious.

12  Without knowing what the denominator is, I think

13  the information is -- is not forthcoming.

14      Q.    And why is that obvious?  Is that

15  based on your experience in academics?  Is it

16  based on a survey that you conducted?

17            MR. ZIBEL:  Objection to form.

18      A.    It's based on experience.  It's

19  based on observation.  You know, if there are X

20  hundred of students admitted three times a year

21  and there are fewer students than that

22  significantly graduating then, you know,

23  there's -- there's attrition.  And I think that

24  it leaves the impression that if a student

1    enrolls here, one will get the type of education

2    and direction that will ensure a pass rate.  And

3    I think it's misleading otherwise.

4           Q.    And you haven't undertaken any

5    analysis or surveys of the factors that

6    prospective students consider when they enroll

7    in medical school, have you?

8           A.    Not a survey, but I certainly

9    talked to students.

10          Q.    When was the last time you spoke

11   with a student about this issue?

12          A.    Probably while I was still at

13   Intealth.  So it would have been sometime in '23

14   and subsequent years before that, the preceding

15   years before that.

16          Q.    Sitting here today, do you have any

17   recollection of the names of those students?

18          A.    No.  No, definitely not.

19          Q.    Have you ever reviewed any

20   literature, scholarly articles, or white papers

21   that analyze factors that students consider when

22   selecting a medical school?

23          A.    So I'm sure I have.  And I can't

24   name them, but I'm sure, you know, sitting in a,

1  you know, medical education conference that

2  information has been reported out and discussed

3  because I can tell you from my experience it's

4  in my head.  So I've heard that.  I've had

5  conversation with students as well as because

6  I've interviewed them for medical school.  And I

7  have not done a literature review in preparation

8  for this activity.

9       Q.    So you didn't review any literature

10  on this issue when preparing your expert report?

11       A.    No.  I didn't feel like I needed to

12  having had the experience and talking with so

13  many -- been involved with so many students in

14  so much different ways.

15       Q.    And those students told you that

16  attrition is necessary to be disclosed in order

17  to make an informed enrollment decision?

18       A.    It's more likely that the

19  discussion was looking at the success rate of

20  students.  You know, most students don't use the

21  term "retention" or "attrition."  It's more

22  looking to see how they would be successful, and

23  they talk about students, you know, who are able

24  to get through the program.

1          Q.      Sitting here today, can you name

2    any medical schools in the Caribbean that

3    disclosed an attrition rate?

4          A.      I'm not aware that any do.

5          Q.      Sitting here today, are you aware

6    of any U.S. medical schools that disclose an

7    attrition rate?

8          A.      I'm pretty sure that all medical

9    schools have to disclose their attrition rate to

10   the LCME.

11         Q.      And is it an attrition rate or a

12   retention rate?

13         A.      It's the -- it's the same thing.

14         Q.      And you testified earlier that

15   the -- it is calculated solely based on number

16   of students in versus number of students out?

17         A.      Basically.

18         Q.      What do you mean by "basically"?

19         A.      It means that's how you do it.  It

20   means it's a basic arithmetic calculation.

21         Q.      Now, I understand your testimony

22   that you think all schools reported to the LCME.

23   Can you name one U.S. medical school that

24   advertises an attrition rate?

William Pinsky, M.D. - 10/1/2024

Page 154

1                    MR. ZIBEL:  Objection to form.

2         You can answer the question.

3         A.    I don't know.  I haven't looked at

4   the marketing for the U.S. medical schools, or I

5   haven't for a long, long time.

6   BY MR. EVANS:

7         Q.    You're not an expert on marketing;

8   is that correct?

9         A.    For U.S. schools or marketing in

10  general?  I don't know what you're asking.

11        Q.    Yeah, we can limit it to, you know,

12  you not being an expert of marketing for

13  U.S. medical schools?

14        A.    I am not.

15        Q.    And I think it's also fair to say

16  you're not an expert on marketing of Caribbean

17  medical schools?

18        A.    I am aware of the marketing that

19  goes on.  I'm not sure I would consider myself

20  an expert.

21        Q.    Are you aware of any U.S. medical

22  schools -- I asked about advertising.  Are you

23  aware of any U.S. medical schools that publishes

24  an attrition rate?

```
 1                      MR. ZIBEL:  Objection to form.
 2        You can answer.
 3        A.    Yeah, I'm not aware of that because
 4   I haven't -- haven't looked for it.
 5   BY MR. EVANS:
 6        Q.    Do students have an obligation to
 7   search for publicly available information when
 8   deciding which medical school to enroll in?
 9                      MR. ZIBEL:  Objection to form.
10        A.    I think students should do their
11   best at due diligence to understand the
12   information of what they're considering.
13   BY MR. EVANS:
14        Q.    Would that due diligence entail
15   examining the qualifications of the staff of the
16   medical school?
17                      MR. ZIBEL:  Objection to form.
18        A.    What?
19   BY MR. EVANS:
20        Q.    Would a student's due diligence
21   obligation include evaluating the rigor of the
22   curriculum?
23                      MR. ZIBEL:  Objection to form.
24        "Obligation" is incredibly vague.
```

1          A.      Yeah, you know, I think there's a

2    lot of different factors that go into a due

3    diligence in deciding where you're going to

4    school.

5    BY MR. EVANS:

6          Q.      So maybe it will be less vague

7    to -- you know, what I'm getting at is what a

8    reasonable prospective medical student is

9    supposed to do.  And in your opinion, as someone

10   with experience in medical academics, is it

11   reasonable for a prospective medical school

12   student to inform him or herself of the

13   curriculum of a particular medical school that

14   that person is considering enrolling in?

15                    MR. ZIBEL:  I'm going to

16        object to the form of the question.

17         A.      It's reasonable that one would do

18   that.

19   BY MR. EVANS:

20         Q.      And is it reasonable to expect that

21   a student would evaluate other factors of the

22   medical school such as the quality of its

23   technology or its connections to teaching

24   hospitals?

```
 1        A.     Yes.
 2        Q.     And is it reasonable for
 3   prospective students to attempt to inform
 4   themselves of how -- you know, the outcome or
 5   the performance of former students?
 6        A.     Yes.
 7        Q.     Okay.  And based on everything we
 8   discussed today, I want to make sure I
 9   understand.  You're not aware of any requirement
10   that a school has to disclose attrition when it
11   advertises its first-time USMLE Step 1 pass
12   rate, correct?
13              MR. ZIBEL:  Objection to form.
14        A.     I'm aware that schools -- to have
15   an obligation to be forthright with their data
16   and what it means.
17   BY MR. EVANS:
18        Q.     That's not the question I asked.
19   The question I asked is:  Is there a requirement
20   that a school disclose attrition when it
21   advertises its first-time USMLE Step 1 pass
22   rate?
23              MR. ZIBEL:  Objection to form.
24        A.     I'm not sure how I can answer in
```

1  terms of what they're obligated to do as a

2  school, as to how they -- what they should be

3  obligated to be doing from a fairness

4  perspective.

5  BY MR. EVANS:

6       Q.    And to be clear, I'm not looking

7  for a legal opinion.  I understand you're not a

8  lawyer.  At the same time, I'm not looking for a

9  fairness evaluation.  What I'm exploring is your

10 personal knowledge of any regulation governing

11 the disclosure of USMLE pass rates vis-a-vis

12 attrition.

13                MR. ZIBEL:  Objection to form

14      of the question.

15      A.    I'm not aware of it.

16 BY MR. EVANS:

17      Q.    Is it your position that a medical

18 school is supposed to disclose attrition rates

19 alongside first-time USMLE Step 1 pass rates

20 when its attrition rates are considered high?

21                MR. ZIBEL:  Objection to form.

22      A.    So just like the last question,

23 from a fairness perspective, they should.

24 BY MR. EVANS:

1      Q.      And we discussed earlier that you

2    consider a high attrition rate anything over 10

3    percent?

4      A.      Yeah, 10 percent would be generous.

5      Q.      And this is based on your -- well,

6    let me explain to you my understanding of your

7    earlier testimony because I don't want to ask

8    the same questions.  I just want to make sure I

9    understand, but your opinion that 10 percent

10   being a generous attrition rate, that's not

11   based on any published guidelines or written

12   papers.  That's based on your experience?

13                    MR. ZIBEL:  Objection to the

14        extent it's asked and answered.

15     A.      Based on my experience, you know, I

16   think that, you know, 10 percent is -- is

17   accept -- is maybe acceptable.  It should be in

18   single digits and lower, but -- I also

19   understand that sometimes there are things that

20   can't be controlled, but it's all based on my

21   experience.

22     Q.      And what are some of the factors

23   that a school is unable to control with respect

24   to its attrition rate?

1                    MR. ZIBEL:  Objection to form.

2        A.      Personal relations of a student;

3    potentially environmental factors, although

4    schools can control that to some degree;

5    financial situation of the student, although,

6    again, the schools can impact that sometimes as

7    well.  Those are some of the ones that come to

8    mind.

