# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NATALIA ORTIZ,

                    *Plaintiff*,

v.                                                          Case No. 1:23-cv-12002-WGY

SABA UNIVERSITY SCHOOL OF
MEDICINE; and R3 EDUCATION, INC.,

                    *Defendants*.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF WILLIAM W. PINSKY, MD

Plaintiff Natalia Ortiz hereby files this memorandum of law in opposition to Defendants Saba University School of Medicine and R3 Education's ("Defendants" or "Saba") motion to exclude testimony of Plaintiff's expert, William W. Pinsky, MD. (ECF. No. 118).

## INTRODUCTION

There could hardly be a person more qualified to offer expert testimony in this case than Dr. William W. Pinsky. Dr. Pinsky has more than 40 years of experience in medical education, including on issues specifically related to the United States Medical Licensing Exam ("USMLE") and Caribbean medical schools—precisely the issues in this case. Ignoring his experience and mischaracterizing his opinions, Defendants contend that Dr. Pinsky's testimony must be excluded because he "has no substantive training or experience in marketing or economics," because his "opinions are not specifically addressed to Saba," and because they are unhelpful to the jury. ECF No. 119 at 1. Defendants completely miss the mark. Dr. Pinsky is not offering any opinions in this case that require expertise in marketing or economics and there is no legal requirement that his opinions address Saba specifically.

Instead, Dr. Pinsky offers opinions that are all directly connected to and supported by his decades of experience, which courts have regularly found sufficient under Rule 702 and *Daubert*. Further, his opinions will be helpful to a jury, many of whom will lack knowledge of medical education and the importance of the USMLE. This Court should deny Defendants' motion to exclude Dr. Pinsky.

## BACKGROUND

### I.     Defendants' unfair and deceptive marketing campaign exploits the importance of the USMLE to prospective medical students.

Defendants advertise that "virtually every Saba student passes the USMLE on their first attempt" and that Saba's USMLE performance is "higher than many US medical schools," which Saba claims, is a testament to "the quality of [the Saba] education." *See, e.g.*, ECF No. 1 at ¶¶ 58A, 58C, 60A, 61B, 61E, 63-64.[1] Understanding the importance of USMLE Step 1 passage rates, Defendants repeatedly made such statements to prospective students, including Ms. Ortiz, while intentionally taking steps to conceal that more than half of Saba's students withdraw or are dismissed prior to even being able to take the Step 1 exam. *See id.* at ¶¶ 78-79. This deliberate concealment includes training admissions staff to dodge questions about attrition and providing incorrect attrition figures when directly asked by prospective students. *See, e.g.*, ECF No. 82 at 2.[2] Thus, the issue at the heart of this case is whether such statements, when made to prospective students considering obtaining a medical school education at Saba, are unfair or deceptive under Mass.Gen. Laws Ann. Ch. 93A, §2.

---

[1] For a detailed summary of the facts *see* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion For Summary Judgment (ECF No. 139 at 1-6) and Plaintiff's Counterstatement of Material Facts (ECF No. 140 ("PCMF")).

[2] *See* PCMF at ¶¶ 16, 22-30.

II.   **Dr. Pinsky's decades of experience make him a qualified and reliable expert to opine on the importance of the USMLE to prospective medical students, the lack of value of a partial medical education, and key characteristics of Caribbean medical schools.**

Dr. Pinsky has over 40 years of experience working as a doctor, educator, academic medical program administrator, board member, and CEO of medical education oversight bodies—all of which make him a qualified and reliable expert to opine on relevant matters in this case. He began his medical career with training in pediatrics and pediatric cardiology before taking on leadership positions in the medical field.[3] Pinsky Rep. ¶ 5. Dr. Pinsky spent 17 years as an executive at Ochsner Health System, the leading nonprofit healthcare provider in the Gulf South.[4] Dr. Pinsky has also spent a total of 24 years serving on three different boards in the field of medical education and academics with two of those three focused on medical school accreditation. *Id.* ¶ 7.

