UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

NATALIA ORTIZ, on behalf of herself and a class of similarly situated persons,

Plaintiff,

v.

SABA UNIVERSITY SCHOOL OF MEDICINE; AND R3 EDUCATION, INC.,

Defendants.

</td><td>

Civil Action No.: 1:23-cv-12002-WGY

</td></tr>
</table>

### DEFENDANTS' RESPONSE TO PLAINTIFF'S COUNTERSTATEMENTS OF MATERIAL FACTS

**A. The Parties**

1.      Saba University School of Medicine ("Saba") is a for-profit medical school owned by R3 Education, Inc. ("R3"), which provides administrative and support services to Saba. (**Evans Decl. Ex. 1**, Compl. ¶¶ 1, 13.)

**DEFENDANTS' RESPONSE:** Undisputed.

2.      Saba University School of Medicine ("Saba") operates out of Devens, Massachusetts. (**Siller Decl. Ex. 3**, Wargo Dep. at 79:22 ("Saba's only office is in Devens.").)

**DEFENDANTS' RESPONSE:** Disputed in part. Undisputed that Saba operates some administrative functions out of Devens, Massachusetts. Disputed that Saba conducts all operations out of Devens, Massachusetts, as Saba's campus is located on the island of Saba and many of Saba's operations are conducted from other U.S. states, such as Connecticut, New Hampshire, New Jersey, and Florida. (**Ex. 2** to the Declaration of Dale Evans ("Evans Decl."), Donnellan Dep. at 61:9-14; **Ex. 5** to Evans Decl., Wargo Dep. at 52:1-5, 79:2-11).[1]

---

[1] Citations to exhibits to the Declaration of Dale Evans refer to the declaration accompanying Defendants' Motion for Summary Judgment and Statement of Undisputed Material Facts in support thereof.

3.      Saba has routinely reported to its regulators that Saba's "administrative offices are located in Devens, MA," that it "maintains services for admissions as well as financial aid at the U.S. administrative offices in Devens, MA," and lists its location as Devens, Massachusetts on advertisements. (**Siller Decl. Ex. 7**, R3S00018357-688 at R3S00018367 & R3S00018373; **Siller Decl. Ex. 8**, R3S00012037-66 at R3S00012039, R3S00012041).

**DEFENDANTS' RESPONSE:** <u>Undisputed</u> that Saba reported to the New York State Department of Education the quoted language in 2021. (**Ex. 7** to the Declaration of Margaret M. Siller ("Siller Decl."), R3S00018357-688 at R3S00018367 & R3S00018373).[2] <u>Disputed</u> that the cited exhibits support the fact that "Saba has routinely reported to its regulators" these statements, especially Exhibit 8 to the Siller Declaration, which is a set of advertisements, and not a report to Saba "regulators."

4.      R3, headquartered in Devens, Massachusetts, owns, operates, and provides additional resources to Saba. (**Siller Decl. Ex. 9**, 30(b)(6) Deposition of Patrick Donnellan, Vol. I, taken on November 5, 2024 ("Donnellan, 30(b)(6) Dep. Vol. I") at 54:7–8 ("Q. [W]here is R3's headquarters located? A. Devens, Massachusetts"); *id.* at 88:2–7 ("To the extent that that school requires additional resources or from R3, it has to interact with R3 Education, Inc."); **Siller Decl. Ex. 3**, Wargo Dep. at 16:17-19 ("I'm employed by R3 Education which owns and operates several different medical schools including Saba University.").)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u> that R3 is headquartered in Devens, Massachusetts, and that it owns Saba. Otherwise <u>disputed</u>, as the cited testimony does not support the remaining statements in Paragraph 4. The evidence in the record does not establish that R3 "operates" Saba; Mr. Donnellan, testified as the corporate representative that R3 provides certain specified services to Saba through a management agreement—for which Saba compensates R3—not that R3 operates Saba. (Donnellan Tr. 424:1 – 425:4). Mr. Donnellan's testimony also establishes that Saba is operated by its Board of Trustees, not R3. (Donnellan Tr. 62:15 – 62:19) (R3 does not conduct business as Saba); 88:2-4 (Saba University School of Medicine is—is a school and

---

[2] Citations to exhibits to the Declaration of Margaret M. Siller refer to the declaration accompanying Plaintiff's Opposition to Motion for Summary Judgment and Counterstatement of Material Facts in support thereof.

operates the educational institution.); 88:21 – 89:2 (Saba's budget is approved by Saba's board of Trustees and would only go to R3 if it needed to make decisions outside that budget); 89:14-17 (Saba and R3 do not have any of the same board members). Mr. Wargo is not an employee of Saba, nor designated as its corporate representative and therefore his testimony regarding the corporate and educational structure of R3 or any of the professional schools that it owns is neither competent nor binding.

5.      Many departments within R3 are run from Devens, Massachusetts, including its financing functions (receivables and payables), its clinical functions (overseeing the second two years of the medical education), the financial aid department, and registrars (maintaining student records). (**Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 54:15-55:22.)

**DEFENDANTS' RESPONSE:** <u>Disputed</u>. The cited testimony does not support this statement, and Paragraph 5 mischaracterizes the cited testimony and/or is otherwise incomplete. Mr. Donnellan did not testify that any of these functions are "run from" Devens; he testified that "[t]he people [he] kn[e]w that are currently going to the office regularly are portions of the finance functions, the financial aid function, some of the clinical function, the registrars for Saba." (**Ex. 9** to Siller Decl., Donnellan, 30(b)(6) Dep. Vol. I at 54:15-55:2.)

6.      Ms. Ortiz was enrolled as a medical student at Saba from September 2019 to August 2022. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶2.)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u>.

**B. Saba's Basic Sciences Curriculum and the Comprehensive Basic Sciences Exam**

7.      Prior to sitting for the USMLE Step 1 exam, Saba's students must complete and pass the Basic Science Curriculum, including the class, Foundations of Clinical Medicine, which requires that students pass a "comprehensive examination." (**Siller Decl. Ex. 10**, Defendants' Answer and Jury Demand, ¶¶ 87–88.)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u> that prior to sitting for the USMLE Step 1 exam, Saba's students must, among other things, successfully complete and pass the Basic Science

Curriculum, which includes the Foundations of Clinical Medicine course that requires students to pass a comprehensive examination.