9    BY MR. EVANS:

10       Q.      To your knowledge, are there

11   other -- are they any other Caribbean medical

12   schools with an attrition rate above 10 percent?

13                    MR. ZIBEL:  Objection to form.

14       I think asked and answered as well.

15       A.      All right.  As I said earlier, the

16   schools obfuscate the data, and so there's not

17   someplace you can go to -- to reference a

18   number.  Because of seeing transcripts and

19   individuals who come to ECFMG in a variety of

20   different ways, it seems like there are schools

21   with high attrition rates.

22   BY MR. EVANS:

23       Q.      Are you aware of any Caribbean

24   medical schools that have attrition rates above

```
 1   10 percent?
 2                    MR. ZIBEL:  Objection to form.
 3        Asked and answered.
 4        A.    Yeah, I'm not going to say anything
 5   different from what I said, and that's that the
 6   data is obfuscated throughout the Caribbean.
 7   And what I'm aware of is -- is inferring from
 8   experience and dealing with students and seeing
 9   what has transpired.
10   BY MR. EVANS:
11        Q.    I want to go back to the use of the
12   word "obfuscates" because the example you
13   provided me was that Ross very openly told you
14   that it doesn't publish the data because other
15   schools don't, but what are schools doing to
16   obfuscate the data?
17                    It just sounds -- it just seems to
18   me that schools aren't publishing it because
19   they're not required to.
20                    MR. ZIBEL:  Objection to form.
21        A.    So I would draw -- I would draw a
22   different conclusion.  I would say they're not
23   publishing it because they don't want it to be
24   known and they're more concerned about
```

1  attracting students in and competing with the

2  other schools.

3  BY MR. EVANS:

4      Q.    And why would you say that?

5      A.    Just it's the sense that I have of

6  it, and otherwise, they'd be publishing the

7  data.  If the attrition rates were positive and

8  the students wouldn't be discouraged from going

9  to that school because there would be a

10  higher -- a relatively high chance that they

11  would be spending money, not getting screwed,

12  then they would publish the data.

13      Q.    Why wouldn't U.S. medical schools

14  publish the data?

15      A.    Because they don't need to because

16  it's known that the U.S. schools have a very low

17  attrition rate.  And I believe that -- I

18  believe, you know, that's all part of their

19  accreditation standards and their responsibility

20  to the students.

21      Q.    So Caribbean medical schools should

22  publish their attrition rates for sakes of --

23  for the sake of transparency, but U.S. medical

24  schools don't have to because you believe they

```
 1   have low attrition rates?
 2                   MR. ZIBEL:  Objection to the
 3        form of the question.  Was that actually a
 4        question?
 5                   MR. EVANS:  It was.
 6        A.    You know, the U.S. medical schools,
 7   I don't believe, really see themselves competing
 8   with other U.S. medical schools.  I think -- I
 9   believe they really just represent what they
10   have to offer and attract the type of student
11   that they want to have, and so they're not
12   concerned whether their attrition rate is 2
13   percent and somebody else's is 3 percent or 1
14   percent.
15        Q.    Isn't it also possible that
16   Caribbean medical schools don't publish
17   attrition rates because there isn't a
18   well-defined standard for how it would be
19   calculated, therefore, rendering it subject to
20   manipulation?
21                   MR. ZIBEL:  Objection to form.
22        A.    It's a simple calculation.
23   BY MR. EVANS:
24        Q.    But sitting here today, you can't
```

1  point to any organization that defines precisely

2  how it should be calculated?

3       A.    Because it's a known factor.  It's

4  not something that one publishes.

5       Q.    You're familiar with the U.S.

6  one-time completion rate, correct?

7       A.    You got distorted there for a

8  second.

9                 MR. ZIBEL:  There is some

10       feedback coming through.  I'm not sure

11       why.

12       (Off-record conference)

13  BY MR. EVANS:

14       Q.    Dr. Pinsky, you said that there's

15  no standard definition of attrition because it's

16  so well known.  Is that the gist of your

17  testimony?

18       A.    Yes.  I think it's somewhat

19  disingenuous to think that it's a difficult

20  calculation.

21       Q.    Does it include -- does the

22  attrition rate include students who voluntarily

23  withdraw?

24       A.    Yes.

1      Q.      Does it include students who are
2  dismissed for nonacademic reasons?
3      A.      Yes.
4      Q.      Does it include students that
5  transfer to other medical universities?
6      A.      Yes.
7      Q.      Does it include students who fail
8  to advance in a particular semester and,
9  therefore, do not graduate at the same time with
10  their cohort?
11      A.      Yes.
12      Q.      Okay.  You very emphatically
13  answered that series of questions.  What
14  authority supports the inclusion of those
15  variables in the calculation of attrition?
16      A.      You know, frankly, it's an accepted
17  way to calculate it.  And then one looks at the
18  numbers and says, Our attrition rate is X
19  percent.  Of that X percent, Y percent have
20  transferred because they no longer wanted to be
21  a doctor.  Z percent transferred for another
22  reason and another reason and another reason,
23  but there -- you start off with the numbers, and
24  then you can break it down for the reasons of

1   it.

2        Q.     And is there an accreditor or a

3   regulator that specifies that this type of

4   information is supposed to be provided in that

5   fashion?

6        A.     I'm not sure, but it would be

7   standard operating procedure if that's what one

8   would do.

9        Q.     Whose standard operating procedure?

10       A.     The world.  I mean, I -- you know,

11  it's a simple calculation.  And I think that if

12  the intent is to justify a 50 percent attrition

13  rate based on not calculating it properly, I

14  think that's not a good road to go down.

15       Q.     You're aware that the U.S.

16  Department of Education requires medical

17  universities to receive Title IV funding to

18  report an on-time U.S. completion rate?

19       A.     Yes.

20       Q.     Are you aware that that particular

21  metric has a well defined and descriptive method

22  for calculating that figure?

23       A.     I'm not sure I do.  I may have seen

24  it.

1      Q.      And the reason I'm mentioning that

2  is because there's no corresponding metric for

3  calculating attrition for U.S. medical -- or

4  Caribbean medical schools, correct?

5      A.      I'm not aware of a published

6  criteria -- a published number for it.

7      Q.      Okay.  Going back to paragraph 37,

8  fourth line or so, you say, "For example,

9  prospective students reading an advertisement

10  stating that a school has a 99 percent USMLE

11  Step 1 passage rate will likely believe that the

12  advertising institution will provide a quality

13  medical education that will position them to

14  succeed on the Step 1 exam, and ultimately, to

15  match into a U.S. residency program.  Such

16  prospective students would have reason to think

17  otherwise; however, if they were told that over

18  half the students who enroll do not continue

19  beyond their second year in the program."

20            Obviously, you'll agree that in

21  every medical school some students do not

22  complete the first two years of the medical

23  program?

24      A.      Yes.

1      Q.      And we've discussed the variety of

2  reason why students maybe leave the program, for

3  example, personal, family, financial,

4  nonacademic reasons?

5      A.      Correct.

6      Q.      In your statement in paragraph 37,

7  you refer to students being told that over half

8  the students who enroll do not continue.  Why do

9  you use "half" in that statement?

10      A.      Because of the information that I

11  was provided from, I believe, the Donahue

12  e-mails as well as the calculations of the

13  publicly available information.

14      Q.      And so you believe that Saba has a

15  15 -- a 50 percent attrition rate?

16      A.      I believe that they have had that.

17      Q.      In what years did they have a 50

18  percent attrition rate?

19      A.      I'd have to go back and look at the

20  chart.  I don't recall right now.

21      Q.      You would agree that attrition rate

22  tends to fluctuate over time?

23      A.      In small ways.

24      Q.      What do you mean "in small ways"?

```
 1        A.      Small percentage.
 2        Q.      Do you know what variables and data
 3   were used to arrive at this alleged 50 percent
 4   attrition rate?
 5        A.      I do not.
 6                   MR. ZIBEL:  Objection to form.
 7        A.      I do not.
 8   BY MR. EVANS:
 9        Q.      So I'm going to get to some of the
10   documents regarding the attrition rate.  If the
11   standards for becoming a doctor are the same for
12   students from both U.S. and Caribbean medical
13   schools, shouldn't a lower percentage of medical
14   students from Caribbean medical schools meet the
15   standards if Caribbean medical schools attract
16   lower qualified students than U.S. medical
17   schools?
18                   MR. ZIBEL:  Objection to form.
19        A.      You're going to have to repeat
20   that, Dale, because I think I know what you
21   meant, but I'm not sure.
22   BY MR. EVANS:
23        Q.      So would you -- you would agree
24   that Caribbean medical schools attract lower
```

1    qualified students than U.S. medical schools?