From 2016 to 2023, Dr. Pinsky served on the UMSLE Composite Committee, an oversight committee responsible for determining how the USMLE is run and scored. *Id.* ¶ 11. As part of the committee, Dr. Pinsky reviewed USMLE score trends, reviewed and approved the scoring system, and addressed other operational issues related to students taking the exam. *Id.*

In recent years, Dr. Pinsky's work has focused on advancing the quality of healthcare worldwide through his role as CEO of at Intealth, the 501(c)(3) parent company of the Educational

---

[3] Dr. Pinsky served as the Associate Dean for Clinical Affairs, Professor of Pediatrics, Chief of Pediatric Cardiology, and Vice-Chair for the Department of Pediatrics at Wayne State University School of Medicine (1986-1999); as the Chief Quality Officer, Regional Executive Sinai, Senior Vice President for Clinical Affairs, and other roles at the Detroit Medical Center (1993-1998); and as a faculty member for Baylor College of Medicine (1978-1983), University of Nebraska Medical Center (1986-1993), Tulane University Medical Center (1999-2016), and University of Queensland School of Medicine (2009-2016). Rep. ¶ 6. He is also a Fellow of the American Academy of Pediatrics, the American College of Cardiology, and the American College of Chest Physicians. *Id.* ¶ 7.

[4] *About Ochsner*, Ochsner Health (last visited Nov. 22, 2024), https://www.ochsner.org/about-ochsner#:~:text=Ochsner%20Health%20is%20the%20leading,health%20and%20urgent%20care%20centers.

Commission for Foreign Medical Graduates ("ECFMG"). *Id.* ¶ 4. ECFMG has a 70-year history of reviewing and providing credentials for graduates of foreign medical schools, like Saba, including documentation of their exam scores and academic histories.[5] During his seven years at the helm of ECFMG, Dr. Pinsky worked regularly with medical schools around the world, including in the Caribbean, as well as with international medical school accreditation agencies, including the Caribbean Accreditation Authority for Education in Medicine and Other Health Professions ("CAAM-HP"). *Id.* ¶ 14. He has personally reviewed applications, including academic transcripts, from Caribbean medical students seeking ECFMG certification. *Id.* ¶ 15. Under Dr. Pinsky's leadership, ECFMG worked to keep prospective medical students informed about subpar Caribbean schools, focusing specifically on issues of transparency at such schools.[6]

  Dr. Pinsky also spent seven years serving on an executive counsel of the World Federation of Medical Education ("WFME"), which works to "provide a transparent and rigorous method" of accrediting medical schools at a high and internally accepted standard. *Id.* ¶ 16. In his role with the WFME, Dr. Pinsky helped to develop and implement medical school accreditation standards and worked with lawmakers all over the world to create effective rules and policies to govern the quality and review of medical school programs. *Id.* ¶ 17.

Based on these decades of experience, Dr. Pinsky is prepared to offer opinions on the USMLE and its gatekeeping function for medical students aspiring to practice in the United States. Pinsky Rep. ¶¶ 20-25. International medical students must obtain ECFMG certification to match

---

[5] ECFMG has "developed unparalleled expertise on the world's medical schools, the credentials they issue to their graduates, and the verification of those credentials." *See* Educ. Comm. for Foreign Med. Graduates, *About Us*, https://www.ecfmg.org/about/_(last visited Dec. 6, 2024).