8.      On or around March 9, 2017, at the direction of its Executive Vice President, Saba intentionally removed information regarding the "comprehensive exam" from its website and hid any reference to such an exam within the Teaching and Examination Regulations ("OER"). **Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 187:23–198:10 ("Q. Is there anywhere else on your website other than the OER where you notify students of the comp exam in order to sit for the USMLE Step 1? A. Not that I'm aware of.").)

**DEFENDANTS' RESPONSE:** <u>Disputed</u>. The cited testimony does not support the statement that Saba intentionally removed information regarding the "comprehensive exam" from its website, or that it "hid" any reference to it within the Teaching and Examination Regulations ("OER"). The statement simply mischaracterizes Mr. Donnellan's testimony.  Mr. Donnellan testified that a reference to a no-longer-existing course (Med 912), which included a comprehensive exam, was removed from Saba's website. (**Ex. 9** to Siller Decl., Donnellan, 30(b)(6) Dep. Vol. I at 191:9-22). He also testified that he did not know why the reference to a comprehensive exam was removed, other than because "the course changed and so the course description and the course number had to change" (*id.* at 196:17-21, 198:2-6), and that this information was contained within the OER, which is available online (**Ex. 2** to Evans Decl., Donnellan Dep. at 186:17-23). This information is also contained within the Saba Catalog, which is also available online. Evans Decl., Ex. 14, 2018-2020 Course Catalog.

**C.  Saba's Advertisements to Prospective Students**

9.      Saba advertises its USMLE Step 1 first time passage rates because this figure is a "selling point" that prospective students focus on when applying to medical schools. (**Siller Decl. Ex. 11**, R3S00024119-120 (listing residency placement rates, USMLE pass rate, and retention rate as the "selling points" for agents that are recruiting students; *see also* **Siller Decl. Ex. 12**, R3S00016462-478 at R3S00016464 (a 2022 "Saba Acceptance Survey" revealing that USMLE passage rates and residency placements were the most important factors for prospective medical school students); *see also* **Siller Decl. Ex. 3**, Wargo Dep. at 111:2–6, ("the couple of items that students really like to know are the USMLE pass rates because you cannot pass—you cannot move forward at different points of your education without passing the USMLE.").)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u>.

10.    The USMLE Step 1 "is the key 'pivot point' in med school" and that an institution's "[f]irst-time pass rates is critical" to prospective students. (**Siller Decl. Ex. 13**, R3S00000081-128 at R3S00000096 ("USMLE is the key 'pivot point' in med school"); **Siller Decl. Ex. 14**, R3S00003900-944 at R3S00003914 (same); **Siller Decl. Ex. 15**, R3S00003702-720 at R3S00003709 ("USMLE is the key 'pivot point' in med school. Taken midway in med school—before clinical rotations. First-time pass rate is critical."); **Siller Decl. Ex. 3**, Wargo Dep. at 112:1–17 ("many students do want to see that you have a track record of success with USMLE and residency attainment rate").)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u> that the cited exhibits contain the quoted language but <u>disputed</u> that the cited exhibits support the statement that the first-time pass rate is critical to "prospective students."

11.    Saba advertises its USMLE passage rates in marketing emails, in search engine ads, on YouTube, at the top of its Facebook, Twitter, and LinkedIn profiles, in brochures, and at open houses and webinars. (**Siller Decl. Ex. 16**, P-000838 (Saba's website: "Virtually every student passes the USMLE Step 1 on their first attempt. 100% USMLE Step 1 Exam first-time pass rate"); **Siller Decl. Ex. 17**, P-000359 (advertising email from Saba: "virtually every Saba student passes the USMLE on their first attempt") (emphasis in original); **Siller Decl. Ex. 18**, R3S00012265 at R3S00012275 (sponsored Google search result: "You have until Aug 4 to apply – 98% USMLE Step 1 Pass Rate"); **Siller Decl. Ex. 19**, R3S00012418 at R3S00012421 (Facebook: "the first-time pass rate among Saba students was 100% on the USMLE Step 1"); **Siller Decl. Ex. 20**, P-000835 ("Saba offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1"); **Siller Decl. Ex. 8**, R3S00012037 at R3S00012064 (YouTube: "Students achieve a 99% USMLE Step 1 first-time pass rate"); **Siller Decl. Ex. 21**, R3S00001083 at R3S00001084 (prospectus: "99% USMLE Step 1 first time pass rate"); **Siller Decl. Ex. 22**, R3S00018045 at R3S00018049 (open house presentation: "USMLE Test Results >99% First Time Pass Rate, Step 1").)

**DEFENDANTS' RESPONSE:** <u>Disputed</u>, what Saba specifically advertises is its USMLE **Step 1 first-time** passage rates. Also <u>disputed</u>, as to materiality; most of the cited exhibits, other than Ex. 17 to Siller Decl., postdate Plaintiff's enrollment at Saba in September 2019 and are thus not material.

12.    Saba's advertisements state that "virtually every Saba student passes the USMLE on their first attempt" and that its "99% USMLE Step 1 first-time pass rate speaks for itself." (**Evans Decl. Ex. 1**, Compl. ¶¶ 58, 70; **Siller Decl. Ex. 23**, R3S00004463 ("Each year, virtually **every Saba student passes the USMLE** on their first attempt – an unprecedented achievement

unmatched by any other international medical school.") (emphasis in original); **Siller Decl. Ex. 24**, R3S00012773 at R3S00012776 ("In short, Saba University is committed to doing everything possible to help ensure your success on this all-important exam [(the USMLE Step 1)]. Saba University students' 99%* [(2015-2019 average)] USMLE Step 1 first-time pass rate speaks for itself."); **Siller Decl. Ex. 25**, R3S00004229 at R3S00004230 ("Saba University students' 99% USMLE Step 1 first-time pass rate speaks for itself").)

**DEFENDANTS' RESPONSE:** Undisputed that the quoted language is contained within the

cited exhibits.

13.    In addition to Saba's advertisements referencing a 97% to 100% passage rate, Saba also claims that the high rates are a testament to "the quality of [the Saba] education." (**Siller Decl. Ex. 26**, R3S00017443; **Siller Decl. Ex. 27**, R3S00028831.)