2         A.    I would believe that the metrics

3    associated with students are lower.  I hesitate

4    to call somebody a -- lower qualified.  That's

5    an implication of a person as an individual,

6    but --

7         Q.    Sure, and that's fair.  That's

8    fair.  So to recast it in your -- in accordance

9    with what you just said, would you agree that

10   Caribbean medical schools attract students with

11   lower --

12        A.    Credentials.

13        Q.    -- credentials than U.S. medical

14   schools?

15        A.    Yes.

16        Q.    And if the standards for becoming a

17   doctor are the same for both U.S. and Caribbean

18   medical schools, then shouldn't a significantly

19   lower percentage of medical students from

20   Caribbean medical schools meet those standards?

21             MR. ZIBEL:  Objection to form,

22        but you can answer if you can.

23        A.    So that's an interesting question.

24   So the answer could be "yes and."  And the "and"

1  part is that if the students were admitted with

2  lower qualifications and their expectation with

3  their lower qualifications, that the school was

4  going to give them the type of education and

5  support that they would be successful, then one

6  would not expect that they would perform less

7  well and have a higher attrition.

8           So the goal to be -- if a school is

9  going to accept students who have not

10  demonstrated the same qualifications -- or I

11  shouldn't say "the same" -- comparable

12  qualifications, then the expectation should be

13  that they still can be successful by giving them

14  the opportunity and everything that goes with

15  that opportunity.

16     Q.    Do you think it's improper for a

17  Caribbean medical school to have a higher

18  attrition rate than a U.S. medical school?

19     A.    I think it's improper to have a

20  high attrition rate.  I think the medical --

21  U.S. medical schools is one benchmark to look

22  at.  And I think that, you know, within a

23  standard error of deviation, the schools should

24  be close to that.  I'm not in a position to say

1  exactly what should be or in a situation of,

2  number one, saying what it shouldn't be, which

3  is very high, but number two, really what's

4  important is the disclosure of that so the

5  students can have the proper expectation.

6          Q.      When you say, you know, "one

7  standard area of -- error of deviation," is

8  there a number you had in mind there?

9          A.      No.  I mean, it depends on how, you

10  know, a standard error measurement is

11  calculated.  So it depends on the volumes and

12  the percents that go in there, but it implies

13  something close to that, not necessarily exactly

14  that.

15          But, once again, the issue is -- is

16  whatever the attrition rate is, if it's not, you

17  know, immediately thought to be, you know,

18  something that is very positive for the

19  students, then students who are entering in

20  should know what the risk is.  And if the

21  attrition rate is higher than other situations,

22  they should know they're taking a risk on that

23  and what might happen.

24          To me, it's about misleading the

```
 1  students as much as what it is, when it is.
 2  They both go together.
 3       Q.    I want to look at -- I'm going to
 4  share with you Defendants' Exhibit 39.
 5       (Exhibit 39, Saba Database, Bates Stamp
 6       R3S00022350, marked for identification)
 7  BY MR. EVANS:
 8       Q.    I'm showing you what's been marked
 9  as Defendants' Exhibit 39.  It has been Bates
10  numbered R3S00022350.  In your declaration,
11  Dr. Pinsky, but not your report, you list this
12  spreadsheet produced by the defendants in your
13  materials reviewed attachment.  Do you recall
14  that?
15       A.    I recall that it was there, yes.
16       Q.    What is this document?
17       A.    Can you make it bigger for me?
18       Q.    Yeah, sure.  I'll scroll to the
19  left, but I can scroll --
20       A.    Yeah, can I see the top of it,
21  though, too?
22                 MR. ZIBEL:  And I just want to
23       object.  Objection to the form of the
24       question.
```

1      A.      It looks like it's a database in

2  terms of students in the first semester during

3  various terms.

4  BY MR. EVANS:

5      Q.      And do you know the purpose for

6  which this document was created?

7      A.      I do not.

8                  MR. ZIBEL:  Objection to form.

9      A.      I do not.

10 BY MR. EVANS:

11     Q.      You cited this in your declaration,

12 correct?

13     A.      Yes.

14     Q.      And how did this document factor in

15 to your opinion in your declaration?

16     A.      Can you see the rest of the

17 document?

18     Q.      Yeah, absolutely.

19                  MR. ZIBEL:  Dale, can you

20          point to Dr. Pinsky where he references

21          this in his declaration or is he supposed

22          to just remember?

23                  THE WITNESS:  Yeah, that would

24          be helpful because I'm having a memory

1          problem here.

2                    MR. EVANS:  All right.  I'm

3          getting everything loaded up here.

4    BY MR. EVANS:

5          Q.    This is the last page of your

6    declaration, which we've marked as Defendants'

7    Exhibit 37.  And the final bullet point refers

8    to this document number and states, "Chart

9    showing Saba's enrollment and attrition rates

10   from spring 2018 through spring 2021."

11                   MR. ZIBEL:  Can you repeat the

12         pending question then?

13                   MR. EVANS:  I believe the

14         pending question was, do you know the

15         purpose for which this statement was made?

16                   MR. ZIBEL:  I'm going to

17         object to the question on the grounds

18         that -- I guess what do you mean by

19         "factor into," I guess is the question I

20         would have.  If you could clarify that,

21         that may help us a lot.

22                   MR. EVANS:  Sure.

23   BY MR. EVANS:

24         Q.    You listed this spreadsheet as the

```
 1  documents that you reviewed.  And so I'm asking
 2  you, how did this spreadsheet factor in to your
 3  opinion in the declaration?
 4        A.      Frankly, sitting here today and
 5  seeing the document, I don't actually recall
 6  specifically how that one document factored in
 7  to it.
 8        Q.      And you didn't cite that document,
 9  the document being the spreadsheet that's Bates
10  numbered with the ending five numerals, 22350.
11  You didn't cite that document in your report
12  even though it was cited in your declaration.
13  Do you know why?
14              MR. ZIBEL:  Objection to form.
15        A.      No.  In fact, that's why I can't
16  remember even right now how it factored in.
17  BY MR. EVANS:
18        Q.      Okay.
19              MR. ZIBEL:  For the sake of
20        the record, the document is not cited in
21        the declaration itself, but it is used --
22        it's listed as a document that is reviewed
23        and relied upon.
24  BY MR. EVANS:
```

1      Q.     I'm going to share 37 again.  This
2  is paragraph 21.  And the final sentence says,
3  "For instance, based on representations made to
4  me by Plaintiff's counsel, the attrition rate of
5  students that matriculated at Saba from spring
6  2018 to fall 2019 appears to have been 51.75
7  percent."
8            Did that spreadsheet that we were
9  just looking at -- was that part of the
10  representations that were made to you by counsel
11  in arriving at that number?
12     A.     I don't believe so.  I think that
13  was another --
14              MR. ZIBEL:  Objection to form.
15     A.     -- that was another document.
16  BY MR. EVANS:
17     Q.     And what was the other document?
18     A.     It was the one that had public
19  information, available information, that showed
20  the attrition rate over several years year by
21  year, not by semester by semester.
22     Q.     And if we go back to your materials
23  reviewed, which one -- what document is the one
24  you just referenced?

William Pinsky, M.D. - 10/1/2024

```
 1        A.     As I recall -- because I don't have
 2   the documents in front of me, as if I recall, it
 3   was a chart that was embedded, I think, in the
 4   Complaint, if I'm remembering the correct
 5   document.
 6        Q.     But sitting here right now, you
 7   don't recall specifically which one it was?
 8        A.     No, I really don't.
 9               MR. EVANS:  Okay.  We've been
10          going for a little over an hour here.  Why
11          don't we take a five-minute break?
12               THE VIDEOGRAPHER:  Okay.  The
13          time is 2:43 p.m., and we're going off the
14          record.
15          (A recess was taken)
16               THE VIDEOGRAPHER:  The time is
17          2:52 p.m., and we are back on the record.
18   BY MR. EVANS:
19        Q.     Dr. Pinsky, I'm going to share with
20   you what we've marked as Defendants' Exhibit 40.
21          (Exhibit 40, Class Action Complaint,
22          marked for identification)
23   BY MR. EVANS:
24        Q.     Give me just a second here.
```

```
 1              MR. ZIBEL:  Dale, I think
 2    Dr. Pinsky just wants to jump in one
 3    second just to clarify his answer, which
 4    he mentioned to me in the break, if that's
 5    all right.
 6              THE WITNESS:  Yeah, I'm not
 7    sure where you're going to with the
 8    next --
 9              MR. EVANS:  Okay.
10              THE WITNESS:  -- thing, but I
11    think that when I was talking about the
12    information or the chart that was in the
13    Complaint, I was reminded that that was
14    the percentage taking the USMLE exam.  And
15    from that, in addition to other
16    calculations that Plaintiff's attorneys
17    provided to me, may be inference in terms
18    of what that meant from an attrition rate.
19              The problem is that since the
20    numbers are not forthcoming and
21    transparent, you know, one has to be able
22    to infer from other numbers that are
23    available.  And frankly, I'd suggest if
24    the numbers were available actually in
```

```
 1          terms of numerators and denominators, it
 2          would be more definitive in terms of the
 3          numbers, but I would stand by the
 4          inference that this -- that's what the
 5          rate appears to be.
 6  BY MR. EVANS:
 7          Q.     And you spoke with your attorney
 8  before revising your answer just now?
 9          A.     The attorney reminded me what I was
10  looking at was the USMLE rating.  Again, I don't
11  have the documents in front of me, so I didn't
12  quite remember what it was.
13          Q.     Okay.  Let's take that testimony
14  one by one here.  I'm going to share Defendants'
15  Exhibit 40.  We'll start with that I'm showing
16  you what we've marked as Defendants' Exhibit 40.
17  That's the Complaint filed in this action.  Is
18  this the Complaint that you were referring to?
19          A.     Yes, I believe so.  Can you make it
20  just a little bit bigger, not a lot but just a
21  little?
22          Q.     Sure, yeah.  And actually, I'm
23  going to skip ahead to a particular paragraph,
24  and then I'll zoom in.
```

1            So I'm showing you paragraph 79,

2    which alleges, "According to data produced to

3    undersigned counsel by the Department of

4    Education pursuant to the Freedom of Information

5    Act, since 2015, the following number of

6    students have sat for the USMLE Step 1 exam per

7    year."