[6] *See* Emma Goldberg, *'It's Tough to Get Out': How Caribbean Medical Schools Fail Their Students*, THE N.Y. TIMES (Oct. 13. 2021), https://www.nytimes.com/2021/06/29/health/caribbean-medical-school.html#:~:text=In%20the%201970s%2C%20a%20wave,as%20those%20at%20American%20schools.

for U.S. residency programs and eventually practice medicine in the United States, and that certification requires passage of USMLE Steps 1 and 2. *Id.* ¶ 20. Dr. Pinsky will explain that because of the competitive nature of medical school admissions, many students not admitted to U.S. schools apply to Caribbean schools, which are "well known by medical education professionals for having more relaxed admissions standard." *Id.* ¶¶ 26-28. Because passing the USMLE is critical to be certified to practice in the United States, Step 1 passage rates are particularly important for prospective students considering whether it is worth the financial risk to attend a Caribbean medical school. *Id.* ¶ 31; *see id.* ¶¶ 29-30. Based on his experience, Dr. Pinsky will opine that "[h]igh passage rates give prospective students confidence that, like nearly all students before them, they are likely to succeed [on the USMLE] if they enroll." *Id.* ¶ 30. Dr. Pinsky will also opine that, by contrast with students at U.S. schools, "significant numbers" of Caribbean medical students "do not advance far enough" in the program to sit for the USMLE Step 1 exam. *Id.* ¶¶ 32-33.

Dr. Pinsky is also being proffered to opine on the value of a partial medical education, again based on his years of experience. *Id.* ¶¶ 38-40. He will testify about how Caribbean medical schools fit into the broader context of medical education. *Id.* ¶ 40. Where an aspiring doctor has academic credits from a Caribbean medical school, transferring to a medical school of equal or greater reputation is not a "meaningful" option. *Id.* ¶ 40. Dr. Pinsky has direct knowledge regarding the transfer of credits into and out of Caribbean medical schools because, among other things, he reviewed applications from international medical students seeking ECFMG certification in his role as CEO of Intealth. *Id.* ¶ 15. Based on that experience, Dr. Pinsky knows that students with a partial Caribbean medical education can only transfer credits to a lower-tiered Caribbean medical school, which are widely understood to provide a lower-quality education and to have students who are

less competitive for residency placements. *Id.* ¶ 40. Based on this knowledge and experience, Dr. Pinsky will testify that a partial Caribbean medical education has little to no economic value on its own. *Id.* ¶ 39.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. That rule provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 is "interpreted liberally in favor of the admission of expert testimony," *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006), and places the district court in the position of "gatekeeper" with respect to expert evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court's role is to determine whether the expert possesses some specialized knowledge such that his or her testimony will be helpful to the trier of fact and, if so, whether that knowledge arises from reliable methods applied in a reliable manner. *Id.* at 590–91. Although *Daubert* sets out a list of factors for the evaluation of scientific experts, *see* 509 U.S. at 593–94, those factors do not always apply cleanly to non-scientific experts, and the trial court's discretion in such matters is broad. *United States v. Mooney*, 315 F.3d 54, 62 (1st Cir. 2002).

## ARGUMENT

It is difficult to imagine an expert more qualified to opine on the international system of medical education or who could be more helpful to the jury in this case than Dr. Pinsky. Likely

recognizing that they cannot challenge his qualifications to offer opinions on medical education and the USMLE, Defendants were forced to mischaracterize his opinions in an unpersuasive attempt to minimize the relevance of his experience and knowledge. Defendants challenge Dr. Pinsky's qualifications and reliability with respect to only three of his opinions[7]: (1) the marketing of high USMLE passage rates without disclosing that most students do not sit for the exam; (2) the economic value of a partial medical education from a Caribbean medical school; and (3) the causes of attrition at Caribbean medical schools. But Dr. Pinsky's decades of experience qualify him to offer testimony on these topics, and courts regularly find long experience in a field to be a sufficient basis for expert testimony. *See, e.g.*, *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 357–58 (D. Mass. 2008) (explaining that in non-technical areas, "long experience in a field can confer expertise upon a witness"); *McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 426 (D. Mass. 2008) (Young, J.) (noting that an expert may "testify solely on the basis of experience").