**DEFENDANTS' RESPONSE:** Disputed, as the cited exhibits do not support the statement in

Paragraph 13, and that statement mischaracterizes the cited record and/or is otherwise

incomplete.

14.    Saba claims that its USMLE passage rate figures are an "unprecedented achievement" that is "unmatched by any other international medical school," "**exceeds** most US medical schools and ALL international medical schools," and a "testament to the quality" of Saba's education. (**Evans Dect. Ex. 1**, Compl. ¶¶ 58, 63, 70 & Ex. 1, thereto; **Siller Decl. Ex. 23**, R3S00004463 ("Each year, virtually **every Saba student passes the USMLE** on their first attempt—an unprecedented achievement unmatched by any other international medical school.") (emphasis in original); **Siller Decl. Ex. 28**, R3S00012091 at R3S000012095 ("In 2021, the first-time pass rate among Saba students was 100% on the USMLE Step 1. This is a testament to the quality of our [education]"); **Siller Decl. Ex. 29**, R3S00003945 at R3S00003952 ("Saba's first time pass rate **exceeds** most US medical schools and ALL international medical schools.") (emphasis in original); **Siller Decl. Ex. 22**, R3S00018045 at R3S00018049 ("When you look at two key measures of medical school performance, USMLE results and residency attainment, there are few international medical schools that can match Saba's results."); **Siller Decl. Ex. 30**, R3S00003653 ("Each year, virtually every Saba student passes the USMLE Step 1 on their first attempt. In 2017, Saba's first-time pass rate was a perfect 100%. That's an achievement unmatched by any other international medical school."); **Siller Decl. Ex. 31**, R3S00012588 at R3S00012595 ("Passing [the USMLE Step 1] with a high score on first attempt is key to residency. Saba's first-time pass rate **exceeds** most US medical schools and ALL international schools.") (emphasis in original); **Siller Decl. Ex. 21**, R3S00001083 at R3S00001096 ("Each year, virtually every Saba student passes the USMLE Step 1 on their first attempt. Between 2015 and 2019, the first time pass rate averaged 99% - a consistently strong performance."); **Siller Decl. Ex. 20**, P-000835 ("Saba University offers an excellent medical education with students consistently achieving a first-time average pass rate of 99% on the USMLE Step 1."); **Siller Decl. Ex. 32**, R3S00012527 at R3S00012540 ("98% USMLE Step 1 & 2 First-Time Pass Rate (avg. 2018-2022). Strong USMLE Track Record. Passing the USMLE Step exams help you to become a successful doctor in the U.S. and Canada.").)

**DEFENDANTS' RESPONSE:** Disputed. The cited exhibits do not support the statement in Paragraph 14, most of the exhibits postdate Plaintiff's enrollment in September 2019 and thus are not material, and many of the quoted statements are opinions and not facts. Saba only advertises its students USMLE **Step 1 first-time** passage rates.

15.    As to Saba's marketing strategy, the Executive Dean for Saba testified that Saba's focus shifted from education to marketing: "[P]rior to [2020], everything was about focusing on student success, getting them through the program and into residence. And after that, it was all marketing." He continued, "they were wasting millions of dollars that could have been used to improve the education program." (**Siller Decl. Ex. 1**, Clifton Dep. at 45:4–46:1.)

**DEFENDANTS' RESPONSE:** Undisputed that Dr. Clifton testified the quoted language, but

disputed, as it characterizes his testimony in a misleading or otherwise incomplete manner.

Disputed, as the cited testimony is an opinion, not a fact statement. Dr. Clifton testified as to

his own opinion, he stated "*I thought* they were wasting millions of dollars. . ." (**Siller Decl.**

**Ex. 1, Clifton Dep.** at 45:4–46:1) (emphasis added). Moreover, Dr. Clifton is a former dean

who was testifying in his individual capacity; therefore, his statements are not binding on Saba.

16.    Saba's USMLE Step 1 messaging was carefully crafted by R3 and Saba leadership. (**Siller Decl. Ex. 33**, R3S00024071 (Patrick Donnellan emails Donald Donahue saying [Text Redacted]); **Siller Decl. Ex. 34**, R3S00014670 at R3S00014673 (Donald Donahue discussing with a marketing consultant that the PowerPoint [Text Redacted]); **Siller Decl. Ex. 35**, R3S00014946 at R3S00014949 (executives at R3 and Global University Systems discussing the use of "approved language" for USMLE Step 1 advertisements; **Siller Decl. Ex. 36**, R3S00016284-85 at R3S00016284 (email from Donald Donahue to R3 marketing staff member ordering him to change the Step 1 representations on the website. "Change paragraph 2 'In recent years, Saba University students have achieved a 99% USMLE Step One first-time pass rate, outpacing students at 89% of U.S. medical schools.' TO THE FOLLOWING: 'For the past several years Saba University students have achieved a 99% Step One first-time past rate. In 2017, this rate was a perfect 100%, placing Saba's results in the top echelon of medical schools in the country.'"); **Siller Decl. Ex. 37**, R3S00015838 (Donald Donahue instructs GUS marketing team, "We should use the five year average with date range. Verbiage such as: Saba— Virtually every student passes the USMLE Step 1 on their first attempt. Between 2015 and 2019, the first time pass rate averaged 95%—a consistently strong performance.").

**DEFENDANTS' RESPONSE:** Disputed that R3 and Saba leadership "crafted" USMLE Step

1 messaging, as the cited exhibits do not support the statement in Paragraph 16, and the

statement mischaracterizes and contradicts record evidence and testimony. The cited exhibits demonstrate nothing more than routine oversight by leadership, ensuring that that USMLE Step 1 messaging was correct and accurate, and not misleading. For example, in the same deposition that Plaintiff cites, Mr. Donnellan testified as to Exhibit 33 to the Siller Declaration, that what he was "telling Don is not to compare our numbers to other schools until we understand how the other schools are reporting the data and the basis on which they are reporting the data to ensure, that, at the very least, the calculations are done in the same way" because some schools report USMLE pass rates that are "either not labeled properly, aren't footnoted properly, don't – or are overall pass rates instead of first-time pass rates and then compared them to first-time pass rates; those – those sorts of things." (Donnellan Dep. at 159-160). He also clarified that he was "not referring to [Saba's] data[,]" which is "verified via the ECFMG." (*Id.* at 161:8-10).[3]

17.    Saba's advertised success of its students on the USMLE Step 1, however, did not disclose that roughly 50% of matriculating students do not complete the Basic Science Portion of Saba's medical program. (**Evans Decl. Ex. 1**, Compl. ¶¶ 79–80; **Siller Decl. Ex. 38**, R3S00037434 at R3S00037435 (percentage of enrolled students completing the Basic Science Portion of the Program averaged [Text Redacted], with an average of [Text Redacted]).)