8            And there's a chart listing

9    students -- Saba students sitting for the USMLE

10   exam and percentage of Saba students taking the

11   USMLE Step 1 assuming 270 students enroll per

12   year, and chart goes from 2015 to 2021.  Do you

13   see that?

14        A.    Yes.

15        Q.    Is this the chart that you were

16   referring to a minute ago?

17        A.    Yes.  That was what I was trying to

18   clarify.  I had confused it with something else.

19        Q.    And have you personally reviewed

20   the data received from the Department of

21   Education underlying this chart?

22        A.    I have not.

23        Q.    Did you do any of the calculation

24   rendering these percentages here?

1          A.      I did not.

2          Q.      Okay.  And then you also mentioned

3    that you inferred an attrition rate based upon

4    this chart as well as other information received

5    from counsel; is that correct?

6          A.      Yes.

7          Q.      And what was the other information

8    received from counsel?

9                          MR. ZIBEL:  Objection.  I

10         think that misstates his testimony, but

11         you can answer.

12         A.      Just, you know, further

13   calculations in terms of what this meant overall

14   in terms of attrition rate.

15   BY MR. EVANS:

16         Q.      I'm sorry, could you repeat that?

17         A.      This -- inferring from this data

18   versus the total number of students and how that

19   would calculate to an attrition rate.  The

20   issue, you know, to resolve this is the data is

21   just not available, and so that's why there have

22   been inferences to this.

23         Q.      In this chart, in the far right

24   column, it assumes that 270 students enroll in

```
 1   Saba per year.  Have you done anything to verify
 2   whether 270 students actually enrolled in Saba
 3   in the years 2015 through 2021?
 4                     MR. ZIBEL:  Objection.  Asked
 5        and answered.
 6        A.    I have not directly.
 7   BY MR. EVANS:
 8        Q.    Can you describe any other
 9   information you received from counsel that help
10   draw your inference of a 50 percent attrition
11   rate at Saba?
12        A.    No.
13        Q.    Can you describe any conversations
14   in which you were advised that the attrition
15   rate was 50 percent?
16                     MR. ZIBEL:  Other than what he
17        says in paragraph 21 of the declaration?
18                     MR. EVANS:  Yes.
19        A.    No.
20   BY MR. EVANS:
21        Q.    Did you do anything other than read
22   this chart?
23                     MR. ZIBEL:  Objection.
24        Misstates prior testimony and the
```

 1      declaration.

 2      A.      What do you mean "do anything

 3 other"?

 4 BY MR. EVANS:

 5      Q.      To ascertain the attrition rate of

 6 Saba.

 7      A.      No.

 8      Q.      And it sounds to me that you're not

 9 even sure of the attrition rate at Saba because

10 you haven't received enough information to

11 calculate it; is that correct?

12                   MR. ZIBEL:  Objection to form

13      of the question.  It misstates his prior

14      testimony and his declaration.

15      A.      I'm inferring the attrition rate by

16 the means that we have because Saba does not

17 produce the numbers.

18 BY MR. EVANS:

19      Q.      What were the means -- you said,

20 "I'm inferring the attrition rate by the means

21 that we have."  What do you mean when you say

22 "means that we have"?

23      A.      I think I already answered that as

24 well, which is this chart and the further

```
 1   discussion with counsel.
 2        Q.     And what were those further
 3   discussions with counsel?
 4                     MR. ZIBEL:  Objection to form
 5             of the question.  Again, you're asking him
 6             to say more than what's already in page --
 7             I'm sorry, paragraph 21 of the Complaint.
 8             And if so, I'm going to instruct him not
 9             to answer on the basis of it's not
10             discoverable.
11                     MR. EVANS:  Are you talking
12             about --
13                     MR. ZIBEL:  I'm just confused
14             as to what you're asking, Dale.
15                     MR. EVANS:  You're saying that
16             he can't testify beyond paragraph 21 of
17             which document?
18                     MR. ZIBEL:  The declaration,
19             I'm sorry.  If I said Complaint, I
20             apologize.
21                     MR. EVANS:  Hang on.  I'm
22             going to paragraph 21.
23                     MR. McMORROW:  Dan, just to be
24             clear, you're instructing the witness not
```

```
 1   to answer?
 2             MR. ZIBEL:  Well, I'm trying
 3   to understand the question.
 4             MR. McMORROW:  Well, what's
 5   the basis for your instruction not to
 6   answer?  Is it a privilege?
 7             MR. ZIBEL:  That it's not
 8   discoverable under Rule 26, yes.  You can
 9   ask --
10             MR. McMORROW:  No, I'm talking
11   about what he testified about in his
12   declaration isn't discoverable?
13             MR. ZIBEL:  Well, I'm trying
14   to understand the question itself.
15             MR. EVANS:  So I think I can
16   clarify here.  So paragraph 21 says,
17   "Based on representations made to me by
18   Plaintiff's counsel, the attrition rate
19   for students that matriculated at Saba
20   from spring '18 through fall 2019 appears
21   to have been 51.75 percent."  I think
22   we're entitled to know what
23   representations were made that support
24   that statement.  I don't think that's
```

```
 1            protected by any privilege.  This is

 2            information what was supplied to

 3            Dr. Pinsky in the formulation of his

 4            opinion.

 5                      MR. ZIBEL:  And I think that's

 6            fine if you want to ask him what

 7            representations were made that the

 8            attrition rate was 51.75 percent.  I think

 9            that's a fair question.

10                      MR. EVANS:  Okay.  Perfect.  I

11            think we're in agreement then.

12   BY MR. EVANS:

13        Q.     So, Dr. Pinsky, what

14   representations were made to you that the

15   attrition rate was 51.75 percent?

16        A.     I was given information that based

17   on calculations from available data, that's what

18   the number was.

19        Q.     And did Plaintiff's counsel provide

20   you with the calculations they made from the

21   available data?

22        A.     I don't believe I saw the actual

23   calculations.

24        Q.     Did you see the data from which
```

1  they made those calculations?

2       A.    The right now data?

3       Q.    Yes.

4       A.    I don't believe so.

5       Q.    Does the University of Queensland

6  Ochsner advertise his first-time USMLE Step 1

7  pass rates?

8       A.    You know, I'm not really sure.

9  Again, I haven't been involved for a number of

10  years, so I'm not really sure.

11       Q.    Just to go back to the attrition

12  calculation, you mentioned you didn't see the

13  calculations of counsel of the underlying data.

14  So I think it's fair to assume that you accepted

15  their calculations as true and accurate?

16       A.    Yes.

17       Q.    And going back to the question

18  about UQ Ochsner, I understand you haven't been

19  there in a while, so this follow-up question

20  relates specifically to your time at the

21  university.  Do you recall UQ Ochsner

22  advertising it's Step 1 pass rates?

23       A.    I recall that we had that in our

24  information packets and were very clear as to

William Pinsky, M.D. - 10/1/2024

Page 189

1  what that meant, which was basically what I was

2  talking about before, was the number of students

3  that were there, the number of students that

4  took an exam, the number of students that

5  graduated, the number of students who acquired a

6  residency position.

7          The only thing that's a little bit

8  different is that in each class, almost every

9  class, as I can recall, there was a couple

10  students that met somebody while they were in

11  Australia and decided to stay in Australia as

12  opposed to coming back.  That was a factor I had

13  overlooked when designing the program of what

14  might happen, but -- and so I -- I'm -- I can't

15  recall how that went into the calculations.

16          Because they all did internships or

17  residencies, even if they stayed in Australia,

18  that was probably included in the number, but I

19  don't quite recall.

20     Q.     And did the University of

21  Queensland Ochsner advertise its first-time

22  USMLE Step 1 pass rates?

23               MR. ZIBEL:  Objection.  Asked

24        and answered.