## I.     Dr. Pinsky is qualified by his decades of experience in medical education, accreditation, and certification.

Courts regularly find that "long experience in a field can confer expertise upon a witness" in non-technical areas. *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 357–58 (D. Mass. 2008) (citing *Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 57 (1st Cir. 1996)). An expert offering opinions on the basis of experience need only "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *U.S. ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 94 (1st Cir. 2012) (quoting Fed. R. Evid. 702 advisory committee's note). When an expert is qualified by

---

[7] Defendants seek to exclude Dr. Pinsky's remaining opinions not based on his qualifications or their reliability, but on the basis that they will be unhelpful to the trier of fact.

knowledge, skill, experience, training, or education, "he need not have had first-hand dealings with the precise type of event that is at issue." *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004).

*Drouin v. Symetra Life Ins. Co* is illustrative. There, a court in this district allowed the testimony of an expert witness on the standard of care for release of funds by an insurance company based on his 40 years of experience working in the industry. No. 06-cv-10764-RBC, 2008 WL 11511490, at *3 (D. Mass. May 27, 2008). The court rejected the defendant's argument that the expert was unreliable because he "failed to review any independent literature" or "conduct[] a study" of companies and their security measures. *Id.* at *7. Similarly, in *Diefenbach v. Sheridan Transp.*, the First Circuit upheld the district court's rejection of the defendant's challenge to the qualifications of a sea captain testifying about equipment, machinery, and docking and undocking procedures in a case involving an accident at sea. 229 F.3d 27, 31 (1st Cir. 2000). While the captain had never been part of a crew aboard the particular type of vessel on which the plaintiff was injured, his long experience in the field qualified him to reliably testify about the vessel at issue, which had the same parts as vessels he knew intimately. *Id.*

Not only is Dr. Pinsky a medical doctor who has worked in medical education for decades, but he also has specific and direct experience with (1) the USMLE—including seven years on the committee responsible for the test's administration and scoring; (2) the system of international medical education—including differences between U.S. and Caribbean schools and how credits transfer into and out of Caribbean schools; and (3) the certification of international medical school graduates who seek to practice medicine in the United States. This experience makes him eminently qualified to testify in this case and to offer the opinions outlined in his report. And as

set forth below, he directly ties that experience to the opinions he proffers, which makes them reliable.

## II.    Dr. Pinsky's opinions are reliable because they flow directly from his extensive relevant experience.

Defendants challenge the reliability of Dr. Pinsky's opinions regarding: (A) the meaning or weight prospective students give to USMLE passage rates; (B) the lack of value in two years or less of a Caribbean medical school education; and (C) the causes of attrition and the impact that concealing high attrition has on prospective students. As set forth below, these opinions are based on decades of experience in the field and are therefore reliable.

### A.    Dr. Pinsky's opinions about the marketing of high USMLE pass rates are reliable.

Plaintiff proffers Dr. Pinsky to opine about the importance of USMLE Step 1 passage rates to prospective Caribbean medical students. Defendants contend that these opinions are not reliable because they are not supported by "reliable facts, data or sound methods and principles." Doc. 119 at 10. To the contrary, these opinions are reliable because they flow directly from Dr. Pinsky's experience.

Dr. Pinsky explains that for students applying to Caribbean schools (where admissions standards are lower) USMLE Step 1 passage rates are a critical barometer for them to understand their chances of success. Pinsky Rep. ¶¶ 29-30. Prospective students rely on those rates to decide whether to take the risk of enrolling in a Caribbean medical school. Pinsky Rep. ¶ 29; *see also* Pinsky Tr. 88:11-24 (explaining that his opinion is based on "my almost eight years experience at Intealth and knowing how Step 1 scores are utilized as well as my prior experience being involved in leading graduate medical education programs and knowing what criteria program directors use to cull their list of the applicants"). Only after providing all of this context does Dr. Pinsky explain

that prospective students considering a Caribbean medical school are denied necessary information to make an "informed enrollment decision" where a school's marketing highlights a high USMLE Step 1 passage rate without disclosing that most students who enroll never sit for the exam. Pinsky Rep. ¶ 37.