**DEFENDANTS' RESPONSE:** Disputed.    None of the cited materials support the statement that "roughly 50% of matriculating students do not complete Saba's Basic Sciences program," nor do they support the notion that Saba "does not disclose" such a fact. Saba does not dispute that it advertises the success of its students on the USMLE Step 1 exam.

18.    Saba's attrition rate, or "whether people are successful through the program or not" is tracked by Defendants. (**Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 359:8–23); **Siller Decl.**

---

[3] Pursuant to Fed. R. Civ. P. 32(a)(6), which states that, "if a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts," Saba demands hereby that Plaintiff introduce into evidence the omitted parts of the deposition transcripts cited herein by Saba that in fairness should be considered with the parts introduced by Plaintiff in her Counterstatement of Facts. All such omitted parts of the deposition transcripts are cited where their introduction into the record is needed.

**Ex. 39**, R3S00029536 (email from Saba's Registrar with the subject line "Attrition List" attaching a document titled "TRANSCRIPT, ATTRITION & GRADS.xls").

**DEFENDANTS' RESPONSE:** Disputed. The cited exhibits do not support the statement in Paragraph 18. That statement mischaracterizes the cited record and is also incomplete. Mr. Donnellan testified that there is no definition for attrition and that what it focuses on is "whether people are successful through the program or not," but he never testified that this is what attrition means. (**Ex. 9** to Siller Decl., Donnellan, 30(b)(6) Dep. Vol. I at 359:8-23). Additionally, the referenced "Attrition List" (Exhibit 39 to the Siller Declaration) does not track any "attrition rate." Saba's Registrar, Ms. Boisseau, testified that, "[o]nce a student leaves [Saba] and I've entered everything into Phoenix, I take the forms that – whether it's a withdrawal or a dismissal" and she then enters the student's information and the reason for leaving. (Boisseau Dep. at 82:4-14).

19.    Defendants systematically tracked Saba's attrition data, which they used to calculate profitability, make revenue forecasts, and provide updates to the board. (**Siller Decl. Ex. 40**, R3S00022067-96 (Donnellan, R3's SVP of Marketing and Enrollment, receiving a dataset of Saba's attrition rates from 2000 to 2011); **Siller Decl. Ex. 41**, R3S00022097 at R3S00022101 (Terry Moya ("Moya"), R3's CFO, asks for help calculating attrition to determine profitability); **Siller Decl. Ex. 42**, R3S00022289-R3S00022290 at R3S00022289 (Moya explains: "Once we have that subset of the total we then need to place our attrition rate to the number to get close to a real return on marketing dollars."); **Siller Decl. Ex. 43**, R3S00022360 (Moya explains: "One thing to point out on your analysis, you have no attrition baked in to your assumptions. The attrition rate on these classes lately have been much higher than ... in the past."); **Siller Decl. Ex. 44**, R3S00022280 (Moya stating: "We have the next BOD meeting in less than 2 weeks and they are expecting the answer on the attrition. I sent you the attrition breakdown with no attrition assumption so I am going to assume you are addressing this in the next meeting.").)

**DEFENDANTS' RESPONSE:** Disputed. The statement that Defendants "systematically tracked Saba's attrition data," is misleading, and is not supported by the cited exhibits or the evidentiary record. What Defendants referred to in the cited communications as "attrition" was "assumptions [they] make in developing [their] revenue forecast" (Donnellan Dep. at 302:10-13), to understand, "given the students [they] have enrolled now and the students [they] expect

to be enrolled in the coming periods, what revenue is expected to be." (*Id.* at 302:20-23). These exhibits refer to calculations made for projections and forecasts of revenue, based on enrollment assumptions, not on any data about the past performance of students who enrolled at Saba.

20.    Attrition information, specifically a students' withdrawal or academic dismissal from Saba's medical program, was logged by the Registrar into the school's Phoenix database, which Senior Management had direct access to. (**Siller Decl. Ex. 45**, Deposition of Paula Boisseau Taken on November 21, 2024, at 48:4–16, 71:10–72:15.)

**DEFENDANTS' RESPONSE:** Disputed. Although Saba students' withdrawal or academic

dismissal from the program was logged by the Registrar into the school's Phoenix database,

neither the Registrar or any other employee at Saba referred to those records as "attrition data."

This term "attrition data" as used in this paragraph is simply a characterization by Plaintiff of

the information.

21.    Saba's senior executives ensured that the attrition data was not available to the public, or even non-executive members of Saba, as the data reveals that Saba has long had a serious attrition problem. (**Siller Decl. Ex. 46**, R3S00021917-27 at R3S00021919 ("high attrition rates" pose a "potential threat to accreditation" and lead to "unreliable revenue from tuition fees"); **Siller Decl. Ex. 47**, R3S00022132 ("[O]ur retention is a challenge"); **Siller Decl. Ex. 48**, R3S00012697 ("Why is the attrition rate so high?" and Donahue replies "Let's discuss."); **Siller Decl. Ex. 49**, R3S00021829 (Wargo summarizing a board meeting: "Attrition is high."); **Siller Decl. Ex. 50**, R3S00022125 (Rodger says: "The Saba numbers are 1/8th of what they used to be and the quality is down significantly. Patrick and I have done an attrition analysis and the numbers are quite clear."); **Siller Decl. Ex. 51**, R3S00030717 at R3S00030739 (the NY State Board of Education explained in a 2022 Site Visit Report that: "There should be concern about the reported high attrition rate of students who attend Saba. This should be analyzed and discussed with the admissions committee with a goal to decrease this percentage."); **Siller Decl. Ex. 3**, Wargo Dep. at 261:7–15, 262:13–263:5 (noting that the attrition number was being protected because he heard there were problems with attrition from an accreditation visit.)