1                    MR. EVANS:  If I did, I

2        apologize.  But I think we were just

3        talking about attrition rates, so I want

4        to make sure that we covered Step 1 pass

5        rates, too.

6        A.    Yeah, I -- you know, I can't quite

7    remember.  I know we had in-depth conversations

8    with students about preparation for the exams

9    and the resources available and talked about the

10   success rate.  I can't remember if we said

11   first-time pass rate or not.  I just don't

12   recall.  Whatever it was, I know that we were

13   clear of what the numbers represented when I was

14   there.

15   BY MR. EVANS:

16       Q.    Do you recall, during your time at

17   UQ Ochsner, did the university advertise its

18   attrition rate alongside its Step 1 pass rates?

19       A.    So the promotional that came out

20   for the program was joint.  There was really --

21   you know, it was only a combined effort.  It

22   wasn't that UQ advertised and Ochsner

23   advertised.  It was UQ Ochsner that would do

24   promotional material.

1        Q.       Right, but no -- and I understand

2   that.   I appreciate the clarification, but what

3   I'm getting at is when UQ Ochsner, the program,

4   the joint program, when it would disclose

5   information about the USMLE Step 1, would it

6   include within those disclosures information

7   about its attrition rates?

8        A.       I can't say it was at the same time

9   or with it.   I know that was information that we

10  provided to prospective students.

11       Q.       And earlier, I think you mentioned

12  an information packet containing attrition

13  rates.   What other -- is that the only method by

14  which attrition rate information would be

15  conveyed?

16                 MR. ZIBEL:   Objection to form.

17       You can answer.

18       A.       Yeah, I really don't recall, Dale.

19  I -- you know, there was information on website.

20  There was information that was directed to

21  individuals who inquired.   There was information

22  that went to premed advisors, you know, a

23  variety of different things.

24       Q.       I'm going to share Exhibit 41.

```
 1          (Exhibit 41, The University Match Rates
 2          and Locations, marked for identification)
 3  BY MR. EVANS:
 4          Q.    While I'm getting that up on the
 5  screen, how did Ochsner provide this information
 6  to its prospective students?  Was it something
 7  published online?  Was it sent via e-mail?
 8                    MR. ZIBEL:  Objection to the
 9          form of the question.
10          A.    Oh, I think all of the above.
11  BY MR. EVANS:
12          Q.    Okay.  Showing you what we've
13  marked as Defendants' Exhibit 41, this is a
14  printout from the University of Queensland
15  website discussing match rates and locations.
16  Do you recognize this web page, Dr. Pinsky?
17          A.    I recognize the page, but not the
18  numbers.  I really haven't looked at it for
19  quite a while.
20          Q.    Sure.  And this contains -- I'll
21  represent to you and I'll show you that this
22  contains match rates and locations from 2024 to
23  2018.
24          A.    Okay.
```

William Pinsky, M.D. - 10/1/2024

```
 1          Q.      If you'll see at the top here, this
 2   is 2024.   If we go a few pages down, we get to
 3   2023, 2022, 2021, and it goes all the way down
 4   to 2018.
 5          A.      Okay.
 6          Q.      The second paragraph of this web
 7   page says, "Our 2023 class secured a match rate
 8   of 99 percent - testament to the quality of
 9   students entering our program as well as the
10   curriculum taught by our faculty in both
11   Queensland and Louisiana."
12               So would you agree with me here
13   that UQ Ochsner is telling prospective students
14   that a high residency match rate is a result of
15   the high quality of the university?
16                    MR. ZIBEL:   Objection to form.
17          A.      Yes.
18   BY MR. EVANS:
19          Q.      And we can scroll through this
20   document, but I have not been available to
21   identify any instance in which UQ Ochsner listed
22   an attrition rate in connection with its
23   advertising of its 99 percent match rate.
24                    Are you aware of any disclosure in
```

FARMER ARSENAULT BROCK LLC

1  the attrition rate in conjunction with a -- the

2  residency match rate at UQ?

3            MR. ZIBEL:  Objection to form.

4       A.    I'm aware that when I was there,

5  that we were very public with attrition rate.

6  How it's conveyed and when it's conveyed and to

7  whom it's conveyed, I don't know and I cannot go

8  to -- anywhere to find that information about

9  Saba.  And I think trying to draw comparison to

10 the open, honest communication that comes out of

11 this program -- I find it very interesting.

12 BY MR. EVANS:

13      Q.    So based on the opinions of your

14 report, you believe that students are unable to

15 evaluate an advertising of Saba that advertises

16 a 99 percent Step 1 pass rate because it doesn't

17 disclose an attrition rate.  However, here we

18 have an advertisement from UQ Ochsner

19 advertising a 99 match rate, but it's your

20 position that students don't know Ochsner's

21 attrition rate in conjunction with this

22 advertisement in order to make a fully informed

23 enrollment decision?

24            MR. ZIBEL:  Objection to form.

```
 1        Misstates his prior testimony.
 2        A.     It has nothing to do with attrition
 3   rate.  And I'm not sure why the attrition rate
 4   keeps coming up in the context of the match.
 5   The issue is when it says 99 percent match rate,
 6   that means of the students who graduated, 99
 7   percent matched.
 8             And there are other forms to see
 9   how many students that have not made it that far
10   to graduate.  And again, I'm only going on the
11   data of when I was there, and I know that the
12   numbers were entirely transparent as to what was
13   occurring.
14   BY MR. EVANS:
15        Q.     So this advertisement is not
16   misleading because prospective UQ Ochsner
17   students can go to other locations to find
18   information about attrition rates at UQ Ochsner;
19   is that true?  Is that what I'm hearing?
20                  MR. ZIBEL:  Objection to form.
21        Misstates his testimony.
22        A.     They can have other conversations
23   with people and go to other places to find out
24   how many students started, how many students
```

1  finished, and how many graduated residency and

2  got residency positions.

3  BY MR. EVANS:

4       Q.    And you're familiar that

5  prospective Saba students can get information

6  about Saba's U.S. on-time completion rate online

7  as well?

8                 MR. ZIBEL:  Objection to form.

9       A.    USLME -- say that again.  USLME

10  on-time completion?

11  BY MR. EVANS:

12       Q.    No, no, it's -- you're aware that

13  the U.S. Department of Education requires Saba

14  to report its on-time U.S. completion rate,

15  correct?

16       A.    Yes.

17       Q.    Are you aware that the United

18  States Department of Education then publishes

19  that information it receives from Saba online?

20  Correct?

21       A.    Yes.

22       Q.    Okay.  I want to go back to the

23  report.  Dr. Pinsky, how are you doing?  Would

24  you like another break?  I've probably got

William Pinsky, M.D. - 10/1/2024

```
 1   another 30 minutes or so, but I'm happy to take
 2   a break or we can try to get through it?
 3        A.    I'd rather just push on.
 4                   MR. EVANS:  Okay.
 5                   MR. ZIBEL:  That's fine with
 6        me.
 7   BY MR. EVANS:
 8        Q.    Dr. Pinsky, I would like to talk
 9   about paragraph 39 of your report.  You say, "A
10   partial medical education, specifically from a
11   Caribbean school, has little to no economic
12   value by itself."
13                   What is the basis for this
14   statement?
15        A.    It's based on the fact that it
16   doesn't give any type of qualifications by
17   itself to -- for employment, in particular,
18   high-value employment.
19        Q.    So your position is that if a
20   student takes all two years of basic sciences,
21   but fails the final course, then the two years
22   of instruction and training that the student
23   received has little or no economic value?
24                   MR. ZIBEL:  Objection to form.
```

1          A.     That's my impression.

2   BY MR. EVANS:

3          Q.     And what is this impression based

4   on?

5          A.     You know, without sounding

6   redundant, 40 years in academics, counseling

7   students professionally, including students that

8   decided to not go through the medical education

9   or decided to go ahead or not, what the

10  opportunities are.  I think that two years by

11  itself does not qualify anybody for anything in

12  particular.

13         Q.     Wouldn't two years of basic

14  sciences and education at a medical school --

15  medical school have some value in an MD-adjacent

16  occupation?

17                MR. ZIBEL:  Objection to form.

18         A.     What's an "adjacent MD occupation"?

19  BY MR. EVANS:

20         Q.     Sure.  So I'm referring to

21  something like a physician assistant or a nurse

22  practitioner or some other medical profession

23  that doesn't require an MD, but does require

24  advanced medical training.

William Pinsky, M.D. - 10/1/2024

1      A.      Yeah, so the receiving school -- so

2  one would have to go on to further education to

3  qualify for one of those positions, and it would

4  depend on the receiving school to accept the

5  credits earned through the prior education.  And

6  particularly, if that individual did not

7  progress because they had academic issues, then

8  I think it would be more difficult to have --

9  than it would be.  It is more difficult to have

10  those credits accepted.