Defendants attempt to erase Dr. Pinsky's experience and the methodical way in which he ties it to the opinion they challenge. Dr. Pinsky explains how his experience in the field—with the role and importance of the USMLE, the lower admission standards at Caribbean medical schools, and the problem of attrition at Caribbean medical schools—supports his opinion. Defendants argue that Dr. Pinsky is not qualified to offer these opinions because he has not conducted a "literature review" analyzing what prospective students care about, has not "served on any marketing or advertising committee," has never "testified about marketing practices" or "published any statistical analyses on marketing," does not have a degree in marketing, and has not "conduct[ed] any surveys or interviews with students." ECF No. 119 at 6, 11. Defendants' motion utilizes a strawman argument; Dr. Pinsky has never claimed to be a marketing expert and his opinions require expertise in medical education, not marketing. Because Dr. Pinsky's opinions are grounded in his experience with medical education and medical students around the world, no additional expertise or outside sources are required to qualify him or to make his opinions reliable. *See Drouin*, 2008 WL 11511490, at *7 (rejecting the idea that an expert with long experience was unreliable for "fail[ing] to review any independent literature" or "conduct[] a study").

Defendants' reliance on *Hasted* is misplaced. There, a psychology Ph.D. sought to opine on the standard of care owed to patients in a locked, inpatient psychiatric unit—while "nowhere in his expert report" did he explain how his background or training made him qualified to do so. *Hasted v. United States*, No. 19-cv-12049-ADB, 2022 WL 17404918, at *2 (D. Mass. Dec. 2,

2022). By contrast, Dr. Pinsky thoroughly describes his experience and how it led to his conclusions about the importance of USMLE Step 1 passage rates for prospective Caribbean medical students—none of which Defendants challenge as unreliable. That experience and those conclusions provide more than sufficient basis for Dr. Pinsky's opinion that a marketing campaign touting that "virtually every Saba student passes the USMLE on their first attempt"—while concealing that most students do not sit for the test—deprives prospective students of information necessary to make an informed enrollment decision. *See Brigham*, 678 F.3d at 94 (reversing the district court's exclusion of expert testimony because the expert adequately explained the tie between her experience and background and the opinions she offered).

> **B.     Dr. Pinsky's opinion that a partial medical education from a Caribbean medical school has little to no economic value is reliable.**

Defendants adopt the same approach to attack Dr. Pinsky's opinions on the economic value of a partial medical education: focusing on just one aspect of the opinion, while attempting to divorce it from Dr. Pinsky's experience with, and knowledge of, Caribbean medical education and how that fits into the broader system of medical education. Dr. Pinsky explains that when students are unsuccessful at one Caribbean medical school, their only meaningful option for using those academic credits is to transfer them to a lower-tiered school. Pinsky Rep. ¶ 40. He understands how credits transfer due to his long experience in medical education, including his review of transcripts of international medical student seeking ECFMG certification. Pinsky Rep. ¶ 15. But transferring to a lower-tiered school does not confer value because such schools are widely understood to provide a lower-quality education and to have students who are less competitive for residency placements. *Id.* ¶ 40. And for the many more students who are dismissed or withdraw and do not continue their medical education, Dr. Pinsky concludes from his experience that a partial medical education, specifically from a Caribbean medical school, has "little to no economic

value by itself." *Id.* ¶ 39. He further explains that students enroll in medical school for the obvious purpose of obtaining their medical degree so that they can practice medicine; if they don't complete their education, they do not receive a "partial medical degree"—they receive nothing. Pinsky Reply Rep. ¶ 19.