**DEFENDANTS' RESPONSE:** Disputed. The cited exhibits do not support the statement in

Paragraph 21, and that statement mischaracterizes the cited record and inserts the term

"attrition data" at the beginning, which is supplied only by Plaintiff. For example, the language

from Exhibit 50 to the Siller Declaration did not refer to attrition, it referred to the fact that

"the number of Canadian students coming to Saba over whichever period this was were less than they were by an eighth -- or one-eighth of the old amount." (Donnellan Dep. at 315:18-24). Defendants also incorporate their responses to Paragraphs 22 and 35 of Plaintiff's Counterstatement of Material Facts.

22.     As the Executive Vice President for Marketing and Enrollment acknowledged, the school would not provide attrition data to students and intentionally avoided posting these closely guarded figures on Saba's website. (**Siller Decl. Ex. 3**, Wargo Dep. at 128:20–129:9 ("A. [Attrition is] not on our website, so—and I don't think I've told any students what they might—they are or might be . . . . A. Attrition rates for Caribbean medical schools are traditionally higher than what you find at US med schools or US DO schools, so it's not something that we put on our websites.").)

**DEFENDANTS' RESPONSE:** <u>Disputed.</u> Plaintiff misleadingly cites only a portion of Mr. Wargo's deposition testimony, which in its full context contradicts the statement Plaintiff makes in this Paragraph. For example, in responding to the question "how is a webinar presenter trained to answer the question as to attrition?", Mr. Wargo testified, "If we don't know an answer, we – we let the student know that we'll get back to them and we'll reach out to academics to get the answer on attrition." (**Ex. 3** to Siller Decl., Wargo Dep. at 128:4-9).

23.     In response to an internal question about the number of students attending Saba, Donald Donahue (formerly a Senior Vice President of Marketing and Enrollment at Defendant R3 Education, Inc.) wrote: "I'm always a bit leary [*sic*] to say. If somebody does the math then attrition assessment becomes easier." (**Siller Decl. Ex. 52**, R3S00012685.)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u> that the cited exhibit contains the quoted language.

24.     In a separate communication with marketing staff regarding attrition rates, Mr. Donahue explained that "[w]e do not publish anything on this number." (**Siller Decl. Ex. 53**, R3S00012689.)

**DEFENDANTS' RESPONSE:** <u>Undisputed</u>.

25.     Saba's admissions staff were also trained to avoid questions about attrition by stating that "it varies," that "online information is not always accurate," or that the numbers were not available and to pivot to topics like the USMLE passage rate or small class sizes. (See, e.g., **Siller Decl. Ex. 54**, R3S00012691 (providing a scripted answer to a question about attrition that stated

"[u]nfortunately online information is not always accurate so we think it is important to stick with facts," and then failing to provide any information about attrition); **Siller Decl. Ex. 55**, R3S00012696 (in a correspondence titled "Admissions FAQs," the stock response for questions about attrition was that "it varies" followed by statements about Saba's small class size and ability to give students "constant feedback"); **Siller Decl. Ex. 26**, R3S00017443 (in response to a prospective student's question about attrition rates, Saba's admissions coordinator states: "I do not have those specific numbers" and then goes on to explain that Saba has "a 99% pass rate for the USMLE step 1 which is higher than any other school in the Caribbean and, in fact higher than many US medical schools," and further assures the prospective student that Saba students "felt that they were very prepared for the USMLE step 1 test and that it was almost easy."))

**DEFENDANTS' RESPONSE:** <u>Disputed.</u> The cited exhibits do not support Plaintiff's characterizations in Paragraph 25, and that statement contradicts record evidence and testimony. For example, Ms. Russell, in response to counsel's question "So you said that Mr. Rodger provided you instructions specific to attrition rate, correct?", testified, "No. Because that sounds like a script to me." (**Ex. 4** to Evans Decl., Russell Dep. 143:3-6). She further testified, "I would seek confirmation from Steve or perhaps in the past Patrick in just saying is there any – any other new services that we've got, is there anything else that we can speak with the prospective students about regarding their concern for not doing well or not continuing their education." (*Id.* at 142:5-11). Additionally, Mr. Donnellan testified that "what we talk about with regard to attrition is to try to understand why students are concerned about it and what it is about the program that makes them worried." (Donnellan Dep. at 231:22-232:1). Defendants incorporate by reference Paragraph 34 of Defendants' Statement of Undisputed Material Facts.

26.    R3's Senior Vice President of Marketing and Enrollment (Donald Donahue) made clear that "[w]e do not publish anything on this number" and closely guarded even basic enrollment data because "[i]f somebody does the math then attrition assessment becomes easier." (**Siller Decl. Ex. 56**, R3S00012689; **Siller Decl. Ex. 57**, R3S00012685.)

**DEFENDANTS' RESPONSE:** <u>Disputed.</u> Although the cited exhibits contain the quoted language, the statements that Mr. Donahue "made clear" and "closely guarded even basic

enrollment data," are not facts, but Plaintiff's characterizations. Those characterizations are themselves misleading and unsupported by the cited record. Mr. Donahue testified as to the reason for his comment, "I just know that whenever – whenever attrition would ever come up in meetings, meeting externally with students or open houses or whatever, you know, it's – it's a very difficult number to understand and it's not necessarily comparable between different schools and so forth." (Donahue Dep. at 121:9-14). He continued, "And so, you know, I just don't like to put that out there that will have people reach conclusions that isn't necessarily reflective of what -- you know, what Saba does and the kind of education you get." (*Id.* at 121:20-24).

27.    In one email between marketing executives about how to answer questions from prospective students about Saba's "retention challenge," R3's director of enrollment for North America (Jennifer Bosco) explained: "We want to ensure we can respond to the question in a way that does not give too much information and subsides the concern." (**Siller Decl. Ex. 47**, R3S00022132.)

**DEFENDANTS' RESPONSE:** Disputed.  Although  the cited exhibit contains the quoted language, this statement is misleading, incomplete, and the quoted language does not support Plaintiff's statement. Defendants incorporate by reference Paragraph 34 of Defendants' Statement of Undisputed Material Facts.

28.    In another communication, R3's VP of Marketing (Melissa Kushner) asked: "Who has the ability to pull attrition rates based upon upcoming scores. I'm sure Patrick [Donnellan] and Steve [Rodger] have it, but will they share it?" In response, R3's EVP for Marketing and Enrollment (Gerald Wargo) wrote: "Melissa – go ahead and ask. He may want to know why you want the info as I think they are trying to protect that number from getting out. I think it's really bad." (**Siller Decl. Ex. 58**, R3S00021747-52 at R3S00021747-48.)