11      Q.      So setting aside the issue of

12  transfer, which we will get to, but wouldn't

13  just having the foundational knowledge of two

14  years of basic sciences be useful in another

15  medical plan of study or course of study?

16                  MR. ZIBEL:  Objection to form.

17      A.      It may have some personal value.  I

18  don't think it has an economic value because,

19  once again, to pursue another degree that would

20  lead to a profession would require another

21  school accepting those transfer credits.

22  BY MR. EVANS:

23      Q.      Are you aware of what the plaintiff

24  has pursued academically following her dismissal

1    from Saba University?

2         A.    No.

3         Q.    She graduated from a bachelor of

4    biology program at UCF, and she testified at her

5    deposition that she plans to enroll in an

6    anesthesiologist assistance program.  And she

7    testified at her deposition that some of the

8    courses she took at Saba were similar to those

9    in the biology program at UCF.

10              Wouldn't her experience in taking

11   and passing those courses in medical school add

12   value to her if she completed her biology

13   program and moves on to the anesthesiologist

14   assistance program?

15                  MR. ZIBEL:  Objection to form.

16        A.    It could have some value.  I think

17   it could add value to her personally.  I'm not

18   sure there's an economic value to it.

19   BY MR. EVANS:

20        Q.    And when you refer to economic

21   value here, did you undertake any sort of

22   economic analysis of the value of education?

23        A.    I did not.  I'm saying that in

24   terms of being applied those credits to a

1  profession where somebody would be employed for
2  that.
3      Q.    Did you utilize any models to
4  measure the plaintiff's return to education?
5                  MR. ZIBEL:  Objection to form,
6      but you can answer.
7      A.    No, because I really didn't know
8  what she did afterwards.
9  BY MR. EVANS:
10     Q.    And I assume you didn't run any
11 models as to any particular class member
12 regarding the return that they got on the
13 education they received from Saba University?
14     A.    No.
15     Q.    Are you familiar with the human
16 capital earnings function?
17                  MR. ZIBEL:  Objection.  Form,
18     but you can answer if you know what he's
19     talking about.
20     A.    Say the question again, Dale.
21 BY MR. EVANS:
22     Q.    Sure.  Are you familiar with the
23 human capital earnings function?
24     A.    No.

```
 1        Q.     Are you familiar with the sheepskin
 2   effect hypothesis?
 3                    MR. ZIBEL:  Objection to form.
 4        A.     No.
 5   BY MR. EVANS:
 6        Q.     Are you familiar with the Mincer
 7   earnings function?
 8                    MR. ZIBEL:  Objection.
 9        A.     No.
10   BY MR. EVANS:
11        Q.     Did you interview any former
12   students of Saba to determine their subsequent
13   career trajectory?
14                    MR. ZIBEL:  Objection to the
15        form.
16        A.     No.
17   BY MR. EVANS:
18        Q.     Now, I noticed in this section of
19   your report regarding the value of a partial
20   education as well as in your declaration, you
21   didn't refer to any academic literature or
22   studies supporting your theory.  Are there any
23   such articles or literature out there of which
24   you're aware?
```

William Pinsky, M.D. - 10/1/2024

```
 1        A.      I am not aware.

 2        Q.      All right.  I want to take a look

 3   at paragraph 40, "Medical" -- I'll read it as

 4   well.

 5             "Medical students who attend a

 6   Caribbean institution typically have no

 7   meaningful option to transfer their credits to

 8   another medical school of equal or greater

 9   status.  The transfer opportunities for students

10   that have partially completed a medical program

11   at one Caribbean institution are typically

12   limited to lower-tiered (i.e., graduates are

13   less competitive for residency programs)

14   Caribbean schools that are widely considered to

15   provide a lower quality medical education.

16   Students from these schools have an even higher

17   degree of difficulty in matching for residency.

18   Moreover, students who attend a Caribbean

19   medical school but do not sit for the USMLE are

20   often left with significant debt and forced to

21   change their career trajectories."

22             Did you review any records

23   regarding the number of student transfers from

24   Saba during the class period?
```

```
 1        A.     I did not.  And I've got to
 2  apologize if you're hearing noise in the
 3  background, but our yard person just arrived.
 4        Q.     Not a problem.
 5        A.     It shouldn't be very long because
 6  it's just the side where we are.
 7        Q.     It's not very loud on our end, and
 8  I do believe --
 9                    MR. ZIBEL:  It's making it a
10        little hard to hear, Dale.
11        (Off-record conference)
12                    THE WITNESS:  Where were we?
13  BY MR. EVANS:
14        Q.     We were looking at paragraph 40.
15  And the pending question -- I'm not sure if you
16  answered it -- was, did you review any records
17  regarding the number of student transfers from
18  Saba during the class period?
19        A.     I did not.
20        Q.     If you were to learn that more than
21  50 students were able to transfer their credits
22  to medical schools, would that have any impact
23  on your opinion here in paragraph 40?
24        A.     If they were able to transfer their
```

```
 1   credits to a school that made them more

 2   competitive, than that would influence it.

 3        Q.    And if they were able to transfer

 4   their credits to a school that was admittedly

 5   less competitive, but they still completed the

 6   course of education and were able to obtain

 7   ECFMG certification, would that change your

 8   opinion?

 9                  MR. ZIBEL:  Objection to form.

10        A.    And a residency position?

11   BY MR. EVANS:

12        Q.    Yes.

13        A.    I would say they were lucky.

14        Q.    We're talking about valuation here

15   as opposed to luck.  So if they were able to

16   transfer the credits that they paid for and

17   received at Saba and that translated into a

18   residency, would you say that what they paid for

19   at Saba had some value?

20                  MR. ZIBEL:  Objection to form.

21        A.    I would say that's not the norm and

22   that they were fortunate to be able to do that.

23   BY MR. EVANS:

24        Q.    We talked about this earlier, this
```

```
 1   concept of the big four Caribbean medical
 2   schools.  If I were to say that that includes
 3   St. George's, Ross, Saba, and the American
 4   University of the Caribbean, would you agree
 5   with that?
 6        A.    Again, I -- you know, the context
 7   of that, but that's considered the big four
 8   because of size, I would understand.  I
 9   really -- I am not paying attention to that
10   term.  So is that by size?  Is that what it
11   usually is?
12   BY MR. EVANS:
13        Q.    So I don't know.  I believe that
14   it's intended to refer to the top four schools
15   in the Caribbean.  If I were to represent that
16   to you, would you agree that these are the top
17   four schools -- medical schools in the
18   Caribbean?
19              MR. ZIBEL:  Objection to form.
20        I don't know what you mean by that.
21        A.    So I -- I can't agree with that
22   because I've heard in terms -- before, in terms
23   of, This is the best school or this is a better
24   school or this the top school, and I've always
```

1  challenged people on what their criteria is for

2  that.  So I would have to see the criteria

3  before I could say that I agree with it.

4  BY MR. EVANS:

5       Q.    So even setting aside the issue of

6  big four or not big four, there are other

7  Caribbean medical schools besides St. George's,

8  Ross, Saba, and American University of the

9  Caribbean that meet the requirements for ECFMG

10  certification, correct?

11      A.    Meet the requirements for ECFMG

12  sponsor note so that the student can get

13  certified.

14      Q.    And there are other Caribbean

15  medical schools that meet that standard,

16  correct?

17      A.    Yes.

18      Q.    And so students that transfer to

19  these schools and graduate, they still have an

20  opportunity to apply for the match?

21              MR. ZIBEL:  Objection to form.

22      A.    You know, experience would say that

23  their percentage of being successful reduce with

24  each transfer.

```
 1  BY MR. EVANS:
 2       Q.    But there is a percentage of
 3  opportunity that remains even after the
 4  transfer?
 5       A.    There's a chance.
 6       Q.    And you haven't conducted an
 7  examination of each student that transferred
 8  from Saba to another Caribbean medical school to
 9  determine whether they were able to graduate and
10  practice medicine?
11       A.    No.
12       Q.    Okay.  If those students within the
13  class period were able to transfer their Saba
14  credits, complete medical school, and become
15  practicing physicians, how would they be
16  damaged?
17                 MR. ZIBEL:  Objection to form.
18       It's well beyond the scope.
19       A.    Yeah, I'm not -- I'm in a -- I
20  don't think I'm in a position to calculate
21  damages or damage.
22  BY MR. EVANS:
23       Q.    Well, your testimony is that if a
24  student that is dismissed from Saba has a
```

1  partial education, it has no value.  Would you

2  agree with that?

3        A.    Yeah, it has literally no value.

4        Q.    And so if a student was able to

5  transfer those credits and continue his or her

6  medical education, how would they be damaged?

7                  MR. ZIBEL:  Objection to form.

8        You're asking for a legal conclusion.

9                  MR. EVANS:  I'm asking for

10       support for the opinions in Dr. Pinsky's

11       report.

12                 MR. ZIBEL:  Actually, that's

13       not what you asked for, but that's fine.