Defendants do not and cannot challenge Dr. Pinsky's extensive knowledge of international medical education or his direct experience with international medical students. This experience leads to his opinions and provides the context necessary to understand their basis such that Defendants can challenge it on cross examination. Unable to undermine the close tie between Dr. Pinsky's experience and his opinions, Defendants intently focus on Dr. Pinsky's use of the word "economic," which appears once in his report. But that word does not render economics expertise the only qualification an expert could have to opine on the value of a partial Caribbean medical education.

The close tie between Dr. Pinsky's opinions and his experience stands in stark contrast to the disconnect in *Organon*, where a healthcare lawyer without experience in the pharmaceutical industry offered opinions "entirely unmoored from any relevant context." *See United States v. Organon USA Inc.*, No. 07-cv-12153-RWZ, 2015 WL 10002943, at *4 (D. Mass. Aug. 17, 2015); ECF No. 119 at 9, 11 (citing *Organon*). Unlike Dr. Pinsky, the expert in *Organon* vaguely based his opinions on his experience while offering "no explanation of how his experience [led] to his conclusions." *Organon*, 2015 WL 10002943, at *4.

Defendants' reliance on Dr. Jeziorski's rebuttal report is also misplaced. As the Court knows, Plaintiff challenges Dr. Jeziorski's opinions, which are based on inapplicable academic papers that provide no support for his opinions about medical education, which he concedes he has

no experience in.[8] *See* ECF No. 123 at 10-12. Even if the Court were to admit Dr. Jeziorski's opinions, the fact that he relied on certain sources and knowledge does not require Dr. Pinsky to rely on those same sources to offer reliable, admissible expert testimony in this case. *See Lawes v. CSA Architects & Engineers LLP*, 963 F.3d 72, 101 (1st Cir. 2020) ("Rule 702 does not demand that experts rely on all data that could be deemed relevant."). The other forms of value Defendants raise, like the possibility that Plaintiff could abstractly make use of her medical knowledge by enrolling in an anesthesiologist assistant's program, are questions for cross-examination. *See* ECF No. 119 at 8. Defendants are welcome to test the basis of Dr. Pinsky's opinions and to argue to the jury that his experience is insufficient to support the opinion he offers. But those challenges go to weight, not admissibility. *See Drouin*, 2008 WL 11511490, at *5.

> ### C.    Dr. Pinsky's opinions on the significance of concealing high attrition and causes of attrition are reliable.

Dr. Pinsky opines that, when a Caribbean medical school with high attrition rates runs a marketing campaign that touts high USMLE passage rates but does not disclose that most students do not sit for the test, it leaves out critical information necessary for prospective students to make an informed enrollment decision. Pinsky. Rep. ¶ 37. Defendants contend that this opinion is not reliable because Dr. Pinsky has "not done any survey or analysis of the factors students consider when they enroll in medical schools" and "did not review any literature in connection with rendering this opinion." Doc. 119 at 15. To the contrary, as with the opinions above Dr. Pinsky's opinion is grounded in his experience with medical education and medical students around the world, such that no additional expertise or outside sources are required to qualify him or to make his opinions reliable. *See Drouin*, 2008 WL 11511490, at *7.

---

[8] Defendants inexplicably cite to the working paper that Dr. Jeziorski conceded carried little weight. *See* ECF No. 119 at 8 n.1; ECF No. 123 at 10-11; ECF No. 124-1 at 90:13-18; 160:11-15

Defendants also mischaracterize Dr. Pinsky's discussion about the causes of attrition. While his report states that high attrition is "often due to a *range of factors*" and provides illustrative examples, Pinsky Rep. ¶ 34 (emphasis added), Defendants devote three pages to argue that Dr. Pinsky's opinion is not reliable because he attributes attrition only to school quality, ECF No. 119 at 12-14. But as his report makes clear, Dr. Pinsky does not chalk attrition up to just one cause, nor does he claim that the illustrative examples he lists are the only possible causes. Pinsky Rep. ¶ 34.