**DEFENDANTS' RESPONSE:** Disputed. Although the cited exhibit contains the quoted language, this statement is misleading, as the manner in which the term "attrition" is used varies because there is no definition or standard for that term. In addition, the statements in this series of emails are not material, as the emails postdate not only Plaintiff's decision to

enroll at Saba, but also her academic dismissal from Saba. Defendants incorporate by reference

Paragraph 31 of Defendants' Statement of Undisputed Material Facts.

29.    Prospective students regularly asked about attrition in the context of generalized questions regarding Saba's medical school. (**Siller Decl. Ex. 47**, R3S00022132 (the Regional Director of Enrollment, North America asking for an "approved standard response" to questions regarding attrition because they "are asked this question a lot . . . . [and] want to ensure we can respond to the question in a way that does not give too much information and subsides the concern"); **Siller Decl. Ex. 54**, R3S00012691 (providing a scripted answer to a question about attrition that stated "[u]nfortunately online information is not always accurate so we think it is important to stick with facts," and then failing to provide any information about attrition); **Siller Decl. Ex. 55**, R3S00012696 (in a correspondence titled "Admissions FAQs," the stock response for questions about attrition was that "it varies" followed by statements about Saba's small class size and ability to give students "constant feedback"); **Siller Decl. Ex. 26**, R3S00017443 (in response to a prospective student's question about attrition rates, Saba's admissions coordinator states: "I do not have those specific numbers" and then goes on to explain that Saba has "a 99% pass rate for the USMLE step 1 which is higher than any other school in the Caribbean and, in fact higher than many US medical schools," and further assures the prospective student that Saba students "felt that they were very prepared for the USMLE step 1 test and that it was almost easy.").

**DEFENDANTS' RESPONSE:** Disputed. The few examples cited by Plaintiff of questions

by prospective students about "attrition" over the nine-year period covered by the discovery in

this matter does not support the idea that "prospective students regularly asked about attrition."

The phrase "in the context of generalized questions regarding Saba's medical school" is

separately vague and meaningless. In addition, Plaintiff's parenthetical characterizations of the

documents are themselves misleading and mostly immaterial as they postdate Plaintiff's

matriculation to Saba.  Exhibit 47 postdates Plaintiff's initial enrollment at Saba.  Exhibit 54

also postdates Plaintiff's tenure at Saba and does not, as Plaintiff claims, "provide a scripted

answer" to anything.  There is no evidence in the record that any of the information in those

emails was provided to any prospective student.  As to Exhibit 55, the term "stock response to

questions about attrition" is a characterization by Plaintiff, not a statement by any witness.

There is no evidence in the record that the statements in the emails were a "stock response" to

anything, or were ever provided to any prospective student. Exhibit 26 also postdates Plaintiff's initial enrollment at Saba.

30.     Actual conversations with prospective students confirm that Defendants routinely misled prospective students who simply wanted to know how many students made it through the program. (**Siller Decl. Ex. 26**, R3S00017443-45 at R3S00017443-44 (Saba has "an attrition rate comparable to U.S. schools" and "I do not have those specific [attrition] numbers" and pivoting to explain that Saba has "a 99% pass rate for the USMLE"); **Siller Decl. Ex. 59**, R3S00026497 ("Our attrition rate is similar to those at US medical schools. Schools with a high attrition rate lose their accreditation and ours is in good standing"); **Siller Decl. Ex. 60**, R3S00026543 ("[W]e are comparable to US med school numbers and our accreditation relies on low attrition numbers—we are in very good standing with this."); **Siller Decl. Ex. 61**, R3S00029159-161 at R3S00029160-61 (when a prospective student says he heard attrition was "around 40 percent," the response was that the attrition rate is "20-25%" and that the "numbers you are hearing or reading about on blogs are all hearsay from no school officials"); **Siller Decl. Ex. 62**, R3S00026552 ("I do not have the answer as to why this information is not posted on the website.... My understanding is that our attrition rate hovers around 10-12%.").

**DEFENDANTS' RESPONSE:** <u>Disputed</u>. The statement in Paragraph 30 is not supported by the cited exhibits and it is misleading and otherwise incomplete. Plaintiff points to no evidence that the "attrition rates" cited to prospective students in these exhibits were incorrect, much less that they "misled" prospective students or did so "routinely." The entire statement is nothing more that Plaintiff's mischaracterization of the content of these emails. Moreover, Defendants incorporate by reference Paragraph 34 of Defendants' Statement of Undisputed Material Facts.

31.     The only documents Plaintiff has located regarding Saba's attrition rates being known to any third-party is when the Dutch Inspectorate of Education wrote in their notes from an online 2021 site visit with Rodger, Donnellan, and others that "[a]pproximately 25% of the students pass USMLE Step 1 at the end of year 2 directly." (**Siller Decl. Ex. 63**, R3S00026081-83 at R3S00026082.)

**DEFENDANTS' RESPONSE:** <u>Disputed</u>.  Paragraph 31 is not a statement of fact and it mischaracterizes the document upon which it relies, which does not discuss any "attrition rate." The percentage mentioned in the cited exhibit does not refer to any "attrition rate," but rather, to the "students who take Step 1 *immediately* following the end of the second year." (Donnellan

Dep. at 333:20-334:1). Mr. Donnellan testified about this document, stating that "certain students take the Step 1 immediately following the second year and others take a month to a few months to study for Step 1 to be prepared." (*Id.* at 334: 8-10). The cited exhibit is also immaterial because it postdates Plaintiff's initial enrollment at Saba.

32.     As of the date of their depositions, several of Defendants' executives testified in this matter that they do not know what attrition means. (**Siller Decl. Ex. 64**, Deposition of Steven Rodger taken on September 5, 2024 at 115:23–116:9 (when asked about Saba's tracking of attrition, "People threw that term around but the answer is no. People threw that term around and it would be a continual irritant to many of us at the organization, one, because they had no idea what they were talking about; and two, because the institution itself had never defined what such a term would mean."); **Siller Decl. Ex. 65**, Deposition of Donald Donahue taken on October 31, 2024 at 122:23–25 ("And so it just became a very—it's an impossible number to—to identify what attrition really meant.").)