14       You can answer the question to the extent

15       you understand what he's saying.

16       A.    Yeah, I think what I said in the

17  report is they have a higher degree of

18  difficulty of getting in and didn't say that --

19  whether or not that was a value or not.

20  BY MR. EVANS:

21       Q.    Would you agree -- I'm sorry,

22  Dr. Pinsky, go ahead.

23       A.    I was just going to say I was just

24  reading what's in front of me.

1      Q.     Would you agree that having a
2  completed medical degree has value?
3      A.     Yes.
4      Q.     And a medical degree is a -- is
5  a -- essentially a summation of the credits that
6  you earn in the program, correct?
7                   MR. ZIBEL:  Objection to form.
8      A.     And meeting the requirements for
9  graduation, which sometimes goes along -- goes
10  beyond the credits.
11  BY MR. EVANS:
12      Q.     And so is it your position that if
13  a student transfers and is able to graduate,
14  they're left with a valuable medical degree, a
15  portion of it of which consists of valueless
16  Saba credits and valuable credits from the
17  transfer university?
18                   MR. ZIBEL:  Objection to form.
19      A.     Assuming they've got into a
20  residency program and are able to be licensed.
21  BY MR. EVANS:
22      Q.     Is a partial medical education from
23  Saba valueless only until they're able to
24  transfer it to another medical university and

```
1  continue their course of study?
2                  MR. ZIBEL:  Objection to form.
3       A.    I think a partial education from
4  Saba has -- itself alone with nothing after that
5  has very little value.
6  BY MR. EVANS:
7       Q.    But if it's combined with and part
8  of a completed medical degree, then it does have
9  value?
10                 MR. ZIBEL:  Objection to form.
11      A.    If they did not have to start all
12 over again, then it would.
13                 MR. EVANS:  Okay.  Let's take
14      another -- let's take a -- let's call it
15      ten minutes.  I might be done here.  I
16      just want to review my notes and see if
17      I've got any follow-up questions.
18                      THE VIDEOGRAPHER:  The time is
19      3:27 p.m., and we are going off the
20      record.
21      (A recess was taken)
22                      THE VIDEOGRAPHER:  The time is
23      3:37 p.m., and we are back on the record.
24 BY MR. EVANS:
```

```
 1        Q.    All right.  I'm going to go back to
 2   the report.  Just a couple more questions on
 3   that, and then I think we can wrap this up.
 4              Going back to paragraph 40 of your
 5   Complaint, you state here, "The transfer
 6   opportunities for students that have partially
 7   completed a medical program at one Caribbean
 8   institution are typically limited to
 9   lower-tiered (i.e., graduates are less
10   competitive for residency positions) Caribbean
11   schools that are widely considered to provide a
12   lower quality medical education."
13              What are the lower-tiered medical
14   schools in the Caribbean?
15        A.    Those are schools that --
16              MR. ZIBEL:  Objection to form
17   of the question.
18        A.    Those are schools that have
19   lower-success-rated students getting into a
20   residency program, have clinical experiences
21   that are not as good or as reliable as some of
22   the other schools, you know, to -- I can't sit
23   here today and just rattle off the names of
24   schools, but one can see it when you look at max
```

 1  data and that sort of thing.
 2  BY MR. EVANS:
 3      Q.    And specifically, you know, to the
 4  extent your declaration or your report refers to
 5  Saba, what are lower-tiered schools that former
 6  students of Saba would be relegated to?
 7                    MR. ZIBEL:  Objection to form.
 8      Beyond the scope.
 9      A.    Yeah, I mean, there's a whole
10  host -- I mean, there's so many schools in the
11  Caribbean.  There's a whole host of schools that
12  could be.
13  BY MR. EVANS:
14      Q.    Can you name a few of them?
15      A.    Not really.  I mean, I would have
16  to sit down with a list of schools and think
17  about it.
18      Q.    So sitting here today, it's your
19  belief that a former student of Saba is left
20  with a valueless education because it has no
21  options but to transfer to a lower-tiered
22  medical school, but you're not in a position to
23  name any lower-tiered medical schools that would
24  be encompassed by that opinion?

```
1         A.      Not today.
2         Q.      So how are we supposed to access
3    whether it's truly -- you know, has little to no
4    economic value, as you state here, if we have no
5    real-world examples of the lower quality schools
6    to which the students would be enforced to
7    enroll?
8                     MR. ZIBEL:  Objection.
9         Misstates testimony and his report.  You
10        can answer.
11        A.      Is that a question --
12                    MR. ZIBEL:  If you can, you
13        can answer.
14        A.      Is that a question for me to
15   answer?  I'm sorry.
16   BY MR. EVANS:
17        Q.      Yes, Doctor.
18        A.      I would say maybe that's a TBD or
19   something.  I -- I'm just not prepared to answer
20   that right now.
21        Q.      Is there value to a partial medical
22   education at Ochsner, the University of
23   Queensland Ochsner program?
24        A.      So when we're saying a partial --
```

```
 1                    MR. ZIBEL:  Hold on.
 2         Objection to form.
 3         A.      Partial education meaning somebody
 4    who's finished one year, two years, three years,
 5    but didn't graduate?
 6    BY MR. EVANS:
 7         Q.      That's correct.
 8         A.      It depends on the circumstances.
 9    If they finished two years and decided they
10    didn't want to be a doctor, wanted to go to
11    school in public health, you know, they would
12    have been in -- had an incredible background,
13    assuming they were a good student.  If they had
14    failed out for whatever reason, I think there
15    wouldn't be much value there.
16         Q.      So applying that corollary to Saba,
17    if a student voluntarily withdraws because they
18    decided to go into health administration, would
19    you then agree that that education they got at
20    Saba has some inherent value?
21                    MR. ZIBEL:  Objection to form.
22         A.      You know, probably for not health
23    administration.  If they went into public health
24    or something, there -- you know, there might be
```

1  something there, but that -- as you said the

2  question, it was voluntarily withdrew as far as

3  being dismissed or not allowed to progress, and

4  that makes a difference.

5  BY MR. EVANS:

6      Q.    And so that was an important

7  correction that you made.  And I used the wrong

8  term, but I attempted to mirror the example that

9  you provided for UQ Ochsner.  If a student at

10  Saba voluntarily withdrew and decided to enroll

11  in a public health program instead, would the

12  education they received then have value?

13              MR. ZIBEL:  Objection to form.

14      A.    It might be.  It would be more

15  indirect in terms of a good student who decides

16  to do something else and shows that they had

17  accomplishment with what they were doing before.

18  That's why it's a difference if it's a voluntary

19  withdrawal versus a poor academic performance or

20  some other reason they were dismissed.

21      Q.    I see.  So a student that is

22  dismissed involuntarily for poor academic

23  performance, that education -- that partial has

24  little to no value, but if a student is meeting

1  his or her requirements and voluntarily

2  withdrawals to pursue either an unrelated career

3  or a related career, then at that point the

4  education might have some value?

5              MR. ZIBEL:  Objection to form.

6      A.    It would be more likely to have

7  value in that situation.

8  BY MR. EVANS:

9      Q.    Okay.  And so how would you go

10  about quantifying whether the partial education

11  has value in those circumstances?

12              MR. ZIBEL:  Objection to form.

13      Beyond the scope.  Vague.

14      A.    That's beyond my expertise.

15  BY MR. EVANS:

16      Q.    You don't have the expertise to

17  value how much an education is worth or not?

18              MR. ZIBEL:  Objection to form.

19      That's not what he said.

20      A.    Yeah, I can do it generically.  I

21  can't put a number on it.

22  BY MR. EVANS:

23      Q.    And when you say "generically," is

24  that an all-or-nothing thing.  You can say when

1  an education has no value, but you're unable to

2  say how much value it has?

3              MR. ZIBEL:  Objection to form.

4      A.    So the bottom line on this -- and

5  we can go round and round and try to pick this

6  apart as much as you would like, but the bottom

7  line is somebody that goes to Saba for one or

8  two years and for whatever is not allowed to

9  progress to get their medical degree -- and that

10 would usually be on the basis of their academic

11 performance unless there was some personal

12 issue, some behavior issue, that came up --

13 there's very little marketability of taking what

14 they learned in that partial medical education

15 and turn that directly into some sort of

16 profession.

17 BY MR. EVANS:

18     Q.    And again, you haven't assessed

19 what the former students in the -- in this

20 particular class went on to do professionally

21 after Saba University?

22             MR. ZIBEL:  Objection.  Asked

23      and answered.  Vague.