*           *           *

Where experts offer opinions on the basis of experience, the law requires them to explain how that experience led to their opinions and why it is sufficient to support them. *See Brigham*, 678 F.3d at 94. As set forth above, Dr. Pinsky has done so with respect to his opinions on marketing USMLE Step 1 passage rates, the lack of economic value of a partial medical education, and the causes of high attrition and significance of concealing it from prospective students. The Court should reject Defendants' challenges to the reliability of Dr. Pinsky's opinions.

### III.    Dr. Pinsky's opinions will help the trier of fact.

In their final attempt to exclude Dr. Pinsky, Defendants contend that his testimony will not aid the trier of fact. ECF No. 119 at 17-18. That could not be further from the truth.

In evaluating whether expert testimony will be helpful to the trier of fact, the court must determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Botelho v. Nordic Fisheries, Inc.*, No. 15-cv-11916-FDS, 2018 WL 2291315, at *2 (D. Mass. May 18, 2018); *see also Daubert*, 509 U.S. at 597 (noting testimony is "helpful to the trier of fact" where it is relevant and "rests on a reliable

14

foundation"). Reliable expert testimony is admissible if it will assist the jury to "better understand the case." *Diefenbach*, 229 F.3d at 31.

In a case where the jury is going to be asked to decide whether Defendants' advertising of USMLE passage rates were unfair or deceptive, Dr. Pinsky's opinions provide critical context. For example, Dr. Pinsky will provide necessary context about Caribbean medical schools, the students they attract, and how they differ from U.S. medical schools. This information will help the jury understand the claims in this case, which require an understanding of international medical education and the steps required to practice medicine in the United States. Even Defendants' purported expert, Dr. Jeziorski, relied on Dr. Pinsky's expertise to understand this context. ECF No. 124-1 at 77:15-78:12; 281:13-18; 286:15-288:8.

Similarly foundational to the jury's understanding of this case are Dr. Pinsky's opinions about the function and purpose of the USMLE and its critical role in a medical student's journey to practice medicine. While Defendants claim that Dr. Pinsky's opinions are "common sense," medical education and licensing are distinct from other fields in numerous respects and are not at all intuitive or common knowledge. For example, even if jurors may have heard of the USMLE Step 1, many are unlikely to understand why it is so important to a prospective medical student's decision making about what school to attend. *See* Pinsky Rep. ¶¶ 20-25. Again, even Defendants' purported expert, a professor with access to the facts of the case, did not know the meaning of "USMLE" and was mistaken about when medical students sit for the exam. ECF No. 124-1 69:14-18; 70:16-23. The Court should reject Defendants' contention that Dr. Pinsky's opinions are somehow unhelpful to the jury.

## CONCLUSION

Dr. Pinsky's experience provides more than sufficient basis for the testimony he will offer at a trial, and that testimony will greatly assist the jury in understanding the facts at issue in this case. The Court should deny Defendants' motion.

Dated: December 9, 2024

Respectfully submitted,

/s/ Patrick T. Egan

**BERMAN TABACCO**
Patrick T. Egan (BBO #637477)
Christina L. G. Fitzgerald (BBO #709220)
One Liberty Square
Boston, MA 02109
(617) 542-8300
pegan@bermantabacco.com
cfitzgerald@bermantabacco.com

**MAYNARD NEXSEN PC**
Margaret M. Siller (admitted *pro hac vice*)
1131 4th Avenue South, Suite 320
Nashville, TN 37210
(629) 258-2253
msiller@maynardnexsen.com

John R. Alford, Jr. (admitted *pro hac vice*)
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1847
jalfordjr@maynardnexsen.com

**NATIONAL STUDENT LEGAL DEFENSE NETWORK**
Alexander S. Elson (admitted *pro hac vice*)
Daniel A. Zibel (admitted *pro hac vice*)
Madeline D. Wiseman (admitted *pro hac vice*)
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
alex@defendstudents.org
dan@defendstudents.org
madeline@defendstudents.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

*/s/ Patrick T. Egan*
Patrick T. Egan