**DEFENDANTS' RESPONSE:** Undisputed.

33.     Defendants' corporate representative testified that Saba "always focus[es]" on attrition rates and determines attrition by assessing "whether people are successful through the program or not." (**Siller Decl. Ex. 9**, Donnellan, 30(b)(6) Dep. Vol. I at 359:8–23 ("Q. So there's no heightened concern given the NYSED's comments on high attrition rates? A. It's something we always focus on. Q. But how do you always focus on something you don't have a definition for? A. There's no defined definition of what attrition rate is, no. Q. Yeah. But how do you always focus on it then? A. Well, whether people are successful through the program or not. Q. So whether or not they withdraw or dismissed? . . . . A. And -- well, some die.").

**DEFENDANTS' RESPONSE:** Disputed, as the cited exhibits do not support the statement in Paragraph 33, and that statement mischaracterizes the cited testimony and/or is otherwise incomplete. Context matters here. First, Patrick Donnellan was testifying as to the New York State Department of Education's site visit report. Second, Mr. Donnellan testified that there is no definition for attrition and that what it focuses on is "whether people are successful through the program or not," but he never testified that this is what attrition means. (**Ex. 9** to Siller Decl., Donnellan, 30(b)(6) Dep. Vol. I at 359:13-18). Additionally, he testified that the NYSED's comment about concern with high attrition related to the standard on "all student outcomes in

relation to the admission standards and processes" and that this is something Saba always focuses on. (*Id.* at 358:4-359:5-7).

34.     While Defendants intentionally choose to not publish or advertise their attrition rates, St. George's University's School of Medicine, a for-profit medical school in the Caribbean and direct competitor of Saba, publishes its attrition rates conspicuously on its website for all prospective students to view:

[Image omitted]

*Stats*, St. George's University School of Medicine, https://www.sgu.edu/stats/.

**DEFENDANTS' RESPONSE:** Disputed. Paragraph 34 is misleading or otherwise incomplete. The inserted image and link from St. George's University School of Medicine do not show an attrition rate; what is reflected is a purported ***graduation*** rate, and that rate is based on a six-year horizon.  Moreover, there is no foundation for the admission of this document into evidence, as there is no indication whether the numbers reflected in it are true, or how the graduation rate was calculated.  Plaintiff's statement also points to no evidence that Saba maintains a defined "attrition rate," that it could choose whether to "publish or advertise." As other evidence in the record demonstrates, that term is not defined (*see* Defendants' Statement of Undisputed Material Facts, ¶ 31).

**D. Plaintiff's Application and Admission to Saba**

35.     While in the process of considering attending medical school, Ms. Ortiz looked into the following non-exhaustive list of schools: University of Central Florida, University of South Florida, the University of Florida, Florida International University, Medical Universities of America, Ross University School of Medicine, the University of Arizona, and Saba. (**Siller Decl. Ex. 2**, Pl. Dep. at 54:1–19, 64:5–65:6.)

**DEFENDANTS' RESPONSE:** Undisputed.

36.     Ms. Ortiz also may have looked into St. George's University. (**Siller Decl. Ex. 2**, Pl. Dep. at 54:23–55:3.)

**DEFENDANTS' RESPONSE:** Disputed.  The statement is not a fact; it is conjecture.

37. In researching these schools, Ms. Ortiz looked at the materials posted on the schools' websites, visited the University of Arizona campus, and broadly researched Caribbean medical schools using Google and subsequent web results. (**Siller Decl. Ex. 2**, Pl. Dep. at 64:24– 65:6; 56:4–57:13.)

**DEFENDANTS' RESPONSE:** Undisputed.

38. Ms. Ortiz visited Saba's website and social media accounts where she saw the USMLE passage rates and requested additional information about Saba's medical education. (**Siller Decl. Ex. 4**, Ortiz Decl. at ¶ 3.)

**DEFENDANTS' RESPONSE:** Disputed. There is no evidence in the record to support the

statement that Plaintiff visited Saba's social media accounts. Otherwise, undisputed that

Plaintiff testified she visited Saba's website where she saw USMLE Step 1 first-time pass rates,

or that she requested additional information about Saba.

39. In response to her request for information, Ms. Ortiz received standardized solicitations from Saba touting its high USMLE Step 1 passage rates. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶ 3; **Siller Decl. Ex. 66**, P-000222-224 at P-000222 (99%); **Siller Decl. Ex. 67**, P-000234241 at P-000237 (99%); **Siller Decl. Ex. 68**, P-000293-295 at P-000293 (99%); **Siller Decl. Ex. 69**, P-000296-298 at P-000296 (99%); **Siller Decl. Ex. 70**, P-000315-318 at P-000315 (100%); **Siller Decl.  Ex. 71**, P-000319-322 at P-000319 (100%); **Siller Decl. Ex. 72**, P-000359 ("virtually every student"); **Siller Decl. Ex. 73**, P-000393-398 at P-000393 (100%); **Siller Decl. Ex. 74**, P000399-404 at P-000399 (100%); **Siller Decl. Ex. 75**, P-000405-410 at P-000405 (100%); **Siller Decl. Ex. 76**, P-000799-804 at P-000799 (100%).)

**DEFENDANTS' RESPONSE:** Disputed that Plaintiff received "standardized solicitations"

in response to her request for information. There is no evidence in the record to suggest that

Saba's responses to Plaintiff's requests were "standardized" or that they were "solicitations."

Otherwise, undisputed that Plaintiff received various emails with information about Saba,

including regarding Saba's USMLE Step 1 first-time pass rates, and undisputed that those pass

rates are "high."

40. Ms. Ortiz also attended an open house, where Saba reiterated its impressive pass rate for the USMLE Step 1 exam. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶ 4; **Siller Decl. Ex. 67**, P000234-241 at P-000237 ("The average USMLE Step 1 pass rate for the past five years for Saba Students is >99%").)

**DEFENDANTS' RESPONSE:** Disputed. The cited exhibits do not support any statement about what was said in the open house that Plaintiff attended. Otherwise, undisputed that Plaintiff attended a Saba open house, and that Saba's "pass rate for the USMLE Step 1 exam" is "impressive."