24     A.    Yes.  Correct.

```
 1  BY MR. EVANS:
 2      Q.    Does the University of Queensland
 3  Ochsner provide students a refund for a partial
 4  medical education if they drop out or are
 5  dismissed?
 6      A.    When I was there, we did not.  I
 7  have no idea what's going on now.
 8      Q.    Just a couple final foundational
 9  questions.  You don't have a degree in
10  statistics, correct?
11      A.    I do not.  The statistics are part
12  of my education.
13      Q.    You took statistics courses in the
14  pursuit of your degrees?
15      A.    Degrees and residency and
16  fellowship.
17      Q.    Have you ever published statistical
18  anal- -- a statistical analysis or statisical
19  analyses, plural?
20                  MR. ZIBEL:  Objection to form.
21      Vague, but if you understand.
22      A.    Yeah, in my CV, there are articles
23  that I published from research and other things
24  that have had statisical evaluations.
```

```
 1  BY MR. EVANS:
 2       Q.    Any with respect to marketing?
 3       A.    No.
 4       Q.    Any with respect to the value of a
 5  medical education?
 6       A.    No.
 7                 MR. EVANS:  Okay.  I don't
 8       have any further questions, Dr. Pinsky.  I
 9       appreciate your time today.  Thank you for
10       joining us today.  I really appreciate it.
11                 THE WITNESS:  Sure.  Thank
12       you.
13                 MR. ZIBEL:  Dale, why don't we
14       go off the record for two minutes?  And
15       let me talk to my colleagues, and then --
16                 MR. EVANS:  Sure.
17                 THE VIDEOGRAPHER:  The time is
18       3:46 p.m., and we are going off the
19       record.
20       (A recess was taken)
21                 THE VIDEOGRAPHER:  The time is
22       3:54 p.m., and we are back on the record.
23  EXAMINATION BY MR. ZIBEL:
24       Q.    Dr. Pinsky, a few minutes ago, you
```

1  were asked by counsel for Saba, the defendant, a

2  lot of questions about value.  Do you recall

3  that?

4        A.    Yes.

5        Q.    Are there types of value,

6  different --

7        A.    Yes.

8        Q.    -- I should say, are there

9  different types of value?

10       A.    Yes.  In this type of situation,

11 there's different kinds of value.  There's what

12 I would call academic value just, in general, in

13 an education of learning something -- about

14 something.  There's value in terms of being able

15 to apply what you've learned and have a

16 financial return on that.  There's a value in

17 terms of an investment of the value that leads

18 to something else that is positive.  So yes,

19 there's different kinds of value.

20       Q.    Intrinsic -- some sort of intrinsic

21 value, a form type of value?

22       A.    Right.  Intrinsic value is what I

23 refer to really as an academic value, something

24 that you've learned that benefits personally,

William Pinsky, M.D. - 10/1/2024

```
 1   not necessarily from a job perspective.
 2        Q.    In recognizing that and looking at
 3   paragraph 39 of your report, which --
 4                  MR. ZIBEL:  Dale, if you could
 5        pull that up?
 6                  MR. EVANS:  Yeah, sure.
 7   BY MR. ZIBEL:
 8        Q.    If you look at paragraph 39 of your
 9   report, considering all of the questions that
10   you were just asked about value and Ochsner and
11   Saba, you wrote, "Partial medical education,
12   specifically from a Caribbean medical school,
13   has little to no economic value by itself."
14                  In consideration of all the things
15   you assessed, do you stand by your testimony in
16   your expert report?
17        A.    Yes, I do.
18                  MR. ZIBEL:  That's all I got.
19                  MR. EVANS:  Just give us five
20        more minutes, and we'll see if we have any
21        redirect or recross or whatever you want
22        to call it and we can wrap this up.
23                  THE VIDEOGRAPHER:  The time is
24        3:57 p.m., and we're going off the record.
```

FARMER ARSENAULT BROCK LLC

William Pinsky, M.D. - 10/1/2024

```
1   (A recess was taken)
2              THE VIDEOGRAPHER:  The time is
3   4:02 p.m., and we are back on the record.
4              MR. ZIBEL:  Dr. Pinsky would
5   like the opportunity to read and sign the
6   deposition transcript.
7              THE COURT REPORTER:  Attorney
8   Zibel, are you ordering a copy of the
9   transcript?
10             MR. ZIBEL:  We would like a
11  copy of the transcript, yes.
12             THE COURT REPORTER:  Attorney
13  Evans, what is the time period that you're
14  looking for?
15             MR. EVANS:  Tomorrow.
16  Thursday at the latest.
17             THE COURT REPORTER:  Attorney
18  Zibel, are you going to expedite as well?
19             MR. ZIBEL:  Not independently,
20  no.  Why don't we -- your wheels are going
21  to be in motion for the defendants here.
22  Let me talk to some of my -- is that all
23  right if I just talk to my colleagues and
24  get back to you?
```

William Pinsky, M.D. - 10/1/2024

```
 1                   THE COURT REPORTER:  Yes.

 2    (Off-record conference)

 3                   THE VIDEOGRAPHER:  This

 4    concludes today's deposition.  The time is

 5    4:07 p.m., and we're going off the record.

 6    (Deposition concluded at 4:07 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


        I, REBECCA J. DeCARLO, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me via
videoconference on October 1, 2024, appearing
remotely from New Orleans, Louisiana, the
following named person, to wit:  WILLIAM W.
PINSKY, M.D., who was by me duly sworn to
testify to the truth and nothing but the truth
as to his knowledge touching and concerning the
matters in controversy in this cause; that he
was thereupon examined upon his oath and said
examination reduced to writing by me; and that
the statement is a true record of the testimony
given by the witness, to the best of my
knowledge and ability.


        I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.


        WITNESS MY HAND October 3, 2024.



                        _____
                        Rebecca J. DeCarlo
                        Notary Public




My Commission expires:
July 28, 2028

                                        October 14, 2024
Daniel Zibel, Esq.
NATIONAL STUDENT DEFENSE COUNSEL
1701 Rhode Island Avenue NW
Washington, D.C.  20036


Re:  ORTIZ v. SABA UNIVERSITY, et al.


Dear Counselor:

        Enclosed is a copy of the deposition of
WILLIAM W. PINSKY, M.D., taken on October 1,
2024 in the above-entitled action.

        According to Rule 30(e) of the
Massachusetts Rules of Civil Procedure, the
deponent has thirty days to sign the deposition
from the date of its submission to the deponent,
which is the above date.

        Please have the deponent sign the enclosed
Signature Page/Errata Sheet and return it to the
offices of:
                Dale Evans, Esq.
                LOCKE LORD, LLP
                777 South Flagler Drive
                Suite 215 East Tower
                West Palm Beach, FL  33401

        Whereupon it will be attached to the
original deposition transcript, and a copy
thereof to all counsel of record.

        Thank you for your cooperation in this
matter.



                        Rebecca J. DeCarlo


cc:  Dale Evans, Esq.

                    UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

                                1:23-CV-12002-WGY

NATALIA ORTIZ, on behalf of herself and a class
of similarly situated persons,
                        Plaintiff,
v.
SABA UNIVERSITY SCHOOL OF MEDICINE and R3
EDUCATION, INC.,
                        Defendants.

        I, WILLIAM W. PINSKY, M.D., do hereby
certify, under the pains and penalties of
perjury, that the foregoing testimony is true
and accurate, to the best of my knowledge and
belief, with the addition of the following
changes/corrections:

Page| Line| Change/Correction

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

WITNESS MY HAND, this    day of         , 2024.



                    _____
                        WILLIAM W. PINSKY, M.D.
cc:  Dale Evans, Esq.
     Daniel Zibel, Esq.

William Pinsky, M.D. - 10/1/2024

**Page 227**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

1:23-CV-12002-WGY

NATALIA ORTIZ, on behalf of herself and a class
of similarly situated persons,
                              Plaintiff,
v.
SABA UNIVERSITY SCHOOL OF MEDICINE and R3
EDUCATION, INC.,
                              Defendants.

        I, WILLIAM W. PINSKY, M.D., do hereby
certify, under the pains and penalties of
perjury, that the foregoing testimony is true
and accurate, to the best of my knowledge and
belief, with the addition of the following
changes/corrections:

| Page | Line | Change/Correction |
|------|------|-------------------|
| 43 | 5 | "executive" to "academic" |
| 53 | 13 | "DEA" to "DBA" |
| 70 | 14-15 | "Australian counsel" to Australian Medical Council" |
| 88 | 13 | "Middle East" to "USMLE" |
| 88 | 23 | "code" to "cull" |
| 89 | 6 | "coding" to "culling" |
| 90 | 13 | "Middle East" to "USMLE" |
| 100 | 14 | "code" to "cull" |
|  |  |  |

WITNESS MY HAND, this 29 day of DCTOBER 2024.

_William W Pinsky_
WILLIAM W. PINSKY, M.D.

cc:  Dale Evans, Esq.
     Daniel Zibel, Esq.

Created with Scanner Pro

Re:    Deposition of **William Pinsky, M.D.**
      Date: 10/1/2024
      Case: Ortiz -v- Saba University School of Medicine, et al.

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 125 | 19-20 | The phrase "you're familiar" should be changed to "you're not familiar" to accurately reflect the question asked that was asked. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

11/15/2025
Date

Dale Evans Jr
Signature