41.    Ms. Ortiz considered a number of factors when looking at Saba, including facilities, education, USMLE pass rate, and ongoing admissions three times a year. (**Siller Decl. Ex. 2**, Pl. Dep. at 55:13–23, 58:3–14; *see also* **Siller Decl. Ex. 4**, Ortiz Decl. at ¶¶ 3.)

**DEFENDANTS' RESPONSE:** Undisputed that Plaintiff testified that the reason she was looking at Saba and "willing to consider" it was its ongoing admissions (**Ex. 2** to Siller Decl., Pl. Dep. at 55:13-23), but disputed that Plaintiff's cited deposition testimony supports the statement that Plaintiff considered other factors, like Saba's facilities, education and USMLE pass rate. Plaintiff testified that when she researched schools, she recalls reviewing their websites and looking at those aspects, but not that she considered those as factors. (*Id.* at 58:3-14).

42.    Ms. Ortiz testified that "[o]ne of the biggest things for [her] was the USMLE pass rate that they were advertising," which she explained "indicated an idea about their education. So I thought that if they have such good pass rates that means their education is really good." (**Siller Decl. Ex. 2**, Pl. Dep. at 66:9-20; *see also id.* at 58:3–17 (when asked to recall what she viewed on the website that was important, she explained: "it was the USMLE pass rates that they were advertising" which "kind of give you an idea of like their education, how they are better or how they compete with other schools and stuff like that"); *id.* at 80:2–6 (explaining that "such good numbers for the USMLE pass rates" indicated to her that the Saba education "is really good").)

**DEFENDANTS' RESPONSE:** Undisputed that Plaintiff testified to the quoted language, but disputed that this is a statement of a material fact. This statement is misleading, as Plaintiff testified later that "[h]aving a high USMLE Step 1 first-time pass rate, that specifically was not important to me," (**Ex. 2** to Siller Decl., Pl. Dep. at 91:21-22), and explained that the only meaning the USMLE pass rate had to her was that it "indicated an idea about their education,"

Dkt. 127-5, at 22, that "it spoke on their education, and that was important to me," Dkt. 127-

5, at 31, and that the Step 1 rate "wasn't important to me, because to me what was important is

the education you are getting in order to take this exam. Because that education is what you

use to actually take the exam. So that's what was important."  Dkt. 127-5, at 32.

43.    Ms. Ortiz testimony was clear that "to [her] [the high USMLE first-time pass rates]
spoke on their education, and that was important to [her] ... [She] took this as our education is this
good, that we have a hundred percent or 98 percent or 99, whatever [she] read, percent first-time
pass rate." (**Siller Decl. Ex. 2**, Pl. Dep. at 91:15–93:9.)

**DEFENDANTS' RESPONSE**: <u>Disputed.</u> Although Plaintiff testified to the quoted language,

this statement is incomplete and misleading, as demonstrated in Saba's Response to Paragraph

42 above.

44.    Ms. Ortiz testified that Saba's USMLE pass rate was important to her because "[i]t
indicated an idea about their education. So [she] thought that if they have such good pass rates that
means their education is really good." (**Siller Decl. Ex. 2**, Pl. Dep. at 66:18–20; *see also* **Siller
Decl. Ex. 4**, Ortiz Decl. at ¶¶ 3-5.)

**DEFENDANTS' RESPONSE**: <u>Disputed.</u> Although Plaintiff testified to the quoted language,

this statement is incomplete and misleading, as demonstrated in Saba's Response to Paragraph

42 above.

45.    Ms. Ortiz testified that a small degree of attrition is expected at any educational
institution, but there is a dramatic difference between the typical attrition rate at a U.S. medical
school (less than 10%) and the approximately 50% attrition rate at Saba. (**Siller Decl. Ex. 2**, Pl.
Dep. at 186:20–188:3.)

**DEFENDANTS' RESPONSE**: <u>Disputed</u>, as the cited testimony does not support the

statement in Paragraph 45, and that statement is misleading or otherwise incomplete. Plaintiff

testified, "I'm not a professional. I wouldn't know what to say exactly, what to specify. But

it's my belief that if it is more than 50 percent, I should be told." (**Ex. 2** to Siller Decl., Pl. Dep.

at 187:3-6).  She also testified that once it gets to 20%, "we are starting to get to numbers I

think should be disclosed[,]" (*id.* at 188:2-3) and "I'm not a professional, this is what I believe.

I'm going through a feeling" (*id.* at 188:7-8).

46.    Ms. Ortiz enrolled at Saba in September 2019. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶¶ 2, 6; *see also* **Siller Decl. Ex. 5**, R3S00002135 at R3S00002143 ("First Day of Enrollment – September 2, 2019").)

**DEFENDANTS' RESPONSE:** Undisputed.

47.    Ms. Ortiz was dismissed from Saba before she had the opportunity to take the USMLE Step 1 exam. (**Siller Decl. Ex. 4**, Ortiz Decl. ¶ 7.)

**DEFENDANTS' RESPONSE:** Undisputed.

December 20, 2024                          SABA UNIVERSITY SCHOOL OF MEDICINE,
                                          R3 EDUCATION, INC.

                                          */s/Daryl J. Lapp*
                                          Daryl J. Lapp (BBO #554980)
                                          daryl.lapp@lockelord.com
                                          LOCKE LORD LLP
                                          111 Huntington Avenue
                                          Boston, MA 02199
                                          T: (617) 239-0100

                                          Michael J. McMorrow (*pro hac vice*)
                                          michael.mcmorrow@lockelord.com
                                          LOCKE LORD LLP
                                          111 South Wacker Drive, Suite 4100
                                          Chicago, IL 60606
                                          T: 312-443-0700

                                          Dale Evans (*pro hac vice*)
                                          dale.evans@lockelord.com
                                          LOCKE LORD LLP
                                          777 South Flagler Drive
                                          Suite 215 East Tower
                                          West Palm Beach, FL 33401
                                          T: 561-833-7700

Nathalie Vega (BBO #712480)
nathalie.vega@lockelord.com
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI 02903
T: 401-276-6421

## CERTIFICATE OF SERVICE

I certify that on December 20, 2024, this document was filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the Court to the Registered Participants identified in the Notice of Electronic Filing.

/s/ Daryl J. Lapp
Daryl J. Lapp